```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     GALVESTON DIVISION

 3   STACEY KIBODEAUX, a/k/a      §
     "ILLUSION," et al.,          §
 4   individually, and on behalf  §
     of all others similarly      §
 5   situated,                    §
                                  §
 6        Plaintiffs,             §
                                  §
 7   v.                           § CIVIL ACTION NO.
                                  §         3:20-cv-00008
 8   A&D INTERESTS, INC., d/b/a   §
     HEARTBREAKERS GENTLEMAN'S    §
 9   CLUB, et al.,                §
                                  §
10        Defendants.             §

11

12

13

14      *********************************************

15                  ORAL DEPOSITION OF

16                  STACEY KIBODEAUX

17               APPEARING REMOTELY FROM

18               HARRIS COUNTY, TEXAS

19                   APRIL 22, 2021

20      *********************************************

21

22

23

24

25
```

1           ORAL DEPOSITION OF STACEY KIBODEAUX,

2    produced as a witness at the instance of the

3    Defendants, and duly sworn, was taken in the

4    above-styled and numbered cause on Thursday, April 22,

5    2021, from 10:03 a.m. to 2:52 p.m., before Cassandra

6    Lee, CSR in and for the State of Texas, recorded by

7    machine shorthand, and appearing remotely from Harris

8    County, Texas, pursuant to the Federal Rules of Civil

9    Procedure, the First Emergency Order Regarding the

10   COVID-19 State of Disaster, and the provisions stated

11   on the record or attached hereto; that the deposition

12   shall be read and signed before any notary public.

13

14

15

16

17

18

19

20

21

22

23

24

25                    JOB NO. 10803

```
 1            R E M O T E   A P P E A R A N C E S

 2    COUNSEL FOR THE PLAINTIFFS:
              Ms. Ghazzaleh Rezazadeh (Via
 3            videoconference)
              HUGHES ELLZEY, LLP
 4            1105 Milford Street
              Houston, Texas  77066
 5            Phone:  (713) 554-2377
              E-mail:  ghazzaleh@ellzeylaw.com
 6
      COUNSEL FOR THE DEFENDANTS:
 7            Mr. William X. King (Via videoconference)
              WALLACE & ALLEN, LLP
 8            440 Louisiana, Suite 1500
              Houston, Texas  77002
 9            Phone:  (713) 227-1744
              E-mail:  wking@wallaceallen.com
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2

3                                                          PAGE

4

5    APPEARANCES......................................  3

6

7      WITNESS:  STACEY KIBODEAUX

8

9        EXAMINATION BY MR. KING......................  7

10       EXAMINATION BY MS. REZAZADEH................ 175

11       FURTHER EXAMINATION BY MR. KING............. 180

12

13   CHANGES AND SIGNATURE............................ 183

14

15   REPORTER'S CERTIFICATE.......................... 185

16

17

18

19

20

21

22

23

24

25

Case 3:20-cv-00008  Document 82-1  Filed on 05/21/21 in TXSD  Page 5 of 186  **EXHIBIT A**

Deposition of Stacey Kibodeaux                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

```
 1              E X H I B I T   I N D E X
                  ORAL DEPOSITION OF
 2                 STACEY KIBODEAUX
                    APRIL 22, 2021
 3
     NUMBER & DESCRIPTION                          PAGE
 4
          Exhibit 1.................................  29
 5             Facebook Printout

 6        Exhibit 2.................................  83
               January 27, 2020 Stacey Elizabeth
 7             Facebook Post

 8        Exhibit 3.................................  93
               Photographs
 9
          Exhibit 4................................. 107
10             July 13, 2020 Leah Christine Facebook
               Post
11
          Exhibit 5................................. 108
12             Video Clip

13        Exhibit 6................................. 115
               Independent Contractor/License Agreement
14             Between A&D Interests, Inc. D/B/A
               Heartbreakers and Independent Contractor
15
          Exhibit 7................................. 118
16             Hours and Earnings Detail Report

17        Exhibit 8................................. 121
               Calendar
18
          Exhibit 9................................. 139
19             Declaration of Stacey Kibodeaux

20        Exhibit 10................................ 150
               Heartbreaker Policy
21

22

23

24

25
```

1          THE REPORTER:  Pursuant to the First

2   Emergency Order Regarding the COVID-19 State of

3   Disaster, Paragraphs 2.b and 2.c, this deposition of

4   Stacey Kibodeaux is being conducted remotely via Zoom.

5   Today's date is April 22, 2021, and the time is

6   10:03 a.m.  The witness is located at Hughes

7   Ellzey, LLP in Houston, Texas.

8          My name is Casey Lee, Texas CSR

9   No. 8900.  I am administering the oath and reporting

10  this deposition remotely by stenographic means from my

11  residence within the state of Texas.  The witness has

12  represented to me under oath that she is Stacey

13  Kibodeaux.

14          Would counsel please state their

15  appearances for the record?

16          MR. KING:  Will King for the

17  defendants.

18          MS. REZAZADEH:  Ghazzaleh Rezazadeh for

19  the plaintiffs.

20          THE REPORTER:  And Ms. Kibodeaux, would

21  you please raise your right hand to be sworn?

22             STACEY KIBODEAUX,

23  having been first duly sworn, testified as follows:

24          THE WITNESS:  Yes.

25          THE REPORTER:  Thank you, ma'am.

```
 1                  E X A M I N A T I O N

 2    BY MR. WALLACE:

 3        Q    All right.  Good morning, Ms. Kibodeaux.

 4    How are you?

 5        A    Good morning.  I'm good.  How are you?

 6        Q    Doing well.  Thank you for asking.

 7             Have you ever given a deposition

 8    before?

 9        A    I have not.

10        Q    You might have already gone over some of the

11    ground rules about depositions with your counsel, but

12    I just -- I'd like to emphasize a couple of things,

13    and it's really for the court reporter's sake.

14             The first thing is wait until I manage

15    to get my question out before you start answering that

16    way the court reporter can just, you know, type down

17    one person speaking at a time.  And it also allows

18    your counsel to lodge any objections.  And by all

19    means, if I ask a question that doesn't make any sense

20    to you or you're confused by it or you don't hear it,

21    which happens a lot on Zoom, please feel free to ask

22    me for clarification --

23        A    Okay.

24        Q    -- all right?

25             I might remind you periodically to give
```

1   an audible answer.  It's common for a lot of folks to

2   go, "Huh-uh," or, "Uh-huh," or nod their head.  The

3   court reporter can't take that down, so I might remind

4   you, you know, "Please say yes, no, or whatever," all

5   right?

6        A    Okay.  Sounds good.

7        Q    Great.  Your full name is Stacey Elizabeth

8   Kibodeaux, true?

9        A    True.

10       Q    What stage names have you gone by?

11       A    I have gone by Illusion and now I go by

12  Haze.

13       Q    Have you ever gone by Flower?

14       A    No.

15       Q    And what's your current address, ma'am?

16       A    My current address is 500 10th Street,

17  Kemah, Texas.

18       Q    How long have you lived at that address?

19       A    Like six months.

20       Q    What was your address before that?

21       A    My address before that was 696 Pineloch

22  Drive, Webster.

23       Q    And how long did you reside at that address?

24       A    Approximately a year.

25       Q    From about when to when?

1      A    I want to say about -- from the December

2  before this previous December to that December.

3      Q    So December of 2019 to approximately

4  December of 2020?

5      A    Yes.

6      Q    And what was your address prior to December

7  of 2019?

8      A    That is when I lived in Nassau Bay.  I don't

9  remember exactly that address, though.

10      Q    Okay.  And that's fine.  What's your current

11  phone number?

12      A    My current phone number is 832 --

13      Q    Uh-huh.

14      A    -- 655-8113.

15      Q    How long have you had that phone number?

16      A    Forever.

17      Q    Can you give me a count, like a ballpark, a

18  number of years you've had that number?

19      A    Okay.  Probably like around 10 years.

20      Q    And who is your cell phone carrier?

21      A    I believe it is T-Mobile.

22      Q    Has T-Mobile always been your cell phone

23  carrier?

24      A    No.

25      Q    During the time that you worked at

1  Heartbreakers, who was your cell phone carrier?

2      A    Should be -- it should have been T-Mobile as

3  well.

4      Q    And what's your e-mail address?

5      A    Staceykib@gmail.com.

6      Q    Have you always used that -- that personal

7  e-mail address?

8      A    Yes.

9      Q    You mentioned earlier that you've never been

10  deposed before.  Have you ever been involved in any

11  other lawsuits as a plaintiff or a defendant?

12      A    No.

13      Q    So this is your first lawsuit, correct?

14      A    Yes.

15      Q    Is this the only current lawsuit that you're

16  involved in?

17      A    Yes.

18      Q    What did you do to prepare for today's

19  deposition?

20      A    I woke up early and I came here and of

21  course I talked a little bit with my attorney just to

22  brush over some things.

23      Q    Did you review any documents?

24      A    Not today.

25      Q    Did you review any documents yesterday?

```
 1        A     Yes, I did.

 2        Q     Which documents were those?

 3        A     I do not remember, like, which exact

 4   documents.

 5        Q     Do you recall reading responses to

 6   interrogatories?

 7        A     Yes.

 8        Q     And I'll pull those up so that -- just to

 9   make sure we're on the same page.  No one ever

10   remembers the documents -- the names of the documents

11   that they reviewed.

12        A     Right.

13        Q     So I just want to make sure we're talking

14   about the same stuff.

15              Can you see my screen?

16        A     Yes.

17        Q     Does this document look familiar to you?

18   It's titled Plaintiff Stacey Kibodeaux's Objections

19   and Responses to Defendant A&D Interests' Requests for

20   Discovery.

21        A     Yes.  I believe I've recently looked at

22   that, yes.

23        Q     And did you review the first set of

24   interrogatories?

25        A     I just very briefly went over them.
```

```
1        Q    Sure.  And these questions, I'm just trying

2   to figure out what -- what you have looked at.  Would

3   you take a look over the -- your responses to the

4   requests for admissions?

5        A    Yes.

6        Q    And did you have an opportunity to --

7   opportunity to review the requests for production?

8        A    Yes.

9        Q    All right.  What other documents did you

10  have an opportunity to review?

11       A    Those are really the -- like the main two.

12  I don't really recall all the -- all the documents.

13       Q    Did you have a chance to review the -- the

14  complaint in this case?  And I'll show you that so

15  you'll know what I'm talking about.

16       A    Okay.

17       Q    Can you see my screen?

18       A    Yes.

19       Q    I'm now showing you a document that says

20  Plaintiff's First Amended Complaint.

21       A    Yes.  I believe I've looked at that.

22       Q    Have you looked at any other documents in

23  preparation for today's deposition?

24            MS. REZAZADEH:  Objection; asked and

25  answered.
```

```
 1        Q     (By Mr. King) You can go ahead -- she's

 2   just saying I'm asking a repetitive question.

 3        A     Oh, okay.

 4        Q     So you can go ahead and answer.

 5        A     Oh, okay.  No, I do not recall really any

 6   other documents.

 7        Q     Aside from your attorneys, have you spoken

 8   with anyone else about your deposition?

 9        A     No.

10        Q     Have you spoken with any of the other

11   plaintiffs in this case about your deposition?

12        A     No.

13        Q     Have you spoken with any friends or family

14   about your deposition?

15        A     Yes.

16        Q     And who was that?

17        A     My sister.

18        Q     What did you discuss with your sister?

19        A     I just told her what was basically just

20   going on and asked for, like, some positivity.

21        Q     Sure.  And what's your sister's name?

22        A     Nicole Kibodeaux.

23        Q     Well, I -- you'll have my assurances I'll

24   try to make this a positive experience.  I don't like

25   beating up on anyone or giving anyone a hard time, all
```

1   right?

2        A     Okay.

3        Q     I understand that beginning in about 2017

4   you worked at Target in the beauty department, true?

5        A     True.

6        Q     And then you left Target roughly in February

7   of 2018, right?

8        A     Yes.

9        Q     What -- what did you do at Target?  What was

10  your job?

11       A     My job at Target was to make sure everything

12  was stocked correctly and it was my responsibility to

13  help everybody who came into the cosmetics department,

14  to help them pick out whatever they might be looking

15  for.

16       Q     So you were assigned to the cosmetics

17  department in particular?

18       A     Yes.

19       Q     Did you have to wear like a Target shirt?

20       A     Yes.

21       Q     Did you get a schedule from Target about

22  when you had to be there?

23       A     Yes.

24       Q     Were you paid based on how many hours you

25  worked?

Case 3:20-cv-00008   Document 82-1   Filed on 05/21/21 in TXSD   Page 15 of 186   **EXHIBIT A**

Deposition of Stacey Kibodeaux                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

```
 1        A    Yes.

 2        Q    Did you receive a -- like a commission for

 3   selling cosmetics?

 4        A    No.

 5        Q    Did you ever receive any benefits from

 6   Target?

 7        A    No.

 8        Q    Were you given like an HR manual before you

 9   started working for Target or an employee manual,

10   maybe?

11        A    Yes.

12        Q    Do you -- do you recall kind of like what --

13   what stuff was in that manual?

14        A    I -- I recall it just being, you know,

15   what's expected.  Like dress code, clocking in and

16   out.  Things like that.

17        Q    After you left Target, you went to go work

18   at a -- I guess like a dog facility called Camp Bow

19   Wow, right?

20        A    Yes.

21        Q    And what is Camp Bow Wow?

22        A    Camp Bow Wow is a doggy day care facility.

23        Q    You worked there from approximately

24   March 2018 through August 2018?

25        A    Yes.
```

```
 1         Q     What did you do at Camp Bow Wow?  What was

 2    your job?

 3         A     My job was to take care of everybody's dogs.

 4    Give them medicine, walk them, play with them, keep

 5    everything orderly, and just make sure every dog is

 6    taken care of.

 7         Q     How much were you paid at Camp Bow Wow?

 8         A     About minimum wage.

 9         Q     So about 7.25 an hour?

10         A     Yes.

11         Q     How much were you paid at Target?

12         A     I believe around maybe $11.

13         Q     $11 an hour, right?

14         A     Yes.

15         Q     After you left Camp Bow Wow in August 2018,

16    where did you go work next?

17         A     I ended up going to apply at Heartbreakers.

18         Q     And that was in January of 2019?

19         A     Yes.

20         Q     And you performed at Heartbreakers until the

21    end of December of 2019 approximately, right?

22         A     Yes.

23         Q     Between your time at Camp Bow Wow and -- the

24    end of your time at Heartbreakers in December of 2019,

25    did you hold any other jobs?
```

```
 1        A     No.
 2        Q     Was Heartbreakers the first strip club that
 3   you had ever worked at?
 4        A     Yes.
 5        Q     Have you worked at any other gentlemen's
 6   clubs, strip clubs since then?
 7        A     Yes.
 8        Q     Which ones?
 9        A     I have worked at The Ritz, but I was
10   actually fired from The Ritz because somebody had came
11   in and knew exactly who I was and had told the
12   management about me and my lawsuit with Heartbreakers.
13   So they fired me.  I've worked at Polekatz, Paradise
14   City, Double Shoe.
15        Q     Any other clubs?
16        A     I've worked at XTC.
17        Q     XTC South or North?
18        A     South.
19        Q     That's the one by Hobby, right?
20        A     Yes.
21        Q     Any other clubs that you've worked at?
22        A     I am currently working at a club, Sunset
23   Strip and Chicas Cabaret South.
24        Q     I'm going to ask you questions just about
25   time frames for each one of these clubs.  So from --
```

1  from about when to when did you perform at The Ritz?

2       A    That following January and that's it for The

3  Ritz.  I wasn't there very long.

4       Q    So from January -- January of 2020, right?

5       A    Yes.

6       Q    Was it a couple days, couple weeks?

7       A    A couple days.

8       Q    Who -- who told on you, I guess?

9       A    I -- I have no idea.  I had never seen this

10  man before in my life.  It was very random and

11  suspicious to me.  He just came in and came right up

12  to me and knew exactly who I was and everything.

13  So -- but I had no idea who he is.

14       Q    Was this a customer?

15       A    Yes.

16       Q    Did he reference The Houston Chronicle

17  article talking about this lawsuit?

18       A    He didn't mention that.

19       Q    You're aware that there was a Houston

20  Chronicle article about this lawsuit, right?

21       A    Yes.

22       Q    Okay.  All right.  From when to when did you

23  work at Polekatz approximately?

24       A    February -- approximately February 2020 to

25  maybe April, April 2020.

1   Q Do you still go back there once in a while?

2   A No.

3   Q Did you decide to leave Polekatz or did

4 something happen?

5   A I decided to leave.

6   Q Why did you decide to leave?

7   A I just didn't really like the energy there.

8 I didn't like the atmosphere, I guess.

9   Q Fair enough.  Is there -- was there some

10 particular element of the atmosphere that turned you

11 off?

12   A No.

13   Q Paradise City, from when to when?

14   A I worked at Paradise City very, very briefly

15 a couple times while I was actually still employed at

16 Heartbreakers.

17   Q What are the outer boundaries of the times

18 that you've worked at Paradise City?

19   A Maybe like August 2019.  Around that time.

20 But I only worked about, like, two shifts there.

21   Q After working a couple times in August of

22 2019 at Paradise City, have you gone back to perform

23 there?

24   A No.

25   Q So August 2019 was the only time that you

1    ever performed at Paradise City, right?

2         A    Yes.

3         Q    Why did you only perform a couple shifts?

4         A    I just wanted to see what it was like there

5    and I just decided I didn't really like -- want to

6    keep going there.

7         Q    Why did you decide not to keep going there?

8         A    Well, it was a little too chaotic for me.

9         Q    What do you mean by chaotic?

10        A    Just like the atmosphere.  Like it was a

11   very large club and after hours, so the hours were a

12   little bit too long for me as well.  It just wasn't a

13   fit.

14        Q    Fair enough.  They're -- they're open to,

15   what, 4:00 a.m.?

16        A    6:00 a.m.

17        Q    6:00 a.m.?  That's pretty long.  And that's

18   a -- that's a BYOB place, right?

19        A    Yes.

20        Q    All right.  Double Shoe, from when to when

21   approximately?

22        A    About, like, the summer of 2020.  Probably

23   around, like, June.

24        Q    So from approximately June of 2020 until

25   when?

```
 1        A     Probably August 2020.

 2        Q     How often did you go to Double Shoe during

 3  this time period?

 4        A     Pretty frequently.  Maybe four or five times

 5  out of the week.

 6        Q     Did you have any preferred shifts at Double

 7  Shoe?

 8        A     Can you repeat that?

 9        Q     Sure.  Were there any preferred days that

10  you appeared at Double Shoe?

11        A     No, not particularly.

12        Q     Just kind of whenever?

13        A     Uh-huh.

14        Q     Was that a yes?

15        A     Oh, yes.  Sorry.  Yes.

16        Q     That's okay.  XTC South, from when to when?

17        A     I only worked one night there.  And that was

18  probably, like, around August 2019.

19        Q     Sunset Strip?

20        A     April of last year to currently.

21        Q     I'm sorry.  I forgot to ask.  Why did you

22  only work one night at XTC South?

23        A     I just didn't like the club.

24        Q     Atmosphere issues?

25        A     Yes.
```

```
1        Q     XTC is a pretty rowdy place, isn't it?

2        A     Yes.

3        Q     All right.  You were saying that you have

4   performed at Sunset Strip between April 2020 and

5   currently.  How often do you appear there?

6        A     About five days or six days a week.

7        Q     Are you more of a day dancer, night dancer?

8        A     I'm more of a night dancer.  But some -- I

9   usually come in, like, during the afternoon.

10       Q     Is that to get a lower house fee?

11       A     To get a lower house fee and to get some

12  more hours.

13       Q     Chicas Cabaret South, from when to when

14  approximately?

15       A     About two months ago to currently.

16       Q     I can't even remember what month it is.  So

17  from February to now?

18       A     Yes.

19       Q     And how often do you appear at Chicas?

20       A     About twice a week.

21       Q     So just to summarize it, you currently

22  perform at Sunset Strip and Chicas, right?

23       A     Yes.

24       Q     Okay.  And you appear more often at Sunset

25  Strip as opposed to Chicas, right?
```

1        A     Yes.

2        Q     Is there any reason for that?

3        A     Just different -- two very different clubs.

4    Chicas is after hours --

5        Q     Uh-huh.

6        A     -- and Sunset Strip is not.

7        Q     So after performing at Sunset Strip, do you

8    sometimes go over to Chicas to catch the after hours

9    crowd?

10       A     No.

11       Q     How do you decide which club to perform at?

12       A     It just depends on how I feel that day.

13       Q     What -- what do you mean by that?

14              MS. REZAZADEH:  Objection; vague.

15              You can answer.  You can ignore my

16   objections.

17       A     It just depends on how -- like what kind of

18   energy I have.  If I think maybe I'll have enough

19   energy to go to Chicas and be able to dance the full

20   night and after hours, then I will -- I would go

21   there.

22       Q     (By Mr. King) I understand.  Different clubs

23   have different vibes to them, don't they?

24       A     Yes.

25       Q     Different clubs have different kinds of

 1   demographics and customers that come in, right?

 2       A    Yes.

 3       Q    Different clubs have different genres of

 4   music that they play more often, right?

 5       A    Yes.

 6       Q    Different clubs have different -- different

 7   kind of managers, shall we say?

 8       A    Yes.

 9       Q    At all of the clubs that we've just

10   discussed, have you been considered to be an

11   independent contractor?

12       A    I am --

13              MS. REZAZADEH:  Calls for a legal

14   conclusion.

15              Go ahead.

16       A    I am not sure.

17       Q    (By Mr. King) I'll ask this:  At all of the

18   clubs that we've just discussed, have you signed a

19   document saying you were treated as an independent

20   contractor?

21       A    Well, every club has different applications,

22   and I've been to some clubs where they'll give me,

23   like, a packet and then another club that will

24   literally just be a single sheet of paper.

25       Q    Uh-huh.

Deposition of Stacey Kibodeaux                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

```
 1        A    So I'm not exactly sure.

 2        Q    Okay.  Have any of these clubs paid you by

 3   the hour for your time?

 4        A    No.

 5        Q    Have all of these clubs had some sort of

 6   house fee where you -- you pay a sum in order to

 7   perform at the club on a daily basis or whatever?

 8        A    Yes.

 9        Q    And the amount of those house fees varies

10   from club to club, right?

11        A    Yes.

12        Q    Because each one of these clubs has I assume

13   a schedule of house fees that increases based on the

14   time of -- time of day, right?

15        A    Yes.

16        Q    So a Friday night shift, maybe, let's say

17   hypothetically starts at 8:00 would be more than a

18   Wednesday afternoon shift, right?

19        A    Yes.

20        Q    Do all of these clubs have the same sort of

21   policies as far as tipping other personnel?

22                  MS. REZAZADEH:  Objection; vague.

23                  You can answer, always.  Go ahead.

24        A    Can you actually repeat the question,

25   please?
```

Case 3:20-cv-00008   Document 82-1   Filed on 05/21/21 in TXSD   Page 26 of 186

**EXHIBIT A**

Deposition of Stacey Kibodeaux                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

 1      Q     (By Mr. King) Sure.  It was probably a bad

 2   question anyway.

 3            Do -- do all of these clubs have stage

 4   rotations?

 5      A     Stage rotations?

 6      Q     Yes, ma'am.

 7      A     Yes.

 8      Q     Where you have to go and put your name down

 9   on the list with the DJ, right?

10      A     Yeah.

11      Q     And then when your name is called, you go up

12   on stage and perform?

13      A     Yes.

14      Q     Are you expected to tip other club personnel

15   at any of these clubs?

16            MS. REZAZADEH:  Objection; vague.

17      A     It really depends on what club I'm at.  My

18   current club that I go to the most, they don't really

19   bother me too much about that.

20      Q     (By Mr. King) Sunset Strip?

21      A     Yes.

22      Q     Do you have a schedule -- a set schedule at

23   any of these clubs?

24      A     No.

25      Q     Have we now covered all of the clubs that

1   you've performed at?

2       A    Yes.

3       Q    Do you maintain any social media accounts?

4       A    Yes.

5       Q    Do you have a Facebook account?

6       A    Yes.

7       Q    Is that Facebook account

8   stacey.kibodeaux.98?

9       A    Yes.

10      Q    Can you see my screen?

11      A    Yes.

12      Q    Let me zoom in.  It might be a little bit

13  hard to see.

14              Is this the -- like I guess the cover

15  photo part of your Facebook account?

16      A    Yes.

17      Q    And you're the only one who has access to

18  your Facebook account as far as maintaining it, right?

19      A    Correct.

20      Q    Does anyone else have authorization to

21  update or edit your page?

22      A    No.

23      Q    And this is --

24              MS. REZAZADEH:  This stuff hasn't been

25  produced to us.  I had asked to look at it before you

 1   ask her about it.

 2                   MR. KING:  Okay.

 3        Q    (By Mr. King) This is your Facebook page

 4   from -- a previous version of your Facebook page,

 5   right?

 6        A    Yes.

 7                   MS. REZAZADEH:  Just -- again, I

 8   have -- none of these documents have been produced to

 9   us, so, Stacey, I haven't reviewed them know where

10   they came from or, you know, if they're authentic or

11   whatever.  So just keep that in mind when you're

12   answering questions not been produced by Heartbreakers

13   to us in this lawsuit.

14        Q    (By Mr. King) Have you ever worked at Dan's

15   Pizza Company?

16        A    Yes.

17        Q    From September of 2018 until when?

18        A    I don't think that's accurate at all,

19   actually.  I worked there very briefly, but I don't

20   really -- like, I don't remember what dates.  And it's

21   definitely not to present time.

22        Q    Understood.  And I'll represent to you that

23   this is a screenshot from a long time ago.

24        A    Uh-huh.

25                   MS. REZAZADEH:  What date?

```
 1              MR. KING:  This was probably January of

 2   2020.

 3              MS. REZAZADEH:  I'm going to object to

 4   any line of questioning about this.  We have no

 5   idea -- she has no idea what date this screen capture

 6   of this -- her Facebook page is from, whether it's

 7   within the relevant period of our lawsuit, of the

 8   heart -- of her employment at Heartbreakers, anything

 9   like that.  So I'm just letting you know I'm going to

10   object to any questioning on this -- these documents.

11              MR. KING:  That's fine.

12       Q    (By Mr. King) I'm just asking you if you've

13   ever worked at Dan's Pizza Company.

14       A    Yes.

15       Q    Okay.  How long did you work at Dan's Pizza

16   Company?

17       A    Like a week.

18       Q    That's fine.  Let me see about dropping this

19   into the Zoom thing.

20              MS. REZAZADEH:  Can you enter that as

21   an exhibit too so that we know what you're asking

22   about?

23              MR. KING:  Sure.

24              MS. REZAZADEH:  Awesome.

25              (Marked was Kibodeaux Exhibit No. 1.)
```

```
 1          Q    (By Mr. King) Do you have a Snapchat

 2    profile?

 3          A    Yes, I have a Snapchat.

 4          Q    And what's your username?

 5          A    It's metalandcatshey.

 6          Q    I'm sorry.  Metal -- metalandcatshey?

 7          A    Yeah.  All together.

 8          Q    Got it.  Thank you.  M -- M-E-T-A-L?

 9          A    Uh-huh.  Yes.

10          Q    What other social media accounts do you

11    maintain?

12          A    I have an Instagram.

13          Q    Uh-huh.  Is your username blunted_illusion.

14          A    No.

15          Q    What is your username on Instagram?

16          A    It's hazedncaked.

17          Q    Hazed M Kate?  Can you spell that for the

18    court reporter?

19          A    Yes.  H-A-Z-E-D, the letter N, and then

20    C-A-K-E-D.

21          Q    Got it.  Is -- is your -- is that Instagram

22    profile set to private?

23          A    No.

24          Q    Any -- any other social media accounts?

25          A    No.
```

1    Q    Do you have -- do you have an Etsy?

2    A    An Etsy.

3    Q    Uh-huh.  An Etsy page.

4    A    I mean, I have a login for it, but I don't

5    have, like, a page that I run.

6    Q    You've never heard of the username Taco

7    Bell -- tacobellsqueen?

8    A    Yes.  I made that when I was like 12.

9    Q    I understand.  Okay.  Fair enough.

10             Do you have a Twitter account?

11   A    No.

12   Q    Do you have a YouTube channel?

13   A    No.

14   Q    Okay.  And I have to ask.  I don't mean any

15   offense by this, but do you have an OnlyFans account?

16   A    Yes.

17   Q    What's your username on OnlyFans?

18   A    I believe it's the same as my Instagram

19   username.

20   Q    Could it be something different?

21   A    I don't think so, but I'm not, like, active

22   on it, so that's what I think I remember.

23   Q    Do you consider your Facebook page a private

24   account?

25   A    Yes.

1      Q     What -- why so?

2      A     My Facebook?

3      Q     Uh-huh.

4      A     Because that's where I have my family and a

5  few friends.

6      Q     Any of the social media accounts that we've

7  just talked about, have you ever posted anything about

8  Heartbreakers?

9      A     Yes.

10     Q     On which account or accounts?

11     A     So I had an old Instagram that you mentioned

12 earlier --

13     Q     Uh-huh.

14     A     -- the Illusion one.

15     Q     Yeah.

16     A     I would sometime post selfies and stuff.

17     Q     Sure.

18     A     And on my Facebook, I had made a status

19 before basically saying, you know, I'm going through a

20 lawsuit and if anybody wants to send, like, good,

21 positive vibes or keep me in your thoughts or

22 whatever, that kind of thing.  And that's it.

23     Q     The Facebook post that you just mentioned,

24 do you recall about when that was posted?

25     A     No.

```
 1        Q     Is that post set to public or private?

 2        A     Probably private.

 3        Q     Did you receive any comments about that,

 4   that post?

 5        A     I do not recall.

 6        Q     Is that post still available on your

 7   Facebook profile?

 8        A     I do not know.

 9        Q     Do you know if you deleted the post after

10   posting it?

11        A     I do not know.

12        Q     We would just have to look at your profile,

13   right?

14        A     Uh-huh.  Yes.

15        Q     Out of curiosity, why did you -- what

16   motivated you to make that post?

17        A     I just was looking for, I guess, some

18   reassurance possibly.

19        Q     Uh-huh.

20        A     That's really it.  I wasn't -- I was just

21   kind of like letting my friends know a little bit.

22        Q     Sure.  Do you -- are you Facebook friends

23   with any dancers at Heartbreakers?

24        A     Yes.

25        Q     Did you ask any of them to join the lawsuit
```

1    in that post?

2         A    No.

3         Q    On any of the social media accounts that

4    we've just discussed, Facebook, Snapchat, Instagram,

5    have you ever made any postings about your work as a

6    dancer?

7         A    Can you specify?

8         Q    Sure.  Just about your thoughts on the

9    exotic dance club industry or your occupation as a

10   dancer.

11             MS. REZAZADEH:  Objection; vague.

12        A    I mean, yes, I've made -- I've made, like,

13   posts or, like, I will post a picture saying, like,

14   "Hey, I'm at work."

15             Or just very simple -- simple-minded

16   posts, I guess.

17        Q    (By Mr. King) Fair enough.  Do you recall

18   having ever made any posts that you're, you know,

19   performing at Heartbreakers?

20        A    Yes.  I would sometimes post things like

21   that.

22        Q    What -- what was -- what's the purpose of

23   those posts?

24        A    Just to let my friends know, like, I would

25   just post because -- I don't know.  I feel like that's

1   what a lot of people my age do.  Like just to post it,

2   I guess.

3        Q    So just to let your friends know?

4        A    Yes.

5        Q    Did you ever post where -- where you were

6   performing to let potential customers know that you're

7   there?

8                   MS. REZAZADEH:  Objection; asked and

9   answered.

10        A    Yes.

11        Q    (By Mr. King) Do you know if those posts

12   are still on your page, your Facebook page?

13        A    No.  Any posts like that would have not even

14   been on my Facebook.  It would have been on my old

15   Instagram, but I deleted that, like, over a year ago.

16        Q    Do you recall about when you deleted that

17   account?

18                   MS. REZAZADEH:  Objection; asked and

19   answered.

20        A    Did you say why I deleted it?

21        Q    (By Mr. King) When.

22        A    When?

23        Q    Yes, ma'am.

24        A    Approximately a year ago.

25        Q    Was that after this lawsuit was filed?

1    A    Yes.  Probably right after it was filed, I

2  deleted it.

3    Q    Sure.  Why -- why did you delete it?

4    A    I deleted it because I didn't want to be,

5  like, associated with that old dancer name.  I just

6  wanted a -- a new page for myself.

7    Q    Do you know if that -- if your postings

8  under that former username, blunted --

9  blunted_illusion, are they still accessible?

10   A    No, they're not.

11   Q    So the -- the account's just totally

12  deleted?

13   A    Yes.

14   Q    On any of these social media platforms that

15  we've discussed, did you ever communicate with any

16  club managers, Heartbreakers' club managers?

17   A    Like through my social media pages?

18   Q    Yeah.

19   A    No.

20   Q    Did you ever send like direct messages with

21  any club managers?

22   A    Well, I -- yes.

23   Q    Which -- which one?

24   A    Well, I've talked to sometimes my club

25  managers that I am currently with.

1    Q    Uh-huh.

2    A    Because they like to, like, post our

3  pictures and stuff sometimes for their page.

4    Q    Sure.

5    A    So they'll ask me and I'll say yes or no.

6    Q    I was just talking about at Heartbreakers.

7    A    Oh, at Heartbreakers?

8    Q    Yeah.

9    A    No.

10    Q    Did you send any -- did you use any of the

11  social media platforms that we've discussed to send

12  DMs with other -- like waitresses or bartenders or any

13  other club personnel aside from managers?

14    A    No.

15    Q    What about other dancers?

16    A    I had some of the dancers on that old

17  Instagram and I followed them.

18    Q    What about your Facebook?

19    A    My Facebook?

20    Q    Uh-huh.

21    A    I think there's like one -- one girl on

22  there.  She might still work at that club, but I don't

23  really keep in touch with her.

24    Q    Have you -- have you had an opportunity to

25  search your phone for any text messages with any

Case 3:20-cv-00008   Document 82-1   Filed on 05/21/21 in TXSD   Page 38 of 186

**EXHIBIT A**

Deposition of Stacey Kibodeaux                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

```
 1   Heartbreakers -- Heartbreakers' managers?

 2        A    Yes.  I've gone through any documents for

 3   texts, pictures, and I gave my attorney everything

 4   that I could find and have.  So I don't have any --

 5   any other things.

 6        Q    And I appreciate your answer.  But just --

 7   just to make sure I've got all my bases covered, so

 8   you don't have any texts or e-mails, Facebook messages

 9   or other kinds of electronic communications with

10   Whitey?

11        A    No.

12        Q    What about with Gary Wasek?

13        A    No.

14        Q    What about with Carl Arceneaux?

15        A    No.

16        Q    Jeremy Goldsboro?

17        A    No.

18        Q    Danny Jackson?

19        A    No.

20        Q    Peggy or Mike Armstrong?

21        A    No.

22        Q    Brandy or Jen?

23        A    No.

24        Q    Any of the DJs?

25        A    No.
```

```
 1        Q    I can't remember their names.  I think

 2   Vanek -- does that ring a bell?

 3        A    No.  I remember a DJ named Ben and that's

 4   it.

 5        Q    Okay.

 6        A    But no, no contact.

 7        Q    Understood.  Have you -- have you searched

 8   for or found any documents in which you recorded the

 9   days that you performed at Heartbreakers?

10             MS. REZAZADEH:  Objection; vague.

11        A    No.

12        Q    (By Mr. King) When I'm -- what I'm asking is

13   sometimes people have, you know, daily -- they'll have

14   calendars or they'll write down, you know, I worked X,

15   Y, Z days.  Do you have any -- any of that kind of

16   information written down somewhere?

17        A    No.  The only, like, reference I would have

18   is, like, a picture I sent my attorney or something,

19   like, to have the date on it or something, but no.

20        Q    Sure.  I get it.  Do you have any -- any

21   documents in which you reported the number of hours

22   that you performed at Heartbreakers?

23        A    No.

24             MS. REZAZADEH:  Objection; asked and

25   answered.
```

```
 1        Q     (By Mr. King) Do you have any -- any

 2   documents in which you recorded the amount of house

 3   fees that you paid at Heartbreakers?

 4        A     No.

 5        Q     Do you have any documents in which you have

 6   written down or reported how much money you made at

 7   Heartbreakers?

 8        A     No.

 9        Q     And the last question on this -- this very

10   boring line of questions is do you have any records of

11   how much money that you might have paid to a DJ or a

12   manager or a bartender or a waitress?

13        A     No.

14        Q     So just so I can make sure I have covered

15   all of my bases, all of the documents that you have

16   related to your time at Heartbreakers have been

17   provided to your counsel?

18        A     Yes.

19        Q     Okay.  It's -- it's true that Heartbreakers

20   never paid you for any of the hours that you performed

21   there, right?

22        A     True.

23        Q     And it's true that Heartbreakers never paid

24   you for the number of dances that you performed on

25   stage, right?
```

```
 1        A    True.

 2        Q    Heartbreakers never paid you for the number

 3   of dances that you performed for customers on the

 4   floor, right?

 5             MS. REZAZADEH:  Objection; vague.

 6        Q    (By Mr. King) Lap dances, table dances,

 7   things of that sort, Heartbreakers never paid you for

 8   that, right?

 9        A    Correct.

10        Q    And Heartbreakers never gave you any money

11   for selling food and beverages to any customers,

12   right?

13        A    No.

14             MS. REZAZADEH:  Objection; vague.

15        Q    (By Mr. King) They certainly never gave you

16   any share of the money that they collected for cover

17   charges, right?

18        A    Right.

19        Q    The bottom line is that Heartbreakers didn't

20   pay you any money, true?

21             MS. REZAZADEH:  Objection; vague.

22        A    True.

23        Q    (By Mr. King) And the -- Heartbreakers

24   didn't offer you any sort of benefits, right?

25             MS. REZAZADEH:  Objection; vague.
```

```
 1        A     Can you please repeat that question?

 2        Q     (By Mr. King) Sure.  And I'll try to be a

 3  little bit more specific for you.  Heartbreakers

 4  didn't offer you any sort of employment type of

 5  benefits like health insurance, right?

 6        A     Oh, no.

 7        Q     They didn't offer a retirement plan, right?

 8        A     Correct.  They did not offer anything.

 9        Q     No paid time off or sick leave?

10        A     No.

11        Q     In fact, you -- you had to pay Heartbreakers

12  to perform there, right?

13        A     Correct.

14        Q     I'm sorry?

15        A     Correct.

16        Q     And you paid a house fee in order to perform

17  at Heartbreakers, right?

18        A     Yes.

19        Q     And it's true that no one at Heartbreakers

20  ever promoted or advertised your particular services

21  at the club, right?

22        A     True.

23        Q     Heart -- I take it that Heartbreakers didn't

24  really advertise or promote any of the entertainers at

25  that club, right?
```

```
1        A     True.

2        Q     Inside of the club, it's true that

3   Heartbreakers never gave you like a list of customers

4   that you had to go perform for, right?

5        A     No.

6        Q     No one assigned you to go meet a quota of

7   how many patrons you needed to perform for on a given

8   night, right?

9              MS. REZAZADEH:  Objection; incomplete

10  hypothetical, vague.

11       A     No.

12       Q     (By Mr. King) Heartbreakers never reimbursed

13  you for things like makeup, attire, shoes, right?

14       A     Correct.

15       Q     So the bottom line is Heartbreakers paid you

16  $0 and didn't promote you within the club, right?

17       A     Right.

18             MS. REZAZADEH:  Objection; assumes

19  facts in dispute.

20       Q     (By Mr. King) And you have alleged that

21  Heartbreakers, in fact, forced you to tip other

22  personnel at Heartbreakers, right?

23       A     Right.

24       Q     Which would include DJs?

25       A     Yes.
```

1    Q    You allege that you were forced to tip

2  waitresses?

3    A    Yes.

4    Q    You allege that you were forced to tip

5  bartenders?

6    A    Yes.

7    Q    Do you allege that Heartbreakers required

8  you to tip managers?

9    A    Indirectly, yes.

10    Q    Indirectly how?

11    A    Because if I would tip the DJ or pay for --

12  to skip my rotation, they would split that between

13  themselves.

14    Q    How -- how did you come to learn that

15  information?

16    A    Just because I was there all the time,

17  I -- you know, I just started to notice.  Or, you

18  know, like my manager would know if I didn't tip the

19  DJ or things like that.

20    Q    Did somebody tell you that the DJs and

21  managers shared in tips?

22    A    Yes.

23    Q    And who was that?

24    A    Girls.  Just dancers talked about it.

25    Q    Any -- any particular dancers?

```
 1        A     No.

 2        Q     Can you remember the names of any dancers

 3   who provided you with that information?

 4        A     No.

 5        Q     Do you recall when you first were -- when

 6   you first learned about that information?

 7        A     Probably sometime within the middle of

 8   working there, that time frame.

 9        Q     So in the summer of 2019?

10              MS. REZAZADEH:  Objection; calls for

11   speculation.

12        A     Something like that.

13        Q     (By Mr. King) Something like that?  Okay.

14   But I take it you can't recall any specific

15   conversations with any particular dancers about that?

16        A     Correct.

17        Q     Okay.  So kind of back to what we were

18   talking about here about how Heartbreakers didn't pay

19   you any money and you -- you say that you had to pay

20   money to Heartbreakers and various people.  How -- how

21   did you make money?

22        A     How did I make money?

23        Q     Yeah.

24        A     By doing my stage sets and giving dances.

25        Q     So you -- you sold entertainment, right?
```

```
 1       A    Yes.

 2       Q    Were you selling your time providing

 3  entertainment?

 4            MS. REZAZADEH:  Objection; vague.

 5       A    What exactly do you mean?

 6       Q    (By Mr. King) Sure.  You didn't -- since

 7  you didn't have any quotas as far as how many

 8  customers you had to perform, how would you gauge how

 9  much money you would make?  Was it like on a

10  time-based increment, per dance, per customer?

11            MS. REZAZADEH:  Objection; calls for

12  speculation, compound.

13       A    I would say it had to do with really who

14  tipped me or how many dances I gave, but I wouldn't

15  really know the amount I made until the very end of my

16  shift and I got home.

17       Q    (By Mr. King) Would it be fair to

18  characterize your work as a dancer at Heartbreakers as

19  basically like a service type of job?

20            MS. REZAZADEH:  Objection; vague.

21       A    I suppose so, yes.

22       Q    (By Mr. King) You were -- you weren't

23  making any goods, right?  Like you weren't putting

24  together hamburgers to serve to customers, right?

25       A    No.
```

1    Q    You weren't mixing drinks and taking them

2  over to customers, right?

3    A    No, but I did help with all of those sales.

4    Q    I -- I get it.  But the thing that you were

5  selling were your entertainment services, right?

6    A    Yeah.

7            MS. REZAZADEH:  Objection; asked and

8  answered.

9    Q   (By Mr. King) I'm sorry.  I didn't hear

10  your answer.

11    A    Yes.

12    Q    All right.  So you mentioned that you

13  performed on stage, right?

14    A    Yes.

15    Q    During one of your shifts -- or during --

16  let me start over.

17            During your shifts, on average, about

18  how much time have you spent performing on stage?

19            MS. REZAZADEH:  Objection; calls for a

20  calculation.

21    A    It would always depend on the day of the

22  week and how many dancers were there.  But on a

23  weekday, I could be on stage, like, even ten times.

24  And there's floor stages that could be opened as well.

25    Q    (By Mr. King) So you said about ten times

1  in a weekday.  What about on a weekend day or night?

2  On average, about how many times would you be on

3  stage during a shift?

4       A    Probably still close around that same --

5  that same average.

6       Q    You said that it could and depend on how

7  many other dancers are there, right?

8       A    Right.

9       Q    How -- how would that affect how many times

10 you would be on stage?

11      A    Well, if there is less dancers, then the

12 rotation list is shorter.  So then, you know, it would

13 come back to your rotation more quick.

14      Q    So the contrary is true, right, where if

15 there are more dancers at the club, then your name

16 wouldn't be called more frequently, right?

17      A    Right.

18      Q    If the club had very few customers there --

19 well, let me -- strike that.

20           Did you ever perform at the club when

21 there weren't a lot of customers?

22      A    Yes.

23      Q    During slow periods, some would say?

24      A    Yes.

25      Q    Did anyone at Heartbreakers still require

1    you to perform on stage?

2         A    Yes.

3         Q    Who?

4         A    Whitey would require it.  Any of -- any of

5    the management or owners, it was required.

6         Q    At any time -- or when you were performing

7    at Heartbreakers, did any managers just say there's no

8    point in performing on stage because there's no one

9    here?

10        A    No.

11        Q    On average how much money would you make by

12   performing on stage?

13             MS. REZAZADEH:  Objection; calls for

14   speculation and calculation.

15        A    Like -- do you mean, like, if people were to

16   tip me on stage?

17        Q    (By Mr. King) Yeah.

18        A    It varied.  Like very like -- very -- it

19   just varies very extremely.  Like, it's not very

20   predictable or steady.

21        Q    What -- what things made it so varied?  What

22   would affect that variability?

23        A    How many people were there, the atmosphere,

24   the music, if people were drinking or not drinking, if

25   it was, like, a slow night or whatnot.

 1      Q    Sure.  Was there anything that you were able

 2 to do to affect the amount of money that people would

 3 pay when you were on stage?

 4           MS. REZAZADEH:  Objection; vague.

 5      A    I just did my best every time.

 6      Q    (By Mr. King) So when you got on stage, did

 7 you just do the same thing every time?

 8           MS. REZAZADEH:  Objection -- sorry.  Go

 9 ahead.

10      A    Pretty much.

11      Q    (By Mr. King) Did you ever try to, I don't

12 know, gauge how you danced based on the audience's

13 reaction?

14           MS. REZAZADEH:  Objection; vague.

15      A    Yes.

16      Q    (By Mr. King) Why so?

17      A    Because I want to be a good performer for

18 the club I'm working for.

19      Q    Would that increase the amount of money that

20 you made on stage?

21           MS. REZAZADEH:  Objection; calls for

22 speculation.

23      A    It's not guaranteed.

24      Q    (By Mr. King) All right.  As we discussed,

25 the club never paid you to dance on stage, right?

1            MS. REZAZADEH:  Objection; vague.

2       A     Correct.

3       Q     (By Mr. King) So the quality of your

4  performance was something that you took into account

5  for the club's sake?

6       A     Can you clarify, please?

7       Q     Sure.  I guess I'm trying to -- what I'm

8  trying to get at is did the quality of your

9  performance affect how much money you made on stage?

10      A     I mean, it just really, like, depended.

11 Like I just -- I did the best I could every time and

12 people would either come up and tip me or they

13 wouldn't.

14      Q     So the amount of money that you made on

15 stage was totally out of your hands?

16            MS. REZAZADEH:  Objection; misquoting

17 the deponent.

18      A     I mean, yes.  I technically have no control

19 of what people choose to tip.

20      Q     (By Mr. King) And -- and so you had no way

21 of encouraging customers to pay -- to pay for stage

22 performances?

23            MS. REZAZADEH:  Objection; vague.

24      A     I did what I could to, you know, entice

25 people and try to bring in some more tips.

Deposition of Stacey Kibodeaux                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

```
 1        Q    (By Mr. King) Sure.  And I'm just trying to
 2   find out what those things were.
 3        A    Just looking at people, smiling, trying to
 4   show that I'm friendly.  That's pretty much it.
 5        Q    How did -- how did you make money off stage?
 6        A    By either spending time with a regular and
 7   being tipped or by giving dances in the booth area.
 8        Q    Can you explain what a regular is?
 9        A    A regular would be a regular customer that
10   would come in to the establishment, like, pretty
11   frequently or somebody that I would maybe kind of get
12   to know a little bit.
13        Q    So -- and please correct me if I'm
14   misunderstanding you.  So is a regular somebody that
15   is appearing -- or that shows up at the club to come
16   see you in particular?
17             MS. REZAZADEH:  Objection; misquoting
18   the deponent.
19        A    They could be or they could be coming to see
20   multiple girls or some regulars might just go there
21   because they like the drink specials or something.
22        Q    (By Mr. King) Sure.  So did you have any
23   regulars that came to -- because you were there?
24        A    Yes.  I had, like, two.
25        Q    And what would the -- what would they pay
```

 1   you for?

 2        A    Dances.

 3        Q    Anything else?

 4        A    I would sit and talk with them.

 5        Q    Talk with them?  It's my understanding that

 6   exotic -- some exotic dancers get paid pretty much to

 7   hang out with the customer, right?

 8        A    Yeah, sometimes.

 9        Q    Is that something that you would get paid

10   for?

11        A    Yes.  But I would have to pay to skip my

12   rotation so I could keep sitting with them.

13        Q    I understand.  But getting paid -- a

14   customer would pay you to spend time with them on the

15   floor, right?

16        A    Correct.

17        Q    And how -- how was the amount of money that

18   they would pay you decided?

19        A    It would be discussed between me and that

20   person.

21        Q    Did you have like a set amount of money that

22   you would ask the customer to pay based on a certain

23   amount of time or how did you gauge that?

24        A    I just gauged it based off of I guess our,

25   like, chemistry or, like, if we were just talking and

1   hanging out or what exactly they're looking for or --

2   it was just completely up to whatever we had both

3   decided.

4        Q    What -- how much money could you make from,

5   you know, just hanging out with the customer?

6                MS. REZAZADEH:  Objection; calls for

7   speculation, incomplete hypothetical.

8        A    I mean, it was -- it's really just up to

9   however much that person is willing to tip or give.

10  There's never really like a set amount.

11       Q    (By Mr. King) What was the most amount that

12  you -- you can recall?

13       A    Maybe like -- maybe like 300.

14       Q    300 for what?  Half an hour, hour, five

15  minutes?

16       A    Probably like an hour.

17       Q    What's the least amount that you've ever

18  been paid for an hour of just hanging out?

19       A    I can't really recall.

20       Q    Did you ever just hang out with the customer

21  for free?

22       A    No.

23       Q    Why not?

24       A    Because I need to spend my time wisely and

25  make sure I make my money to pay my bills.

```
 1        Q    All right.  And you're not -- you're not

 2   going there to Heartbreakers or any other club for

 3   that matter just for the heck of it.  You're there to

 4   work, right?

 5        A    Correct.

 6        Q    Okay.  So how would you -- how would you

 7   decide, you know, how to spend your time wisely when

 8   you were on the floor at Heartbreakers?

 9        A    Well, if somebody wasn't, like, tipping me

10   for my company in time, then I would decide to move on

11   to the next person.

12        Q    You wouldn't -- you wouldn't want to hang

13   around somebody who is basically wasting your time,

14   right?

15        A    Correct.

16        Q    How did you assess whether somebody was

17   going to pay you for your time?

18        A    Talk to them and I can tell, like, you know,

19   usually if somebody is going to pay me, they are

20   very -- like, they do so usually right away.

21        Q    Right.

22        A    Or they tell me they are and then pay me or

23   whatever.

24        Q    Got it.  Did you have customers that would

25   often waste your time and just not pay you?
```

1          MS. REZAZADEH:  Objection; vague.

2     A    Yes.

3     Q    (By Mr. King) Is that frustrating?

4     A    Of course it's frustrating.  Or it can be

5     frustrating.

6     Q    How -- how did you try to avoid that

7     frustration?

8     A    By setting boundaries for myself and

9     basically how I told you, you know, if they're not

10    going to be tipping, then I need to move on to the

11    next person.

12    Q    Got it.  What kind of boundaries would you

13    set?

14    A    Boundaries, like, with my time and my worth

15    and not giving my time to customers who are, like,

16    inappropriate or too rowdy or too drunk.

17    Q    Got it.  Do you know if other dancers took

18    the same approach that we've just been talking about?

19         MS. REZAZADEH:  Objection; calls for

20    speculation and vague.

21    A    I mean, I don't really know.  I'm sure --

22    I'm sure some dancers think that way too.

23    Q    (By Mr. King) Have you ever talked to other

24    dancers about their approach towards customers while

25    working on the floor?

1    A    I don't typically, like, talk too much to

2  the other dancers, but I've heard conversations and

3  stuff, I suppose.

4    Q    Sure.  Did Heartbreakers ever tell you how

5  you're supposed to interact with customers one-on-one?

6    A    No.

7    Q    Did anybody at Heartbreakers ever provide

8  you with pointers on, you know, how to leverage your

9  time with customers?

10    A    No.

11              MS. REZAZADEH:  Vague.

12    Q    (By Mr. King) So is it -- is it true that

13  you basically kind of had to figure it out as you

14  went?

15              MS. REZAZADEH:  Objection; vague.

16    A    Yes.  I had to figure everything out on my

17  own.

18    Q    (By Mr. King) All right.  You also gave

19  private dances -- well, you also gave dances to

20  customers on the floor, right?

21    A    Yes.

22    Q    It wasn't just chatting with customers,

23  right?

24    A    Right.

25    Q    Are you able to kind of give, like, a

```
 1    proportion of time that you were on the floor that you

 2    would spend really just chatting with customers versus

 3    performing lap dances?

 4              MS. REZAZADEH:  Objection; vague.

 5    A    I don't think I understand the question.

 6    Q    (By Mr. King) Sure.  I've talked to some

 7    dancers who they don't really perform well at lap

 8    dances, they might perform a couple during the shift,

 9    and they spend, you know, 70 percent of their time on

10    the floor just talking with customers, and then there

11    are other dancers who do the complete opposite.

12    They're performing lots of lap dances and don't really

13    chitchat.  I'm just trying to figure out how you

14    allocated your time.

15              MS. REZAZADEH:  Objection; incomplete

16    hypothetical.  Is there a question?

17    A    I prefer to give dances.  It's basically,

18    like, guaranteed money, I suppose.

19    Q    (By Mr. King) Why would that be guaranteed

20    money?

21    A    Not exactly, like, guaranteed.  I don't

22    really think that that was the right word.

23    Q    Sure.

24    A    But if I had a customer that I know wants a

25    dance and the club has the price set to $20, then I
```

```
 1   know if I give that customer a dance, that they're

 2   going to give me the $20.

 3        Q    Right.  You've mentioned that the club sets

 4   the dance price?

 5        A    Yes.  They set it to exactly $20.  So I did

 6   not, like, decide that price myself.

 7        Q    Did the club set the -- the price for your

 8   time spent chatting with customers?

 9        A    No.

10        Q    That was up to you?

11             MS. REZAZADEH:  Objection; asked and

12   answered.

13        A    That was up to me and that customer.

14        Q    (By Mr. King) Who told you that the price

15   for a table dance was $20?

16        A    I believe that would have been the manager

17   who hired me.

18        Q    And who was that manager?

19        A    That manager, I believe, was either Damon or

20   Gary.

21        Q    That would be Damon Jackson, a guy with an

22   eye patch?

23        A    Yes.

24        Q    Okay.  What did Damon tell you?

25             MS. REZAZADEH:  Objection; misquoting
```

```
 1   deponent.

 2        Q    (By Mr. King) Or Gary.  I mean, I don't

 3   know who communicated this to you.

 4        A    I don't exactly recall, but I just know that

 5   it was, like, one of the few things that I was

 6   actually, like, verbally told, like, my very first

 7   day.

 8        Q    And do you recall whether it was Gary or

 9   Damon who told you this on your very first day?

10        A    I do not recall.

11        Q    Do you recall what either Gary or Damon told

12   you about $20 for a dance?

13        A    Yes.

14        Q    And what was that?

15        A    I'm sorry.  Can you repeat that?

16        Q    Sure.  I'm just trying to understand what --

17   what they told you about dance prices.

18        A    I just remember that I was told that it was

19   $20 a song.

20        Q    And that was it?

21        A    That's all I remember.

22        Q    Did -- did anyone tell you that you could

23   charge less than $20 a song?

24        A    No.  You can't do that.

25        Q    Okay.  And who told you that?
```

1      A    I think I just kind of figured that out or

2   it was made clear to me that the price is set to

3   exactly $20.  So to me, you know, that means no more,

4   no less.  It's $20 a song.

5      Q    Do you recall if anyone at Heartbreakers

6   specifically told you minimum and maximum is 20?

7                MS. REZAZADEH:  Objection; asked and

8   answered.

9      A    I don't know.  There was -- it was just $20,

10  and if I were to charge more, then I would get in

11  trouble.

12     Q    (By Mr. King) Did that ever happen to you?

13     A    No, it did not because I followed that rule.

14     Q    How did you find out or come to learn that

15  you got in trouble for charging more than $20?

16     A    Being in the dressing room and hearing other

17  dancers, like, talk about a lot of things like that.

18     Q    Do you recall discussing -- discussing this

19  with any particular dancers?

20     A    No.

21     Q    Do you recall any specific -- well, just

22  tell me, like, what were those conversations like?

23  What were they saying?

24                MS. REZAZADEH:  Vague.

25     A    I would -- I would just hear, like, you

1   know, girls talking in the dressing room about --

2   maybe they were talking about, like, Oh, so-and-so got

3   in trouble by Whitey because she was caught charging

4   $25 or a customer would complain and then there would

5   be repercussions for that.

6        Q    (By Mr. King) Did you ever verify this kind

7   of grapevine talk with any managers?

8        A    No.

9        Q    So you were assuming that those dancers were

10  telling the truth?

11            MS. REZAZADEH:  Objection; misquoting

12  deponent.  I mean...

13       A    I mean, yes.  I assumed they were telling

14  the truth I don't see why else they would really be

15  talking about that.

16       Q    (By Mr. King) Do you have any personal

17  experience with any caps on how much could be charged

18  for a dance?

19            MS. REZAZADEH:  Objection; vague.

20       A    I -- I don't know.  I just know that I was

21  supposed to be charging $20 a song.

22       Q    (By Mr. King) I understand.  And here's

23  what I'm getting at, Ms. Kibodeaux, is I'm just

24  trying to understand where that -- where your

25  understanding came from.  That's all.

```
 1                  MS. REZAZADEH:  I think she just --

 2       Q    (By Mr. King) And it sounds like --

 3                  MS. REZAZADEH:  -- told you the

 4   managers told you that.  She's already told you that.

 5                  MR. KING:  Don't testify for the

 6   witness.  I'm not asking her a harassing question.

 7   I'm just trying to understand where this came from.

 8   And you're not under oath.

 9                  MS. REZAZADEH:  You're asking the

10   question -- you have been asking her the same question

11   for the last five minutes and I don't know how else

12   she can tell you Damon or Gary.

13                  MR. KING:  Okay.  So let's -- let's

14   start over.

15       Q    (By Mr. King) I'm just trying to understand

16   where any policy or rule that you attribute to

17   Heartbreakers that you could not charge less than $20

18   for a dance or more than $20, where that came from.

19   And is it your testimony that that understanding came

20   from locker room talk?

21                  MS. REZAZADEH:  Objection; misquoting

22   the deponent and asked and answered.

23       A    So no.  My manager told me that the set

24   price is 20.  And then I was explaining that I had

25   heard some dancers talking about their own personal
```

  1   experiences and basically, like, just saying, like,

  2   the price is just $20.

  3        Q    (By Mr. King) Did you ever accept more than

  4   $20 for a dance?

  5        A    No.

  6        Q    Did you ever accept less than $20 for a

  7   dance?

  8        A    No.

  9        Q    Do you know of any dancers that accepted

 10   more than $20 for a dance?

 11        A    No.

 12        Q    Did you ever ask any other dancers if they

 13   accepted more than $20?

 14        A    No.

 15        Q    So you don't have any personal knowledge

 16   based on conversations with any particular dancers

 17   about this policy that I just gave you?

 18             MS. REZAZADEH:  Objection; vague and

 19   asked and answered.

 20        A    I just know my managers told me it's $20 a

 21   song, so I assumed since that was my manager telling

 22   me, that that is the set rule and that that's expected

 23   of me, to charge exactly $20.

 24        Q    (By Mr. King) All right.

 25             MS. REZAZADEH:  Can we take a break?

1    Use the bathroom.

2                    MR. KING:  Yeah.  I have no problem

3    with that.

4                    MS. REZAZADEH:  It's been, like, an

5    hour and a half.

6                    MR. KING:  Sure.

7                    (Break.)

8        Q    (By Mr. King) All right, Ms. Kibodeaux.  We

9    just came back from a little break.  Are you ready to

10   proceed?

11       A    Yes.

12       Q    Okay.  And I forgot to ask at the beginning

13   of the deposition, and I don't want you to be offended

14   by it.  This is kind of a standard question.  Are you

15   under the influence of any medications or drugs that

16   might affect your ability to recall events from 2019?

17       A    No.

18       Q    So nothing would impair your memory, right?

19       A    No.

20       Q    As a dancer at Heartbreakers, how would you

21   describe your workload?

22       A    My work what?

23       Q    Your workload.

24       A    My workload?

25       Q    Uh-huh.

1     A     I would describe it as heavy.

2     Q     Why was it heavy?

3     A     Because after I started working there, I

4  started seeing -- or started noticing all -- all the

5  money that they were making off of me and the other

6  dancers.  They started adding on extra fees out of

7  nowhere.  I can give -- a good example of that would

8  be --

9     Q     Well, I -- I guess my question was:  Why was

10  your workload heavy as a dancer?

11          MS. REZAZADEH:  Objection; vague.

12     A     I guess can you clarify what exactly you

13  mean by workload?

14     Q     (By Mr. King) Sure.  We both agree that

15  exotic dancing is -- is work, right?

16     A     Correct.

17     Q     You're dancing for customers, you're

18  chatting with customer, you're performing on stage.

19  People might think otherwise, but it is, in fact, a

20  job --

21     A     Of course.

22     Q     -- right?

23     A     Yes.

24     Q     Of course.  And you were -- and customers

25  would pay you money to do your job, right?

1      A    Yes.

2      Q    And -- and in every job, you're producing

3  something or spending your time doing something and

4  that's your workload.  So sometimes I have tons of

5  things that I have to do and I'm in the office all

6  day.  Other days are slower.  So I'm just trying to

7  figure out what a workload for a dancer looks like

8  based on your experience.

9      A    My workload would be coming into work and

10  spending hours of my shift doing my stage rotations --

11     Q    Uh-huh.

12     A    -- making the money I can make and then

13  having to make sure I also tip out everybody from that

14  money I've made.

15     Q    Right.  But tipping other people isn't part

16  of your workload, right?  Because you're paying other

17  people.  I'm just trying to figure out, you know, you

18  said performing on stage, part of your workload as a

19  dancer?

20     A    Yes.

21     Q    What other -- what other things factored

22  into your workload?

23     A    So performing on stage, performing for the

24  customers, helping the club make money, so they could

25  stay open.

 1      Q      How would you help the club make money?

 2      A      By showing up to work every day, doing my

 3   best, getting customers to drink more.  Basically

 4   helping the whole atmosphere of the club keep going

 5   and keeping the customers coming back.

 6      Q      Did you -- you decided which customers to

 7   perform for on stage --

 8      A      Yes.

 9      Q      -- or off stage, rather?  I'm sorry.

10      A      Off stage, yes.

11      Q      Off stage.  Was that something you took into

12   account in, you know, assessing your workload?

13                  MS. REZAZADEH:  Objection; vague.

14      A      Well, I would go up to every customer, at

15   least say hi.  So really it was, like, a gamble, I

16   guess, of seeing who I really spend time with.

17      Q      (By Mr. King) Because you wanted to find as

18   many customers as possible to perform for, right?

19      A      Yes.

20      Q      Were there ever instances in which you were

21   able to perform for more than one customer at a time?

22      A      What do you mean by that?

23      Q      On the floor -- sorry.  Were there ever

24   instances in which you would have two paying customers

25   who you would perform for at the same time?

1    A    I suppose so, yes, like if a group of people

2    were to come in --

3    Q    Uh-huh.

4    A    -- and if more than one person was

5    interested, then I've had occasions like that.

6    Q    And would each one of those customers pay

7    you for -- for your time?

8    A    Possibly, yes.

9    Q    So did you ever have an occasion in which

10   you would perform, you know, one song and Customer 1

11   and Customer 2 both pay you $20 for that song?

12   A    No.  I would only give a dance to one

13   customer at a time.

14   Q    Got it.  So in what instances would you be

15   paid by, you know, more than one customer at a time?

16   A    If I were to walk up to some people on the

17   floor and, like, say hi and all that stuff, if they

18   decided they wanted to give me a couple dollars each

19   or something, it would be that kind of situation.

20   Q    Okay.  Would you decide how long to perform

21   for each customer?

22   A    How long what?

23   Q    How long you would -- you would decide to

24   perform with each customer.

25   A    It would just depend on how everything was

 1    going or how much they're paying and how they're

 2    paying as well.

 3        Q    What do you -- what do you mean how they

 4    were paying?

 5        A    Because some customers would come in with

 6    cash.

 7        Q    Uh-huh.

 8        A    Other customers would have credit cards that

 9    they would have to use.

10        Q    Yeah.

11        A    And the credit cards would transfer into,

12    like, Heartbreaker funny money, basically, and so

13    every $25 funny-money bill, the club would deduct

14    money from that.

15        Q    Sure.  So your preference was for customers

16    who had cash in hand?

17        A    Yes.

18        Q    And did you ever turn down customers who

19    only had a credit card on them?

20        A    No.

21        Q    Not -- not once?

22        A    No.

23        Q    Did you -- and so you accepted the dance

24    dollars, right?

25        A    Yes.

1    Q    Did anyone ever tell you that you had to

2   accept dance dollars?

3    A    No.  Nobody told me that.  I just accepted

4   it because I had to.

5    Q    Because you had to make money?

6    A    Yes.  I mean, like, I -- I had to accept it,

7   you know, so I could get what I can from that and try

8   to pay my bills.

9    Q    Got it.  So is it fair to say that it was --

10  it was up to you to find consistent work within the

11  club when you were performing off stage?

12            MS. REZAZADEH:  Objection; vague.

13   A    Can you clarify, please?

14   Q    (By Mr. King) Sure.  Earlier we were talking

15  about how no one at the club never gave you like a

16  list of customers that you had to perform for, right?

17   A    Right.

18   Q    It probably would have been nice if they

19  had, right?

20   A    Possibly.

21   Q    Possibly?  Maybe.  It would at least be

22  guaranteed work, though, right?

23            MS. REZAZADEH:  Objection; vague.

24   A    Maybe.

25   Q    (By Mr. King) Maybe?  Okay.  So no one at

1  Heartbreakers helped you find customers to perform

2  for, right?

3          MS. REZAZADEH:  Objection; vague.

4     A    No.  Nobody, like, gave me any guidance.

5  They didn't -- nobody was ever like, "Hey, go talk to

6  this person," or nothing like that.

7     Q    (By Mr. King) Right.  So if -- it was --

8  Heartbreakers left it up to you to find consistent,

9  paying customers in the club, right?  I see your

10  counsel shaking her head.

11          MR. KING:  Do you disagree with me,

12  Counsel?

13          MS. REZAZADEH:  Objection; asked and

14  answered.

15          MR. KING:  Well, I didn't get an

16  answer.

17     Q    (By Mr. King) I'm just trying to find out.

18  I mean, it is what it is.  Was it left up to you to

19  find consistent, paying customers in the club?

20          MS. REZAZADEH:  Objection; vague.

21     A    I suppose so, yes.  I had to go and talk to

22  everybody and see who had money.

23     Q    (By Mr. King) That's all I was asking.

24          Did anyone at Heartbreakers ever limit

25  the amount of time that you could spend with a

1  customer on the floor aside from, you know, if your

2  name gets called for the stage rotation?

3      A    No.

4      Q    So the amount of time that you allocated, as

5  you've been explaining to me, to each customer on the

6  floor was up to you?

7      A    Yes.  To a degree.  Because I'm -- I mean, I

8  was on stage for a lot of my shift.

9      Q    Sure.  Did you ever ask any DJs or managers

10  if you were with a good, paying customer, like, "Hey,

11  I need to skip me"?

12      A    I mean, it would -- I would have to pay

13  them.

14      Q    But did you ever ask?

15      A    Yes.

16      Q    Okay.  And -- and who did you ask?  Can you

17  remember an instance?

18      A    Yes.  I had asked the DJ before so I could

19  keep sitting with a customer --

20      Q    Uh-huh.

21      A    -- a few times.  Yeah, several instances, I

22  did do that.  And then it would also be $20 fees,

23  like, if I wanted to leave early then they would,

24  like, look at the rotation and calculate, like, how

25  many more times on stage I would have been up and they

1    would charge me 20 times for every rotation for

2    leaving early.

3                    MR. KING:  I'll object to the

4    nonresponsive portion.

5        Q    (By Mr. King) I was just asking you if you

6    ever approached a DJ or a manager to say, "Hey, I'm

7    with this customer, skip me."

8                    MS. REZAZADEH:  You asked her if there

9    was a specific instance --

10       Q    (By Mr. King) And I was asking if there's a

11   specific instance that you can recall where they

12   said, "Okay."

13                   And so that's -- can you recall a

14   specific instance in which that happened?

15       A    Yes.

16       Q    Okay.  And did you -- did they say, "Okay.

17   Well, now you have to pay me $20"?

18       A    Yes.

19       Q    And who -- who -- who told that to you?

20       A    The DJ.

21       Q    Okay.  Do you recall the DJ's name?

22       A    All of them.

23       Q    At the same time?

24       A    No.  The -- there were several instances.

25   It didn't matter who the DJ was.  If you're going to

1    skip, you've got to pay that DJ the $20.

2         Q    Right.  And there was no leeway in that for

3    you, right?

4         A    No.

5         Q    Okay.  Do you know if the DJs ever, I don't

6    know, played favorites with some -- some of the

7    dancers?

8         A    I have no idea.

9         Q    You don't know what other dancers'

10   experiences with -- with this system might have been

11   like?

12             MS. REZAZADEH:  Objection; assumes

13   facts in dispute.

14        A    I -- I just knew to pay the DJ the fees and

15   tips if I wanted a pleasant work shift.

16        Q    (By Mr. King) Got it.  Are you aware of

17   whether other -- other performers had this same

18   requirement in place?

19        A    I'm assuming it was required for every

20   single dancer to pay their same fees.

21        Q    And what -- what are you basing your

22   assumption on?

23        A    Well, I -- I -- actually, I take that back.

24   It's not an assumption.  It's like a fact.

25        Q    Where did that fact come from or that

1    knowledge?

2        A    Being told so by the DJ and management, that

3    that's what you're supposed to be doing.

4        Q    Which -- which manager told you this?

5        A    I'm assuming any of them or Whitey or -- it

6    was something that was, like, repetitive.

7        Q    Sure.  And I'm just trying to understand who

8    was communicating this information to you.

9            MS. REZAZADEH:  Objection; asked and

10   answered.

11       A    I mean, basically everybody was relaying

12   that information to me.

13       Q    (By Mr. King) Okay.  Did Carl Arceneaux

14   communicate that information to you?

15           MS. REZAZADEH:  Objection; vague.

16       A    Who is Carl?

17       Q    (By Mr. King) He's -- he's one of the

18   daytime managers.

19       A    I don't know.  I didn't really work daytime.

20       Q    Did Gary Wasek ever communicate this

21   information to you?

22           MS. REZAZADEH:  Objection; vague.

23       A    Yes.

24       Q    (By Mr. King) Okay.  Can you kind of set

25   the scene for me and explain what he told you?

```
 1        A    I mean, not really, no.

 2        Q    What about Whitey?  Can you remember an

 3   instance where he said, "Hey, you've got to" --

 4   "You've got to go pay your stage fee"?

 5        A    Well, they were always watching and always

 6   on it.  So they would know and, like, check in with

 7   the DJ to make sure I paid my fee or I -- I couldn't

 8   leave without paying my fee.  You know, I would have

 9   to wait for a slip.  So everybody would have to

10   approve of that slip before I could go.

11        Q    Right.  I just want to make sure we're on

12   the same page.  I'm not -- I'm not talking about

13   leaving the club.  I'm just talking about saying,

14   "Hey, I'm with a customer, I don't want to get up on

15   stage right now," and having some manager tell you,

16   "Okay.  Well, you need to pay the DJ"?

17        A    Yes.  I would be told that at least at the

18   end of the night.  Like, "Hey, did you pay the DJ?"

19        Q    Okay.  Is exotic dancing the type of work

20   that would allow you to hire any help?

21             MS. REZAZADEH:  Objection; vague.

22        A    I'm sorry.  Can you repeat that question?

23        Q    (By Mr. King) Sure.  Is -- as an exotic

24   dancer at Heartbreakers, was there any way for you to

25   hire any helpers?
```

```
 1        A     Hire any helpers?

 2        Q     Uh-huh.

 3        A     Helpers for what?

 4        Q     To provide your entertainment services.

 5        A     No.

 6        Q     You can't really farm out your exotic

 7   dancing to somebody else, right?

 8              MS. REZAZADEH:  Objection; vague.

 9        A     I just know I'm responsible for my own -- my

10   own self and my own entertainment services for the

11   club.

12        Q     (By Mr. King) Okay.  Did you ever have --

13   have like a fellow dancer who you would partner up

14   with to perform for a customer?

15        A     On occasion, yes.

16        Q     How did that work?

17              MS. REZAZADEH:  Objection; vague, calls

18   for a narrative.

19        A     We would just go up to a group of people

20   together and talk to them.

21        Q     (By Mr. King) All right.  Would you both

22   provide lap dances for these groups of people at the

23   same time?

24        A     Every once in a while, yes.

25        Q     And did you ever split the money that those
```

1   customers paid with, you know, another dancer who you

2   were performing with?

3               MS. REZAZADEH:   Objection; incomplete

4   hypothetical.

5       A    Well, we would each be given separately

6   our -- what we were supposed to be paid by the

7   customer.

8       Q    (By Mr. King) Okay.  So there was never an

9   occasion in which you would perform for a customer or

10  a group of customers with another dancer and they

11  would just give both of you like a lump sum?

12      A    No.  We would be like -- if I -- if me and

13  somebody danced for somebody, well, then we each get a

14  $20 for that dance.

15      Q    Okay.  What about just hanging out with the

16  customer?

17      A    No.

18      Q    Never -- never tag-teamed it with another

19  dancer?

20      A    No.

21      Q    Did you ever perform on stage with another

22  dancer?

23      A    No.

24      Q    Did you ever try?

25      A    That's not allowed there.

1      Q    It was not allowed?

2      A    No.  I would get fired.

3      Q    And who told you that?

4      A    The management.

5      Q    Which -- which manager?

6      A    Whitey, I assume.

7      Q    Do you recall when Whitey told you that?

8      A    I do not recall, like, a specific date or

9  anything --

10     Q    Uh-huh.

11     A    -- but I do know that I was curious if that

12  was allowed or not and I was told it's not allowed.

13     Q    So you recall a time when you asked Whitey,

14  "Hey, can I perform with another dancer on stage?"

15     A    Yes.

16     Q    Do you know if that was Whitey's rule or if

17  other managers saw it differently?

18     A    It was the club -- the whole club's rule.

19     Q    Did you ever ask any other managers about

20  that?

21     A    No.

22     Q    So you don't know one way or the other if

23  another manager would have permitted that?

24     A    I'm very sure they wouldn't permit that.

25     Q    Okay.  Is that because of something Whitey

1    told you?

2        A    Well, I know -- I mean, if Whitey says it,

3    then it's basically like written in stone.

4        Q    Why is that?

5        A    Because he's very in charge of a lot of

6    things.

7        Q    Like what sort of stuff?

8        A    I mean, I believe he's, like, even a -- a

9    co-owner, I think, or something of the club.  But

10   either way, I knew he was kind of like the head

11   manager, so -- even the other managers would listen to

12   him.

13       Q    Did anyone at Heartbreakers train you how to

14   dance?

15       A    No.

16       Q    And as you said, no one at Heartbreakers

17   trained you how to interact with customers either,

18   right?

19       A    Correct.

20       Q    So since no one told you how to dance,

21   did -- or train you how to dance, rather, was the

22   manner in which you performed as a dancer left up to

23   you?

24       A    In some ways, yes.

25       Q    Okay.  In what ways?

1      A     Like the style that I dance.

2      Q     Uh-huh.

3      A     But I would have to make sure that I was in

4   an outfit that they liked or approved of and I

5   couldn't dance onstage with anybody else.  Just the

6   style of dancing is what I controlled.

7      Q     Does -- is -- does exotic dancing require

8   any skill?

9      A     Not really.

10      Q     What about just being a performer?  Because

11   it's more than just dancing, right?

12      A     Correct.

13      Q     We've talked a lot about how it's also a lot

14   of social interaction.  Does that require any skill?

15      A     Not really, no.

16      Q     So you would tell somebody if they're asking

17   about your job that it doesn't require any skill,

18   right?

19      A     Pretty much, yes.

20      Q     Can anyone just become an exotic dancer?

21      A     Yes.

22      Q     I'm going to send you an exhibit.  Let me

23   see.  I'll give your counsel an opportunity to review

24   it.

25                  MR. KING:  Let me know when you've had

 1    a chance to review it.

 2                      MS. REZAZADEH:  I mean, have you -- why

 3    haven't you produced this in discovery?  It's kind of

 4    blindsiding her -- or blindsiding us, something that

 5    is discoverable and responsive, I'm pretty sure.

 6                      MR. KING:  Well, I'm pretty sure I

 7    asked for it in our document request, but it wasn't

 8    in, right?

 9                      All right.  Let's -- can we mark this

10    as Exhibit 2?

11                      (Marked was Kibodeaux Exhibit No. 2.)

12        Q     (By Mr. King) Okay.  Do you recognize this

13    posting, Ms. Kibodeaux?

14        A     What?

15        Q     Do you -- do you recognize this Facebook

16    post?

17        A     What post?

18        Q     Are you not able to see it?

19        A     I don't see anything.

20        Q     Oh, I'm sorry.

21                      Can you see that?

22        A     Uh-huh.

23        Q     Okay.  Is -- is this a Facebook post that

24    you wrote?

25        A     Yes.

```
 1        Q     Okay.  And this Facebook post appears on --

 2   on your Facebook page, right?

 3        A     Yes.

 4        Q     All right.  Does it appear to be altered in

 5   any way, the text at the top?

 6        A     No.

 7        Q     You write that, "No one wants to give you

 8   their hard-earned money unless you are worth the

 9   investment."

10              Are you talking about dance -- dance

11   customers?

12              MS. REZAZADEH:  Objection; vague.

13        A     I was mostly talking about sugar babies.

14        Q     (By Mr. King) What's a sugar baby?

15        A     What do you mean?

16        Q     I don't know.  What's a sugar baby?  I

17   always thought it was like a flying squirrel.  Or is

18   that a sugar glider?

19        A     A sugar baby is somebody who hangs out with

20   older men usually and is paid, et cetera, but not

21   dancing.

22        Q     Okay.  So in this post, are you addressing

23   any aspect of your work as an exotic dancer?

24        A     It -- it's basically just saying like if

25   you're in the industry, you just have to do your part.
```

```
 1    But I mean, it's not really, like, hard or

 2    challenging.

 3         Q    But if you're -- if you're -- if you're

 4    dancing, camming, or sugaring, you have to look the

 5    part, right?

 6         A    Yeah.

 7         Q    And you've got to play the part too, right?

 8              MS. REZAZADEH:  Objection; vague.

 9         Q    (By Mr. King) What -- what do you mean by

10    "play the part"?

11         A    Like do your job.

12         Q    In what ways?

13         A    Like if you're dancing, then you're supposed

14    to show up to work with your makeup on and talk to

15    customers.

16         Q    How do you show customers that you are worth

17    the investment?

18         A    By being a good dancer.

19         Q    Anything else?

20         A    No.

21         Q    Are some dancers not good dancers?

22         A    What?

23         Q    Are some dancers not good dancers?

24         A    I don't know.

25         Q    Are some dancers not worth the investment?
```

1    Some customers.

2         A    Possibly.

3         Q    Do you know of any?

4         A    No.

5         Q    Did you ever see any at Heartbreakers?

6         A    Not that I can really think of.

7         Q    Did you ever have an experience where

8    somebody didn't want to give you their hard-earned

9    money because you didn't do your job --

10               MS. REZAZADEH:  Objection; vague.

11        Q    (By Mr. King) -- at Heartbreakers?

12        A    What exactly do you mean?

13        Q    Well, I'm just trying to figure kind of what

14   the -- you know, where your thoughts in this post are

15   coming from.

16        A    I -- I honestly don't know.  That was a long

17   time ago.  I don't know what exactly...

18        Q    You say that, "Don't make this industry

19   cloudy."

20               Which industry are you referring to?

21        A    The sugar baby industry.

22        Q    The -- and the sugar babies are the --

23   again, correct me if I'm wrong, hang out with older

24   men who pay them for their time?

25        A    Sometimes, yes.

1        Q     Would you -- would you consider yourself as

2    a dancer a sugar baby at all?

3        A     No.

4        Q     Okay.  Are you -- so you're not part of the

5    sugar baby industry?

6        A     No.

7        Q     Okay.  What do you mean by, "You need to go

8    to Walmart"?

9        A     I don't know.

10       Q     You wrote it.

11       A     I did write it, but I mean, I don't -- that

12   was a long time ago.  Like...

13       Q     I'm not trying to -- look, I'm really not

14   trying to embarrass you.  I'm just trying to

15   understand what you're writing here.

16       A     I mean, I -- I'm being honest.  Like, I

17   really don't know.  I -- I've put all kind of -- I

18   don't know.

19       Q     I get it.  I've got Facebook posts that go

20   back 12 years where I -- if I look at them, I go I

21   can't believe I wrote that.  I understand.  Trust me.

22             Are you saying in this post that if

23   you're not willing to put in the work as a dancer, you

24   need to go get a job at a place like Walmart,

25   basically?

```
 1              MS. REZAZADEH:  Objection; asked and

 2     answered.

 3         A    I'm really just saying, like, don't scam

 4     people.

 5         Q    (By Mr. King) Do dancers scam people?

 6         A    I don't know.  All kinds of people scam

 7     people.

 8         Q    Have you ever scammed anybody?

 9         A    No.

10         Q    Good.  "Being kind of pretty doesn't get you

11     a whole lot."  What do you mean by that?

12         A    Like, looks aren't everything.

13         Q    For -- for a dancer, your appearance isn't

14     the end-all be-all as far as making money, right?

15         A    It plays a part in it.

16         Q    Sure.  I mean, you would be naive to say

17     that exotic dancing isn't an appearance-based job,

18     right?

19         A    Right.

20         Q    You attract men based on your physical

21     appearance, true?

22         A    True.

23         Q    There are -- but there are other things

24     about yourself that you can use to attract customers,

25     right?
```

1        A     Correct.

2        Q     What are those things?

3        A     Your personality.

4        Q     What else?

5        A     How you work.

6        Q     What do you mean "how you work"?

7        A     Like show up to work ready to work.

8        Q     Not just sitting around, right?

9        A     Right.

10        Q     You're not going to make any money if you

11   just sit around as a dancer, right?

12        A     Right.

13        Q     And you're not going to make very much money

14   as a dancer if your appearance is totally off-key,

15   right?

16        A     Sometimes.

17        Q     Sometimes?

18        A     Yeah.

19        Q     Is that often?

20        A     I mean, I've seen dancers look all kinds of

21   ways and still make money.

22        Q     At Heartbreakers?

23        A     Yeah.

24        Q     Okay.  Do you think that exotic dancing is a

25   good way to make money?

```
 1        A    I mean, yes.  It can be.

 2        Q    Do you have any business ventures aside from

 3   exotic dancing?

 4        A    Do I have any what?

 5        Q    Business ventures.  And I'm referring to

 6   this sentence where you say, "Do you want money for a

 7   McDouble or money for your career and business?"

 8        A    Like spend your money wisely.

 9        Q    Right.  You want to reinvest in yourself,

10   true?

11        A    True.

12        Q    How -- have you invested any of the money

13   that you've made as a dancer at Heartbreakers back

14   into yourself in any way?

15             MS. REZAZADEH:  Objection; assumes

16   facts not in evidence, calls for speculation.

17        A    Yes.  I spend a lot of money investing in

18   myself to work.

19        Q    (By Mr. King) In what ways?

20        A    Like hair, makeup, exercise, fitness,

21   dancewear.

22        Q    During your time at Heartbreakers, do you

23   have a ballpark idea of how much money you spent on

24   the items you've just summarized?

25        A    I mean, like, several hundred.
```

**EXHIBIT A**

Case 3:20-cv-00008   Document 82-1   Filed on 05/21/21 in TXSD   Page 91 of 186

Deposition of Stacey Kibodeaux
Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

```
 1        Q     Several hundred dollars?

 2        A     Yeah.  If not more.

 3        Q     If not more?  More than a thousand?

 4              MS. REZAZADEH:  Objection; calls for

 5   speculation, calculation, incomplete hypothetical.

 6        A     I have no idea.

 7        Q     (By Mr. King) And earlier you told me you

 8   don't have any records of how much you might have

 9   spent on the investments that we're talking about

10   right now, right?

11              MS. REZAZADEH:  Objection; misquoting

12   the deponent.

13        Q     (By Mr. King) Correct me if I'm wrong.  I

14   can't remember -- I honestly can't remember if I

15   asked you that question.

16        A     Can you repeat it, please?

17        Q     Sure.  Do you have any records of how much

18   money you invested in things like attire, makeup,

19   beauty regimen, gym memberships?  Did you ever tally

20   that up?

21              MS. REZAZADEH:  Objection; vague.

22        A     No.

23        Q     (By Mr. King) Okay.  No?

24        A     (Moving head from side to side.)

25        Q     How much -- how much do things like the big
```

Case 3:20-cv-00008   Document 82-1   Filed on 05/21/21 in TXSD   Page 92 of 186

**EXHIBIT A**

Deposition of Stacey Kibodeaux                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

 1   high heels cost?

 2        A    At least 100.

 3        Q    At least 100?  All right.  How much does

 4   your makeup run a month?

 5        A    Like -- I really -- I don't know.  I don't

 6   have an idea.

 7        Q    You have no idea?

 8        A    I just know it's a lot.

 9        Q    Okay.  Do you know about what other dancers

10   paid for their attire, makeup, beauty regimens, what

11   they paid?

12              MS. REZAZADEH:  Objection; calls for

13   speculation.

14        A    I truly have no idea.  It's probably a lot

15   and around the amount I spend, I'm sure.

16        Q    (By Mr. King) We just -- we would have to

17   go and ask those other dancers, right?

18        A    Huh?

19        Q    We would have to go and ask those other

20   dancers about their -- their investments, right?

21        A    Right.  There's no way for me to know.

22        Q    Let me see.  Here we go.  All right.  I'm

23   going to send you some of the photographs that you

24   have produced.

25              MR. KING:  Can we mark this one as

```
 1    Exhibit 3?

 2                    (Marked was Kibodeaux Exhibit No. 3.)

 3         Q     (By Mr. King) Okay.  And this is -- this is

 4    documents labeled Kibodeaux 009, 10, 12, 13, 14, 17,

 5    18, 19, 20, 21.

 6                    Ms. Kibodeaux, are -- do you have

 7    access to the file that I just dropped in here?

 8         A     Is it in the little chat?

 9         Q     Yeah.

10         A     Yes, but I -- I can't see it and it's not my

11    computer, so I don't know --

12         Q     Okay.  I'll help you out.

13                    All right.  Can you see my screen?

14         A     Yes.

15         Q     Okay.  I'll scroll through them so you have

16    an opportunity to see what I'm talking about, okay?

17         A     Right.

18         Q     Do you recognize these pictures?

19         A     Yeah.

20         Q     Are these pictures that you took?

21         A     Yes.

22         Q     The first picture is a pile of cash.  Was

23    this taken at Heartbreakers?

24         A     Yes.  In the dressing room.

25         Q     Okay.  Is this your money?
```

1     A     Yes.

2     Q     Did you earn that money by performing on

3  stage?

4     A     Yes.  It looks like it.

5     Q     You have a 20 there, right?

6     A     Uh-huh.  Yes.

7     Q     Okay.  And you've got some of the dance

8  dollars, right?

9     A     Right.

10    Q     For the $1 dance dollars, did the club take

11 any portion out of that if you redeemed it?

12    A     If it exceeded a certain amount, then they

13 would start deducting.

14    Q     What was that amount?

15    A     I believe, like, once you hit 25, they

16 start, like, taking -- taking some of it.

17    Q     Do dancers ever trade dance dollars with

18 each other?

19    A     I think some did, but I'm not -- I don't

20 really know.

21    Q     Sure.  Did you ever tip a waitress with

22 dance dollars?

23    A     No.

24    Q     All right.  You kept all the dance dollars

25 you got and traded them in, true?

1      A      True.

2      Q      Okay.  Is this pile of cash kind of the --

3  an average amount that you would make for a stage

4  performance?

5                  MS. REZAZADEH:  Objection; calls for

6  speculation.

7      A      I mean, no, not really.

8      Q      (By Mr. King) Is it a smaller number?

9      A      I don't remember -- I don't remember, like,

10  what exactly that pile is from.  It looks like it was

11  from stage money, but it wasn't always like that, you

12  know...

13      Q      It could have been smaller?

14      A      Uh-huh.  Yes.

15      Q      It could have been more?

16      A      Yes.

17      Q      Okay.  So this is not necessarily a

18  representative of what -- what kind of sums you would

19  get after a stage routine, right?

20      A      Right.

21      Q      Okay.  Next picture is -- are some bundles

22  of fifties, $50.

23      A      Yes.

24      Q      Okay.  And you took this picture as well?

25      A      Yes.

1    Q    Was this in the club?

2    A    Yes.

3    Q    Were -- is that your money?

4    A    Yes.

5    Q    Who gave you that money?

6    A    I believe that was from one customer for

7  giving dances.

8    Q    That's a pretty good haul.

9    A    Huh?

10   Q    I said that's a pretty good haul.

11   A    Oh, yes.

12   Q    How many dances did you have to give for it?

13  I don't know.  It looks like at least $200.

14   A    Something like that, I'm sure.

15   Q    Maybe you didn't hear my question.  How many

16  dances did you have to give for, it looks like, a

17  minimum of $200?

18   A    Oh, I don't know the math for that, but it's

19  $20 a song.  We might have gone to VIP.

20   Q    In the VIP were dances $20?

21   A    Yes.

22   Q    And you say that that's a club rule, right?

23  It also applied in the VIP area?

24   A    Yes.

25   Q    Okay.  Do you -- do you recall actually

1    taking this picture and the circumstances behind it?

2        A    No.

3        Q    No?  So you can't say one way or the other

4    what you actually got paid over $200 for?

5        A    No, but I mean, like, I know it was for,

6    like, dancing.

7        Q    Sure.  And you don't recall how many dances

8    you actually performed for this sum of money?

9        A    Correct.  Correct.

10       Q    Do you recall if it was, like, at least 10

11   dances?

12                MS. REZAZADEH:  Objection; asked and

13   answered.

14       A    It is probably something around that.

15       Q    (By Mr. King) It could have been more,

16   could have been less?

17       A    Possibly, yes.

18       Q    Next picture, this is Kibodeaux 12.  That is

19   you depicted in this picture, true?

20       A    Yes.

21       Q    And who took the picture?

22       A    My old friend at that club did.

23       Q    Who was your old friend?

24       A    She danced by Krystal.

25       Q    Is her -- is her name Leah Christine Hughes?

```
 1        A    Yes.  I think.

 2        Q    Is this blonde woman here your friend?

 3        A    Yes.

 4        Q    Who goes by Krystal?

 5        A    Yes.

 6        Q    Obviously this picture was not taken in

 7   1998, right?

 8        A    Right.

 9        Q    Okay.  I just wanted to make sure you don't

10   have a time machine or anything.

11             Did anyone at the club tell you you

12   can't wear black lipstick?

13        A    I was allowed to wear black lipstick.

14        Q    Did anyone at the club ever tell you you

15   can't wear fishnets?

16        A    No.  They told me that I couldn't wear other

17   things, though.

18        Q    But not fishnets, right?

19        A    I could wear fishnets.

20        Q    Did anyone at the club ever tell you that

21   you couldn't have plug-style earrings, it looks like?

22        A    That was allowed.

23        Q    Those are plugs, right?

24        A    Yes.

25        Q    Okay.  Did anyone at the club ever tell you
```

```
 1   that you can't have kind of the long -- I don't know

 2   what they're called -- glued on fingernails, acrylic?

 3        A    Those were allowed.

 4        Q    In this photograph are you -- is any part of

 5   your appearance disallowed by the club?

 6        A    Not in this picture.

 7        Q    Okay.  What about your makeup?  Did anyone

 8   have a problem with your makeup?

 9        A    No.  Because I always came to work with my

10   makeup done.

11        Q    Right.  What about your -- the -- the fake

12   eyelashes?  Did anyone have a problem with those?

13        A    No.

14        Q    So I just want to make sure.  There's

15   nothing in this photo that's breaking any rules that

16   you're aware of at the club?

17        A    No.  It's just a picture of me.

18        Q    Got it.  Next photo is -- that's you on the

19   left and Krystal on the right, correct?

20        A    Correct.

21        Q    Okay.  And this is Kibodeaux 13.  Where is

22   this picture taken?

23        A    Somewhere in the dressing room.

24        Q    At Heartbreakers, right?

25        A    Yes.
```

1   Q    Okay.  Were -- did the club have any rules

2   about not taking photographs in the dressing room?

3   A    Yes.

4   Q    What kind of rules?

5   A    We were not supposed to take any -- we were

6   not supposed to take any pictures at work, I don't

7   think.

8   Q    But you did, right?

9   A    Yes.

10   Q    Okay.  Did anyone -- did Whitey come and

11   tell you don't do that after this picture was taken?

12   A    No, not that time, but he -- I had seen him

13   get on to a lot of girls before and he had gotten on

14   to me before too.

15   Q    Do you recall about when this picture was

16   taken, by any chance?

17   A    I know I was 20 because I have a wristband

18   on that says I can't drink.  So around that time.

19   Q    Your birthday is in July, right?

20   A    August.

21   Q    August.  So can you give me a time frame for

22   when this picture might have been taken?

23                MS. REZAZADEH:  Objection; asked and

24   answered.

25   A    Like two or so years ago.

```
 1        Q    (By Mr. King) Do you still have this

 2   picture on your phone?

 3        A    No.  That was a completely different phone.

 4        Q    It was a completely different phone?  How

 5   long after you started working at Heartbreakers in

 6   January 2019 do you think this picture might have been

 7   taken?

 8                  MS. REZAZADEH:  Objection; asked and

 9   answered.

10        A    I have no idea.

11        Q    (By Mr. King) Okay.  You've got it looks

12   like a different hairstyle going on in this picture

13   versus the one on Kibodeaux 12.  Did you change your

14   hair whenever you showed up?

15        A    It just kind of looks short in that picture,

16   but it's the same hair.

17        Q    Oh, okay.  Your friend is wearing it looks

18   like knee-high boots/high heels.  Is she breaking any

19   rules at the club?

20        A    No.  She was in dress code.

21        Q    Okay.  Is your attire on Kibodeaux 13 in

22   violation of any -- any rules or restrictions?

23        A    No, not this outfit.

24        Q    Okay.  Kibodeaux 14, it's a photo captioned,

25   "My BFF at the club."
```

```
 1                        Is that also Krystal?

 2        A    Yes.

 3        Q    Were there any restrictions about taking

 4   selfies on the floor?

 5        A    Yes.  It was just -- like, we weren't

 6   supposed to take pictures at all, so...

 7        Q    But you did, right?

 8        A    Yes.

 9        Q    Okay.  Were you worried about any

10   repercussions after taking this photograph?

11        A    I don't think so.  I didn't really know that

12   we weren't allowed to take pictures on the floor until

13   later on.

14        Q    Do you know about when this picture was

15   taken?

16        A    I have no idea.

17        Q    So at this time are you saying whenever this

18   picture was taken, you weren't aware of the -- any

19   policies against taking selfies on the floor?

20        A    Right.  Because I stopped taking selfies on

21   the floor after I had gotten on to and after I had

22   seen him get on to other girls.

23        Q    Okay.  On Kibodeaux 17, that is you also

24   taking a -- I presume you took this as a selfie,

25   right?
```

1      A     Yes.

2      Q     Okay.  And this was taken in the

3  Heartbreakers dressing room?

4      A     Yes.

5      Q     Okay.  And here you have -- I don't know.

6  Are -- do you have extensions in?

7      A     Yes.

8      Q     Did anyone have a problem with putting on

9  extensions?

10     A     No.

11     Q     Or wearing bangs?

12     A     No.

13     Q     Did anyone have any issue with the manner in

14 which you did your makeup in this photograph?

15     A     No.

16     Q     No one cared about your nail polish choices

17 either?

18     A     No.

19     Q     Okay.  Kibodeaux 18, this is another selfie

20 taken in the Heartbreakers dressing room, true?

21     A     Yes.

22     Q     Okay.  Do you recall about when you took

23 this photograph?

24     A     Maybe not.

25     Q     Do you have any kind of time context for it?

```
 1              MS. REZAZADEH:  Objection; asked and

 2    answered.

 3        A    Yeah.  I really can't -- I can't tell you

 4    when I took it.

 5        Q    (By Mr. King) So it could have been when you

 6    first started at Heartbreakers in January 2019 or it

 7    could have been after that?

 8        A    Well, it would have been after that.

 9        Q    Sure.  That was a stupid question.  It was

10    at some point in 2019, you just can't say when?

11        A    Correct.

12        Q    Why -- why did you -- do you recall why you

13    felt moved to take this selfie?

14        A    I felt cute.

15        Q    Okay.  Fair enough.  Do you know if this was

16    at the beginning or end of your shift?

17        A    This was at the end of my shift, I'm pretty

18    sure.

19        Q    Okay.  Because you've got a black T-shirt

20    on?

21        A    Right.

22        Q    So you're getting ready to go take off, go

23    home in this picture?

24        A    Yes.  That's what I think.

25        Q    So did you -- you took this picture because
```

**EXHIBIT A**

Case 3:20-cv-00008   Document 82-1   Filed on 05/21/21 in TXSD   Page 105 of 186
Deposition of Stacey Kibodeaux                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

1   you were feeling good about yourself, not because of

2   the sign, right?

3        A    Right.

4        Q    Okay.  Do dancers leave the locker room a

5   mess ever?

6        A    All the time.

7        Q    All the time?  What do they do?  Just throw

8   their garbage all over the place?

9        A    Yes.

10       Q    Kibodeaux 19, do you recognize this?

11       A    Yes.

12       Q    What is it?

13       A    It is a picture of me and Krystal from her

14  Instagram.

15       Q    Did you take a screenshot of this on your

16  phone?

17       A    Yes.  It looks like I took a screenshot of

18  that.

19       Q    Okay.  And is her username on Instagram,

20  krybaby97?

21       A    I think so, but I am not really sure.

22       Q    And at the bottom here, it -- it looks cut

23  off, but I think that's your username, blunted

24  illusion, right?

25       A    Yes.

1    Q    Okay.  Just wanted to make sure.

2              Do you recall when -- what time is

3    depicted in this photograph?

4    A    I don't know.

5    Q    Do you remember when Krystal took this

6    selfie image, is probably a better way of putting it?

7    A    I don't.  I only know that I -- I see I'm

8    wearing the under 21 wristband.  That's it.

9    Q    Okay.  Was this selfie taken in the locker

10   room at Heartbreakers?

11   A    Yes.

12   Q    Are -- is any part of your attire in

13   violation of any Heartbreakers' rules?

14   A    No, not in this picture.

15   Q    No one cared if you wore a green top, right?

16   A    Correct.

17   Q    No one cared if you had red lipstick on that

18   night, right?

19   A    Right.

20   Q    Kibodeaux 20 is another selfie.  This is

21   also taken in the Heartbreakers locker room, true?

22   A    Yes.

23   Q    Is there anything about your outfit here

24   that violated Heartbreakers' rules?

25   A    No.

 1      Q    Okay.  What was that?  So we've looked at a

 2  lot of different outfits.  How much do each one of

 3  these out fifties cost on average?

 4      A    At least $40.

 5      Q    At least 40 bucks?  Sometimes more?

 6      A    Yes.

 7      Q    Any time less?

 8      A    No.

 9      Q    Okay.  How many outfits did you buy during

10  your time at Heartbreakers?

11      A    I bought a lot of outfits.

12      Q    Do you have a ballpark?

13      A    Probably, like, at least 20, but...

14      Q    All right.  Let me see.  I'm going to drop

15  another exhibit in here.  This has been marked as

16  Exhibit 4.

17              (Marked was Kibodeaux Exhibit No. 4.)

18      Q    (By Mr. King) I'm going to share my screen

19  with you.  Is Leah -- Leah Christine, that was your

20  friend Krystal, right?

21      A    Yeah.

22      Q    Pardon?

23      A    Yes.

24      Q    Okay.  And this is a post from her Facebook

25  page, right, it appears?

```
 1        A     Yes.

 2        Q     Okay.  And she writes, "Pole dancing is pure

 3   focus, balance, and never-ending practice.  Always

 4   room for improvement."

 5              Do you agree with that statement?

 6        A     Sure.

 7        Q     Did you ever do anything to practice pole

 8   dancing?

 9        A     I just went to work all the time.

10        Q     Yeah, but it's unskilled work, though,

11   right?

12        A     I mean, yes.  Anybody could do it.

13        Q     Sure.  Have you kept in touch with Leah?

14        A     Not really, no.

15        Q     Have you asked her to join this lawsuit?

16        A     Have I asked her what?

17        Q     If she wants to join this lawsuit?

18        A     No.

19        Q     Okay.  We'll go to your Exhibit 5.  It's a

20   video clip.

21              (Marked was Kibodeaux Exhibit No. 5.)

22              MS. REZAZADEH:  Is this one we produced

23   or a different one?

24              MR. KING:  It's one y'all produced.

25              MS. REZAZADEH:  Okay.  Thank you.
```

1    Q    (By Mr. King) Are you able to access that

2  file, Ms. Kibodeaux?

3    A    I would have to download it onto this

4  laptop.

5    Q    All right.  Then I'll share my screen with

6  you.

7    A    Okay.

8    Q    Are you able to see my screen?

9    A    Yes.

10    Q    Okay.  And this is a video marked Kibodeaux

11  90.

12            MS. REZAZADEH:  You can use it.  You

13  can go ahead and use it.

14    Q    (By Mr. King) Is -- is that you depicted in

15  this video?

16    A    Yes.

17    Q    And is that Leah?

18    A    Yes.

19    Q    Did you take this video or did she?

20    A    I can't tell.

21    Q    Do you know when this video was taken?

22    A    No.

23    Q    Did anyone get on -- get on to you for

24  taking this video?

25    A    I don't think so.

1    Q    Did y'all like to hang out and take selfies

2    with each other?

3              MS. REZAZADEH:  Objection; leading.

4    A    What?

5    Q    (By Mr. King) Did y'all like to hang out

6    and take selfies with each other?

7    A    Sometimes, if it was slow.

8    Q    Sure.  Did anyone with the club ever tell

9    you what days of the week you had to work?

10   A    No.  They never told me what days of the

11   week to work.  They only told me, you know, if I have

12   to stay.

13   Q    Did anyone ever tell you what days of the

14   week you could not work?

15   A    No.

16   Q    Did anyone ever tell you what hours of the

17   day you were not allowed to work?

18   A    I -- I mean, I think, actually, after a

19   certain time you couldn't come in.

20   Q    Like if the place was closed, right?

21   A    Well, no.  Before it closed.

22   Q    Oh.  What time was that?

23   A    I want to say, like, if -- if it was

24   midnight, it was too late for you to come in.

25   Q    Did you ever too try to go in after

1    midnight?

2        A    No.

3        Q    Where did you get that understanding from?

4        A    I want to say it said something like that on

5    the tip-out paper, but...

6        Q    Did anyone ever tell you that verbally?

7        A    Not that I recall.

8        Q    Did anyone at Heartbreakers ever give you a

9    written schedule?

10       A    No.  It was never a written schedule.  Just

11   make sure you stay those hours.

12       Q    Just make sure you stay those hours?

13       A    Like just make sure, like, when you come in,

14   you've got to stay at least eight hours, six to eight

15   hours.

16       Q    Six to eight hours?

17       A    Yes.

18       Q    What would happen if you didn't stay six to

19   eight hours?

20       A    You would get fired.

21       Q    Did you ever try to leave before six to

22   eight hours were up?

23       A    Yes.

24       Q    Okay.  Did you get fired?

25       A    Well, no, because I paid.  I would have to

```
 1   pay like -- I remember before at least paying, like,

 2   $40 before to try to leave, like, an hour early.

 3        Q    Was somebody blocking the doors saying

 4   you're not leaving unless you pay 40 bucks?

 5        A    No, nobody was blocking the door, but I

 6   mean, like, if I were to just walk out, then I would

 7   be terminated and lose my job.

 8        Q    Do you know anybody who that happened to?

 9        A    Yeah.  I don't know their name, but I know

10   one girl walked out and she wasn't allowed to come

11   back in.

12        Q    How did you come to learn that information?

13        A    People were talking about it.

14        Q    Do you remember any of the people who were

15   talking about it?

16        A    No.

17        Q    No?  Do you know if it was other dancers?

18        A    Yes.

19        Q    Did you ever work doubles?

20        A    No, I did not work doubles.

21        Q    Could you -- could you have worked doubles

22   if you wanted to?

23        A    I could have worked doubles if I wanted to,

24   but then I would have to pay them double the tip-out

25   and I didn't want to do that.
```

1    Q    So you made the assessment that working a

2    double and paying two house fees was not worth it,

3    right?

4    A    Right.

5    Q    Did you ever have to ask anyone for

6    permission to, I don't know, take a vacation or

7    anything?

8    A    No.

9    Q    Did Heartbreakers require you to work in the

10   VIP area?

11   A    What exactly do you mean?

12   Q    Did anyone ever command you to go perform in

13   the VIP area?

14   A    No, but it was, like, expected.  So, you

15   know, you'd work back there if somebody wanted you

16   back there.

17   Q    If somebody wanted you back there, it was

18   expected?

19   A    I'm assuming, yes.

20   Q    Expected by who?

21   A    Like by the management if somebody wants to

22   go to VIP.

23   Q    Did anyone ever tell you that?

24   A    No.

25   Q    What about the booth area?  Did anyone --

Deposition of Stacey Kibodeaux           Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

 1   anyone ever say you need to go perform for the

 2   customers in the booth area?

 3        A    No, but that was really one of the only ways

 4   to make money.

 5        Q    Was the booth -- performing entertainment in

 6   the booth area was a way to make more money?

 7        A    Yes.  And it was always being watched.

 8        Q    Sure.  Why was it a way to make more money?

 9        A    Because dances are $20.

10        Q    Those were $20 on the floor too, right?

11        A    Yes.

12        Q    So how is performing in the booth area a way

13   to make more money?  I guess I'm confused.

14        A    So the booths are on the floor.

15        Q    Uh-huh.

16        A    But they're more in the back.

17        Q    Yeah.

18        A    And they started charging us $20 to use

19   those booths.  But of course those are the booths that

20   we had always used to be giving dances.  So that's

21   pretty much where all -- everybody went to give

22   dances.

23        Q    So it sounds like you're telling me that

24   working in the booth area was a good way to lose money

25   if the club charged you $20.  Is that true?

1    A    I mean, that was really the only area you

2    could give dances.

3    Q    You couldn't give dances on the floor?

4    A    I mean, not really, nobody -- like none of

5    the -- nobody wanted that.

6    Q    Customers didn't want table dances on the

7    floor area?

8    A    No.  They all preferred the booths because

9    that's how it had always been.

10    Q    What about the VIP area?  Was that a good

11    place to make money?

12    A    It could be.

13    Q    Would it depend on the customer?

14    A    It would, yes, depend on the customer.  I

15    didn't really like using the VIP very much, though.

16    Q    That's fine.  Can we take a five-minute

17    break?  I've got to do something real quick.

18    A    Yes.

19            (Break.)

20    Q    (By Mr. King) I was telling you,

21    Ms. Kibodeaux, I'm not going to keep you here all

22    day.  I'm getting near the end.

23            MR. KING:  Let's mark this license

24    agreement as Exhibit 6.

25            (Marked was Kibodeaux Exhibit No. 6.)

```
 1      Q      (By Mr. King) All right.  Can you see my

 2   screen, ma'am?

 3      A      Yes.

 4      Q      Okay.  Have you ever seen this document

 5   before?

 6      A      Yes, I have.

 7      Q      And this is a document labeled

 8   Heartbreakers 6 through 10.  Is this the document you

 9   signed before you started performing at Heartbreakers?

10      A      No, because that's not my handwriting.

11      Q      This isn't -- this isn't your handwriting?

12      A      No.

13      Q      Let me ask you this:  Is that your

14   signature?

15      A      Yes.

16      Q      Okay.  So you're not denying that you signed

17   this document, right?

18             MS. REZAZADEH:  Objection; asked and

19   answered.

20      A      Yes, I signed it, but I don't know why it

21   says 2018.

22      Q      (By Mr. King) I have no idea either.

23      A      The only thing that's my handwriting is that

24   signature right there, I think.

25      Q      Right.  Okay.  I was just curious if you
```

 1    knew why it has 2018 on there.

 2              About how many -- how often would you

 3    perform at Heartbreakers on a weekly basis?

 4        A    Around four to six days a week.

 5        Q    Four to six days a week?

 6        A    Yes.

 7        Q    How many weeks would you perform out of

 8    every month at Heartbreakers?

 9        A    Like every week.

10        Q    Every week?

11        A    Uh-huh.  Yes.

12        Q    And was that true for every month in 2019?

13        A    Yes.

14        Q    How many hours would you perform during the

15    days that you would show up and perform?

16        A    At least six to eight hours.

17        Q    Do you know if other dancers kept the same

18    kind of schedule at Heartbreakers?

19        A    No.

20        Q    You would have to ask them, right, or look

21    at their records?

22        A    Right.  All I know is that they had to stay

23    at least six to eight hours.

24        Q    Did -- do you know of any dancers who showed

25    up, you know, one day a week?

```
 1        A    No.

 2        Q    You're not aware of anybody who just showed

 3   up one day a week?

 4        A    No.

 5        Q    Are you aware of anybody who showed up seven

 6   days a week?

 7        A    No.

 8        Q    You just -- you don't have any idea what

 9   other dancers' schedules looked like, right?

10        A    Correct.

11        Q    What about Krystal's schedule?

12        A    No.  I don't know.

13        Q    Was she -- would you-all coordinate when you

14   showed up at Heartbreakers?

15        A    No, not really.  I would ask her sometimes,

16   like, "Hey, are you at work?"  But that's as far as

17   that went.

18        Q    This is Exhibit 7.  It's labeled

19   Heartbreakers 149 through 157.

20             (Marked was Kibodeaux Exhibit No. 7.)

21        Q    (By Mr. King) First question I have for

22   you, the last four of your social is 8061, right?

23        A    Yes.

24        Q    Okay.  All right.  Can you see my screen?

25        A    Yes.
```

1    Q    And I'll just scroll through this just so

2  you can see what all is in it.

3              All right.  Have you had an opportunity

4  to review this document before today?

5    A    Yes, I have looked at it before.

6    Q    And in the first column, it shows date in,

7  January 8th, 2019, right?

8    A    Right.

9    Q    And then time in, it's got 1630.  I believe

10  that's a 24-hour system, so that would be 4:30 p.m.

11    A    Right.

12    Q    And the time out in this instance shows

13  2335.  So that would be, what, 11:35, right?

14    A    Right.

15    Q    Okay.  I just want to make sure we're on the

16  same page.  Does -- does this exhibit that you're

17  looking at right now, have you found anything that's

18  inaccurate about it?

19              MS. REZAZADEH:  Objection; vague.

20    Q    (By Mr. King) I'll break it down.  Does --

21  you've had an opportunity to look at this.  Have

22  you -- are any dates, date-ins missing?

23              MS. REZAZADEH:  Objection; assumes

24  facts not in evidence.

25    A    I mean, I'm assuming that it's correct, but

Case 3:20-cv-00008   Document 82-1   Filed on 05/21/21 in TXSD   Page 120 of 186   **EXHIBIT A**

Deposition of Stacey Kibodeaux                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

 1    I don't know exactly how they, like, do the clocking

 2    out and stuff.

 3         Q    (By Mr. King) I'll -- I'll back up a little

 4    bit.  So this -- this document, I will represent to

 5    you, shows the Heartbreakers' records of the dates

 6    that you appeared to work at the club, the -- the

 7    time that you clocked in, and the time that you

 8    clocked out.  And what I want to know is if you have

 9    reviewed this document and found any missing days or

10    times or anything inaccurate about it.

11              MS. REZAZADEH:  Objection; misquoting

12    deponent, assumes facts not in evidence.

13         A    No.  I don't -- I don't know if there's any

14    missing days or anything.

15         Q    So earlier you said that your recollection

16    is that you worked four to six days a week, right?

17         A    Yes.

18         Q    And that that was your practice every week,

19    right?

20         A    About.

21         Q    So what I -- what I did -- and I'll give

22    your counsel this calendar.  It will help visualize it

23    a little bit better.

24              MR. KING:  What is this, 7?

25              THE REPORTER:  It should be 8.

 1              MR. KING:  8.  Sorry.

 2              (Marked was Kibodeaux Exhibit No. 8.)

 3       Q    (By Mr. King) Let me show this to you.

 4   Okay.  This is -- this is just so that we can discuss

 5   it.  This isn't a Heartbreakers record.  I took the

 6   dates and the times from Exhibit 7 and put it into a

 7   calendar format, okay?

 8       A    Okay.

 9              MS. REZAZADEH:  You're creating an

10   exhibit to ask her about it?

11              MR. KING:  Yeah.  Because -- I just

12   want to make sure I understand this right.

13       Q    (By Mr. King) Okay.  So we've got

14   Exhibit 7, which is side by side with this Exhibit 8.

15   So we've got January 8th, 2019, January 10th, 2019,

16   January 7th, 2019, and so forth.  Do you see what I

17   did there?

18       A    Okay.

19       Q    Okay.  So in January, did you work more than

20   four to six days in any week?

21              MS. REZAZADEH:  Objection; vague.

22       Q    (By Mr. King) In February, did you work more

23   than four days in any given week?

24              MS. REZAZADEH:  Objection; asked and

25   answered.

```
 1        Q     (By Mr. King) Next month.

 2        A     What are you asking?

 3        Q     Sure.  I'm just trying to find out if -- how

 4   to square your testimony that you worked more than --

 5   worked between four to six days a week at

 6   Heartbreakers with Heartbreakers' records.  And if

 7   there's something wrong with Heartbreakers' records, I

 8   just need you to tell me.

 9        A     Well, that is what I recalled to my best,

10   like, memory.

11        Q     Do you have any knowledge as to whether

12   Heartbreakers' records are -- have been -- somebody

13   tampered with them or anything like that?

14        A     I -- I have no idea.  I mean, I -- I truly

15   feel like I worked more.  I truly do think that to

16   my -- like my best memory and recall.  But I -- I

17   can't, like, say for a fact if anybody tampered with

18   their records or anything like that.

19        Q     Do you have any reason to doubt any of the

20   information in the Heartbreakers records?

21        A     Yes.

22        Q     Okay.  Please -- please tell me.  It won't

23   hurt my feelings.  I just need to know.

24        A     I just think that they are not very good

25   people and I don't think that -- I just don't really
```

Deposition of Stacey Kibodeaux                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

1    trust them at all.

2         Q    So is it -- is it your testimony that

3    Heartbreakers' records do not -- don't include all the

4    days that you actually performed there?

5              MS. REZAZADEH:  Objection; asked and

6    answered.

7         A    I'm really not sure.

8         Q    (By Mr. King) We'll look at March.  Okay.

9    So I've got Heartbreakers 150.  It runs from

10   March 1st, 2019 through March 29th.  Can you still see

11   it there or is it too small?

12        A    It's a little small.

13        Q    All right.  Fair enough.  All right.  In

14   March of 2019, do you recall working more than four

15   days in any given workweek or is Heartbreakers'

16   records -- are they -- are these inaccurate?

17        A    I do not know.

18        Q    What -- based on your own recollection, what

19   hour would you typically clock in?

20        A    Like around 5:00 to 7:00 p.m.

21        Q    5:00 to 7:00?  Okay.  So we'll use March as

22   an example.  1900 hours I believe is 7:00 p.m.

23   Twenty -- 20 hours would be 8:00 p.m.  Is -- is that

24   inconsistent with your recollection?

25        A    That sounds about like the time I would come

1    in.

2         Q    I guess I'm just confused because you told

3    me that you recall showing up at 5:00, right?

4         A    Yes.

5         Q    Okay.  And this record that I have shows you

6    having clocked in at 7:00 or 8:00 o'clock in March or

7    8:30 on the 17th.

8         A    Okay.

9         Q    So which is it?

10        A    It varies, I guess.

11        Q    Would you show up at the club at 5:00 and

12   not clock in?

13        A    Yes, if my makeup wasn't done.  I wouldn't

14   be able to clock in until I'm actually, like, ready.

15        Q    Okay.  How -- how long on average would you

16   spend readying yourself for clocking in?

17        A    It takes me, like, at least two hours to get

18   ready, usually.

19        Q    Is that kind of prep -- preparatory

20   activity -- the amount of time you spent doing that,

21   is that, in your experience, typical for other

22   dancers?

23        A    I would say so.

24        Q    Do some dancers spend less time preparing

25   themselves?

1      A     I don't know.  Possibly.

2      Q     Okay.  Do you know if some dancers prepared

3  themselves at home before showing up?

4      A     I don't know.

5      Q     Never -- never asked anybody?

6      A     Not really, no.

7      Q     Did anyone ever get after you for showing up

8  at 5:00 and spending two to three hours in the

9  dressing room before you clocked in?

10     A     No.

11     Q     Do you know whether Krystal had the same

12 experience as you as far as putting her attire and

13 makeup on before clocking in?

14     A     I know that she took a long time, but I

15 don't really know anything else.

16     Q     Okay.  And I'm showing you Heartbreakers

17 151.  This is April 2019.  Heartbreakers' records

18 shows April 5th, 2019 through April 26th of 2019 was

19 the last date.  This -- this record shows that you

20 performed for -- on two days during that first week of

21 April.  Could you have performed more?

22     A     Possibly.

23     Q     This record also shows that between

24 April 14th and April 20th, 2019, that you do not

25 perform at all.  Is that incorrect or correct?

1      A     Where is -- where is those dates?

2      Q     Sure.  So if you look here, we've got

3  April 10th, 2019.

4      A     Right.

5      Q     And then we skip over to April 22nd, 2019.

6  So we've got a 12-day gap.

7      A     That -- to me, that seems like a pretty long

8  time for me to not be working.

9      Q     Okay.

10      A     I -- I never took any, like, vacation or

11  anything.  So, I mean, to me, that's kind of weird.

12      Q     True.  What would be the best way to verify

13  then what days you performed at Heartbreakers?

14      A     I do not know.

15      Q     The time in, do these reflect the time that

16  you appeared at Heartbreakers and then started

17  working --

18           MS. REZAZADEH:  Asked and answered.

19      Q     (By Mr. King) -- for April 2019?

20      A     What do you mean?  Like the -- the times

21  that it's showing?  Like -- like 7:00 to 2:00 or

22  8:00 to 2:00.

23      Q     Yeah.  I -- sorry.  I didn't mean to cut you

24  off.  I'm just asking -- trying to figure out if, you

25  know, we have got here April 5th, 2019, it shows that

Deposition of Stacey Kibodeaux          Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

1   you clocked in at 7:45.  I'm trying to figure out if

2   you were actually at the club prior to 7:45 on these

3   days.

4        A    There's no way for me to know.

5        Q    All right.  We're looking at the bottom of

6   Heartbreakers 151 through 152.  This shows May of

7   2019.  And Heartbreakers' records, I'll represent,

8   showed that you worked one, two, three, four, five

9   days in the month of May of 2019.

10                  Okay.  That's May 10th, May 16th,

11  May 18th, May 19th, May 21st.  Do you feel that this

12  is in any way inaccurate?

13       A    I do, because I don't -- I truly think that

14  I worked more than that.

15       Q    On May 10th -- I'll show you Heartbreakers'

16  record.  It purports to show that you clocked in at --

17  I guess that's 6:00 o'clock, right, and that you

18  clocked out at 9:00 o'clock.  Were there occasions in

19  which you would take off early?

20       A    There -- that might have been the time that

21  I got sick.  I got sick at work before --

22       Q    Yeah.

23       A    -- and I was told to go home because I

24  didn't look good.

25       Q    Did you -- speaking of which, I saw that in

1   one of your discovery responses.  Who told you -- who

2   told you to go home?

3        A    Whitey.

4        Q    Whitey?  Was he mean about it?

5        A    Yeah, he was.

6        Q    He was?  What did he say?

7        A    He told me that I looked like shit.

8        Q    Were you -- like, did you have, like, the

9   flu?

10       A    No.

11       Q    Some other health issue?  You don't have to

12  tell me exactly what it was.

13       A    I just wasn't feeling my best.

14       Q    Yeah.

15       A    And I had wanted to go home early and I

16  finally got the courage to ask him, and he was like,

17  "Yeah.  Is that why you look like that?  You look like

18  shit.  You should go home."

19       Q    Okay.  And so you went home?

20       A    Yeah.

21       Q    All right.  Where are we?  June.  Did you

22  prefer to work on Fridays and Saturday nights?

23       A    I did, but I also liked working the weekdays

24  a lot too.

25       Q    Okay.  During the daytime hours?

1        A    No.  Nighttime.

2        Q    Nighttime?  Did you ever work any, I guess,

3   early afternoon, mid-afternoon shifts?

4        A    Maybe, but only, like, a couple times.

5        Q    So in June, you got the same thing.  It

6   looks -- from Heartbreakers' records, it shows one,

7   two, three, four, five, six -- that you worked seven

8   days in June of 2019.  Do you believe that is

9   inaccurate based on your recollection?

10       A    I -- I don't.

11       Q    You don't believe that that's inaccurate?

12       A    Or I'm sorry.  I -- I do not think that it

13  is very accurate.

14       Q    Okay.  Understood.  Because you think that

15  you worked more days in June of 2019 than what is

16  reflected here, true?

17       A    True.

18       Q    Okay.  July of 2019, one, two, three, four,

19  five, six, seven, eight.  Heartbreakers' records shows

20  that you worked eight days in July 2019.  And if you

21  want to check my math, please let me know.  Because

22  I'm not good at math, all right?  Same thing, you

23  think that you worked more days in July of 2019?

24       A    Possibly.

25       Q    This record also shows that July 1st you

1   showed up at 8:41; July 3rd, it was -- clocked in at

2   8:00.  July 13th, it was at 7:00.  July 14th, it was

3   9:30.  And then for the rest of the month it was about

4   8:00 o'clock.  What -- do you -- do you recall kind of

5   like what time you preferred to show up, clock in?

6        A    I mean, the -- the times, to me -- like the

7   time stamps seem accurate.

8        Q    Okay.  So you don't think that the time

9   stamps that we've been looking at are inaccurate as

10  far as when you clock in to start performing on the --

11  at the club?

12       A    Correct.

13       Q    But they don't account for time that you

14  were in the locker room necessarily, true?

15            MS. REZAZADEH:  Objection; misquoting

16  deponent.

17       A    Well, yeah.  It doesn't count if I'm not

18  clocked in.

19       Q    (By Mr. King) Right.

20       A    Right.

21       Q    And I'm just trying to figure out if -- how

22  many times you would show up at, I don't know,

23  6:00 o'clock and then do your makeup for two hours and

24  then clock in?

25       A    Right.  Probably around the times that it

**EXHIBIT A**

Case 3:20-cv-00008   Document 82-1   Filed on 05/21/21 in TXSD   Page 151 of 186
Deposition of Stacey Kibodeaux                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

1   says I clocked in at 8:00.

2       Q    I'm not sure what you mean.

3       A    So the time stamps that it says that I

4   clocked in at 8:00 --

5       Q    Yeah?

6       A    -- I probably showed up there at around

7   6:00 and got ready.

8       Q    Got it.  And how often would you do that?

9   Was that your usual practice?

10          MS. REZAZADEH:  Objection; calls for

11  speculation.

12      A    It just kind of depended, I think.

13      Q    (By Mr. King) Sure.  What did it depend on?

14      A    I don't really know.

15      Q    Just your personal preference?

16      A    Yes.

17      Q    Did anyone at the club require that you do

18  your makeup, put on your attire in the locker room?

19      A    What do you mean?

20      Q    Like did anyone ever try to prevent you from

21  doing your makeup and attire at home and then showing

22  up and clocking in immediately?  Was there a rule --

23      A    No.

24      Q    August 2019, if Heartbreakers' records show

25  that you worked every Friday night that month, does

Deposition of Stacey Kibodeaux

```
 1   this record look closer to what your recollection

 2   might have been?

 3       A    Yes.

 4       Q    But we still don't have any -- any weeks in

 5   which you worked more than three days a week, right?

 6       A    Correct.

 7       Q    Okay.  August, September.  September 2019,

 8   Heartbreakers' records show that, you know, in the

 9   first week, one, two, three, four.  Do you think that

10   this record is -- has anything wrong with it?

11       A    No.  That record seems like similar to my,

12   like, recollection.

13       Q    Same thing the week of the 22nd, we have

14   one, two, three, four, five days.  Is that closer to

15   your recollection?

16       A    Yes.

17       Q    Okay.  Skip down to -- because I don't want

18   to bore you to tears with October.  So let's -- we'll

19   get to the end of the year, okay?

20               November of 2019, Heartbreakers'

21   records shows that you did one, two, three, four,

22   five, six, seven days in that month.  Does that seem

23   inaccurate to you in any way?

24               MS. REZAZADEH:  Objection; vague.

25       A    I mean, yes.  Because I feel like I worked
```

 1   more days than that.

 2        Q    (By Mr. King) Okay.  And finally, at long

 3   last, this is December 2019, and Heartbreakers'

 4   records show that the first day in December that you

 5   worked was December 8th.  The last day was

 6   December 28th.  Is -- is that consistent with your

 7   recollection?

 8        A    Yes.  That sounds about right.

 9        Q    Okay.  The number of days here -- one, two,

10   three, four, five, six -- six days in the month of

11   December, are the number of days consistent with your

12   recollection?

13        A    Yes.  That was my last month there, so yes.

14        Q    Got it.  And you did not work after

15   December 28th, 2019, to your recollection?

16        A    No.

17        Q    All right.  So just to summarize,

18   Heartbreakers' records do not square with your

19   recollection?

20        A    No.  No.

21        Q    You do not view Heartbreakers' records as a

22   reliable source of information for how much -- how

23   many days you worked, right?

24             MS. REZAZADEH:  Objection; calls for

25   speculation.

1      A    Yes.  I'm not convinced that that's

2  accurate.

3      Q    (By Mr. King) And -- and earlier you told me

4  that you were not aware of an alternative source of

5  information that verify anything in Heartbreakers'

6  records or refute it, for that matter?

7                MS. REZAZADEH:  Objection; misquoting

8  deponent.

9      A    Yes.  I don't have any records.

10      Q    (By Mr. King) The clock-in hours, clock-in

11  time stamps that we've just been looking at, are those

12  consistent with your recollection?

13      A    Yes.

14      Q    The clock-out time stamps, are those

15  consistent with your recollection of when you would

16  leave the club?

17      A    Yes.  I believe so.

18      Q    All right.  What does the house mom at

19  Heartbreakers do?

20      A    She's in charge of counting the dance

21  dollars and taking the deductions out.

22      Q    Were you required to tip the house mom?

23      A    Yes.

24      Q    For what?

25      A    If we were to use her stuff, especially, and

1    she kind of expected tips no matter what from all of

2    us.

3         Q     If you didn't tip the house mom, what would

4    happen?

5         A     She would be very unpleasant and rude.

6         Q     Would you -- anything beyond that?

7         A     No.

8         Q     Would you get a bad stage rotation if you

9    didn't tip the house mom?

10        A     No, not with the house mom.

11        Q     If you didn't tip the DJ, would you be left

12   off of the stage rotation completely?

13        A     Yes.  Either left off the rotation or in a

14   really bad lineup or he would pick, like, the most

15   awful music to dance to for you.

16        Q     What do you mean by bad lineup?

17        A     Like put you, like, somewhere on the list

18   where you don't like or, like, would skip you, like,

19   on purpose or, like, not put you on the list.  Like

20   not -- just not a good lineup.

21        Q     Sure.  So there were instances in which you

22   were actually left off of the stage rotation?

23        A     Yes.

24        Q     Did you resent that?

25        A     What do you mean?

1    Q    Were you opposed to that?  I mean, did you

2    take offense to being left off of the stage rotation?

3    A    Yes.

4    Q    Why?

5    A    Because going on stage is a part of my job,

6    and I mean, it just didn't sit right with me to think

7    that any dancer or I would be just, like, left off the

8    list or forgotten about or whatever.

9    Q    You don't like getting passed over when

10   other dancers are going up on stage, right?

11   A    Right.

12   Q    Did you -- if you were ever left off of the

13   stage rotation, would that affect the amount of money

14   you could make?

15   A    Yes.

16   Q    How so?

17   A    Because that would -- I mean, if you don't

18   go on stage, then you don't make stage money.

19   Q    Right.

20   A    And stage is a way for customers to see you,

21   I guess.  So it would just throw off the whole shift.

22   Q    Did Heartbreakers ever have sporting events

23   or UFC fights on TV?

24   A    Yes.

25   Q    Did they -- did Heartbreakers have special,

1  like, fight-night-type deals, promotions?

2      A    Yes.

3      Q    Did that draw in a lot of customers?

4      A    Yes.

5      Q    When those customers came for fight nights

6  or some game, did that increase the amount of money

7  that you'd make?

8      A    No.  It would actually decrease it.

9      Q    How would it decrease the amount of money

10  you made?

11      A    Because then they -- they would just want to

12  watch the game.

13      Q    So customers would come to watch the game

14  and just wouldn't have any interest in paying for

15  anybody's dances, right?

16      A    Yeah.

17      Q    Okay.  If anything, when Heartbreakers put

18  on promotions like sporting events for UFC fights to

19  draw more customers in, it wouldn't be for the benefit

20  of the dancers?

21              MS. REZAZADEH:  Objection; calls for

22  speculation.

23      A    I mean, it didn't really help me out any.

24      Q    (By Mr. King) And you would still have to

25  pay the house fee even on those nights when the club

1   has a lot of people in it, they're watching whatever

2   was on TV and didn't want to pay for dances, right?

3        A    Yes.  And I even ended up leaving the club

4   negative money, like with negative money if I --

5        Q    You would -- sorry.  I didn't mean to cut

6   you off.

7        A    Oh, it's okay.

8        Q    There were some nights in which you would

9   lose money by appearing at Heartbreakers, right?

10       A    Yes.

11       Q    And the lost money was the house fees that

12  you paid, right?

13       A    Yes.

14       Q    How often would that occur?

15       A    Not, like, super frequently, but it was

16  definitely something that was, like, happening, like,

17  here and there.  Maybe at least once a month or

18  something.

19       Q    Sure.  I assume other nights you would --

20  you would leave positive, right?

21       A    Yes.

22       Q    How did Heartbreakers' control over the

23  house fees affect your ability to earn money?

24       A    Because if you couldn't pay your tip-outs

25  and fees, then they would keep track of that and -- I

 1    mean, you can get fired over that, even if they know

 2    it's been a very slow night.

 3        Q    Did Heartbreakers take a percentage of the

 4    amount that you earned for every shift?

 5                  MS. REZAZADEH:  Objection; vague.

 6        A    What exactly do you mean?

 7        Q    (By Mr. King) Well, let me see if I can do

 8    something here.  Let's put it up.

 9                  Do you recall signing a declaration in

10    this case?

11        A    A declaration?

12        Q    Uh-huh.

13        A    For what?

14        Q    In this case.

15        A    Oh, yes.

16        Q    Let me drop it in here real quick.

17                  (Marked was Kibodeaux Exhibit No. 9.)

18        Q    (By Mr. King) All right.  This is Exhibit 9.

19    All right.  Earlier in this case, a -- you submitted a

20    declaration.  Do you recognize this document?

21        A    Yes.

22        Q    I'll scroll through it so you have an

23    opportunity to look at it.  Just tell me if you

24    need -- if I need to go slower or faster.

25                  All right.  Do you recall signing this

Deposition of Stacey Kibodeaux                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

 1    document?

 2         A     Yes.

 3         Q     And is that your electronic signature, I

 4    assume?

 5         A     Yes.

 6         Q     So in Photograph 8, I just wanted to ask

 7    you, you say, "The defendants would take a percentage

 8    of my earnings each shift."

 9               And I'm just trying to figure out what

10    percentage that was.

11         A     The percentage is talking about -- like, I

12    make -- the amount I make on my shift, and then at the

13    end of my shift, I have to give away, like, my

14    tip-outs and stuff to everybody.

15         Q     And what percentage was that?

16               MS. REZAZADEH:  Objection; calls for

17    calculation.

18         A     I don't know a certain percentage.

19         Q     (By Mr. King) Was it ever 1 percent of

20    whatever you earned?

21               MS. REZAZADEH:  Objection; asked and

22    answered.

23         A     I do not know.

24         Q     (By Mr. King) Was it ever 100 percent of

25    what you earned?

```
 1        A     No, it was never 100 percent.

 2        Q     It was somewhere between 1 percent and a

 3   100 percent?

 4        A     Yes.  And that's all I know.

 5        Q     Who -- who would be taking a percentage of

 6   your earnings each shift?

 7        A     The DJ, bartenders, management, house mom.

 8        Q     Every night?

 9        A     Yes.

10        Q     So we've got bartenders, DJs, house moms.

11   Anyone else?

12        A     That's it.

13        Q     What about the waitresses?

14        A     I never -- well, I did tip the waitresses

15   sometimes.

16        Q     So they were in there taking your earnings

17   from your shifts too?

18        A     Yes.

19        Q     What about the door guy or girl?

20        A     No.

21        Q     Did each -- each one of these categories of

22   individuals have a different percentage that they

23   would take from your earnings?

24        A     I'm not sure.

25        Q     Here's what I'm getting at is I'm just
```

```
 1   trying to figure out how -- what information can be
 2   used to calculate how much money you allege was taken
 3   from your earnings every shift.
 4               MS. REZAZADEH:  Is there a question?
 5               MR. KING:  Yeah.  I just asked it.
 6       Q    (By Mr. King) How do we figure out what the
 7   percentage of your earnings were taken for every
 8   shift?
 9               MS. REZAZADEH:  I'm going to object.
10   Calls for a calculation.
11       Q    (By Mr. King) Was it just arbitrary?
12       A    I'm not exactly sure how to, like, do all
13   those calculations.
14       Q    But you're -- you are alleging in this
15   lawsuit that bartenders, waitresses, the house mom,
16   the DJ took certain sums away from you during each
17   shift?
18       A    Yes.
19       Q    Okay.  You just don't know how much that is?
20       A    Correct.
21       Q    And there's no way of knowing how much that
22   is?
23               MS. REZAZADEH:  Objection; misquoting
24   the deponent.
25       A    I don't know how much.
```

1      Q    (By Mr. King) You have no way to estimate

2   it?

3                MS. REZAZADEH:  Objection; asked and

4   answered.

5      Q    (By Mr. King) Do you have any way of

6   estimating it on a monthly basis?

7      A    No.  I can't think of that right now.

8      Q    Is there anything that -- any -- any source

9   of information out there that might help refresh your

10  recollection?

11     A    No.

12     Q    No?

13     A    No.

14     Q    In Paragraph 9 you write, "The defendants

15  and managers tracked the number of dances I performed

16  each shift in order to calculate payment policies."

17                How were they track the number of

18  dances you performed?

19     A    By sending the DJ to go walk around and look

20  to see who is using the booths or Whitey himself or

21  whoever was the manager that night would do that

22  themselves.

23     Q    So in Paragraph 9 are you talking about the

24  number of dances you performed just in the booth area?

25     A    Yes.  That's where we gave our dances, so

```
 1   yes.

 2        Q    So this Paragraph 9 is not referring to the

 3   number of dances you might have performed on the

 4   floor?

 5                   MS. REZAZADEH:  Objection; vague.

 6        A    Well, the dances I did on the floor were in

 7   the booths.

 8        Q    (By Mr. King) Got it.  What about in the VIP

 9   area?

10        A    That was not as tracked.  Well, I mean, they

11   would know if you used VIP and they would, like, know,

12   you know, that you made, like, a certain amount of

13   good money or something.  So they would ask for it and

14   about it, but...

15        Q    Okay.  And how would they go about recording

16   the number of dances that you performed in the booth

17   area --

18                   MS. REZAZADEH:  Objection; calls --

19        Q    (By Mr. King) -- like a clicker, clipboard,

20   something like that?

21                   MS. REZAZADEH:  Objection; calls for

22   speculation.

23                   MR. KING:  She wrote it.  She says it,

24   that the defendants and managers tracked the number of

25   dances she performed.
```

1      MS. REZAZADEH:  It doesn't say how they

2  tracked it.

3      Q    (By Mr. King) Do you have any idea how they

4  tracked it?

5              MS. REZAZADEH:  Objection; vague.

6      A    Mental -- mental notes and maybe a

7  clipboard, but mental notes for sure.

8      Q    (By Mr. King) In Paragraph 9 you refer to

9  calculation of payment of policies.  What payment

10 policies are you referring to?

11     A    Like tip-out and making sure you tip

12 everybody.

13     Q    So they would track the number of dances you

14 would perform in the booth area in order to calculate

15 how much you would have to pay other people at the end

16 of the night?

17              MS. REZAZADEH:  Objection; misquoting

18 the deponent.

19     A    Yes.  Like they -- they would notice and,

20 like -- I don't know, like, they would, like, hold it

21 against me.  Like, if I wasn't able to pay my tip-out,

22 but if the manager saw me, like, give two distances or

23 something -- like, he's told me specifically, "Well, I

24 watched you, like" -- "like, there's no reason you

25 shouldn't be able to, like, tip us and all that."

1       Q     Who -- who told you that?

2       A     Whitey.

3       Q     And so was there a specific calculation that

4   they used?

5       A     It was whatever their personal preference

6   was.

7       Q     So it was arbitrary, right?

8              MS. REZAZADEH:   Objection; calls for

9   speculation.

10      A     It was whatever they thought that they

11  deserved.

12      Q     (By Mr. King) Is the amount that they

13  thought deserved, was that specific to you?

14      A     Well, if -- basically if they seen that you

15  were working and making money, they expected more

16  money out of you.

17      Q     Okay.  Did they apply this to other dancers?

18      A     Can you repeat that?

19      Q     Sure.  Did they apply this calculation of

20  payment and policies to other dancers?

21      A     Yes.

22      Q     And how were you -- how do you know that?

23      A     Because everybody would complainant it.

24      Q     Okay.  And was there any set formula for

25  calculation of the payment policies that you refer to

 1    in Paragraph No. 9 that applied across the board?

 2                      MS. REZAZADEH:  Objection asked and

 3    answered.

 4        Q    (By Mr. King) Was there any

 5    across-the-board calculation?

 6        A    I don't know.

 7        Q    We would have to just ask each individual

 8    dancer what their experience was with the contents of

 9    Paragraph 9, right?

10                      MS. REZAZADEH:  Objection; misquoting

11    the deponent.

12        A    I just know that everybody had to tip, like,

13    what was expected, basically.

14        Q    (By Mr. King) And what was expected

15    depended on whatever the manager thought?

16        A    Yes.

17        Q    You also said that you were forced to tip

18    out $50 to $100 per shift to individually --

19    individually to DJs and bartenders.  Was that for

20    every single shift that you worked?

21        A    Yes.  I would usually end up spending around

22    that much just to make sure everybody got their

23    tip-out.

24        Q    Was this in addition to the payment of the

25    house fee?

```
 1        A    That is, like, combined.

 2        Q    Okay.  So in Paragraph 8, the 50 to $100

 3   that you're referring to is the combined amount of the

 4   house fee and whatever else, some DJ or bartender,

 5   whoever you're tipping, right?

 6        A    Right.

 7        Q    I'm sorry?

 8        A    Yes.

 9        Q    I guess I'm just confused by the last

10   sentence here, "I was forced to tip out $50 to $100

11   per shift individually to the bartenders and DJs."

12             I -- did you -- did you consider paying

13   the house fee a tip-out to DJs and bartenders?

14        A    I don't know.  I -- I read that as like I

15   wouldn't -- like, I'm saying that that was around the

16   total that I spent including everything.  Like, my tip

17   out and tipping, like, the DJs, bartenders, house mom.

18        Q    So if a -- if you reported in at

19   7:00 p.m. -- and I'm going to show you what I'm

20   looking at.  Do you see this?  So in the agreement

21   that you signed, if you --

22             MS. REZAZADEH:  Objection; assuming

23   facts not in evidence.  She didn't --

24             MR. KING:  She didn't sign this license

25   agreement that she just said that that's her
```

1    signature?

2              MS. REZAZADEH:  It's not her

3    handwriting.  It's not the right date.  It's dated

4    2018.

5        Q    (By Mr. King) Ma'am, did you -- do you deny

6    that that is your signature?

7        A    I mean, like, that's not my handwriting.

8        Q    Do you think somebody forged your signature

9    here?

10       A    Well, I mean, I know that that's not my

11   handwriting.

12       Q    So is -- were you telling me earlier that up

13   here, this is not your handwriting?

14       A    Correct.  That's not my handwriting.

15       Q    And down here where we have this signature,

16   that's not your handwriting, where your signature is

17   provided?

18              MS. REZAZADEH:  Objection; misquoting

19   the deponent.

20       A    I mean, it -- that kind of does look like my

21   signature, but I don't understand how that got there

22   if I didn't fill that out.

23       Q    (By Mr. King) Do you deny ever filling

24   this -- signing this document?

25       A    I don't really remember what document from

Deposition of Stacey Kibodeaux                                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

```
 1    them I did sign.

 2         Q     This will be Exhibit 10.

 3                    (Marked was Kibodeaux Exhibit No. 10.)

 4                    MS. REZAZADEH:  The last one -- oh,

 5    never mind.

 6         Q     (By Mr. King) Have you ever seen this

 7    document before, ma'am?

 8                    MS. REZAZADEH:  What's the Bates number

 9    on that one?

10                    MR. KING:  (Indicating.)

11         A     That is my handwriting.

12         Q     (By Mr. King) Okay.  That is your

13    handwriting?  So Exhibit 10, that's your signature.

14    Exhibit 9 -- or no 6, the license agreement, you

15    don't know if you signed it?

16         A     No.

17         Q     Okay.  But we both agree that there was a

18    house fee at Heartbreakers, right?

19         A     Yes, there was a house fee.

20         Q     Okay.  So if you showed up after 7:00 --

21    after 7:00 and before 8:00, the house fee was $37,

22    right?

23         A     Yes.

24         Q     Okay.  And if you showed up after 8:00 but

25    before 9:00, it climbed to $46, right?
```

Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

```
 1        A    Yes.

 2        Q    So is it fair to say, we're looking back at

 3   your declaration on Paragraph 8, that when you write,

 4   "I was forced to pay" -- "forced to tip out $50 to

 5   $100," we could look at your house fee for some night,

 6   say it was $37, and the additional amount you -- you

 7   claim you paid to DJs and bartenders would be the

 8   difference?

 9        A    Yes.

10        Q    Okay.  So are you saying that if you paid a

11   $37 house fee, you would then pay $63 to DJs and

12   bartenders potentially?

13             MS. REZAZADEH:  Objection; calls for a

14   calculation, vague, incomplete hypothetical.

15             Go ahead.

16        A    I'm not really sure.

17        Q    (By Mr. King) You just have no way of

18   knowing how -- how much you tipped out aside from the

19   house fees?

20             MS. REZAZADEH:  Objection;

21   argumentative, asked and answered.

22        A    Well, I -- I just know that I paid -- I had

23   to pay my tip-out and that I had to make sure I tipped

24   everybody else out.

25             Do you mind if we take a quick break?
```

1    Q    Of course.

2    A    Okay.

3             (Break.)

4    Q    (By Mr. King) Most of the orders at

5  Heartbreakers you received, they were told to you

6  verbally, right?

7    A    Yes.

8    Q    Was anything in writing ever?

9    A    Yes.

10   Q    Aside from posters, I should clarify.

11   A    Oh, no.  Not that I can think of.

12   Q    Heartbreakers never circulated, like, a memo

13  to all dancers, don't do X --

14            MS. REZAZADEH:  Objection; vague and

15  misstating evidence.

16   Q    (By Mr. King) -- right?

17   A    Well, if they wanted something to be told to

18  all dancers, they would put it on a poster in writing.

19  But it was always on a poster in a dressing -- in the

20  dressing room.

21   Q    Did managers ever have group meetings with

22  dancers --

23   A    No.

24   Q    -- to address some issue?

25   A    No.

1    Q    In one of your interrogatory responses, you

2   wrote that, "Most of the orders from management would

3   be communicated verbally at the time and place the

4   management felt we were violating some unknown rule."

5                What did you mean by that?

6    A    So the manager Whitey, sometimes he would

7   enforce certain rules, like -- and other times he

8   wouldn't.  It depended completely on his mood and how

9   drunk he was.  So, like, sometimes he would come out

10  of nowhere and start saying, like, "Oh, this is a

11  rule," like, "You can't, like, dance like that."

12  Like, "You can't have your legs over the stage like

13  that."

14                And then other times, it would be okay.

15   Q    So it would just vary based on his attitude

16  that night, right?

17                MS. REZAZADEH:  Objection; vague.

18   A    Correct.

19   Q    (By Mr. King) I'm sorry.  Did you say

20  correct?

21   A    Well, I mean, not all the rules varied, but

22  some of them did depending on his mood, yes.

23   Q    Some of these things would just be out of

24  the blue, right?

25   A    Yes.

```
 1        Q    And did you ever have to pay a double fee

 2   for working any double shifts?

 3        A    I never worked a double there.

 4        Q    Did you ever suffer any negative

 5   consequences as far as your ability to get shifts at

 6   Heartbreakers?

 7        A    What do you mean exactly?

 8        Q    Did you ever do anything at Heartbreakers

 9   that had the consequence of a manager saying you're

10   not allowed to work some shift?

11        A    No.

12        Q    Did you ever try to -- well, you -- you --

13   in the beginning of today's deposition, you told me

14   that you did perform at other clubs during your time

15   at Heartbreakers.

16        A    Correct.

17             MS. REZAZADEH:  Vague.

18        Q    (By Mr. King) Did you suffer any

19   consequences as a result of working elsewhere at

20   Heartbreakers?

21        A    No, I did not, but I -- a dancer told me to

22   not talk about it there.

23        Q    Why?

24        A    Because they didn't like us working at other

25   clubs.
```

1    Q    Who is the "they"?

2    A    "They" as in Whitey, the management, the

3    owners.

4    Q    Why didn't they like the dancers working at

5    other clubs?

6    A    Because they just considered that to be,

7    like, no good, like, wrong.

8    Q    Why was that a wrong?

9              MS. REZAZADEH:  Objection; calls for

10    speculation.

11    A    I can't say because I don't understand why

12    it would be wrong.  That's just how they felt.

13    Q    (By Mr. King) Did you ever ask any of the

14    managers if that is, in fact, how they felt?

15    A    No.

16    Q    So you never mentioned to any managers,

17    "Hey, I'm work over at some other club"?

18    A    No, because I didn't want to risk being

19    terminated over that.

20    Q    So this was just based on a dancer telling

21    you that?

22    A    Yes.  Well, several dancers.

23    Q    Do you remember any of their names?

24    A    No.

25    Q    Do you remember what they looked like?

Deposition of Stacey Kibodeaux                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

---

1       A     No.

2       Q     Do you remember their stage names?

3       A     No.

4       Q     Did you ever interact with managers other

5    than Whitey?

6       A     Yes.

7       Q     Did the other managers also have this kind

8    of -- did they just, like, make up orders on a whim

9    like Whitey would?

10              MS. REZAZADEH:   Objection; misquoting

11   the -- well, go ahead.

12      A     No, not -- not really.

13      Q     (By Mr. King) You stopped working at

14   Heartbreakers on December 28th, 2019.  Was there any

15   reason that you decided just to move on?

16      A     Yes.  Well, I was ready to leave that club

17   because I felt, like, very upset working there, and

18   then -- well, I filed this lawsuit, so I had to go

19   anyway.

20      Q     Why -- why were you upset working there?

21      A     Because I didn't like the way that I was

22   being treated or the other dancers were being treated.

23      Q     Just so that I understand, you filed -- this

24   lawsuit was filed after you left Heartbreakers, right?

25              Let me -- that was a bad question.

---

1                Did anyone at Heartbreakers tell you

2     you have to leave because you filed a lawsuit?

3          A    No, nobody told me that, but from what I

4     recall, I left a little bit after I had filed the

5     lawsuit.

6          Q    I will represent to you that this lawsuit

7     was filed on January 14th, 2020.

8          A    Right.  I think, like, it was technically

9     before it was technically, like, a lawsuit.  It's

10    whenever I was speaking to, like, my attorneys and

11    stuff trying to figure out what was going on, I think.

12         Q    And you -- you retained your lawyers in mid

13    December of 2019, right?

14         A    I believe so.

15         Q    All right.  This is a document that your

16    counsel has produced.  It's Kibodeaux 1 through 6.

17                Have you ever seen this document

18    before?

19         A    Yes.

20         Q    Okay.  And is that your signature at the

21    bottom?

22         A    Yes.

23         Q    All right.  Is that your electronic

24    signature?

25         A    Yes.

1    Q    All right.  And you recall executing this

2  document on December 15th, 2019, right?

3    A    Yes.

4    Q    Okay.  So you were in the process of hiring

5  a lawyer before you stopped working at Heartbreakers,

6  right?

7    A    Correct.

8    Q    Did you tell anyone at Heartbreakers, "I'm

9  thinking about suing you guys"?

10    A    No.  No.

11    Q    Just thought I'd ask.

12          How did you locate at your lawyers?

13    A    Online.

14    Q    Online?  After you hired your attorneys, did

15  you reach out to any other dancers to see if there

16  would be -- to see if they would want to join?

17    A    No.

18    Q    Do you know who Hailey Chapman is?

19    A    Who?

20    Q    Hailey Chapman.

21    A    No.

22    Q    She went by Daisy.

23    A    No, I don't think I know that person.

24    Q    Do you know Jean Hoffmeister?

25    A    No.

Deposition of Stacey Kibodeaux

```
 1        Q     Do you know Roxanne Murillo?

 2        A     No.

 3        Q     So you're not aware of any of the other

 4   plaintiffs, never talked to them or anything?

 5        A     No, I've never spoken to them.

 6        Q     Let's turn back to your declaration.  So in

 7   Paragraph 25, you write, "Since filing this lawsuit as

 8   an individual plaintiff, I've been joined by three

 9   coworkers.  These coworkers work under the same

10   conditions and payment policies as I did."

11              How do you know that?

12        A     Well, I mean, I was told or made aware that

13   other people had joined in, but I -- I didn't, like,

14   know them or anything or I never even contacted them.

15        Q     You also write that, "Other dancers are

16   likely to join the class as we inform them of the

17   opportunity to challenge these unfair and illegal

18   payment practices."

19              How do you know whether other dancers

20   are likely to join the class?

21        A     I don't know.  Just hopeful.

22        Q     In Paragraph 24, moving backwards, you

23   write, "I'm aware that other exotic

24   dancers/entertainers fear retaliation for voicing

25   concern over defendants' FLSA violations and for
```

Deposition of Stacey Kibodeaux                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

---

 1   opting in as plaintiffs for this lawsuit."

 2              Have you spoken with any particular

 3   dancers about such concerns?

 4        A    No, but I had concerns.

 5        Q    Sure.  Paragraph 22 of your declaration, you

 6   write, "Defendants required dancers/entertainers,

 7   including myself, to participate in promotions for

 8   private events, including birthday parties."

 9              Did you ever participant in a birthday

10   party private event?

11        A    I think the club would sometimes, like,

12   host, like, little events and stuff if it was, like,

13   somebody's birthday, like a -- somebody in management

14   or a waitress or another entertainer.

15        Q    Okay.  So what -- what sort of promotions

16   did you participate in?

17              MS. REZAZADEH:  Objection; form,

18   misquoting the deponent.

19        A    I don't really know.  I just would show up

20   to work.

21        Q    (By Mr. King) So you -- you can't recall

22   any promotions for private events, including birthday

23   parties, in which you personally participated?

24              MS. REZAZADEH:  Objection; misquoting

25   deponent, asked and answered.

---

```
 1        A    Yeah, I'm not sure.

 2        Q    (By Mr. King) Paragraph 19, you say that

 3   your -- we've already covered this, but I've just got

 4   to read it.  "My shifts generally ran from 5:00 p.m.

 5   to 2:00 a.m., in which I was required to stay past

 6   the end of my shift."

 7             What do you mean by you were required

 8   to stay past the end of your shift?

 9        A    Whenever we closed, we would have to wait

10   for everybody to leave.  Like -- like we would have to

11   wait until all the dancers were dressed out before we

12   could -- any of us could leave if it was past 2:00.

13        Q    Why?

14        A    I'm not sure.  That was just a rule.  We

15   weren't -- we had to wait until they said we could go.

16        Q    Do you know whether that had anything to do

17   with watching dancers go to their cars in the parking

18   lot?

19        A    I'm not sure.

20        Q    You don't know?

21        A    Yeah, I don't know.

22        Q    Never asked anybody?

23        A    No.

24        Q    Was there some sort of penalty if you didn't

25   stay past the end of your shift in the circumstance
```

1    you've just described?

2       A    I mean, you had the assumption you would get

3    in trouble if you left when you weren't supposed to.

4       Q    Paragraph 29, you write that, "Peggy

5    Armstrong hired and fired employees."

6            We're just talking about Peggy right

7    now.  Are you aware -- did you -- have you ever met

8    Peggy?

9       A    I think maybe once.

10      Q    Do you recall what the interaction was like?

11      A    No, not really.

12      Q    Do you know whether she's hired or fired any

13   employees?

14      A    I'm sure she has.

15      Q    Yeah, but do you know if she has?

16           MS. REZAZADEH:  Objection; asked and

17   answered.

18      A    Well, I mean, yes, because she's the owner.

19      Q    (By Mr. King) Beyond the fact that she's the

20   owner, are you personally aware of any instance in

21   which Peggy Armstrong has hired or fired any

22   employees?

23           MS. REZAZADEH:  Objection; asked and

24   answered.

25      A    No.

1    Q    (By Mr. King) Are you aware of any instance

2    in which Peggy Armstrong has directed and supervised

3    all employees?

4    A    Well, I mean, I know that they had cameras

5    everywhere and would watch them and would come in and

6    stuff.

7    Q    Do you know if Peggy Armstrong was watching

8    dancers on the floor from the cameras?

9    A    I mean, yes.  It was -- I was made to

10   believe that.

11   Q    By who?

12   A    Everybody.

13   Q    Do you know how Peggy Armstrong made any

14   decisions regarding employee compensation and club

15   improvements?  Do you have any personal knowledge of

16   that happening?

17   A    Can you, like, specify that some for me?

18   Q    Well, I don't know.  It's your declaration.

19   That's why I'm asking is because I don't know.  What

20   were you talking about?

21   A    Well, she directly or indirectly, like,

22   affected everything.

23   Q    How so?

24   A    Because she was the co-owner with Mike and

25   they would come there.

```
 1        Q    When they would come there, would Peggy

 2   start telling dancers what to do?

 3             MS. REZAZADEH:  Objection; calls for

 4   speculation.

 5        A    No.  They would hang out with dancers and

 6   make us uncomfortable.

 7        Q    (By Mr. King) Okay.  What -- how did -- how

 8   did Peggy exercise significant control over you

 9   through unwritten and written policies and procedures?

10        A    She, of course, made sure the club was being

11   ran how it was ran, making sure management is doing

12   their job as to what they see fit.

13        Q    And how do you know that?

14        A    Well, I mean, because they own it and so

15   that just makes sense to me.

16        Q    But you don't have any direct, personal

17   knowledge of that being the case, it's your

18   assumption?

19        A    I suppose.

20        Q    So you are aware of the fact that you have

21   sued A&D Interests, Incorporated doing business as

22   Heartbreakers, Mike Armstrong, and Peggy Armstrong,

23   right?

24        A    Correct.

25        Q    Are you seeking money in your lawsuit -- in
```

1  this lawsuit?

2        A    Yes.

3        Q    What sort of money are you seeking?

4        A    I do not have a specific -- I don't have any

5  specifics for that.

6        Q    Let me show you something that your

7  attorneys have drafted on your behalf.  This is a

8  document called Plaintiffs' Initial Disclosures.  I

9  don't know if you've ever seen it or not, but this is

10  what your attorneys have informed us, is that you are

11  a plaintiff in the lawsuit, obviously, and that you

12  have discoverable information that you may use to

13  support your claims against the defendants, okay?

14             And one of those areas of information

15  is the facts related to your statutory and actual

16  damages.  I don't expect you to know what statutory

17  and actual damages are, but what facts related to your

18  damages can you tell me?

19             MS. REZAZADEH:  Objection; calls for a

20  legal conclusion.

21        A    What exactly are you asking me?

22        Q    (By Mr. King) I'm just trying to figure out

23  how much you're asking for in this lawsuit, whether

24  in -- however you calculate it.

25        A    I am not asking for a specific amount.

1    Q    Is there any formula that we can use to

2   calculate your damages?

3    A    I'm not sure.  I figured I would figure that

4   out with my attorney.

5    Q    Are you seeking 7.25 an hour for every hour

6   that you worked at Heartbreakers?

7              MS. REZAZADEH:  Objection; asked and

8   answered.

9    A    I'm not sure.

10    Q    (By Mr. King) Okay.  Are you seeking

11   compensation for any overtime hours that you say that

12   you have worked at Heartbreakers?

13    A    I am not 100 percent sure.

14    Q    Do you recall any -- any weeks during your

15   time at Heartbreakers in 2019 in which you worked in

16   excess of 40 hours in a -- in a week?

17    A    Well, I -- I feel like I have.

18    Q    Can you recall any instances in which you

19   had?

20    A    No.

21    Q    Do you -- so are you claiming that you are

22   entitled to overtime compensation for working 40

23   hours -- in excess of 40 hours in any seven-day period

24   of time?

25              MS. REZAZADEH:  Objection; asked and

1   answered.

2        A    I personally think that I -- I have worked

3   over 40 hours, but I mean, I don't even think that

4   time sheet cards are even that accurate.

5        Q    (By Mr. King) And that's all I -- and I

6   understand that you feel that you have worked in

7   excess of 40 hours in some workweek or workweeks, and

8   what I -- I just want to know from you is how many --

9   how many times that happened in 2019.

10       A    I -- I can't say how many times that

11   happened.

12       Q    Can you say how many -- how many hours over

13   40 in any seven-day period of time you recall working?

14   For example, there was a workweek in which I worked 45

15   hours or 50 hours.

16       A    No.

17       Q    Have you tried to recall that?

18       A    I mean, I -- I've thought about it, but I

19   mean, I can't -- I can't say anything specific.

20       Q    Is -- is there any -- any source of

21   information that might refresh your recollection or

22   provide some insight into your claim that you are

23   entitled to overtime compensation for working in

24   excess of 40 hours in any particular seven-day period

25   of time?

1        MS. REZAZADEH:  Objection; vague.

2     A    No.

3     Q    (By Mr. King) So do you have no facts

4  related to the damages that you are claiming here?

5        MS. REZAZADEH:  Objection; calls for a

6  legal conclusion, misquoting the deponent.

7     A    I don't really know what to say to that.

8     Q    What sums of money do you claim defendants'

9  conduct caused you to lose?

10     A    I have no -- no, like, set amount of money

11  or an estimate right now.

12     Q    Is that going to change in the future?

13        MS. REZAZADEH:  Objection; vague.

14     A    I -- I do not know.  That's something I

15  guess I would have to talk with my attorney about or

16  something.

17     Q    (By Mr. King) I understand.  And the reason

18  why I'm asking you all these repetitive questions is

19  because I don't want to have to go to the Court and

20  have the Court say you've got to come back and do

21  this whole thing with me all over again.  Because one

22  of the things that I'm trying to find out is how much

23  money you're claiming my client -- clients should pay

24  you.  And what I'm hearing is that you have no idea.

25  And so this is your opportunity to tell me something

 1  about it.

 2              MS. REZAZADEH:  Is there a question?

 3              MR. KING:  Yeah.  I'm giving your

 4  client an opportunity to avoid another deposition

 5  because I'm going to file a motion to compel with her

 6  and Chapman because they have no idea what their

 7  damages are, none.  They can't even tell me, "Yeah, I

 8  think I worked 20 hours in August of 2019 so multiply

 9  that by 7.25 an hour, that's my minimum wage damage."

10              There's nothing.  It's -- it's baffling

11  to me why your clients are being told not to tell --

12  give any information about their damages.

13              MS. REZAZADEH:  Maybe you're not asking

14  the right questions.  They can't do calculations for

15  you off the top -- off of memory and without their

16  attorney advising them what their rights are under the

17  law.

18              MR. KING:  Okay.  Well, you're aware of

19  the burden shift to the framework if an employee says

20  that the employer's records are inaccurate or in any

21  way misleading, right?

22              MS. REZAZADEH:  (Moving head from side

23  to side.)

24              MR. KING:  You're not aware of that?

25              MS. REZAZADEH:  Are you arguing with me

Deposition of Stacey Kibodeaux                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

 1  or are you going to ask her a question?

 2                  MR. KING:  Okay.  Well, I'm trying to

 3  avoid a situation where I get ambushed at trial

 4  because now we've got, "Oh, my memory is refreshed."

 5  I've got to know the range of damages and it's not in

 6  your disclosures.

 7                  I do not want to have to come -- go to

 8  the Court and say they have -- they have got to

 9  disclose this information.

10                  MS. REZAZADEH:  Do you want to talk off

11  the record or do you want to -- do you want to finish

12  your deposition and discuss this off the record?

13                  MR. KING:  No.  I want it on the record

14  because I want to go --

15                  MS. REZAZADEH:  We'll complement our

16  disclosures for you.  It's not -- there's no dead --

17  we haven't passed that deadline so I don't know why

18  you're --

19                  (Speaking simultaneously.)

20                  MR. KING:  This case has been on file

21  for well over a year and there's no supplementation

22  here.  I mean, that's a problem.

23                  MS. REZAZADEH:  Then move to compel our

24  disclosures and we'll supplement them.  I mean, I

25  don't have to tell you --

```
 1                    MR. KING:  And if you supplement them,

 2   I'm going to ask --

 3                    (Speaking simultaneously.)

 4                    MS. REZAZADEH:  I just --

 5                    THE REPORTER:  Guys, I can only take

 6   down one person at a time.

 7                    MS. REZAZADEH:  I'm sure that if you

 8   sent us a letter requesting it, that we would oblige.

 9                    MR. KING:  You -- under Rule 26, you

10   are -- you have the automatic obligation --

11                    MS. REZAZADEH:  I'm not arguing on the

12   record anymore.

13                    MR. KING:  And this is my opportunity

14   to ask your client what her damages are.  She has no

15   idea.

16                    MS. REZAZADEH:  Your opinion.

17                    MR. KING:  And if you want me to, you

18   know, go ask the Court compel her to come back, I can

19   do that.  Or she can just say I don't know and I'll

20   move for summary judgment on her damages and get the

21   case dropped.

22                    MS. REZAZADEH:  We can call Leigh in

23   here and she can come and argue with you because I'm

24   not going to -- I'm not going to do it.  I'm tired.

25                    MR. KING:  I'll talk to Leigh
```

 1   afterwards.

 2        Q    (By Mr. King) Ms. Kibodeaux, I am sorry for

 3   that di -- that horrific digression.  So the bottom

 4   line is you don't know how many hours you worked in

 5   2019?

 6                MS. REZAZADEH:  Objection; vague.

 7        A    Well, I gave my estimate to my best

 8   recollection.

 9        Q    (By Mr. King) Fair enough.  And how much --

10   what categories of money for damages are you going to

11   tell a jury in this case that you should be paid by my

12   client?

13        A    I mean, like I said, I -- I really don't

14   know.  Like, I'm going to have to talk to my attorney

15   and figure that out.

16        Q    Do you have any idea how many hours any

17   other dancers have worked or do we have to ask them

18   too?

19        A    I don't know how many hours anybody works.

20        Q    Do you want to notify other dancers about

21   your lawsuit to give them an opportunity to join and

22   sue Heartbreakers?

23        A    Well, I mean, I -- I would like if other

24   people helped and jumped on.

25        Q    Why is that?

1     A    Well, at some point just because I think

2  that's what's right.

3     Q    And why is that right?

4          MS. REZAZADEH:  Objection; vague, asked

5  and answered.

6     Q    (By Mr. King) I'll ask it like this:  What

7  do you want other entertainers to obtain from this

8  lawsuit?

9     A    I want other dancers to know that -- that

10 this just isn't fair.  It's just not fair.

11    Q    What?

12    A    Like how Heartbreakers works, to me, is just

13 not fair at all.

14    Q    Do you want other dancers to be treated as

15 employees?

16          MS. REZAZADEH:  Objection; calls for a

17 legal conclusion.

18    Q    (By Mr. King) Go ahead.

19    A    I do not have an answer for that.

20    Q    Do you want Heartbreakers to pay all of its

21 dancers 7.25 an hour, minimum wage, for their work as

22 dancers?

23          MS. REZAZADEH:  Objection; incomplete

24 hypothetical.

25    A    I don't know the answer to that either.  All

 1    I know is that what happened to me is happening to

 2    other dancers and they just don't like that.

 3         Q    (By Mr. King) And what happened to you is

 4    you feel that you were treated unfairly, right?

 5         A    Correct.

 6         Q    You -- you feel that Whitey was very harsh

 7    with you, right?

 8         A    Well, I mean, sure.  Yeah.

 9         Q    That Whitey was not nice to you, right?

10         A    No, he wasn't nice to anybody.

11         Q    I've met the guy.  I understand it he looks

12    like Will Ferrell's grandfather.  I get it, okay?

13              MS. REZAZADEH:  Gosh.

14         Q    (By Mr. King) Do you even care whether

15    your -- you were or were not treated as an employee or

16    independent contractor?

17              MS. REZAZADEH:  Objection; vague.

18         A    All I know is that I was given some stuff to

19    sign and it wasn't explained to me and I didn't know

20    what to expect from it.

21         Q    (By Mr. King) Aside from money, is there

22    any -- some unknown amount of money, is there anything

23    else that you are seeking out of this lawsuit?

24         A    Just more fair rights for dancers, really.

25         Q    And which rights would those be?

1    A    Well, we shouldn't be pressured to give

2  percentages of our money away, and we just -- everyone

3  needs to be treated as an independent contractor or as

4  an employee, not some weird mix.

5    Q    And do you feel that you were treated as a

6  mix of those two things?

7    A    Yes.  Very confusing.

8    Q    And do you think that every -- every other

9  dancers at Heartbreakers was a mix of those two

10  things?

11    A    Yes.

12        MR. KING:  I'll pass the witness.

13        MS. REZAZADEH:  Okay, Stacey.  I'll try

14  to make this as quick as possible.

15                E X A M I N A T I O N

16  BY MS. REZAZADEH:

17    Q    Did Heartbreakers expect you to make money

18  when you came into work for a shift?

19    A    Yes.

20    Q    And why is that?

21    A    Because if we make money as the dancers,

22  then they make money to keep their club going off of

23  our money and stuff too.

24    Q    And how did the club make money off of the

25  money that you made?

```
 1        A      By --

 2                    MR. KING:   Objection; leading.

 3        A      -- taking percentages of our dancer dollars,

 4   tip-out fees, the DJ, the management tips, the skips,

 5   including the skips if you wanted to leave early, with

 6   that amount too.

 7        Q      (By Ms. Rezazadeh) Uh-huh.   And how -- what

 8   is the percentage on the dance dollars, to your

 9   understanding, that you mentioned?

10        A      I believe it's about 20 percent.

11        Q      So explain to me how that works.

12                    MR. KING:   Objection; vague.

13        Q      (By Ms. Rezazadeh) How did you get

14   20 percent?

15        A      Well, a lot of the dancer dollars will be,

16   like, the $25 bills, and then they take $5 off of

17   that.

18        Q      Right.   Now, just a couple of questions

19   about the Facebook post that he showed you earlier.

20   It's Exhibit 2, I believe.   Do you see it?

21        A      I do not see it.

22                    MR. KING:   Sorry.   I had mine on.

23                    MS. REZAZADEH:   Oh, no worries.

24        Q      (By Ms. Rezazadeh) Can you see it now?

25        A      Yes.
```

1    Q    Did -- would -- when does it show you made

2   this post?

3    A    January 27th, 2020.

4    Q    So -- and when did you stop working at

5   Heartbreakers?

6    A    Before that.

7    Q    Right.  So sitting here today, do you think

8   this post had anything to do with your work at

9   Heartbreakers?

10    A    No.

11         MR. KING:  Objection; leading.

12    A    My answer was no.

13    Q    (By Ms. Rezazadeh) Oh, sorry.  I didn't

14   hear you.

15         Did Heartbreakers control how you

16   performed when you came into work?

17    A    Yes.

18    Q    They control your entire appearance?

19         MR. KING:  Leading.

20    A    They, like, controlled, like, the outfits,

21   hair, and makeup and the songs we had to dance to.

22    Q    (By Ms. Rezazadeh) Okay.

23         MS. REZAZADEH:  I don't remember what

24   exhibit the license agreement was.

25         MR. KING:  6.

```
 1                    MS. REZAZADEH:   Okay.

 2        Q     (By Ms. Rezazadeh) I'm just curious,

 3   Stacey, this license agreement that we talked about

 4   earlier -- or Will asked you about earlier, that --

 5   this address at the very bottom, is that an address

 6   you've ever lived -- are you -- do you know that

 7   address?  Are you familiar with that address?

 8        A     Yes.  I believe I lived there, like, very,

 9   very briefly.

10        Q     Okay.  But you said this -- is this your

11   handwriting where the address is written?

12        A     No.

13        Q     And the date, what does it say the date it

14   was signed?

15        A     It says it was signed January 8th, 2018.

16        Q     And when did you start working at

17   Heartbreakers?

18        A     A whole year after that.

19        Q     Okay.  Will asked you earlier if there's

20   some time -- some nights you ended up negative at the

21   end of the night, and you said yes; is that correct?

22        A     Yes.

23        Q     Do you have any reason -- scratch that.

24              The exhibit that he showed you earlier,

25   the daily earnings report, there's some amount on each
```

1    line here, right?  Like some numbers, a dollar amount

2    listed on each line?

3        A    Right.

4        Q    So if you ended up negative one night, maybe

5    it wouldn't show up on here if there's no number,

6    dollar amount to put there?

7                MR. KING:  Objection; leading, calls

8    for speculation.

9        Q    (By Ms. Rezazadeh) Is that possible?

10   Sorry.  I didn't hear you.

11       A    It's possible.

12       Q    Okay.  Because Will asked you about this

13   earlier and you said -- did you think all these --

14   that it included all the dates you worked there, this

15   document?

16       A    I don't think so.

17       Q    Okay.  So is it possible that the dates you

18   were negative aren't on here, maybe?

19                MR. KING:  Objection; speculation.

20       A    I think that that might be possible, but --

21       Q    (By Ms. Rezazadeh) That's all.

22       A    Yeah, I can't guarantee.

23       Q    Yeah.  At the end of the night, what did you

24   do with your dance dollars?

25       A    I would have to turn them in to the house

 1    mom and management.

 2         Q     And then what would they do?

 3         A     They would count them out and take their

 4    percentage and then give me whatever is left in -- in

 5    regular cash.

 6         Q     And you said earlier that sometimes you had

 7    to stay after closing?

 8         A     Yes.

 9         Q     So could it have been that you were trying

10    to get your dance dollars cashed out and that's why

11    you were staying after closing?

12              MR. KING:  Objection; leading.

13         A     Yes.

14              MS. REZAZADEH:  Okay.  Pass the

15    witness.

16          F U R T H E R   E X A M I N A T I O N

17    BY MR. KING:

18         Q     Did you receive a 1099 from Heartbreakers,

19    Ms. Kibodeaux?

20         A     I don't know.

21         Q     Did you make at least $12,587 in 2019 from

22    your work at Heartbreakers?

23         A     I do not know.

24         Q     Did you make more than that sum at

25    Heartbreakers?

Case 3:20-cv-00008   Document 82-1   Filed on 05/21/21 in TXSD   Page 181 of 186

**EXHIBIT A**

Deposition of Stacey Kibodeaux                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

```
 1        A    I don't know.

 2        Q    You have no idea?  You have no records?

 3        A    No.

 4        Q    You have no idea where the figure in Box 7

 5   comes from?

 6        A    No.

 7        Q    Do you know whether Box 7 reflects money

 8   that you received via credit card payments?

 9        A    I'm not sure what that is.

10             MR. KING:  That's it.  Okay.

11             MS. REZAZADEH:  Reserve for trial.

12             THE REPORTER:  Ms. Rezaz -- I'm not

13   even going to try.  Do you need a copy of the

14   transcript?

15             MS. REZAZADEH:  Yes.  If you would just

16   e-mail me any order form or whatever, I'll forward it

17   to my paralegal and she'll fill out and -- for

18   whatever we're supposed to order.

19             THE REPORTER:  Okay.  I sure will.

20   Yes, ma'am.

21             MS. REZAZADEH:  And then she'll read

22   and sign, of course.

23             THE REPORTER:  Read and sign also.

24   Okay.

25             MR. KING:  What's your turnaround on
```

1   deposition transcripts?

2                    THE REPORTER:  It's ten business days.

3                    (Discussion off the record.)

4                    MS. REZAZADEH:  Casey, if they request

5   an expedited one, I will need one too.

6                    THE REPORTER:  Okay.  Sure thing.

7   If --

8                    MR. KING:  I'll need an expedited

9   transcript.

10                    THE REPORTER:  Okay.  How quick do you

11   need it?

12                    MR. KING:  Do you think by Monday?  Is

13   that doable?

14                    THE REPORTER:  This coming Monday?  Let

15   me look at a calendar.  That would be...

16                    (Discussion off the record.)

17                    THE REPORTER:  I can do it by Monday.

18   That would be the 26th, so yeah.

19                    MR. KING:  Okay.

20                    (The deposition concluded at 2:52 p.m.)

21

22

23

24

25

Case 3:20-cv-00008   Document 82-1   Filed on 05/21/21 in TXSD   Page 183 of 186   **EXHIBIT A**

Deposition of Stacey Kibodeaux                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

1        WITNESS CORRECTIONS AND SIGNATURE

2              Please indicate changes on this sheet of
paper, giving the change, page number, line number,
3    and reason for the change.  Please sign each page of
changes.

4

PAGE/LINE CORRECTION                    REASON FOR CHANGE
5

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
                    STACEY KIBODEAUX

```
 1              I, STACEY KIBODEAUX, solemnly
    swear or affirm under the pains and penalties of
 2  perjury that the foregoing pages contain a true and
    correct transcript of the testimony given by me at the
 3  time and place stated herein, except as noted on the
    previous correction page(s), and that I am signing
 4  this before a Notary Public.

 5

 6            _____
                              STACEY KIBODEAUX
 7

 8  STATE OF _____      *

 9  COUNTY OF _____       *

10
                 Before me, _____,
11  on this day personally appeared STACEY KIBODEAUX,
    known to me, or proved to me under oath, to be the
12  person whose name is subscribed to the foregoing
    instrument and acknowledged to me that he/she executed
13  the same for the purposes and consideration therein
    expressed.

14
                 Given under my hand and seal of
15  office on this, the _____ day of _____,
    20_____.
16

17

18  _____
19  NOTARY PUBLIC IN AND FOR THE
    STATE OF _____
20
    My Commission Expires: _____
21

22

23

24

25              JOB NO. 10803
```

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     GALVESTON DIVISION

 3  STACEY KIBODEAUX, a/k/a      §
    "ILLUSION," et al.,          §
 4  individually, and on behalf  §
    of all others similarly      §
 5  situated,                    §
                                 §
 6       Plaintiffs,             §
                                 §
 7  v.                           §  CIVIL ACTION NO.
                                 §         3:20-cv-00008
 8  A&D INTERESTS, INC., d/b/a   §
    HEARTBREAKERS GENTLEMAN'S    §
 9  CLUB, et al.,                §
                                 §
10       Defendants.            §

11                 REPORTER'S CERTIFICATION
                    ORAL DEPOSITION OF
12                   STACEY KIBODEAUX
                     APRIL 22, 2021
13                  (REPORTED REMOTELY)

14           I, CASSANDRA LEE, a Certified Shorthand

15  Reporter in and for the State of Texas, hereby certify

16  to the following:

17           That the witness, STACEY KIBODEAUX, was duly

18  sworn by the officer and that the transcript of the

19  oral deposition is a true record of the testimony

20  given by the witness;

21           That the deposition transcript was submitted

22  on _____, 20____, to the witness, or to the

23  attorney for the witness, for examination, signature,

24  and return to Infinity Reporting Group, LLC, by

25  _____, 20____;
```

```
 1            That the amount of time used by each party

 2    at the deposition is as follows:

 3                    MS. GHAZZALEH REZAZADEH - 00:07

 4                    MR. WILLIAM X. KING - 04:11

 5            That pursuant to information given to the

 6    deposition officer at the time said testimony was

 7    taken, the following includes counsel for all parties

 8    of record:

 9                    MS. GHAZZALEH REZAZADEH, ATTORNEY FOR PLAINTIFFS

10                    MR. WILLIAM X. KING, ATTORNEY FOR DEFENDANTS

11            I further certify that I am neither counsel

12    for, related to, nor employed by any of the parties or

13    attorneys in the action in which this proceeding was

14    taken, and further that I am not financially or

15    otherwise interested in the outcome of the action.

16            Certified to by me this the _____ day of
        _____, 20___.
17

18                      _____
                        CASSANDRA LEE, CSR
19                      TEXAS CSR NO. 8900
                        Expiration Date:  02/28/22
20
      INFINITY REPORTING GROUP, LLC
21    Firm Registration No. 782
      11231 Richmond Avenue, Suite D110
22    Houston, Texas  77082
      Phone: 832.930.4484
23

24

25                      JOB NO. 10803
```