Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

STACEY KIBODEAUX, A/K/A        )
"ILLUSION," ET AL.,            )
INDIVIDUALLY AND ON BEHALF     )
OF ALL OTHERS SIMILARLY        )
SITUATED,                      )
                               )
              Plaintiffs,      )
                               )
VS.                            ) CIVIL ACTION
                               )
A&D INTERESTS, INC., D/B/A     ) NO.: 3:20-CV-00008
HEARTBREAKERS GENTLEMAN'S      )
CLUB, ET AL.,                  )
              Defendants.      )

------------------------------------

ORAL DEPOSITION OF

HAILEY CHAPMAN

APRIL 20, 2021

VOLUME 1 OF 1

(REPORTED REMOTELY)

------------------------------------

ORAL DEPOSITION OF HAILEY CHAPMAN, produced as a

witness at the instance of the DEFENDANTS, and duly

sworn, was taken in the above-styled and numbered cause

on April 20, 2021, from 9:02 a.m. to 11:51 p.m., via

videoconference, before Jordana Hodges, CSR in and for

the State of Texas, reported remotely by machine

shorthand, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

Videotaped Deposition of Hailey Chapman

Page 2

```
 1                    A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:

 3          MS. GHAZZALEH REZAZADEH
            ELLZEY & ASSOCIATES
 4          1105 Milford Street
            Houston, Texas  77006
 5          888.350.3931
            ghazzaleh@ellzeylaw.com
 6
      FOR THE DEFENDANTS A&D INTERESTS, INC., D/B/A
 7    HEARTBREAKERS GENTLEMAN'S CLUB, ET AL.:

 8          MR. WILLIAM KING
            WALLACE & ALLEN
 9          440 Louisiana Street
            Suite 1500
10          Houston, Texas  77002
            713.227.1744
11          wking@wallaceallen.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT B

Videotaped Deposition of Hailey Chapman

Page 3

1                          INDEX

2                                                  PAGE

3   Appearances......................................... 2

4   HAILEY CHAPMAN
        Examination by Mr. King......................... 4
5
    Signature and Changes............................ 115
6
    Reporter's Certificate........................... 117
7

8

9                        EXHIBITS

    NO.   DESCRIPTION                              PAGE
10
    1   A&D Interests, Inc. Agreement................    4
11
    2   Hailey Chapman's 1099 for 2018..............    4
12
    3   Hours & Earnings Report.....................    4
13
    4   Independent Contractor/License Agreement......    4
14
    5   Hours & Earning Report......................    4
15
    6   Attorney Fee Agreement......................    4
16
    7   Video.......................................    4
17

18

19

20

21

22

23

24

25

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 4

```
 1                   P R O C E E D I N G S
 2           (Exhibit Nos. 1 through 7 premarked.)
 3                THE REPORTER:  Okay.  Today's date is April
 4   20th, and it is 9:02 a.m.  We are on the record.
 5                This deposition is being conducted remotely
 6   in accordance with the Current Emergency Order regarding
 7   the COVID-19 State of Disaster.
 8                My name is Jordana Hodges, CSR No. 8887,
 9   and I am located at my residence in Midland, Texas.
10                Would counsel please state their
11   appearances and locations for the record, after which I
12   will swear in the witness.
13                MR. KING:  William King for the defendants.
14                MS. REZAZADEH:  Ghazzaleh Rezazadeh for the
15   plaintiffs in Houston, Texas.
16                THE REPORTER:  Would you please raise your
17   right hand, Ms. Chapman.
18                      (Witness sworn.)
19                      HAILEY CHAPMAN,
20   having been first duly sworn, testified as follows:
21                      EXAMINATION
22   BY MR. KING:
23      Q.  All right.  Good morning, Ms. Chapman.  How are
24   you?
25      A.  Good.  How are you?
```

Videotaped Deposition of Hailey Chapman

Page 5

1      Q.  I'm doing well.  Thank you.

2           Have you ever been deposed before?

3      A.  In court?

4      Q.  Yeah.

5      A.  Yes.

6      Q.  Okay.  So have you testified in a courtroom

7  before?

8      A.  No.

9      Q.  Okay.  Have you been deposed like what we're

10  doing right here, although in person?

11     A.  No.

12     Q.  Okay.  Have you ever provided any sworn

13  testimony for any kind of court proceeding?

14     A.  Yes.

15     Q.  Okay.  What was that?

16     A.  I was in a car accident.

17     Q.  Okay.  Were you a plaintiff or a defendant in

18  the case or just a witness?

19     A.  I was defendant.

20          MS. REZAZADEH:  I think she misunderstands,

21  but...

22          MR. KING:  I understand.  I get it.

23     Q.  (BY MR. KING)  Have you ever had two lawyers

24  asking you questions after you swore your hand -- or

25  raised your hand and swore under oath to tell the truth?

Videotaped Deposition of Hailey Chapman

Page 6

1       A.   My lawyer, yes, sir.

2       Q.   Okay.  So since you've already been deposed --

3   it sounds like, I think -- I'll just go over a couple of

4   ground rules.

5            The first one is, the court reporter can

6   only take down one talking at a time.  So if you can

7   just let me get my question out, I'll try to make sure

8   that you finish your answer after that because we don't

9   want people talking over each other, okay?

10      A.   Okay.

11      Q.   Every once in a while, your counsel might

12  object to one of my questions.  Unless she instructs you

13  not to answer the question that I have asked, you have

14  to go ahead and answer it.

15      A.   Okay.

16      Q.   Sometimes I have ask questions that are just

17  bad or incomprehensible or come out like word salad.  If

18  you don't understand what I'm asking you, please, by all

19  means, make sure to let me know, Hey, I don't know what

20  you're talking about, okay?

21      A.   Okay.

22      Q.   And as I mentioned earlier, you are testifying

23  under oath.  Do you understand what that means?

24      A.   Yes.

25      Q.   What have you done to prepare for today's

Videotaped Deposition of Hailey Chapman

Page 7

1    deposition?

2        A.  I just went over a few documents with my

3    lawyer.

4        Q.  And what documents were those?

5        A.  I couldn't tell you any names.

6        Q.  What did those documents contain, just the

7    general subject matter?

8        A.  The general subject matter, it just had to do

9    with Heartbreakers.

10       Q.  Did you review the complaint that was filed in

11   this case?

12       A.  I can't recall if I did or not.

13       Q.  Did you review any records from Heartbreakers?

14       A.  I did.

15       Q.  Okay.  What records were those?

16       A.  I believe that it was -- it looked to be some

17   sort of clock in/clock out type of thing.  It had a lot

18   of numbers.  I wasn't really sure.

19       Q.  Can you see my screen?

20       A.  Yes.

21       Q.  Is this -- is this the document that you

22   reviewed?

23       A.  Yes.

24            MR. KING:  And for the record, this is a

25   document labeled Heartbreakers_000069.

Videotaped Deposition of Hailey Chapman

Page 8

1      Q.  (BY MR. KING)  Okay.  So you reviewed this

2  document, correct?

3      A.  Yes.

4      Q.  Did you see any inaccuracies in this document?

5          MS. REZAZADEH:  Objection, vague.

6      Q.  (BY MR. KING)  Go ahead and answer if you can.

7      A.  Yeah, the whole thing.

8      Q.  Okay.  And let me back up.  I'll represent to

9  you that this document shows the dates that

10  Heartbreakers has you as having appeared at the club to

11  perform.  What -- what is inaccurate about this

12  document?

13      A.  Everything besides the day in, and I don't

14  really recognize anything on there besides the dates

15  that I went in.

16      Q.  Does this document, to your knowledge, reflect

17  all of the days that you performed at Heartbreakers?

18      A.  I believe so.

19      Q.  Did you perform at Heartbreakers on or after

20  August 9th of 2018?

21      A.  I did not.

22      Q.  Did you perform at Heartbreakers on or before

23  July 28th, 2018?

24      A.  Before, no.

25      Q.  As far as the time in column, what kind of

Videotaped Deposition of Hailey Chapman

Page 9

1   inaccuracies have you identified?

2       A.  The time in -- well, I'm not really sure what

3   20 is.  Is that --

4       Q.  I think that they have -- it's a 24-hour clock

5   system.  So if you subtract out 12 from 20, so 20 hours

6   would be 8:00 p.m. at night.

7       A.  I can't say that that's correct.  I only

8   remember going in around 6:00, usually.

9       Q.  So you usually go in at around 6:00.  Did you

10  ever go in at 8:00 or 8:15?

11      A.  I could have.

12      Q.  Sitting here today, do you recall whether you

13  went in routinely at 6:00 or did the times vary?

14      A.  The times varied depending on the day.

15      Q.  Did you have a preferred day that you would go

16  in?

17      A.  No.

18      Q.  Have you performed at any other gentleman's

19  clubs, strip clubs since 2018 besides Heartbreakers?

20      A.  There's a club called Double Shoe in Kemah?

21      Q.  And from about when to when did you perform at

22  Double Shoe?

23      A.  One week before Heartbreakers.  I only stayed

24  there seven days.

25      Q.  I'm sorry, what was the last thing you said?

Videotaped Deposition of Hailey Chapman

Page 10

```
 1       A.  One week before Heartbreakers.  I only stayed
 2   seven days.
 3       Q.  Any other clubs?
 4       A.  Yes.
 5       Q.  Was Heartbreakers the last club that you
 6   performed at?
 7       A.  No.
 8       Q.  Which clubs after Heartbreakers did you perform
 9   at?
10       A.  I performed at Colorado Gentlemen's Club in
11   Houston, Texas.
12       Q.  And from about when to when did you perform at
13   Colorado?
14       A.  I want to say the end of August until the
15   beginning of October, I believe.
16       Q.  Okay.  And if you don't remember the exact days
17   and hours that you showed up three years ago, that's
18   okay.
19       A.  It's around about that time.
20       Q.  Okay.  And so was that roughly approximately
21   August or October of 2018?
22       A.  Yes.
23       Q.  And when did you -- sorry, scratch that.
24           So the last time that you performed in
25   Colorado was October 2018?
```

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 11

```
 1      A.  Yes.
 2      Q.  After that, did you perform at any other club?
 3      A.  No.
 4      Q.  So since October 2018, you haven't performed as
 5  a dancer at any clubs --
 6      A.  No.
 7      Q.  -- true?
 8      A.  True.
 9      Q.  Aside from exotic dance clubs, have you worked
10  at any other kinds of establishments?
11      A.  Yes.
12      Q.  Go ahead.
13      A.  I worked for a law firm in 2017.  I've worked
14  at a few restaurants and -- yeah.
15      Q.  Since 2017, can you just give me a rundown of
16  the different restaurants?
17      A.  Sure.  The different restaurants or do you want
18  me to start with the law firm and then go from there?
19      Q.  Let's go in reverse -- or yeah, reverse
20  chronological order.  So we'll start with the oldest
21  going first.
22      A.  The oldest one first, job-wise?
23      Q.  Yes, ma'am.
24      A.  Okay.  Kelly's was my first waitressing job.
25  And then I worked at the law office for almost a year.
```

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 12

1   And then when I turned 18, I was a dancer.  I went to

2   Double Shoe, and then I went to Heartbreakers, and then

3   I went to Colorado.  And then I was a waitress at

4   Bombshells.  And then I was a caretaker at a daycare,

5   and it's kind of different.  And then I was a waitress

6   at Hooters.  And then I didn't work for two years, I

7   started college.  And then now, I'm a waitress at Twin

8   Peaks.

9       Q.  All right.  So when you were a -- so after

10  Colorado, you went to Bombshells, right?

11      A.  Yes.

12      Q.  And from about when to when did you work at

13  Bombshells?

14      A.  I worked at Bombshells twice, actually.  When

15  to when?  So we can say October 2018 and I worked there

16  for maybe a week or two, and I just didn't like

17  management.

18      Q.  Understood.  And then you -- you worked as a

19  caretaker, right?

20      A.  Yeah, I worked at a daycare.

21      Q.  A daycare?

22      A.  Yes.

23      Q.  Okay.  From when to when?

24      A.  I want to say from December 2018 until, like,

25  January or February 2020.  I'd say January of 2020.

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 13

1      Q.   So roughly a year, then, as a daycare worker,

2  and you said --

3      A.   No.

4      Q.   Pardon?

5      A.   Not a year.  It was maybe a month from the

6  end -- I'm so sorry, it was the end of 2019.  There we

7  go.  Sorry about that.

8      Q.   No problem.  Okay.  So after Bombshells, you

9  went and worked at a daycare.  So from January 2019 to

10 December 2019, where did you work, if anywhere?

11     A.   Could you repeat that question, please?

12     Q.   Sure.  That was a bad question.  Between

13 January of 2019 and December of 2019 --

14     A.   Between January 2019 and December 2019?

15     Q.   Correct.

16     A.   January 2019 to December 2019.  So January

17 2019, I worked at the daycare.  And then, I quit the

18 daycare at the end of January, beginning of February.

19 And then I went to Hooters, and I quit Hooters in

20 March 2019.

21     Q.   And when did you begin college?

22     A.   I started college in 2019.  The summer of 2019,

23 I started with the summer courses.

24     Q.   And which college is that?

25     A.   College of the Mainland.

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 14

1       Q.  And when did you begin at Twin Peaks?

2       A.  Maybe a few months ago.  We're in April, so

3  January.

4       Q.  And do you currently work at Twin Peaks?

5       A.  I do.

6       Q.  Out of curiosity, what prompted you to become

7  an exotic dancer?

8       A.  I just needed to pay my bills.

9       Q.  I understand.  What is your current telephone

10  number, ma'am?

11      A.  (281) 905-4455.

12      Q.  And who is your current cell phone carrier?

13      A.  T-Mobile.

14      Q.  And what e-mail addresses do you use?

15      A.  Haileychapman52@icloud.com.

16      Q.  Any other e-mail addresses?

17      A.  No.

18      Q.  Do you maintain a Facebook profile?

19      A.  I do.

20      Q.  Let's see if I've got it.  Is your Facebook

21  profile located at Hailey.Chapman, and then a bunch of

22  numbers after it, 3958914?

23      A.  I'm not sure what that is.

24      Q.  Do you maintain any other social media

25  accounts?

Videotaped Deposition of Hailey Chapman

Page 15

1       A.  Yes.

2       Q.  Which ones?

3       A.  Instagram and Snapchat.

4       Q.  What's your user name on Instagram?

5       A.  Can I look?

6            MS. REZAZADEH:  No, you don't need to.

7   She's saying look on her phone, I guess.

8       Q.  (BY MR. KING)  You don't remember what your

9   handle is?

10      A.  I have two of them.

11      Q.  And do you know what they are, off the top of

12  your head?

13      A.  I think one of them is HTX.Hailey3.  And then

14  don't quote me, but I think the second one is

15  Hailey.HTX3.

16      Q.  All right.  And on Snapchat, do you have any

17  user names?

18      A.  Yes, OhBae_Hailey3.

19      Q.  That's all right.  If somebody asked me what my

20  username were --

21      A.  Yeah, I made it a long time ago.

22      Q.  -- I would be embarrassed to say it too.

23            And has anyone with the club ever

24  interacted with you on social media.  Facebook,

25  Instagram, Twitter, Snapchat or any social media

EXHIBIT B

Videotaped Deposition of Hailey Chapman

Page 16

1    platform?

2         A.   No.

3         Q.   Have you ever posted on any of your social

4    media platforms that you've identified about

5    Heartbreakers?

6         A.   No.

7         Q.   Have you ever posted comments on social media

8    on somebody else's page, profile, or anything else about

9    Heartbreakers?

10        A.   No.

11        Q.   Have you searched for any text messages from

12   anyone affiliated with Heartbreakers, managers,

13   waitresses, DJs, bartenders?

14        A.   No.

15        Q.   Okay.  So you have not searched for any text

16   messages from people with Heartbreakers, right?

17        A.   No.

18        Q.   And so I take it that you haven't found any

19   text messages from anybody affiliated with

20   Heartbreakers, correct?

21        A.   Can you repeat that question?

22        Q.   Sure.  I take it since you haven't searched for

23   any of those documents we're talking about -- or text

24   messages, you also haven't found any text messages?

25        A.   No.

Videotaped Deposition of Hailey Chapman

1      Q.   Do you recall ever sending or receiving any

2  text messages from any managers, DJs, bartenders,

3  waitresses, or any other personnel at Heartbreakers?

4      A.   No.

5      Q.   Is it fair to say no one at Heartbreakers ever

6  contacted you through text messages?

7      A.   Yes.

8      Q.   What about any dancers?

9      A.   No.

10     Q.   You never contacted any dancers?

11     A.   No.

12     Q.   Have you had any communications in any form

13  with the other plaintiffs in this lawsuit?

14     A.   No.

15     Q.   Do you know who the other plaintiffs are?

16     A.   No.

17     Q.   Do you know an individual named Stacy

18  Kibodeaux, also known as Illusion?

19     A.   I can't say for sure.

20     Q.   Do you know somebody named Jean Hoffmeister,

21  also known as, I think, Jane?

22     A.   Not that I know of.

23     Q.   Have you ever talked to someone named Roxanne

24  Murillo?

25     A.   Not that I know of.

**EXHIBIT B**
Videotaped Deposition of Hailey Chapman

Page 18

1      Q.   Also known as Unique or Roxanne?

2      A.   Not that I know of.

3      Q.   What was your stage name at Heartbreakers?

4      A.   Daisy.

5      Q.   You laughed.  Is that was that just

6   your preferred name?

7      A.   I just literally made it up randomly.  I just

8   came up with it, yeah.

9      Q.   Do you know why dancers have stage names now?

10     A.   Do what?

11     Q.   Why do dancers have stage names?

12     A.   So you don't have to tell people your real

13   name.

14     Q.   This might be a stupid question, but why

15   wouldn't you want to tell people your real name if

16   you're an exotic dancer?

17     A.   Because there's men that can stalk you and do

18   things in that kind of manner.

19     Q.   And so --

20     A.   Yeah.

21     Q.   -- it's a privacy thing, right?

22     A.   Yes, yes.

23     Q.   And it's important that you keep your

24   information confidential, right?

25     A.   Yes.

Videotaped Deposition of Hailey Chapman

Page 19

1      Q.  Is it -- for you, at least, is it something

2    that you've made known to your family and friends that

3    you were a dancer?

4      A.  My boyfriend only and my mother.

5      Q.  And is your mother's name Misty?

6      A.  Yes.

7      Q.  How did you find out about this lawsuit?

8      A.  I'm assuming that one of the girls that is in

9    this mentioned to the lawyer that I worked there, and

10   they asked me if I wanted to join and I said I do.

11     Q.  Do you know which person that was that --

12     A.  I couldn't -- I couldn't -- I couldn't tell you

13   her name.

14     Q.  Okay.  So you received a call from somebody

15   about joining the lawsuit?

16     A.  Yes.

17     Q.  And who did you receive that call from?

18     A.  I don't remember the name.

19     Q.  Was it a -- was it the dancer or a lawyer?

20     A.  It was a lawyer.

21     Q.  And when did that call occur?

22     A.  It was a letter.

23     Q.  A letter?

24     A.  Yes.

25     Q.  And what did that -- what did that letter say?

Videotaped Deposition of Hailey Chapman

Page 20

1    A.   That there's a girl from Heartbreakers that's

2  making a claim, and asking if I would be interested in

3  joining.

4    Q.   And I take it you received that letter in the

5  mail?

6    A.   Yes.

7    Q.   Did you receive an e-mail?

8    A.   Not that I can remember.

9    Q.   Did you receive a text message?

10    A.   No.

11    Q.   Did you receive any kind of notice on social

12  media?

13    A.   No.

14    Q.   Do you still have that letter?

15    A.   I don't.

16    Q.   Do you recall approximately when you received

17  this letter?

18    A.   In 20- -- the end of 2019, maybe the beginning

19  of 2020.  I'm not 100 percent sure.

20    Q.   And I will represent to you that this lawsuit

21  was filed in -- or on January 14th of 2020, is that --

22    A.   Yeah, it was around that time, I want to say.

23    Q.   And what did you do with that letter?

24    A.   I reached out to them and let them know that I

25  was interested and that I did agree.

EXHIBIT B

Videotaped Deposition of Hailey Chapman

Page 21

1      Q.   You did agree to what?

2      A.   That I wanted to pursue.

3      Q.   And why did you want to pursue the lawsuit?

4      A.   Because I felt like Heartbreakers wasn't

5   following the rules correctly, and I wasn't being

6   treated fairly.

7      Q.   What rules do you say that Heartbreakers wasn't

8   following?

9      A.   Whenever I signed the contract, there was only

10   one fee, which was a house fee, and they did not just

11   follow that.

12      Q.   So you recall signing a dancer agreement,

13   right?

14      A.   Yes.

15      Q.   And in that dancer agreement, it spells out

16   that there's going to be a house fee, right?

17      A.   Yes.

18      Q.   And you agreed to pay that, true?

19      A.   Yes.

20      Q.   But you're talking about other monetary --

21      A.   Yes.

22      Q.   -- fees, right?

23           Can you identify what those were for me?

24      A.   Yes, there was actually multiple.  So there was

25   the houses fee, which was the fee that we agreed to, and

**EXHIBIT B**
Videotaped Deposition of Hailey Chapman

Page 22

1   which was the only fee that was in the contract that I

2   signed.

3              Once I started, I was basically conned and

4   scammed into paying multiple other fees, which were DJ

5   tip out.  There was also a fee if you wanted to skip

6   your place on stage, you would have to pay $20.  If you

7   wanted to leave early, they would calculate how many

8   times they approximated you to be on stage, and they

9   would make you pay $20 per.  There was also tipping out

10  bartenders.

11             There was also a thing called dancer money

12  or funny money.  They took money out of that too.  So

13  basically, that was -- people would purchase funny

14  money, and whenever they would purchase it, they would

15  -- Heartbreakers would take out $5 out of every $20 --

16  every $25, so it'd give them only $20.

17             And then, whenever you wanted to cash in

18  funny money -- think of it as in, like, H-E-B money --

19       Q.   Uh-huh.

20       A.   -- they would make you may a fee just to cash

21  out money that you earned.

22             So to me, it was like they just scammed any

23  way that they could.  There was also -- I want so say

24  that that's all that I can remember right now.

25       Q.   Sitting here today, have you now told me about

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 23

1   all of the different monetary fees and other stuff that

2   you say, Hey, Heartbreakers, you didn't put this in

3   contract, I didn't agree to pay this?  Have we covered

4   everything else?

5              MS. REZAZADEH:  Objection, vague.

6       Q.  (BY MR. KING)  You can answer.

7       A.  Only to my knowledge, that I can remember.

8       Q.  All right.  I'll circle back to everything that

9   you just listed out in a little bit, but I wanted to ask

10  you another question.  Have you contacted any other

11  performers about joining this lawsuit?

12      A.  No.

13      Q.  So you kept this lawsuit completely to

14  yourself, right?

15      A.  Yes, correct.

16      Q.  Have you asked any other dancers to -- for

17  information about Heartbreakers?

18      A.  No.

19      Q.  Do you know who Peggy Armstrong is?

20      A.  Who?

21      Q.  Peggy Armstrong.

22      A.  Yes.

23      Q.  Who is Peggy?

24      A.  The wife of the owner.

25      Q.  Did you ever have any interactions with Peggy?

Videotaped Deposition of Hailey Chapman

Page 24

1       A.   Not personal, but I have seen her in the club.

2       Q.   Sure.  Did Peggy ever tell you to do anything

3   or not do anything?

4       A.   Not Peggy herself.

5       Q.   Did Peggy ever give you, like, a schedule or

6   anything?

7       A.   No.

8       Q.   Did Peggy ever tell you how much money you

9   could accept or anything?

10      A.   No.

11      Q.   Is it true that the bottom line is that you

12  never had any face-to-face interaction with Peggy at any

13  time?

14      A.   Yes.

15      Q.   You're limited -- your knowledge is limited to

16  the fact that she's married to the owner?

17      A.   Yes.

18      Q.   Do you know a manager by the name of Gary

19  Lawson?

20      A.   Gary?

21      Q.   Yes.

22      A.   Yes.

23      Q.   Tell me how you knew Gary.

24      A.   I just knew that he was just one of the

25  managers.

Videotaped Deposition of Hailey Chapman

Page 25

1     Q.  Did you ever have any issues with Gary?

2     A.  No.

3          MS. GHAZZALEH:  Objection, vague.

4     Q.  (BY MR. KING)  Did you ever have any sorts of

5  interactions with Gary, good or bad?

6     A.  No.

7     Q.  What about Jeremy Goldsboro?

8     A.  I don't know who that is.

9     Q.  Never even heard of his name?

10    A.  No.

11    Q.  Carl Arceneaux, does that name ring a bell?

12    A.  No.

13    Q.  You never had any interactions with a guy named

14  Carl Arceneaux?

15    A.  No.

16    Q.  Do you remember a manager by the name of Damon

17  Jackson?

18    A.  Yep.

19    Q.  All right.  Tell me about those.

20    A.  Damon is a manager, and I can only recall

21  seeing him one time.

22    Q.  So I want to make sure I got -- understand you

23  clearly, so correct me if I'm wrong -- correct my

24  understanding.  You've only interacted with him one time

25  or you've only seen him on one day?

Videotaped Deposition of Hailey Chapman

Page 26

1       A.  I've only seen him once when I was working.

2       Q.  Did you have any interaction with Damon during

3   the one instance?

4       A.  Not that I can recall.

5       Q.  Did you have any conversations with him?

6       A.  Actually, I do remember having a conversation

7   with, I believe it to be Damon.  He -- I was on stage

8   and when I came off of stage, he approached me and he

9   told me that I had to go change my bottoms because they

10  weren't appropriate or whatever the case was.  He just

11  asked me if I could change them.

12      Q.  Did you change them?

13      A.  Yes.

14      Q.  What was wrong with your bottoms?

15      A.  I don't think I was double-layered -- or I'm

16  not 100 percent sure.  I can't remember.

17      Q.  So you just recall that Damon told you to go

18  change your bottoms, right?

19      A.  Yes.

20      Q.  And you're not exactly sure what the issue with

21  your bottoms was at the time, right?

22      A.  Yes.  I just did it because I didn't want get

23  in trouble.

24      Q.  And so you went to the locker room, right?

25      A.  Yes.

Videotaped Deposition of Hailey Chapman

Page 27

1       Q.  And what did -- did you put on like a
2  different --
3       A.  Yeah.  I just changed my whole entire outfit,
4  yes.
5       Q.  Did Damon mention anything about complying with
6  any laws?
7       A.  Not at the time.
8       Q.  Aside from that one interaction with Damon
9  Jackson, did anyone else at the club ever tell you that
10  you had to go change your attire?
11       A.  Not change my attire, but there were remarks
12  about how I wore my attire.
13       Q.  What were those remarks?
14       A.  The remarks were that I had to have my top off
15  on occasion -- in instances.  As in, it was mandatory
16  for you to have your top off when you were on stage and
17  when you were interacting with customers.
18       Q.  I guess my question was a little different.
19  I'm talking about your choice of attire?
20       A.  Could you repeat the question?
21       Q.  Sure.  Aside from this interaction that you had
22  with Damon where you were told to go change your
23  bottoms, did any other manager tell you to go change
24  your attire, your shoes, your top, your bottoms?
25       A.  I wasn't asked to change, but I was asked to

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 28

1    take it off.

2         Q.   Okay.   So I'm just asking you about the

3    changing part.

4         A.   No.

5         Q.   So no one ever told you, Hey, I don't like

6    whatever -- black tops, go change that to a green top or

7    something, right?

8         A.   No.

9         Q.   Did you ever have any interactions with the

10   DJs?

11        A.   Yes.

12        Q.   Do you recall their names?

13        A.   No.

14        Q.   What were your interactions like with the DJs?

15        A.   I only remember one DJ, and whenever you got

16   there, you had to clock in with the DJ, and you also had

17   to tip out the DJ.   So that was what my interactions

18   were.

19        Q.   Tell me about the clock in part.

20        A.   So I was 18, which meant I was underage.   So

21   whenever I got there, I had to go clock in and let them

22   know what time I was ready to be on the floor in order

23   for them to calculate how much I would have to pay.   And

24   then, I had to get a wristband because I was under 18.

25        Q.   You were under 18?

**EXHIBIT B**
Videotaped Deposition of Hailey Chapman

Page 29

```
 1      A.  I mean, I'm sorry, I was under 21.  Sorry,
 2  sorry, sorry.
 3      Q.  It's okay.
 4      A.  Yeah, I was under 21.  I was 18, so I had to
 5  wear a wristband.
 6      Q.  Why did you have to wear a wristband?
 7      A.  To let people know that I wasn't allowed to
 8  drink alcohol and that I was under 21.
 9      Q.  Did that wristband interfere with your ability
10  to do your job as a performer?
11      A.  Not personally.  It did -- did not.
12      Q.  So the whole purpose of the wristband was just
13  to let people at the bar know you can't drink because
14  you're under 21 --
15      A.  Yes.
16      Q.  -- right?
17      A.  Yes.
18      Q.  Are there any other steps that had to be taken
19  during the clock-in process?
20      A.  No, you just come in and it was frowned upon if
21  you weren't, like, look ready, as in hair and makeup
22  done.  So that's the only thing I can think of is that
23  it was basically frowned upon if you took your time in
24  the dressing room.  Whitey didn't want people gathering,
25  sitting.  He wanted them out walking the floor, so it
```

Videotaped Deposition of Hailey Chapman

Page 30

1    was a quick process.  You get in, get out.

2         Q.  Did anyone at Heartbreakers prevent you from

3    getting -- you know, putting on your makeup and doing

4    your hair at home before you got to the club?

5         A.  Could you repeat that question?

6         Q.  Sure.  Did anyone at Heartbreakers prevent you

7    from putting yourself together, doing your makeup, doing

8    your hair at home before you came to the club?

9         A.  Did anyone prevent me from getting ready at

10   home?

11        Q.  Yeah.

12        A.  No.

13        Q.  Let me put it like this.  Did anyone require

14   that you put on your makeup, do your hair, get ready at

15   the club after you clocked in?

16        A.  No.

17        Q.  So you were free to also do all that

18   preparatory work at home before you clocked in, right,

19   if you wanted?

20        A.  If you wanted, yes.

21        Q.  What was your preference?

22        A.  I would usually do it at home, for the most

23   part.

24        Q.  How long was that process, on average?

25        A.  Are you referring to me getting ready?

Videotaped Deposition of Hailey Chapman

Page 31

1      Q.  Yeah, just getting ready to go out on the floor

2   as far as, you know, your appearance, your hair and

3   makeup.

4      A.  An hour.

5      Q.  An hour.  How often would you do this hour-long

6   routine at the club?

7      A.  I didn't do it at the club, I did it at home.

8   I got ready at home.

9      Q.  So you never once actually got ready at the

10  club?

11     A.  No.

12     Q.  So did you ever have an issue with Whitey

13  telling people to hurry up in the dressing room?

14     A.  I saw it happen, yes.

15     Q.  But it never personally happened to you, right?

16     A.  No.

17     Q.  We were talking about DJs a little bit earlier.

18  You mentioned tip out the DJ, what does that mean?

19     A.  Tip out means that basically you would give the

20  DJ X amount of money, whatever you felt was generous.

21  And you would just give it to him, and that was that.

22  And you know, he would just -- you would just do your

23  job, go on stage, whatever.  If you didn't tip him out,

24  it was very, very frowned upon.  You got bullied.  You

25  know, you got very, very bad songs.  You got very, very

Videotaped Deposition of Hailey Chapman

Page 32

1    bad, like, sequence, as in, like, what times you would

2    dance at.  Everybody tipped out the DJ because it

3    just -- it was just an unwritten rule that if you didn't

4    do it, you know, Whitey or the DJ himself would, you

5    know, almost initiate, Hey, go tip out the DJ like it

6    was normal.

7        Q.  Did anyone at Heartbreakers ever expressly tell

8    you, Hey, you've got to go tip out the DJ?

9        A.  Yes, Whitey.

10       Q.  When did Whitey tell you that?

11       A.  I couldn't tell you a date, but it was when I

12   worked there.

13       Q.  Can you kind of set the scene?

14           MS. REZAZADEH:  Objection, vague.

15       Q.  (BY MR. KING)  In other words, did this happen,

16   say, when you were, you know, brand new to the club, was

17   it just on a random night, when --

18       A.  It happened when I was working there.  I worked

19   there for seven shirts, so it was just -- it was just

20   known.  He told me to do it one night when I was

21   working.

22       Q.  Had you not tipped out the DJ?

23       A.  Not yet, I hadn't.  At the time, I hadn't got

24   to it yet.

25       Q.  Was there any explanation offered as to why --

**EXHIBIT B**
Videotaped Deposition of Hailey Chapman

Page 33

1      A.  No.

2      Q.  -- this DJ needed a tip?

3      A.  It's just -- it was just something that

4  everybody did.  We just tipped out the bartenders and

5  tipped out the DJs out of -- for whatever reason, you

6  just did it.  You just didn't question people.

7      Q.  Do you know if there was any kind of, like,

8  formal reprimand that you would have got if you would

9  have said, I don't have feel like tipping the DJ?

10     A.  Could you repeat that question?

11     Q.  Sure.  Was there any sort of formal reprimand

12  that Heartbreakers would have given you if you just

13  said, Yeah, I don't feel like tipping the DJ?

14     A.  Yeah, you would probably get -- you know,

15  Whitey would probably basically -- not force you, but

16  make you feel imposed.  Obviously, there's nothing they

17  could do legally because it wasn't in the contract, but

18  if you didn't do it, it was just like -- I don't really

19  know because I always did it, so I can't really answer

20  that question.  I didn't -- I didn't want to risk

21  getting fired from my only source of income, so I just

22  did it.

23     Q.  So if I understand you correctly, it was -- it

24  was more of a feeling of being imposed upon?

25     A.  Obligation.

Videotaped Deposition of Hailey Chapman

Page 34

1      Q.  Obligation?

2      A.  Yes.

3      Q.  Do you know if any other dancers didn't tip

4   DJs?

5      A.  No, everyone tipped the DJ.

6      Q.  And how do you know that?

7      A.  Because I saw it happen.

8      Q.  When would these tips be delivered to DJs?

9      A.  Usually whenever people would leave.  So

10  different girls leave at different times.  Whenever you

11  left, you would just go up there and tell him, Hey, I'm

12  leaving or just give him the money and that's it.

13      Q.  Earlier, you mentioned that if you didn't tip

14  DJs, they would play bad songs?

15      A.  Yes.

16      Q.  What is a bad song?

17      A.  I guess it depends on a preference.

18      Q.  So what's a bad song to you?

19      A.  Something that's, you know, super -- in my

20  opinion, something that's very slow, you know, boring,

21  it doesn't pique the customer's interest and it doesn't

22  allow you to work the way you want to work whenever the

23  environment isn't up to standard -- to your own

24  standard.

25      Q.  Did a DJ ever play a bad song because you

Videotaped Deposition of Hailey Chapman

Page 35

1   didn't tip?

2        A.   I always tipped.

3        Q.   Have you ever seen a DJ play a bad song for

4   somebody else?

5        A.   I wouldn't know because I don't know what other

6   people's preferences are on bad songs.

7        Q.   So I guess I'm just sort of confused how you

8   came to know that a bad song would be played.

9        A.   So basically, if -- in my opinion, a bad song

10  is a super slow song.  So what I'm saying is, if

11  somebody didn't tip the DJ and they got played a bad

12  song, I wouldn't know that it was a bad song because it

13  could be a good song to them.  It's just preference, so

14  I can't say.

15       Q.   Did somebody tell you, Hey, look, if you don't

16  tip the DJ --

17       A.   Yes.

18       Q.   -- he's going to play songs you do not like?

19       A.   Absolutely.

20       Q.   Who told you that?

21       A.   I'm not sure, just one of the dancers there.

22       Q.   So one of the other dancers was like, Hey,

23  look, you've got to tip the DJ?

24       A.   Yes.

25       Q.   Do you remember that dancer's name?

Videotaped Deposition of Hailey Chapman

Page 36

1      A.  I don't.

2      Q.  Do you remember her stage name?

3      A.  I don't.

4      Q.  Do you remember what she looked like?

5      A.  I don't.

6      Q.  Was this before or after Whitey talked to you

7  about DJ tipping?

8      A.  This was before.

9      Q.  How did that conversation come about with the

10  dancer?

11      A.  Just random.  I was new, so she was just giving

12  me a little bit of an insight.

13      Q.  Do dancers kind of tell other dancers how --

14  how the club works?

15      A.  Yes.

16      Q.  So did you have any other conversations with

17  other dancers about what goes on in the club and how it

18  works?

19              MS. REZAZADEH:  Objection, vague.

20      Q.  (BY MR. KING)  As far as any expectations are

21  concerned.

22              MS. REZAZADEH:  Same objection.

23      A.  I mean --

24              MS. REZAZADEH:  Go ahead.

25      A.  I mean -- could you repeat the question one

Videotaped Deposition of Hailey Chapman

Page 37

1    more time?

2        Q.  (BY MR. KING)  Sure.  Can you recall having any

3    other conversations with other dancers about how the

4    club works?

5            MS. REZAZADEH:  Same objection.

6        A.  So I'm just going to say -- I can't remember a

7    specific conversation, but there was conversation of,

8    you know, how things were ran, as in, you know, This is

9    how things go.  You tip out the DJ, you tip out the

10   bartenders.  You know, basically, you take care of them,

11   they take care of you.  I didn't even -- I wasn't even

12   allowed to drink, and I still tipped out the bartenders.

13           So there was just, like, little underlying

14   rules that weren't written that you just followed

15   because you didn't want to be the one that was causing a

16   scene because, you know, if there's five people tipping

17   out the DJ and one not, what do you think they're going

18   to do with that one?

19       Q.  (BY MR. KING)  I'm not sure.

20       A.  Fire them.  Fire them.  Fire them.

21       Q.  Do the DJs have the power to fire dancers?

22       A.  No.

23       Q.  Earlier, you said that it was explained to you

24   by other dancers that tipping was kind of like, You take

25   care of me, I take care of you.  What does that mean?

Videotaped Deposition of Hailey Chapman

Page 38

1      A.   That is basically as, you know, like I said

2  earlier, you tip out the DJ, and he plays really good

3  songs that everybody likes and is familiar with.  And I

4  don't know about bartenders because I didn't drink, but

5  I just did it because everybody else did it and they

6  said to do it, so...

7      Q.   And everybody else are other entertainers,

8  right?

9      A.   Yes.

10      Q.   Was there a set amount that you tipped DJs?

11      A.   I know for sure it was a minimum $20.  He even

12  made a remark to me -- the DJ himself -- I think I tried

13  to give him two fives and he said, This is all?  So I

14  gave him ten more and then I just left.

15      Q.   And I might have already asked you this

16  question, but do you know this DJ's name?

17      A.   I don't.

18      Q.   Do you know what he looked like?

19      A.   Yes, he's the DJ that's been there forever.

20  He's really big and he has long hair.

21      Q.   So you gave him two fives, and you were like,

22  Yeah, that's it?

23      A.   Yeah -- no, he said -- he said, Is that it?  He

24  was like, Is that it?  And I was like, I'll just give

25  you more, then.

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 39

1      Q.  Did you give him more?

2      A.  Yes, I did.

3      Q.  How much more did you give him?

4      A.  Doubled it.

5      Q.  So you gave him the $20?

6      A.  Yes.

7      Q.  You mentioned tipping waitresses?

8      A.  Bartenders.

9      Q.  And bartenders, okay.  Tell me how -- how that

10  worked.

11      A.  So basically, I would just do the same thing I

12  did with the DJ.  I would go and I would just put the

13  tip in the tip jar and just carry on with my business.

14  I didn't really know anybody as a bartender because I

15  didn't drink.  I just tipped and left.

16      Q.  So is your understanding that you had to tip

17  bartenders and waitresses, right?

18      A.  Not waitresses.  I never tipped a waitress,

19  just bartender and DJs.

20      Q.  Just bartenders.  So it's your understanding

21  you tipped bartenders, right?

22      A.  Yes.

23      Q.  And you would do so by just putting money in

24  their tip jar?

25      A.  Yes.

**EXHIBIT B**
Videotaped Deposition of Hailey Chapman

Page 40

1      Q.  Did a bartender ever demand money from you?

2      A.  No.

3      Q.  How much money would you tip them?

4      A.  I can't say.

5      Q.  Can you just ballpark, was it like a buck, five

6  bucks?

7      A.  No, maybe like ranging between five to 30.

8      Q.  Am I understanding you correctly a that none of

9  the managers ever said, Hey, Daisy, go tip the bartender

10  over there?

11      A.  Yes, Whitey did tell me to tip out the DJs.

12      Q.  What about bartenders?

13      A.  No, not personally to me because I wasn't even

14  allowed to drink, so...

15      Q.  So I hate to ask the question again.  Why did

16  you tip bartenders, then?

17      A.  It was just an obligation.  You know, if you

18  didn't do it, you were just frowned upon.  It was just

19  one of those things that was just understood.  You just

20  did it because everyone else did it and you didn't want

21  to be the one that didn't do it.

22      Q.  Did anyone with the club ever give you a

23  written schedule?

24      A.  No.

25      Q.  Did anyone with the club ever say, Hey, Daisy,

Videotaped Deposition of Hailey Chapman

Page 41

1    you need to be here on a Wednesday or Friday or

2    something like that?

3         A.   They never gave me a written schedule, but once

4    you were in, you had to stay a minimum of eight hours.

5         Q.   I understand.  I'm just asking you if anyone

6    ever said, Hey, you must perform on some given day?

7              MS. REZAZADEH:   Objection, asked and

8    answered.

9         A.   No.

10        Q.   (BY MR. KING)  Did anyone ever tell you that

11   you could not perform on some given day?

12        A.   Yes.

13        Q.   And when was that?

14        A.   The day I got fired.

15        Q.   Before -- before you got let go?

16        A.   No.

17        Q.   Did anyone ever tell you you have to report at

18   a certain hour?

19        A.   No.

20        Q.   Did you ever work any doubles?

21        A.   No.

22        Q.   Did you ever have to leave early?

23        A.   You weren't allowed to leave early.

24        Q.   And why is that?

25        A.   Because you would either get fired -- they just

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 42

1   didn't let you leave early.  They would give you an

2   ultimatum.  If you want to leave early, then, okay,

3   either one, have to pay an insane amount of money or you

4   would get fired.  There is no in between.

5        Q.  Did you ever try to leave early?

6        A.  No.

7        Q.  When -- who communicated to you this leave

8   early restriction?

9        A.  Whitey, himself, basically told me that if you

10  want to leave early, they would do a calculation of how

11  many estimated times you would be on stage, and then

12  that would be $20 per time.  So if it was a Monday night

13  and it's like 7:00 and we don't close until 2:00, well,

14  I'm going to be on stage 20 to 40 more times.  That's

15  like --

16       Q.  You would be on stage 20 to 40 times?

17       A.  Around 20, yeah.  20 to 30, depending on, you

18  know, if there's only five girls there, rotation is very

19  small.  And there needs to be somebody on stages at all

20  times, so it just varies with the day, the crowd, the

21  time.

22       Q.  So in order to leave early, is it your

23  testimony that you could do so, but you could only do so

24  if you pay to miss the stage rotations that were to take

25  place for the rest of your time?

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 43

1    A.  Or you were fired.

2    Q.  And Whitey told you that you would be fired if

3 you didn't pay this --

4    A.  He didn't say you'd be fired if you didn't pay

5 the fee, he said you'd be fired if you wanted to leave

6 and you didn't want to pay.

7    Q.  When did he tell you this?

8    A.  In a conversation in the time that I worked

9 there, random.  Just random.

10    Q.  Did you talk a lot to Whitey?

11    A.  I had a few conversations with him.

12    Q.  Were all these conversations about rules and

13 restrictions?

14    A.  For the most part.

15    Q.  How did they come about, these conversations?

16    A.  Just random.  Maybe I would ask him a question

17 about something because I was very new.  I had only

18 danced seven days before, so just me trying to get a

19 grip on what the rules were and what was allowed and

20 what wasn't.

21    Q.  Was Whitey mean to you while explaining any of

22 this?

23    A.  No, he wasn't mean.

24    Q.  He's kind of a big, older guy, isn't he?

25    A.  Yes.

Videotaped Deposition of Hailey Chapman

Page 44

1      Q.  He's kind of grandfatherly-looking, isn't he?

2      A.  Yes.

3      Q.  Was he impolite towards you while explaining

4  any of this?

5      A.  He was impolite and what's the word?  He was

6  impolite and inappropriate during one instance that I

7  can remember.

8      Q.  Tell me about that instance.

9      A.  The day that I went in to apply, he said,

10  Okay -- well, I came with my dance bag, so ready

11  because -- you know, in case I did get hired.  Well, he

12  said, Okay, let's see.  Put your outfit on and let me

13  look at you.

14      Q.  Uh-huh.

15      A.  Okay.  So I went to the dressing room and it

16  was just myself in there.  And once I finished, I told

17  him that I was ready.  So he came into the dressing room

18  and it was just me and him, and he was standing probably

19  about, like, I don't know, two to three feet in front of

20  me, and he asked me to do a 360.

21              So I did a 360, and then he asked me to

22  remove my top so he could see what I looked like naked.

23  And then he told me that I looked really, really good

24  and that he wants me on the floor right now.

25      Q.  And did you go and perform on the floor?

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 45

1       A.   Yes.

2       Q.   As a dancer, is your performance -- excuse me,

3    is your appearance something that is important to your

4    work?

5       A.   Yes.

6       Q.   Why is that?

7       A.   Because guys don't want to talk to ugly girls.

8    I don't really know the answer.  Guys prefer girls that

9    look pretty, I guess.

10      Q.   Is selling your appearance pretty much part of

11   the job of being the dancer?

12      A.   Yes.

13      Q.   Do more attractive women -- if you know, do

14   more attractive women make more money than less

15   attractive dancers?

16           MS. REZAZADEH:  Objection, calls for

17   speculation.  You can answer, Hailey.

18      A.   Could you repeat the question one more time?

19      Q.   (BY MR. KING)  Sure.  Do you know whether less

20   attractive dancers make less money than the more

21   attractive dancers?

22           MS. REZAZADEH:  Same objection.

23      A.   I don't -- I don't know.

24      Q.   (BY MR. KING)  Did you ever hear any dancers

25   talking about their appearance and how it affects their

Videotaped Deposition of Hailey Chapman

Page 46

1  ability to make money?

2      A.  No.

3      Q.  Did you ever have those conversations with

4  anyone else?

5      A.  No.

6      Q.  What do dancers do to earn a living?

7          MS. REZAZADEH:  Objection, vague.

8      Q.  (BY MR. KING)  Just explain it to somebody who

9  has, you know, no idea.

10          MS. REZAZADEH:  Objection, calls for a

11  narrative.

12          Hailey, I don't mean to throw you off

13  with my objections.  You can always answer unless I tell

14  you not to.

15          THE WITNESS:  Okay.

16      A.  So explain what dancers do to somebody who

17  doesn't know, is that what you said?

18      Q.  (BY MR. KING)  Yeah, because a lot of people

19  have no idea what dancers actually do.

20      A.  They go on stage, look nice, look good, come

21  off stage, be super friendly to guys, act like you like

22  them, give them a lap dance, try to get as much money as

23  you can, and that's about it.

24      Q.  It's a lot of work, isn't it?

25      A.  Yes.  Physically, yes.  And mentally,

EXHIBIT B

Videotaped Deposition of Hailey Chapman

Page 47

1   definitely mentally.

2       Q.   Because you've got to be on in order to

3   approach strangers, basically, right?

4       A.   Yes.

5       Q.   So let's start with on stage.  Did anyone at

6   the club -- aside from what you've already told me about

7   being topless, did anyone at the club ever tell you

8   specifically how to dance on stage?

9       A.   No.

10      Q.   Did anyone with the club ever train you how to

11  dance?

12      A.   No.

13      Q.   Did anyone with the club ever, you know,

14  critique your performance and say, you know, I don't

15  like your pole routine?

16      A.   Personally, no.  I've heard of it, yes.

17      Q.   What have you heard?

18      A.   That you have to be active.  You can't just be

19  boring, or you know, lazy.  Whitey didn't like lazy

20  girls.  He made that very clear.  He didn't want lazy

21  girls.  Everyone just kind of knew, and they passed it

22  on.  Like, you know, Hey, don't be lazy, you know,

23  Whitey will say something.  So you couldn't just -- just

24  be mellow or boring.  You had to be active and act like

25  you like it, basically.

Videotaped Deposition of Hailey Chapman

Page 48

1      Q.   Do you know if that was -- that expectation was

2   at all true for any of the other managers?

3      A.   I would say yes.

4      Q.   And what's your basis for saying yes?

5      A.   Because all of the managers coincide together.

6      Q.   Did -- did you ever work alongside any of these

7   other managers?

8      A.   Yes.

9      Q.   Do you recall which one?

10      A.   Peggy's husband.

11      Q.   I'm talking about the floor managers right now.

12      A.   Oh, just Whitey.

13      Q.   Did you ever work any dayshifts?

14      A.   No.

15      Q.   So correct me if I'm wrong, it sounds like a

16   lot of your -- the expectations that we've been talking

17   about were from Whitey?

18      A.   Yes.

19      Q.   And you're not sure if the other floor managers

20   had similar expectations?

21           MS. REZAZADEH:   Objection, misquoting the

22   deponent.

23      A.   I'm not 100 percent sure.

24      Q.   (BY MR. KING)  We would just have to ask

25   dancers who worked alongside those other managers,

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 49

1  right?

2      A.  Yes.

3      Q.  Okay.  So on stage, how would you make money on

4  stage?

5      A.  Because I was a good dancer.

6      Q.  How would that money come to you?

7      A.  You know, just regular stuff like -- I'm sorry,

8  I don't know.  Just -- you would just go on stage and

9  when people would walk up to the stage, you would just,

10  you know, dance on them and just look good.  Just look

11  good.  As long as you looked good, you made money.  And

12  as long as you were active, you made money.

13      Q.  So putting on a good dance was important for

14  you to make money, right?

15      A.  I wouldn't say a good dance, but you know, if

16  you looked good, then, yes, you would make money.  As

17  long as you looked good with what you were doing, you

18  made money.  You didn't have to be good at it.

19      Q.  So is it true that enthusiasm matters when

20  you're on stage?

21      A.  Yes.

22      Q.  Even if you're not a skilled dancer?

23      A.  Yes.

24      Q.  So performers who don't really, like, put on a

25  show, for lack of a better term, may make less money on

Videotaped Deposition of Hailey Chapman

Page 50

1    stage, right?

2              MS. REZAZADEH:  Objection, calls for

3    speculation.

4         A.   Ideally, yes.

5         Q.   (BY MR. KING)  But you were a good -- good

6    performer on stage, in your assessment, true?

7         A.   True.

8         Q.   Were you a -- were you a -- or what is a good

9    dancer on stage?

10        A.   I wasn't a good dancer.  I was a terrible

11   dancer.  I didn't even know how to dance.  I just was

12   able to fake it until I made it.  I just looked really

13   good, and I had a really nice physique that men liked,

14   so it was easy for me to make money.

15        Q.   Understood.  And I'm not trying to embarrass

16   you with these questions, it's just --

17        A.   I'm not embarrassed.

18        Q.   I don't you to feel that way.

19        A.   I'm not embarrassed.  No, it's okay.

20        Q.   This is what the case is about.

21        A.   It's okay.

22        Q.   I get it, dancing is -- it is a job.

23              Okay.  And you would keep the money that

24   customers would put on the stage for your on stage

25   performance, right?

Videotaped Deposition of Hailey Chapman

Page 51

1       A.  Yes.

2       Q.  Did anyone after a stage routine come and take

3   any of the money that was on the tip rail?

4       A.  No.

5       Q.  You just put it in your purse, right?

6       A.  Yes.

7       Q.  So when you weren't performing on stage, you

8   were on the floor, right?

9       A.  Yes.

10      Q.  What was your approach to working on the floor?

11           MS. REZAZADEH:  Objection, vague.

12      Q.  (BY MR. KING)  Or did you have an approach?

13      A.  I didn't have, like, a set approach that I did.

14  I just did my own thing and if I wanted to talk to you,

15  I would talk to you.  And if I didn't, then I didn't.

16      Q.  And again, these might be stupid questions, but

17  I've got to ask.  Did the club -- did anyone at the club

18  ever give you a list of customers that you had to go

19  perform for?

20      A.  No.  Not me, personally.

21      Q.  Was there ever like a line or queue of

22  customers who just come in and it was like, Oh, hey,

23  Daisy, go perform for these five guys or girls?

24      A.  No.

25      Q.  How would you identify which customers to

Videotaped Deposition of Hailey Chapman

Page 52

1  approach?

2      A.  The rich ones, but I guess -- usually, in the

3  strip club, a rule of thumb is that if somebody tips you

4  on stage, they want to see you after.  So you would kind

5  of follow that, and then obviously, I am going to talk

6  to rich guys, so...

7      Q.  And that just makes sense.  So is performing on

8  stage basically like a way to get some more visibility

9  within the club?

10     A.  Yes.

11             MS. REZAZADEH:  Objection, calls for

12  speculation.

13     Q.  (BY MR. KING)  And so after a performance on

14  stage, some guy throes up some fives and tens or

15  something, you might approach him after you're done with

16  the stage routine, right?

17     A.  Yes.

18     Q.  How would you identify rich customers, just out

19  of curiosity?

20     A.  You know, okay --

21     Q.  Maybe, but I don't know.

22     A.  I don't know.  Heartbreakers is in a location

23  where it's by the plant.  So obviously, if they have

24  plant attire on, it was just -- you know, plant guys

25  make a lot of money, so definitely that.  Obviously, if

**EXHIBIT B**
Videotaped Deposition of Hailey Chapman

Page 53

1   they came in a suit, that too.  You know, business -- a

2   lot of people do, like, business meetings.  Even in

3   Colorado, I worked dayshift at Colorado.  Just how they

4   dressed.

5       Q.   So you would evaluate kind of like how they

6   dressed.  Anything else that kind of helped you get a

7   read on who was in the club?

8       A.   Body language, just how everybody is meshing

9   together and how they're acting.  And you know, me,

10  personally, I would watch before I went up to them,

11  so...

12              MR. KING:  Does the reporter need a break?

13              THE REPORTER:  If you're offering, I

14  wouldn't mind taking one.

15              MR. KING:  Okay.  I figured.  You want to

16  take, like, about a five-minute break?

17              THE REPORTER:  Please and thank you.

18              Off the record at 10:11.

19              (Break taken from 10:11 a.m. to 10:25 a.m.)

20              THE REPORTER:  Back on the record at 10:25.

21      Q.   (BY MR. KING)  All right.  Ms. Chapman, we are

22  back.  Heartbreakers didn't pay you for any of the hours

23  that you worked at the club, right?

24      A.   No.

25      Q.   They didn't pay you for every dance performance

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 54

1    that you gave on stage, right?

2         A.  No.

3         Q.  And they didn't pay you because you performed

4    for any given customer, right?

5         A.  No.

6         Q.  And they just didn't pay you flat out anything?

7         A.  No.

8         Q.  So can you explain to the jury how you made

9    money at Heartbreakers?

10        A.  I made money at Heartbreakers because it was

11   enforced to be active and interact with customers,

12   whether you liked it or not.  That was just what you did

13   and what everybody knew to do.

14        Q.  If you didn't interact with customers, you

15   wouldn't make any money, right?

16        A.  Correct.

17        Q.  Did anyone ever tell you that, you know, you

18   couldn't go and sit on a couch and look at your phone?

19        A.  Yes.

20        Q.  Who?

21        A.  Whitey.

22        Q.  Can you set the scene for me?  Tell me how that

23   transaction happened.

24        A.  Yes, there was an instance where I was sitting

25   on my phone, just -- you know, just whatever.  And you

Videotaped Deposition of Hailey Chapman

Page 55

1   know, Whitey had approached me and let me know, Hey, you

2   know, you can't just sit here.  You have to work.

3       Q.  And what was your response?

4       A.  Okay.

5       Q.  Did you just sit there?

6       A.  Well, I didn't just sit there, but I was like,

7   Okay.  And then -- he was like, Okay.  And you know, he

8   just walked off, and I just got up and just walked

9   around.

10      Q.  I guess I'm kind of confused.  Was he basically

11  saying, like, Look, you're not going to make any money

12  if you're just sitting around or I'm telling you to get

13  up and go perform?

14      A.  No, he was telling me.  He was like, Hey, you

15  can't just sit here, you have to be working.

16      Q.  Did he say why?

17      A.  No.

18      Q.  The club didn't promote any of your

19  entertainment, right?

20          MS. REZAZADEH:  Objection, vague.

21      A.  I'm not sure what that means.

22      Q.  (BY MR. KING)  They didn't, like, post

23  advertisements on Facebook --

24      A.  No.

25      Q.  -- saying, Hey, Daisy is here, right?

Videotaped Deposition of Hailey Chapman

Page 56

1     A.  No, not that I'm aware of.

2     Q.  So did you do anything to market yourself

3  within the club or promote your services?

4     A.  No.

5     Q.  Is my understanding correct that the -- you

6  basically just approach customers at your own leisure?

7     A.  It wasn't at your own leisure, but it was you

8  approach customers because you had to.

9     Q.  So I have a question.  So you produced cell

10  phone video, do you recall that?

11     A.  I'm not sure which video.

12     Q.  Okay.  I'll show you a still.

13     A.  Uh-huh.

14     Q.  Hold on.  Can you see my screen?

15     A.  Yes.

16     Q.  And this is a still from a video clip labeled

17  Kibodeaux 000090.  Tell me about this video, this clip.

18     A.  I have no idea.  I don't even know who that is.

19     Q.  Can you see this video?

20     A.  Yes.

21     Q.  You have no idea where this came from?

22     A.  I know where it came from, but I don't know who

23  that is.

24     Q.  Where did it come from?

25     A.  That's Heartbreakers.

**EXHIBIT B**
Videotaped Deposition of Hailey Chapman

Page 57

1     Q.  Right.  But I meant who is on the other side of

2  this cell phone taking this video?

3     A.  I didn't.  I don't know.  I think that the girl

4  with the blonde hair is taking the video.

5     Q.  So you had no involvement in this video?

6     A.  No.

7     Q.  And you have no idea who was just pictured

8  there, right?

9     A.  No.

10    Q.  What things would affect your ability to make

11  money at the club?

12    A.  Circumstances.  So you know, it was just all

13  circumstantial if you made money.  You know, people

14  aren't going to come to a place that looks like a shack.

15  You know, it was all what the club presented itself to

16  be.

17             So basically, you know, you made money if

18  everything was lined up correctly, you had the right

19  crowd, the DJ was playing the right music, there was

20  good lighting, the ambience was set correctly, and

21  everybody was in the same tune, you know, then you were

22  able to, you know, try to make your money how you would.

23    Q.  Sure.  Did customer volume ever fluctuate?

24    A.  Yes.

25    Q.  Do you know what things might have caused

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 58

1    customer volume to fluctuate?

2        A.  Do I know what would cause customer volume to

3    fluctuate?

4        Q.  Yes, ma'am.

5            MS. REZAZADEH:  Objection, calls for

6    speculation.

7        A.  Well, I don't really know what kind of answer

8    you're looking for.  I mean, whether --

9        Q.  (BY MR. KING)  Let me ask it a better way.  Did

10   you ever work slow nights?

11       A.  Yes.

12       Q.  Some nights there were fewer customers than on

13   other nights, right?

14       A.  Yes.

15       Q.  And I assume you also worked nights when the

16   club was just packed, right?

17       A.  Yes.

18       Q.  What -- what elements caused the club to be

19   packed versus less packed --

20           MS. REZAZADEH:  Same objection.

21       Q.  (BY MR. KING)  -- in your experience?

22       A.  The energy, the vibes.  You know, obviously, if

23   the club looks packed from the outside, people are going

24   to want to come inside.  So when you came inside, it was

25   all basically a vibe, I guess you could call it, whereas

Videotaped Deposition of Hailey Chapman

Page 59

1    everybody was just having a good time.  You know, the

2    scene was good, the lighting was good, music was good.

3         Q.   And how would that affect your ability to make

4    money?

5         A.   I would just take advantage of what the club

6    was providing.

7         Q.   Sure.

8         A.   As in music, the stage, the pole.

9         Q.   Right.

10        A.   And I would just --

11        Q.   So when there were a lot of customers at the

12   club, would it be the case that you would make way more

13   money?

14        A.   Not necessarily.

15        Q.   Why is that?

16        A.   You know, just because there was a lot of

17   people doesn't mean that you would make a lot of money,

18   you know, those people might not want to give you money.

19   So it just depends.

20        Q.   It depends on what the customer is there for,

21   right?

22        A.   Yes.

23        Q.   Is it true that some customers go to

24   Heartbreakers just to, like, hang out and have a beer

25   with their friends and don't pay for any dances?

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 60

1      A.  Yes.

2      Q.  You kind of rolled your eyes.  Is that

3 something that you ran into?

4      A.  Sometimes, yes.

5      Q.  Would that bother you?

6      A.  Yes.

7      Q.  Why?

8      A.  I just feel like, you know, the girls that are

9 dancers are only there for one reason, and that's to pay

10 bills.  And whenever a man comes in and wants to have a

11 beer, well, you can have a beer at a bar.  This is a

12 strip club where, you know, girls want to make money.

13 So if they didn't want to pay money, it was just like,

14 why are you here?

15      Q.  Right.  Was that also true that customers come

16 in just to watch?  I don't know, like --

17      A.  The watchers?  Yes.

18      Q.  The watchers?

19      A.  Yes.

20      Q.  What are the watchers?

21      A.  The watchers.  They are just the watchers.

22 They would just watch.

23      Q.  Just sit at a table and just watch everybody,

24 not pay for a single dance?

25      A.  Yes.

Videotaped Deposition of Hailey Chapman

Page 61

1    Q.  Were there nights when there were, like, a lot

2  of watchers versus -- I don't know, what's the opposite

3  of a watcher, a payer?

4    A.  I guess so.  Not that I know of.  I didn't

5  really, like, keep track of how many watchers we had on

6  nights.

7    Q.  Sure.

8    A.  It just varied, whoever came in.

9    Q.  So did the club do anything to draw in

10  customers who were willing to pay for dances?

11    A.  Not that I know of.  Maybe they had promotions,

12  I could say, that I've seen on -- what's the bulletin

13  board or the sign outside, whatever you want to call it.

14    Q.  Sure.  I was just wondering if there's any

15  specific thing that the club did or could have done to

16  draw in customers who would warrant to pay for dancers?

17    A.  Yes, they did do certain things.  Like, they

18  would only pay a certain type of music to draw in a

19  certain type of crowd.

20    Q.  What else?

21    A.  Nothing really that I can think of at this

22  moment.

23    Q.  So we already talked about how if you were on

24  the floor, you would kind of identify who was -- which

25  customer might have had money and then you would

Videotaped Deposition of Hailey Chapman

Page 62

1    approach them, right?

2        A.  I mean, yeah if they had money -- if they

3    looked like they had money, I would approach them, but

4    that doesn't limit me to only approaching men that I

5    thought had money because even if there was men that I

6    thought didn't have money, I still had to engage with

7    them.

8        Q.  How would you engage with them?

9        A.  You just, I don't know, walk up to them.  Some

10   girls would ask if they want company.  I would just walk

11   up and sit with them.  It didn't really matter.  If they

12   didn't like me, they weren't going to say it, so...

13       Q.  Fair enough.  Did any customers ever pay you

14   just to sit and hang out with them?

15       A.  Yes.

16       Q.  How would you get paid for that?

17       A.  They were just paid -- pay me in either funny

18   money or regular money.

19       Q.  How would that amount of money paid for your

20   time be decided?

21       A.  However much I felt like I wanted to charge.

22       Q.  Was that based on the amount of time or just

23   kind of like whatever you thought was appropriate?

24       A.  Whatever I thought was appropriate.

25       Q.  Did you prefer customers who just paid for your

Videotaped Deposition of Hailey Chapman

Page 63

1    time?

2        A.  Yes.

3        Q.  Why is that?

4        A.  It's easier.

5        Q.  Did you have any regulars?

6        A.  No.

7        Q.  That's probably a bad question.  Are you

8    familiar with what a regular is?

9        A.  Yes.

10       Q.  Do some dancers have regulars?

11       A.  Yes.

12       Q.  How does one develop a regular customer base?

13       A.  A guy comes in, he likes what you look like,

14   y'all hit it off good, you tell him to come back and see

15   you, he comes back and then you have a regular.

16       Q.  And I take it in the days that -- how many days

17   did you perform at Heartbreakers?

18       A.  Seven.

19       Q.  You probably didn't have the opportunity to

20   develop --

21       A.  No, I didn't have the opportunity.

22       Q.  Okay.  Were there any nights during the seven

23   days where you left the club with less money than when

24   you came in?

25       A.  No.

Videotaped Deposition of Hailey Chapman

Page 64

1      Q.   Do you recall about how much money you made in

2  the roughly seven days that you performed at

3  Heartbreakers?

4      A.   All together?

5      Q.   Yes, ma'am.

6      A.   From like seven shifts, maybe upwards to like

7  $5,500.

8      Q.   $5,500?

9      A.   Maybe $6,000, $7,000, somewhere around there.

10      Q.   That's pretty good.

11      A.   Thank you.

12      Q.   That's very impressive.  How was most of that

13  money paid to you?

14      A.   Cash, funny money.

15      Q.   Funny money?

16      A.   Funny money was very, very common, so...

17      Q.   Did you -- did you have a preference for cash?

18      A.   Obviously, yes, I did because funny money you

19  had to pay the club for the work that you did, so...

20      Q.   Did you ever tell any customers during your

21  time at Heartbreakers, Hey, I'd rather just have cash?

22      A.   Yes.

23      Q.   Did they give you cash?

24      A.   Some did, some didn't.  It's really just

25  whatever they had on -- excuse me.

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 65

1    Q.  Sure.

2    A.  -- whatever they had on them.

3    Q.  And you were also paid -- well, explain to me

4  how credit cards work as far as paying for your

5  entertainment.

6    A.  Credit cards?  Don't quote me on this because I

7  wasn't right there with them, but basically, from my

8  knowledge, they would go ask to pull money out and they

9  would get funny money in exchange.  And then that funny

10  money, they would give it to us.  And then whenever we

11  would get the funny money at night, we would cash it in

12  and there would be a percentage taken out.

13         Basically, they would take $5 out of --

14  because one funny money was worth $25 flat rate.  And

15  then whenever we got it, it was only worth $20 to us

16  because they automatically take $5 off of each funny

17  money.  And then whenever you wanted to cash it in -- so

18  say I have four funny moneys, that's $80 because they're

19  each worth, like, $20 after they take out the $5.

20    Q.  Okay.

21    A.  So say I have four funny moneys, that's $80.

22  Well, I would only get back $74 because they would -- or

23  $70 whatever because they would take out $1 per bill

24  that you would trade in.

25    Q.  Okay.

Videotaped Deposition of Hailey Chapman

Page 66

1      A.  So they took out five per one bill and then

2  when you traded in, they would take out a dollar for

3  when you wanted to cash it out.

4      Q.  Okay.  So in your experience, a customer would

5  go and give his credit card to somebody, right?  Who,

6  like the waitress, bartender?

7      A.  Bartender over there in the back area or

8  whatever.  I mean, he could go to the ATM if he wanted

9  to, but usually, he would just go through the bartender.

10     Q.  Right.  And then the bartender would swipe his

11 card?

12     A.  Charge it to his card.

13     Q.  And then give him the dance dollars --

14     A.  Yes.

15     Q.  -- or whatever, right?

16     A.  Yes.

17     Q.  Would you -- if a customer let you know, Hey,

18 I've only got a credit card on me, would you adjust your

19 price to account for these sums that are taken out?

20     A.  Well, I'm not going to tell somebody how much

21 money to pull out of their own bank account --

22     Q.  Sure.

23     A.  -- so no, I didn't tell them.

24     Q.  Did anyone tell you that you couldn't do that?

25     A.  No.

Videotaped Deposition of Hailey Chapman

Page 67

```
 1        Q.   Were you able to accept payment through like

 2   Zelle or Venmo?

 3        A.   I'm not sure because I never did it.  I'm sure

 4   that you could do it if you wanted to.

 5        Q.   How much -- how much were dances on the floor?

 6        A.   Well, you could charge however many -- however

 7   much you wanted for a dance.

 8        Q.   So it was just up to you?

 9        A.   Yes.

10        Q.   So if, you know, it's about to be closing time

11   and you've got a customer who says, Hey, I've only got

12   ten bucks left, can I get one last dance --

13        A.   No.

14             MS. REZAZADEH:   Objection, incomplete

15   hypothetical.

16        Q.   (BY MR. KING)  -- you could say, No, I'm not

17   taking ten bucks or sure, right?

18        A.   Yes.

19        Q.   What was your minimum for a dance?

20        A.   It ranged between $20 to $40 for one distance.

21   Usually, upwards to $40.

22        Q.   What -- what considerations would you take into

23   account for, like, a $40 dance?

24        A.   If a guy is really interested, you would just

25   take advantage of the opportunity.
```

Videotaped Deposition of Hailey Chapman

Page 68

1       Q.  Okay.  So you just tell -- tell a customer,

2   Look, a dance is 40 bucks, and if he says okay, okay, if

3   not, move on?

4       A.  More or less.

5       Q.  I'm just trying to figure out what --

6       A.  Uh-huh.

7       Q.  -- what considerations went into setting a

8   price $20, $30, or $40?

9       A.  Just variables --

10              MS. REZAZADEH:  Objection, asked and

11  answered.  Go ahead.

12      A.  Just -- there's just a lot of variables.  You

13  know, if he liked you, if he was impaired.  Obviously,

14  you know, if somebody was drinking, they're a little bit

15  more frivolous in some cases, so...

16      Q.  (BY MR. KING)  Got it.  So you would assess

17  kind of where the customer is at?

18      A.  Yes, just read the room, basically, yeah.

19      Q.  Do you know if all dancers -- or forget that.

20              Do you know if any other dancers took

21  your same approach to making money from customers on the

22  floor?

23              MS. REZAZADEH:  Objection, calls for

24  speculation.

25      A.  I would imagine so.

**EXHIBIT B**
Videotaped Deposition of Hailey Chapman

Page 69

1       Q.  (BY MR. KING)  Do you know of any other dancers

2   who would only charge $20 tops for a dance?

3       A.  I imagine so.

4       Q.  Were you aware of any performers who were able

5   to say, Hey, 100 bucks for a dance?

6               MS. REZAZADEH:  Objection, calls for

7   speculation.

8       A.  Personally, I don't know of anybody, but I

9   wouldn't say that that's not happening.

10      Q.  (BY MR. KING)  We would just have to talk to

11  those other dancers to figure out how their prices were

12  set, right?

13      A.  Correct.

14      Q.  Did you ever perform in the VIP area or the

15  booths?

16      A.  Yes.

17      Q.  Tell me how that worked.

18      A.

19               MS. REZAZADEH:  Objection, vague, calls for

20  a narrative.

21      Q.  (BY MR. KING)  Let's start with the booths.

22      A.  The booths?

23      Q.  Uh-huh.

24      A.  It was basically just a more private area to

25  give a lap dance.  It wasn't anything different than

Videotaped Deposition of Hailey Chapman

Page 70

1  giving somebody a lap dance in a different area.  It was

2  just more closed off and private.

3      Q.  Did you have to pay a fee to the club to access

4  the booths?

5      A.  VIP, yes.  Booths, I'm not 100 -- no, not

6  booths.  You could just walk into a booth if there was

7  one available.

8      Q.  But the VIP, you have to pay a fee?

9      A.  Yes.

10     Q.  How much was that fee?

11     A.  I have no idea.

12     Q.  No idea because you never went up to VIP?

13     A.  Oh, I went to VIP, I just don't know how much

14  people paid to get into VIP because I didn't.  I just

15  went up there whenever I wanted to.

16     Q.  Okay.  Got it.

17     A.  People that went in had to pay for it, an extra

18  fee.

19     Q.  Got it.  I know some dancers have found that

20  they make more money in the VIP area versus on the

21  floor, other dancers, it's different.  What was -- what

22  was your opinion or preference?

23     A.  What was my opinion on how they were making

24  more money in VIP?

25     Q.  Well, that was a bad question.  Did you prefer

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 71

1   performing in VIP because you made more money or did you

2   just avoid it?

3        A.   I mingled, so it was -- you know, if somebody

4   was in VIP and I wanted to go up there, then I'd go up

5   there.  And if not, then I would just stay downstairs.

6        Q.   Was there one part of the club that you thought

7   you could make more money in versus another area?

8        A.   Yeah, the booths because it's more private, and

9   then get a little bit more, you know, hands on, I guess.

10  It's just more private, so it gives people that peace of

11  mind, you could say.  People aren't staring at you.

12       Q.   So in your experience, at least, performing in

13  a booth area was a better -- better way or more

14  effective way of getting money out of customers, right?

15            MS. REZAZADEH:  Objection, misquoting

16  deponent.

17       A.   I mean, you could say that.

18       Q.   (BY MR. KING)  Well, I'm just asking in your

19  experience because I'm trying to figure out --

20       A.   In my experience, I mean, I made money where

21  ever I went, so I can't say I made more money in a booth

22  because I made a lot of money on stage too, so...

23       Q.   Out of curiosity, how much money on average

24  would you make from a stage performance?

25            MS. REZAZADEH:  Objection, vague, calls for

Videotaped Deposition of Hailey Chapman

Page 72

1   calculation.

2        A.   On a stage performance, around how much money I

3   would make for one performance?

4        Q.   (BY MR. KING)  Yeah.

5        A.   It varied.  I made $1,000 on stage once and

6   I've made $30 on stage.  So it just depends on who's at

7   the club.

8        Q.   Who's there?

9        A.   Yeah.

10       Q.   Would you be able to break down for me about --

11  if you had a six-hour shift -- you worked a six-hour

12  shift, right?

13            MS. REZAZADEH:  Objection --

14       A.   I believe they were eight.

15       Q.   (BY MR. KING)  Eight.  Of that eight hours,

16  about how much time would you perform on stage, total?

17            MS. REZAZADEH:  Objection, calls for

18  calculation.

19       A.   It just depends on the day.  On Monday, I could

20  go on stage a lot more than I do on Friday because

21  obviously, there's more girls on Friday.  So it just

22  depends on the day.

23       Q.   (BY MR. KING)  Let's take, like, a Friday

24  night.

25       A.   A Friday night, I would go on stage -- well, we

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 73

1   had four stags open.  So it was -- you went to stage

2   one, performed two songs, went to stage two, performed

3   two songs, stage three, you would perform two songs, and

4   then stage four, you would perform two songs.

5              So I probably went in rotation on a Friday

6   night eight to 10, seven to nine -- seven to 10.  It

7   just depends on how many girls were there on a Friday

8   night.  It could be 20 girls, it could be 40 girls.  So

9   it's just all variables.

10      Q.  Yeah.  I get it.  I totally understand.  I'm

11   just trying to understand, like --

12      A.  Yeah.

13      Q.  -- you know, on a Friday night, was it

14   50 minutes on stage or an hour?

15      A.  It was probably around 40 minutes per rotation.

16      Q.  Okay.

17      A.  So it's probably about five minutes per song,

18   so two songs per stage, so that's five, 10, 15, 20, 25,

19   30, 35, 40 -- so yeah, 40.  40 minutes per rotation and

20   then I would rotate between like seven to 10 to 12 times

21   around -- somewhere around that area.

22      Q.  You would have a 40-minute set?

23      A.  Yes.

24      Q.  Seven to 10 times?

25      A.  Yes.

Videotaped Deposition of Hailey Chapman

Page 74

1      Q.  What is that -- so how many hours would that

2  be?  I'm not good at math.

3      A.  It's 140 minutes, I think.  Something around

4  there.

5      Q.  280 minutes divided by -- so you would be on

6  stage for four-and-a-half hours during a shift?

7      A.  Yes.

8      Q.  Wow.

9      A.  And it was just because they had four -- four

10  stages.

11      Q.  Okay.  So I just want to make sure I

12  understand.  On roughly, on like a given Friday night --

13      A.  On a Friday night, yes.  Friday night.

14      Q.  -- you could be up on stage for roughly

15  four-and-a-half hours?

16      A.  Yes.

17      Q.  Okay.  And then the other three-and-a-half

18  hours, you would be on the floor, right?

19      A.  Yes.

20      Q.  On Monday night -- Monday evenings or weekdays,

21  was that different?

22      A.  Yes, there was usually only two stages open

23  depending on how many people were there.

24      Q.  Were the stage rotations still about 40 minutes

25  on those weekdays?

Videotaped Deposition of Hailey Chapman

Page 75

1        A.   No, because there was only two stages open.

2        Q.   Right.  So it cut in half, approximately?

3        A.   Yes.

4        Q.   Okay.  And during a weekday shift, about how

5   much time out of an eight-hour period of time would you

6   be on stage?

7             MS. REZAZADEH:  Objection, calls for

8   speculation and calculations.

9        A.   I'm not sure because if we only have, like,

10   five girls, obviously, I would go on stage a lot more

11   than if we had 10 girls on a Tuesday night.  So I can't

12   really say with that.

13       Q.   (BY MR. KING)  It just varied, right?

14       A.   Yes.

15       Q.   Did performing on stage interfere with your

16   ability to make money on the floor?

17       A.   It could.

18       Q.   How so?

19       A.   It could interfere with it just because it

20   gives you -- it puts a spotlight on you so people are

21   able to see you, but if you're on the floor, people are

22   obviously still able to see you walking around.  So it

23   just depends if people are looking at you or not.

24       Q.   Did anyone at Heartbreakers ever tell you, Hey,

25   you have to go perform in the VIP area?

Videotaped Deposition of Hailey Chapman

Page 76

1      A.  No.

2      Q.  Same thing for the booths, right?

3      A.  Yes.

4      Q.  I forgot to ask, did the clubs selling food or

5   alcohol affect your ability to make any money?

6              MS. REZAZADEH:  Objection, calls for

7   speculation, vague.

8      A.  I'm not sure.

9      Q.  (BY MR. KING)  You're not sure?

10      A.  I'm not sure.

11      Q.  And just to be clear, you never -- you weren't

12   a waitress, so you didn't sell alcohol, right?

13      A.  Correct.

14      Q.  You didn't deliver alcohol, right?

15      A.  Correct.

16      Q.  You didn't deliver any food, right?

17      A.  Correct.

18      Q.  And obviously, the club never cut you in on any

19   of the sales of food or alcohol, right?

20      A.  Correct.

21      Q.  Because all the money that you made was from

22   selling dances or hanging out with customers, true?

23      A.  Correct.

24      Q.  You pay for your own makeup?

25      A.  Yes.

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 77

1      Q.  Your own shoes?

2      A.  Yes, we had to have dance heels and we had to

3  have, you know, makeup and hair done and we had to have

4  lingerie.

5      Q.  Right.  How much did you spend on your makeup,

6  shoes, clothing, you know, dancer stuff?

7      A.  A lot.

8      Q.  What's a lot?

9      A.  Well, shoes --

10          MS. REZAZADEH:  Objection, calls for

11  speculation and vague.

12      A.  Shoes themselves are $100, so -- it just -- my

13  makeup was -- all of my makeup all together was probably

14  around $300.  My shoes were $100.  My close were

15  probably about $200 to $300.  You know, my flat iron was

16  $100.  Just -- I don't know, a lot.

17      Q.  (BY MR. KING) I get it.  It costs a lot.  My

18  wife complains about it all the time on her stuff.  I'm

19  just trying to get an understanding of how much you --

20  you know, how much of the bill you had to foot for --

21      A.  Yeah, around $1,000.

22      Q.  Around a thousand bucks?

23      A.  Yeah.

24      Q.  Were you able to write any of that money off on

25  taxes?

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 78

1     A.  Yes.

2     Q.  I mean, why not, right?

3     A.  Uh-huh.

4     Q.  Did you consider all of those things necessary

5  to do your job?

6     A.  Yes.

7     Q.  Do you know -- if you know, do some other

8  dancers not really buy a lot of shoes and makeup and

9  stuff?

10            MS. REZAZADEH:  Objection, calls for

11  speculation.

12     A.  Yes.

13     Q.  (BY MR. KING)  So the amount of money that a

14  dancer invests in shoes, makeup, clothing, it varies

15  from dancer to dancer, right?

16     A.  Yes.

17            MS. REZAZADEH:  Objection, calls for

18  speculation.

19     Q.  (BY MR. KING)  Did the club require that you

20  buy $100 heels?

21     A.  They didn't require that you bought $100 heels,

22  but they required that you bought heels.

23     Q.  Did you ever have a desire to wear flats?

24     A.  Of course.

25     Q.  Flip-flops or tennis shoes?

Videotaped Deposition of Hailey Chapman

Page 79

1       A.   Yes.

2       Q.   Did you ever try doing that?

3       A.   No.

4       Q.   Why not?

5       A.   Because you weren't allowed to do that.

6       Q.   How did you come to learn that information?

7       A.   Whitey just told me whenever I was hired, you

8   know, You have to -- you have to wear this -- you have

9   to wear this stuff, you have to wear heels.  You just --

10  you have to have the attire, basically.

11      Q.   Did Whitey tell you, like, how high those heels

12  had to be?

13      A.   No.  I guess they had to be stripper heels.

14  Like you knew what stripper heels were.  Stripper heels

15  are, on average, like five to eight inches.

16      Q.   Yeah, they're pretty tall.

17      A.   Six to eight, yeah.

18      Q.   Sure.  Did he tell you, like, you have to buy a

19  certain color?

20      A.   No.

21      Q.   Did that have to be -- I don't even know if

22  they make closed toe, but could you wear closed toe high

23  heels?

24      A.   Yes, you could.

25      Q.   Did you ever try going barefoot in the club?

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 80

1       A.  I did try to take off my shoes one time.

2       Q.  And you were told not to do that?

3       A.  Yes, you were told it was against the law to

4  take off your shoes at a strip club.

5       Q.  Against the law?

6       A.  Yeah, it's considered prostitution.  That's

7  what Whitey told me, that I had to -- because I was

8  giving a lap dance, and it's hard.  It hurts -- it hurts

9  your legs whenever you're, like, squatting with heels

10  on.  So I did try to take them off once in a booth, and

11  Whitey came up to me and told me that I wasn't allowed

12  to have my shoes off and I had to put them on

13  immediately because it was prostitution if I had them

14  off.

15       Q.  Did you have any preferred days that you

16  performed?  Days of the week.

17            MS. REZAZADEH:  Objection, vague.

18       A.  I didn't have a preferred day.

19       Q.  (BY MR. KING)  I guess I'm asking what -- what

20  caused you to decide on one day at Heartbreakers versus

21  another day?

22       A.  If I needed to make money.

23       Q.  Got it.  What caused you to leave

24  Heartbreakers, what happened?

25       A.  I got fired.

Videotaped Deposition of Hailey Chapman

Page 81

1    Q.   Why?

2    A.   Unlawfully fired.

3    Q.   Why?

4    A.   Well, obviously, we already went over how I had

5    to use a -- wear a wristband because I was under 21.

6    Q.   Uh-huh.

7    A.   Well, I had a customer who, you know, had came

8    in twice.  The first time I met him, everything was

9    fine.  The second time he came in, he was friends with a

10   bartender named Britney.  And Britney had wanted to date

11   this customer, and he didn't want to date her, when was

12   fine.  They were still friends.

13          And you know, he tipped her well because

14   they were friends, whatever.  And well, whenever she

15   seen that I was -- he's actually my boyfriend now --

16   Q.   Oh, okay.

17   A.   -- for three years now.

18          So whenever she seen us hitting it off, she

19   told Whitey that I tried to order an alcoholic drink

20   from her.  And the next day, when I tried to go into

21   work, a man had come up to me and let me know that I was

22   fired.

23          And I demanded to talk to Whitey, and

24   Whitey told me that I wasn't allowed to work there until

25   I turned 21 because a waitress said that I had tried to

Videotaped Deposition of Hailey Chapman

Page 82

1    order a drink from her, which I did not, obviously,

2    because I had a wristband on.  So he just told me that I

3    couldn't work there because of what a bartender had told

4    him.

5         Q.  So bottom line, you thought that that was

6    unfair that Whitey told you you couldn't come back

7    because it was alleged against you that you tried to buy

8    a beverage underage, right?

9         A.  Well, I didn't think it was unfair, it is

10   unfair, but yes.

11        Q.  Got it.  And the waitress's name was Britney?

12        A.  Yes.

13        Q.  Do you know her last name?

14        A.  No.  She's tall, though.  She's really tall.

15        Q.  Okay.  And what's your boyfriend's name?

16        A.  Shawn.

17        Q.  Shawn.  Last name?

18        A.  Chappa.

19        Q.  Chappa.  Okay.  I'm not going to call Shawn up,

20   I've just got to know.

21             Okay.  Otherwise, you would have wanted

22   to continue performing at the club, right?

23        A.  Yeah, I went into work thinking I was going to

24   work.  And they were like, Yeah, you can't work.  I was

25   ready to go on stage, and they were like, Yeah, you

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 83

1   can't work.

2        Q.  And you made a lot of money during the week

3   that you performed there, right?

4        A.  I made a good amount, yes.

5        Q.  Would you return to working at Heartbreakers if

6   you had the opportunity?

7        A.  I would return to Heartbreakers if I had the

8   opportunity if they weren't scamming me out of all of

9   these fees.  So if there wasn't all of this extra stuff

10  going on, yes.

11       Q.  Got it.  Okay.  Would you return to

12  Heartbreakers if they paid you an hourly wage of $7.25

13  an hour?

14            MS. REZAZADEH:  Objection, incomplete

15  hypothetical, calls for speculation.

16       A.  No.

17       Q.  (BY MR. KING)  No?

18       A.  Not for $7.25, I would not.

19       Q.  So the answer is not for $7.25 an hour?

20       A.  No.

21       Q.  Going back for a minute.  Did anyone ever tell

22  you how to do your hair?

23       A.  No, but I know that hair was a big thing for

24  them.  Personally, I know that.

25       Q.  Why?

Videotaped Deposition of Hailey Chapman

Page 84

1      A.   I had a friend go in to apply whenever I was

2  working there --

3      Q.   Uh-huh.

4      A.   -- and I know that they were hiring, that's why

5  I told her to come in.  And she was a -- she was mixed.

6  She -- her father was African-American and her mother

7  was white.  So she was light-skinned and she had curly,

8  poofy hair.  They didn't hire her because of her hair.

9      Q.   Really?

10      A.   Yes, really.  They had a very, very specific

11  look that they wanted to maintain inside the club and a

12  specific crowd.

13      Q.   What kind of look were they trying to maintain?

14      A.   White girl ditzy look.

15      Q.   White girl ditzy look?

16      A.   Yeah, like, they liked to have white girls in

17  there.  I don't think I can even -- maybe one or two

18  girls of color, probably because they had to by law.

19  And you know, just a really ditzy, sweet and flamboyant,

20  petite or busty in shape, you know, type of thing.

21      Q.   And thank you for that, but what I was asking

22  for was once you were actually performing at

23  Heartbreakers, did anyone ever say, Hey, I don't like

24  the color of your hair?

25      A.   No.

Videotaped Deposition of Hailey Chapman

Page 85

1      Q.   Okay.  Do you know if that ever happened to

2  anyone else?

3      A.   I don't know, personally.

4      Q.   Did anyone ever critique your appearance in

5  general?

6      A.   No.

7      Q.   And as you were telling me earlier, your

8  appearance is what attract customers to pay you money,

9  right?

10     A.   Well, not --

11          MS. REZAZADEH:  Objection -- go ahead.

12     A.   Not just my appearance.  It's the whole entire

13  scenery, the whole entire ambience of the whole entire

14  club.  You know, I could be the prettiest girl in the

15  whole entire world, but if I'm working in a shack,

16  nobody is going to come in there.  You know, it's a

17  combination of, oh, I look pretty; oh, this music is

18  really nice; oh, I have this alcohol in my hand, let's

19  do it.

20     Q.   (BY MR. KING)  And so it's a lot of different

21  things that affect --

22     A.   Yes, a lot of variables, especially a lot on

23  the club.  I mean, yes, I looked nice, but most of it

24  was the music that was playing to portray my -- you

25  know, how I looked and stuff like that.

EXHIBIT B

Videotaped Deposition of Hailey Chapman

Page 86

1      Q.   Right.   What was the most important variable

2   that we've discussed, in your opinion?

3      A.   The stage.

4      Q.   The stage.   Did you ever -- out of curiosity,

5   did you ever have any customers come and tell you, Hey,

6   I really like coming to Heartbreakers because of their

7   food offerings or their range of liquor?

8      A.   No.

9      Q.   And you never had any customers come in and

10  say, Hey, I love coming to Heartbreakers because,

11  whatever, their steaks are great?

12     A.   Actually, yes.

13     Q.   Really?

14     A.   I have heard that before, yes.   Strip club food

15  is good food, so for future reference.

16     Q.   Remember, you're under oath.   Is that true?

17     A.   It is true.   It is true.

18     Q.   Okay.   Customers that would in to eat, would

19  they pay for your services?

20     A.   Yes.

21     Q.   What would you tell somebody who said exotic

22  dancing requires no initiative on the part of the

23  dancer?

24          MS. REZAZADEH:   Objection, vague.

25     A.   What do you mean by that?

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 87

1    Q.  (BY MR. KING)  That it's easy work.

2    A.  No, it's not.

3    Q.  Why isn't it easy work?

4    A.  Because it's actually -- it's physical labor,

5  laborious.  Like, you're literally sweating, so...

6    Q.  I guess, along those lines, what would you tell

7  somebody who said exotic dancing requires absolutely no

8  skill whatsoever?

9    A.  I would say that you're right.  You don't have

10  to have skill.

11    Q.  Why is that?

12    A.  You don't have to have a skill to be an exotic

13  dancer.  You just have to get up on stage and fake it

14  until you make it.

15    Q.  All right.  I just want to cover a couple of

16  things that we talked about earlier.  Sorry I'm jumping

17  around.  Did Peggy Armstrong control the pay structure

18  at all?

19    A.  Not that I'm --

20       MS. REZAZADEH:  Objection -- go ahead.

21    A.  Not that I'm aware of.  Obviously, when it

22  comes to, you know, the tip out, everything that we

23  tipped out, the house fees, DJs, skipping dances,

24  leaving early, if you were even given the option to pay

25  out, you know, the stripper money, all of those kinds of

Videotaped Deposition of Hailey Chapman

Page 88

1    things.

2        Q.  (BY MR. KING)  But Peggy didn't -- to your

3    knowledge, did Peggy control any of those things?

4        A.  Well, she owns the club, doesn't she?

5        Q.  I'm just asking for your personal knowledge.

6        A.  I would say yes, because she's the owner of the

7    club so she's the one who came up with it.  She's the

8    one who enforces everybody below her, Whitey, whoever,

9    Hey, you know, make sure this gets done.

10       Q.  Right.  But I'm just trying to understand if

11   that's just your assumption or you actually know that

12   somebody told you Peggy is up there saying, Dancers,

13   here's how you get paid?

14             MS. REZAZADEH:  Objection, vague.

15       A.  I don't want to call it an assumption because I

16   know that it's true.  It's just nobody has told me --

17   nobody has come up to me and said, Hey, Peggy is the one

18   who did this, but I mean, I don't really know how else

19   to put it.

20       Q.  (BY MR. KING)  Okay.  And correct me if I'm

21   wrong, so you were inferring that the fact that she is

22   an owner of the club that she has control over the

23   day-to-day of the club?

24             MS. REZAZADEH:  Objection, misquoting the

25   deponent, asked and answered.

Videotaped Deposition of Hailey Chapman

Page 89

1    A.  I don't think I'm inferring.  I think -- I know

2    that that's a fact, and I know that it was enforced upon

3    Whitey because he's the one that enforced it upon us, so

4    yeah.

5    Q.  (BY MR. KING)  I'm not trying to go around and

6    around with you --

7    A.  It's okay.  I know.

8    Q.  -- it's just that I'm looking at your

9    declaration.  Do you recall signing a declaration in

10   this case --

11   A.  What?

12   Q.  -- last year?

13   A.  Yes.

14   Q.  Do you recall signing a declaration --

15   A.  Yes.

16   Q.  -- dated May 16th, 2020?

17   A.  Yes.

18   Q.  And you made many statements in your

19   declaration and it was signed under penalty of perjury

20   that the foregoing is correct.  I'm not saying that

21   you're lying or anything.

22   A.  Uh-huh.

23   Q.  I'm just trying to understand where the

24   information that's in this declaration came from.

25             MS. REZAZADEH:  Objection, vague.  Is there

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 90

1   a question?

2              MR. KING:  Yes.

3       Q.  (BY MR. KING)  So you write that Peggy

4   Armstrong hired and fired employees and directed and

5   supervised all employees.  And so I'm just trying to

6   figure out what is the basis for your statement?

7       A.  Because she's the owner of the establishment so

8   she has the final say.  She's the one who enforces the

9   rules upon everybody, so I feel like that's almost

10  common sense.

11      Q.  Okay.  But you never personally experienced

12  that, right?

13      A.  She's never personally told me, Hey, I'm the

14  one who enforces this, no, but...

15      Q.  Did anyone ever tell you Peggy is the one that

16  enforces this?

17      A.  No.

18      Q.  Okay.  You also say that Peggy Armstrong is one

19  of the people who signed on the business's checking

20  accounts including payroll accounts.  Do you have any

21  personal knowledge about that?

22      A.  No.

23      Q.  Do you know whether Peggy Armstrong made any

24  decisions regarding club improvements?

25              MS. REZAZADEH:  Objection, asked and

Videotaped Deposition of Hailey Chapman

Page 91

1  answered.

2    A.  Could you repeat the question one more time?

3    Q.  (BY MR. KING)  Certainly.  Do you have any

4  personal knowledge of whether Peggy Armstrong made

5  decisions about club improvements?

6          MS. REZAZADEH:  Same objection.

7    A.  I don't know.

8    Q.  (BY MR. KING)  Do you know if Peggy Armstrong

9  ever refused to let a dancer work a shift?

10          MS. REZAZADEH:  Objection, asked and

11  answered.

12    A.  No.

13    Q.  (BY MR. KING)  In paragraph 16 of your

14  declaration, you state that, Defendants also exercised a

15  great deal of control over how I and all of the dancers

16  performed.  What -- what forms of control are you

17  referring to?

18    A.  The control as in we had to -- we had to do

19  something.  We couldn't just sit there.  We had to be

20  walking around.  Whitey would tell me and some of the

21  other girls, you know, Take your top off, take your top

22  off when you're walking around, you know, to get

23  customers in.

24          You know, just like I said earlier, on

25  stage, you couldn't be lazy.  You had to do your best --

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 92

1    the best of your ability to, you know, dance.  And you

2    know, obviously, lap dances or whatever, you just -- it

3    was enforced that you had to do those things.

4        Q.  Anything else that you can think of?

5        A.  Could you repeat the question one more time?

6        Q.  Sure.  In paragraph 16, you wrote -- or you

7    say, Defendants also exercised a great deal of control

8    over how I and all other dancers/entertainers performed.

9    And I'm just trying to figure out, what is the

10   universal -- you know, great deal of control you're

11   talking about.

12       A.  Yeah, the --

13           MS. REZAZADEH:  Objection, asked and

14   answered, vague.  Go ahead.

15       A.  The control was basically what I just said.

16   You know, on stage, we had to go on stage unless we paid

17   to not go on stage.  We had to be walking the floor.  We

18   couldn't just be sitting down.  We had to -- we had to

19   have our tops off if we were asked.  Also, staying on

20   stage for your amount of time, some girls would try to

21   get off early, you cannot do that.  You -- there was

22   just -- it was very controlled.  You just had to do what

23   you did and that was just what it was.

24       Q.  (BY MR. KING)  Got it.  And correct me if I'm

25   wrong, but if I understand you correctly, it sounds, to

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 93

1   me, at least, that the great deal of control was

2   exercised over your stage performance that's part of

3   your job, right?

4        A.  No, the most control -- the most control was

5   when it came to money.

6        Q.  Because of the tip out of the DJs?

7        A.  Yeah, all of the money that I got scammed into

8   giving, that was where the control was, was you know,

9   you had to pay out all of these little fines and fees.

10  You had to stay a minimum of eight hours.  That's not

11  independent contract.  That's you working a shift.

12       Q.  Sure.

13       A.  So that was -- it was just the whole thing was

14  controlled.  It wasn't what you were led to believe.  It

15  wasn't, Hey, you come in, do whatever, sit down, play on

16  your phone.  It was very, you know, boom, boom, boom,

17  boom.  Like, get on stage, get off, walk the floor, give

18  dances, get people drunk, whatever it may be.  You had

19  to be following the guidelines, basically.  It wasn't

20  just a free-for-all like I was under the impression of.

21       Q.  Did Whitey have any favorite dancers?

22            MS. REZAZADEH:  Objection, calls for

23  speculation, vague.

24       A.  I have no idea.

25       Q.  (BY MR. KING)  Do you know --

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 94

1          A.   I was only there for seven days.

2          Q.   Okay.   I understand that all of your testimony

3     is based on your seven days, right?

4          A.   Yes.

5          Q.   During your experience, did you ever hear of

6     any dancers who were treated more favorably?

7          A.   Yes, I know that there were favorites there.

8     Especially the bartender, Britney.   She's the reason I

9     got fired is because she was a favorite there.   You

10    know, she had been there for a little while and her and

11    Whitey were really cool with each other.   So obviously,

12    she has the upper hand and she can say whatever she

13    wants.   If she doesn't want me there, she doesn't want

14    me there, so there was definitely favoritism there.

15         Q.   I was just talking about dancers now.

16         A.   Oh, dancers?   I'm not really sure because I

17    didn't really talk to any dancers.

18         Q.   So you just -- you don't know one way or the

19    other, right?

20              MS. REZAZADEH:   Objection, asked and

21    answered.

22         Q.   (BY MR. KING)  I just wanted to make sure -- I

23    just need to know if you don't know, like, I have no

24    information about that or what.

25         A.   Could you repeat the question?

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 95

1      Q.  About whether managers had any favorite dancers

2  who got leeway on any of the things we discussed?

3              MS. REZAZADEH:  Asked and answered.

4      A.  I don't know.

5      Q.  (BY MR. KING)  Are you seeking overtime

6  compensation in this case?

7      A.  No.

8      Q.  Are you -- are you seeking -- well, what sums

9  of money are you asking for in this lawsuit?

10             MS. REZAZADEH:  Objection, I'm going to

11 instruct my client not to answer to the extent you're

12 asking her to calculate amounts or give amounts, but she

13 can answer in general terms.

14     A.  I'm not sure.  That's why I hired a lawyer.

15     Q.  (BY MR. KING)  So you're not -- you're not sure

16 if you're seeking $7.25 an hour for the hours you

17 performed at the club?

18             MS. REZAZADEH:  Objection, asked and

19 answered.

20     A.  I'm not sure how much I'm seeking, that's why I

21 hired a lawyer.

22     Q.  (BY MR. KING)  Okay.  So you're not sure if

23 you're seeking $2.13 an hour?

24             MS. REZAZADEH:  Objection, asked and

25 answered.

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 96

1      A.   I'm not sure how much I'm asking for, that's

2    why I hired a lawyer -- or how much I should ask for,

3    that's why I hired a lawyer.

4      Q.   (BY MR. KING)   Sure.   Do you -- are you going

5    to ask the jury or the court to award you $7.25 for all

6    the hours you worked at Heartbreakers?

7           MS. REZAZADEH:   Objection, asked and

8    answered.   How does she know what we're going to ask the

9    jury?

10          MR. KING:   Because it's her lawsuit.

11     A.   No, I'm not going to ask them for $7.25.

12     Q.   (BY MR. KING)   Okay.   Do you want other dancers

13   to join your lawsuit?

14     A.   I do.   Definitely, 100 percent.

15     Q.   Great.   Why is that?

16     A.   Because I know this is not just happening to

17   me, I know that it's happening to every single other

18   girl that's working there because it was happening while

19   I was working there, and I know that nothing has

20   changed, so...

21     Q.   How do you know nothing has changed?

22     A.   Because I've been in there since.

23     Q.   As a customer?

24     A.   Uh-huh.

25     Q.   Have you talked to other dancers?

Videotaped Deposition of Hailey Chapman

Page 97

1      A.   No.

2      Q.   So how do you know it's still happening?

3      A.   You just know, assumption.  Why would it not

4  be?

5      Q.   There are different reasons.  But you don't

6  know that it is, in fact, still happening, everything

7  you described to me today?

8      A.   I'm pretty sure it's still happening.

9      Q.   But that's your assumption?

10      A.   Yes.

11      Q.   Why have you gone back to visit the club?

12      A.   Same reason anybody else goes into a strip

13  club.

14      Q.   For dances?

15      A.   Yes.

16      Q.   Okay.  Just to hang out?

17      A.   Yes.

18      Q.   Did you pay for any dances?

19      A.   Yes.

20      Q.   How much did you pay?

21      A.   For one dance or all the whole entire night.

22      Q.   Just for one dance.

23      A.   $20.

24      Q.   How much did you pay for the whole night?

25      A.   A lot, around $300 or $500.

Videotaped Deposition of Hailey Chapman

Page 98

1        Q.   Those dancers are working hard for their money,

2    right?

3        A.   Yes, I get it.  I 100 percent get it.

4        Q.   Yeah.  Did anyone prevent you or give you a

5    hard time from entering the club?

6        A.   No.

7        Q.   When was the last time that you visited the

8    club?

9        A.   I can't remember.

10       Q.   Was it this year?

11       A.   No.

12       Q.   Was it last year?

13            MS. REZAZADEH:  Objection, asked and

14   answered.

15       A.   I'm not sure.  I'm really not sure.

16       Q.   (BY MR. KING)  Okay.  Have you only been back

17   to the club once --

18       A.   Yes.

19       Q.   -- or more than once?

20       A.   Once.

21       Q.   Only once.  Okay.  Did you talk to anybody

22   there?

23       A.   No.

24       Q.   Did anyone at the club tell you you couldn't

25   perform at any other club during your seven days at

Videotaped Deposition of Hailey Chapman

1    Heartbreakers?

2        A.   No.

3        Q.   No.  Do you know if any such restriction

4    existed?

5        A.   No.

6        Q.   On the amounts that you say you had to tip DJs,

7    do you have any idea how much that was?

8        A.   Altogether?

9        Q.   Yeah.

10       A.   From the seven days I tipped him out?

11       Q.   Uh-huh.

12       A.   I don't know, between like $100 and $200.  I

13   mean, it was different every night.  If I made $500, I

14   would probably tip more than $5 to him.  It was just

15   courteous.  You just really felt obligated because you

16   were actually tipping him to his face.  So you were

17   giving him that -- I don't know the word I'm looking

18   for, but you were giving him that area to be like, Hey,

19   this is only $5.

20       Q.   Is it like a negotiation?

21       A.   Almost, yes.  Almost.

22       Q.   Okay.  So about $100 or $200.  Did you tip any

23   of the managers?

24           MS. REZAZADEH:  Objection, vague.

25       A.   I didn't have to tip the managers, but Whitey

Videotaped Deposition of Hailey Chapman

Page 100

1    did enforce tipping the DJs.  He -- you know, he made

2    sure that -- that you were tipping out what you were

3    supposed to be tipping out.  He made sure before you

4    left because you had to have a little piece of paper

5    that got signed off on.  In order to even leave the

6    establishment, you had to get sign-offs from the DJs and

7    the manager.

8              MR. KING:  I'll object to the nonresponsive

9    portion.

10       Q.  (BY MR. KING)  So my question was whether you

11   had to tip any of the managers, like Whitey?  Did Whitey

12   ever say, Hey, Daisy, pay me 20 bucks?

13             MS. REZAZADEH:  Objection, vague.

14       A.  No.

15       Q.  (BY MR. KING)  Sorry, you said no?

16       A.  No.

17       Q.  So Whitey didn't have his hands in your

18   pockets --

19             MS. REZAZADEH:  Objection, vague.

20       Q.  (BY MR. KING)  -- it was all about the DJs?

21       A.  No, it wasn't all about the DJs.  I know that

22   Whitey was involved in it because he enforced me tipping

23   out the DJs.  So who's to say they weren't splitting the

24   tips together and he was just enforcing it because he

25   was the manager?

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 101

```
 1        Q.  Okay.  I'm just asking if --

 2        A.  Yeah.

 3        Q.  -- there was a night when Whitey came -- you

 4   know, you were about to leave and Whitey says, Hey, give

 5   me 10 bucks?

 6        A.  No, he never specifically told me to give him

 7   money.

 8        Q.  And did any other manager do that to you?

 9        A.  I never talked to any other manager.

10        Q.  Do you have any records showing the amount of

11   time that you performed at Heartbreakers during those

12   seven days, like diaries or calendars?

13        A.  No.

14        Q.  Do you have any records of the amounts of money

15   that you paid over to DJs?

16        A.  No.

17        Q.  Do you have any records of the amounts of money

18   that you paid for house fees?

19        A.  I personally don't have any records, no.

20        Q.  Do you have any records showing any other

21   amounts that the club made you pay?

22        A.  No.

23        Q.  Do you need to take a break?

24        A.  No, I'm okay.  I just want to -- you know...

25        Q.  To stretch?  Are you having fun in this
```

Videotaped Deposition of Hailey Chapman

Page 102

1   deposition?

2       A.  No, I'm not at all, actually.  Thank you for

3   asking, though.  I'm under oath, so I'm not going to

4   lie.

5       Q.  Have I at least been polite with you so far?

6       A.  Yes.  Am I under oath still?  No, I'm just

7   kidding.

8       Q.  Oh, come on.

9       A.  I'm just kidding.  Yes.

10      Q.  Okay.

11          MS. REZAZADEH:  Will, do you have any idea

12  how much longer you're going to be?

13          THE WITNESS:  Yes, do you have -- that's

14  what I want to know.

15          MR. KING:  I'll be done probably around

16  noon.

17          MS. REZAZADEH:  I'd like to take a break.

18          MR. KING:  Let's to this.  Let me take a

19  break, and I'll see what areas we still need to cover

20  and that will speed things up.

21          THE WITNESS:  Okay.  Cool.

22          MS. REZAZADEH:  Okay.  Thank you.

23          THE REPORTER:  Off the record at 11:26.

24          (Break taken from 11:26 a.m. to 11:37 a.m.)

25          THE REPORTER:  Back on the record at 11:37.

**EXHIBIT B**
Videotaped Deposition of Hailey Chapman

Page 103

1      Q.   (BY MR. KING)   Okay.   I'm going to show you a

2   document here.   Can you see my screen, ma'am?

3      A.   Yes.

4      Q.   This is a document Bates labelled Heartbreakers

5   000070 and it runs through 000074.   And this is the

6   Independent Contractor/License Agreement between A&D

7   Interests, Incorporated doing business as Heartbreakers

8   and independent contractor.   Did I read that correctly?

9      A.   Yes.

10      Q.   Do you recognize this document?

11      A.   Yes.

12      Q.   Did you sign this document?

13      A.   Yes.

14      Q.   You don't claim that anyone forged your

15   signature or anything like that, right?

16      A.   No.

17      Q.   Okay.   Do you know if other dancers had to sign

18   the same contract?

19      A.   Yes.

20      Q.   Do you know if other dancers were presented

21   with, like, an employee agreement?

22          MS. REZAZADEH:   Objection, calls for

23   speculation.

24      A.   I would imagine so.

25      Q.   (BY MR. KING)   Were you presented with an

Videotaped Deposition of Hailey Chapman

Page 104

1    alternative employee agreement?

2         A.   I don't know what that is.

3         Q.   Did anyone at the club ever ask or present to

4    you the option of performing in the capacity as an

5    employee who gets paid $7.25 an hour minimum?

6         A.   No, I was never offered that.

7         Q.   Were you expected to tip the house mom?

8         A.   If you used her supplies, yes.

9         Q.   But not just for the heck of it, right?

10        A.   No.

11        Q.   If you didn't tip the house mom, would you get

12   bad music played on stage?

13        A.   Not that I'm aware of.

14        Q.   Who enforced an expectation to tip the house

15   mom?

16        A.   I'm not sure.  I never did.

17        Q.   Because you never used her stuff?

18        A.   Huh-uh.  It was just known that she had a jar

19   that said tips.  If you used her stuff, you put money in

20   the jar as courtesy.

21        Q.   Did you feel that was unfair in any way?

22        A.   That one particular instance, I did not feel

23   like was unfair because if you're using her things, then

24   I feel like it was fair enough for her to say, Hey,

25   throw a dollar in the jar so we can keep our stuff

Videotaped Deposition of Hailey Chapman

Page 105

1   stocked.

2      Q.   Sure.   You've alleged in the lawsuit that

3   plaintiffs in the class -- or the dancers or

4   entertainers would work in excess of 40 hours in some

5   weeks?

6      A.   Yes, some would.

7      Q.   Some would?

8      A.   Yes.

9      Q.   And how do you know that?

10     A.   Oh, you know, the girls talked.

11     Q.   Sure.

12     A.   The girls talked there.  So you know, you would

13  hear of some girls, you know, Oh, I'm working a double

14  today.  Oh, I've been here all week.  I've been here

15  every day this week.  And you know, you have to stay a

16  minimum of eight hours, so...

17     Q.   Do you know whether anyone at the club made

18  other dancers perform overtime hours, over 40 in a week?

19             MS. REZAZADEH:  Objection, calls for

20  calculation.

21     A.   I don't know.

22     Q.   (BY MR. KING)  And you were never required to

23  work over 40 hours a week in seven days, right?

24     A.   No.

25     Q.   I've asked you some questions about calculating

Videotaped Deposition of Hailey Chapman

Page 106

1   the amount of money that you're claiming in this

2   lawsuit.  So let me just understand, you are seeking

3   money in this lawsuit, right?

4        A.  Correct.

5        Q.  Okay.  How -- how is the judge or jury supposed

6   to figure out how much money you're owed?

7        A.  Talk to my lawyer.

8        Q.  Although your lawyers are good lawyers, they

9   can't provide evidence at trial or like we're doing

10  here, they can't testify for you.

11       A.  Yes.

12       Q.  So that will be up to you.

13       A.  Okay.

14       Q.  And so what I'm wondering is, what sums of

15  money are you asking for?

16            MS. REZAZADEH:  Objection, calls for

17  calculation.

18       A.  I don't have a set amount.  I just want to be

19  paid what I feel I'm owed, what I'm entitled to.

20       Q.  (BY MR. KING)  Sure.

21       A.  I cannot give you a set amount because I don't

22  know myself.

23       Q.  Are there any records that we might be able to

24  point to that would show how much money you're seeking?

25       A.  You would have to ask somebody at the club.  I

Videotaped Deposition of Hailey Chapman

1  don't have records that I kept myself, so I don't know.

2      Q.  Do you have any personal knowledge about any

3  facts that might tell us how much you're claiming?

4          MS. REZAZADEH:  Objection, vague.

5      A.  Do I have any facts that are --

6      Q.  (BY MR. KING)  Just in your own personal

7  knowledge.

8      A.  Could you repeat the question one more time,

9  please?

10     Q.  Sure.  What I'm trying to get at is I'm just

11 trying to understand what you're seeking in this lawsuit

12 aside from the just generalized what you're owed.

13         MS. REZAZADEH:  Is there a question?

14         MR. KING:  Yeah.

15     Q.  (BY MR. KING)  What are you owed?  What range,

16 amount, what category of money?

17     A.  Well, see, the thing is, I don't know how much

18 I'm owed, so that's why I hired an attorney so she could

19 figure this out for me and figure out what she thinks is

20 fair from a legal perspective.

21     Q.  So are you claiming that you should have been

22 paid $20 an hour for the time you performed?

23         MS. REZAZADEH:  Objection, asked and

24 answered.

25     A.  I'm not going to say a set number because like

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 108

1    I said, I just don't know.

2        Q.  (BY MR. KING)  Do you want a minimum of $7.25

3    an hour for the time you performed?

4            MS. REZAZADEH:  Objection, asked and

5    answered.

6        A.  No.

7        Q.  (BY MR. KING)  Okay.  Do you know how much

8    other dancers are owed?

9        A.  I have no idea.

10       Q.  You would have to ask them how much they are

11   owed?

12       A.  Yes, it's case by case.

13       Q.  And so there's just no way you can give me,

14   like, the formula for calculating your damages?

15           MS. REZAZADEH:  Objection, calls for a

16   legal conclusion.

17       A.  I'm so sorry.  I cannot give you a formula.  I

18   cannot calculate it.  That -- this is the reason why I

19   hired a lawyer so she could do the work for me,

20   basically, and she could dig deeper and figure out what

21   she thinks I'm rightfully owed.

22       Q.  (BY MR. KING)  Okay.  Well, I don't know what

23   your lawyer thinks, but I want to know what you think.

24       A.  A lot.

25       Q.  Okay.  How much is a lot?

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 109

1              MS. REZAZADEH:  Objection, asked and

2     answered.

3         A.  I don't -- I can't put a number on it because

4     there's a lot of circumstances and I feel like there's a

5     lot of, you know, loopholes and things like that that I

6     necessarily might not know about.  So I don't want to

7     say a number and I still be owed more or less than that

8     number because of a certain set of circumstances.

9         Q.  (BY MR. KING)  Right.  I think I understand

10    what you're saying is that you don't want to provide

11    testimony that might limit the amount of money that

12    you're entitled to; is that right?

13             MS. REZAZADEH:  Objection, misquoting the

14    deponent.

15        A.  I didn't say that, no.  I just don't want to

16    say a number and it not be the correct number that I'm

17    owed, whether it be more or less.

18        Q.  (BY MR. KING)  Okay.  So what source of

19    information would give us the true number that you're

20    owed?

21             MS. REZAZADEH:  Objection, asked and

22    answered.

23        A.  Heartbreakers.

24        Q.  (BY MR. KING)  So Heartbreakers's records would

25    be the true source of information?

EXHIBIT B

Videotaped Deposition of Hailey Chapman

Page 110

1          MS. REZAZADEH:  Objection, calls -- vague,

2    asked and answered.  Go ahead.

3      A.  Well, from the reviews -- from what I reviewed

4    of the documents that they have, they would not know the

5    correct amount, no.

6      Q.  (BY MR. KING)  So who would?

7      A.  My lawyer.  That's why I hired her so she could

8    figure it out for me because I have no idea how much I'm

9    owed.  I have no idea how much I'm entitled to, that's

10   why I hired a lawyer.  I'm sorry I can't answer the

11   question directly for you.

12     Q.  Okay.  Are you going to be able to later answer

13   the question, like if we go to trial, because this is my

14   only opportunity to ask you these questions before we go

15   to trial --

16     A.  Yeah.

17     Q.  -- so I'm just trying to figure it out because

18   your lawyers haven't told me either.

19     A.  Yeah.  I would have to discuss that with my

20   lawyer and see what -- if she thinks, you know, that

21   it's appropriate for me to say an amount.

22          MS. REZAZADEH:  I'm sure -- I'm sure we

23   could figure out an amount for trial if you give us all

24   your receipts and records.

25          MR. KING:  We have.

Videotaped Deposition of Hailey Chapman

Page 111

1              MS. REZAZADEH:  Anyways, obviously, she's

2    not going to give you a number, so can we move on?

3              MR. KING:  All right.

4         Q.  (BY MR. KING)  And there wasn't a maximum

5    amount that you charged for a lap dance, right, we

6    established that?

7         A.  There was not a maximum amount, no.

8         Q.  And there wasn't a minimum amount?

9         A.  No, there was not.

10        Q.  Okay.  Have you now told me all the different

11   ways that the club controlled your work as a dancer?

12             MS. REZAZADEH:  Objection, vague.

13        A.  I want to say, yes, but I think that we should

14   just touch on them a few more times to make sure that

15   we're both, you know, on the same page about them.

16             You know, there was instances where, you

17   know, obviously, you had to be on stage.  It was very

18   frowned upon if you didn't.  If you did not want to go

19   on stage, you had to pay.  Tops off, tops had to be off

20   during dances, on the floor, on the stage.

21        Q.  (BY MR. KING)  Well, let me -- let me stop you

22   right there.  If you were on the floor and a customer

23   didn't want you to take your top off --

24        A.  You just put it back on.

25        Q.  Okay.

EXHIBIT B
Videotaped Deposition of Hailey Chapman

Page 112

1      A.  But for -- you know, to get clientele in, it

2  was obviously favorable for girls to walk around

3  naked -- well, not naked, but topless.

4              I think that there was also instances

5  where if you wanted to go home early, you know, you

6  would get fired.  Stuff like that was really

7  controlling.  And I think, obviously, we went overall

8  the tip out things and the dancer money and all of that

9  kind of thing.

10      Q.  Are you -- are you looking at any notes, out of

11  curiosity?

12      A.  No, why.

13      Q.  I was just curious.  Sometimes on Zoom, people

14  look at notes.

15      A.  One second.

16      Q.  Are you all right?

17      A.  Yeah, one second.

18      Q.  Go ahead.

19      A.  Sorry about that.

20      Q.  That's all right.  Allergies are going around.

21              Better?

22      A.  Yes.

23      Q.  Okay.  Anything else?

24              MS. REZAZADEH:  Objection, vague.

25      A.  Not that I can think of right now.

**EXHIBIT B**
Videotaped Deposition of Hailey Chapman

Page 113

1      Q.   (BY MR. KING)  And what things do you say that

2   the club paid for that was the most essential to your

3   work?

4                MS. REZAZADEH:  Objection, vague.

5      A.   The music, the stage, the whole entire club

6   itself, alcohol and food.  I think that all of it comes

7   together.  Number one would be music.

8      Q.   (BY MR. KING)  And was anything that you had to

9   pay for, do you consider any of that essential to your

10   work?

11      A.   Yes, the $1,000 that I had to spend in order to

12   look accordingly up to Whitey's standards.

13      Q.   Up to Whitey's standards?

14      A.   Yes.

15      Q.   What standards were those?

16      A.   To look good and be presentable.

17      Q.   Is there anything more specific that he told

18   you?

19      A.   Not necessarily.  You just -- you know, you

20   just had to look good, have your makeup done, have on,

21   you know, the correct outfits and shoes.

22      Q.   And when -- we established that it was up to

23   you to decide how to engage with customers on the floor,

24   right?  No one trained you how to do that, right?

25      A.   No one trained me -- trained me to engage, but

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 114

1   I was told to engage.

2       Q.   The club never gave you any sort of benefits

3   like insurance, retirement, nothing like that?

4       A.   No.

5               MR. KING:  All right.  I think that's all I

6   have for you, Ms. Chapman.  I appreciate your time.

7               THE WITNESS:  You're so welcome.

8               MR. KING:  Pass the witness.

9               MS. REZAZADEH:  Reserve for trial.  Thanks

10  everybody.

11              MR. KING:  All right.

12              THE REPORTER:  Read and sign?

13              MS. REZAZADEH:  Yes, please.

14              THE REPORTER:  All right.  Off the record

15  at 11:51.

16              (End of proceedings.)

17

18

19

20

21

22

23

24

25

**EXHIBIT B**

Videotaped Deposition of Hailey Chapman

Page 115

```
 1                    CHANGES AND SIGNATURE

 2    WITNESS NAME: HAILEY CHAPMAN      DATE: APRIL 20, 2021

 3    PAGE LINE        CHANGE            REASON

 4    _____

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____
```

Videotaped Deposition of Hailey Chapman

Page 116

1        I, HAILEY CHAPMAN, have read the foregoing
deposition and hereby affix my signature that same is
2   true and correct, except as noted above.

3

4                              _____

5                              HAILEY CHAPMAN

6

7

8

9   THE STATE OF _____)

10  COUNTY OF _____)

11

12        Before me, _____, on

13  this day personally appeared HAILEY CHAPMAN, known to me

14  (or proved to me under oath or through

15  _____) (description of identity

16  card or other document) to be the person whose name is

17  subscribed to the foregoing instrument and acknowledged

18  to me that they executed the same for the purposes and

19  consideration therein expressed.

20        Given under my hand and seal of office this

21  _____ day of _____, _____.

22

23

24                              _____

25                              NOTARY PUBLIC IN AND FOR
                                THE STATE OF _____

Videotaped Deposition of Hailey Chapman

Page 117

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    GALVESTON DIVISION

 3   STACEY KIBODEAUX, A/K/A        )
     "ILLUSION," ET AL.,            )
 4   INDIVIDUALLY AND ON BEHALF     )
     OF ALL OTHERS SIMILARLY        )
 5   SITUATED,                      )
                                    )
 6                   Plaintiffs,    )
                                    )
 7   VS.                            ) CIVIL ACTION
                                    )
 8   A&D INTERESTS, INC., D/B/A     ) NO.: 3:20-CV-00008
     HEARTBREAKERS GENTLEMAN'S      )
 9   CLUB, ET AL.,                  )
                     Defendants.    )
10

11

                  REPORTER'S CERTIFICATION
12            DEPOSITION OF HAILEY CHAPMAN
                    APRIL 20, 2021
13

14       I, Jordana Hodges, Certified Shorthand Reporter in

15   and for the State of Texas, hereby certify to the

16   following:

17       That the witness, HAILEY CHAPMAN, was duly sworn by

18   the officer and that the transcript of the oral

19   deposition is a true record of the testimony given by

20   the witness;

21       That the original transcript was delivered to

22   _____;

23       That a copy of this certificate was served on all

24   parties and/or the witness shown herein on

25   _____;
```

Videotaped Deposition of Hailey Chapman

Page 118

1      That pursuant to information given to the

2   deposition officer at the time said testimony was taken,

3   the following includes all parties of record:

4   FOR THE PLAINTIFFS:

5        MS. GHAZZALEH REZAZADEH
         ELLZEY & ASSOCIATES
6        1105 Milford Street
         Houston, Texas  77006
7        888.350.3931
         ghazzaleh@ellzeylaw.com
8
    FOR THE DEFENDANTS A&D INTERESTS, INC., D/B/A
9   HEARTBREAKERS GENTLEMAN'S CLUB, ET AL.:

10       MR. WILLIAM KING
         WALLACE & ALLEN
11       440 Louisiana Street
         Suite 1500
12       Houston, Texas  77002
         713.227.1744
13       wking@wallaceallen.com

14      That the amount of time used by each party at the

15   deposition is as follows:

16   MR. KING - 02 HOURS: 24 MINUTES

17      That $_____ is the deposition officer's

18   charges to the Defendants for preparing the original

19   deposition transcript and any copies of exhibits;

20      I further certify that pursuant to FRCP Rule

21   30(e)(1), that the signature of the deponent:

22          ___ was requested by the deponent or a party

23   before the completion of the deposition, and that

24   signature is to be before any notary public and returned

25   within 30 days from date of receipt of the transcript;

Videotaped Deposition of Hailey Chapman

Page 119

1        ___ was not requested by the deponent or a

2    party before the completion of the deposition.

3        If returned, the attached Changes and Signature

4    page contains any changes and the reasons therefor;

5        That $_____ is the deposition officer's

6    charges to the Plaintiff for preparing the original

7    deposition transcript and any copies of exhibits;

8        I further certify that I am neither counsel for,

9    related to, nor employed by any of the parties or

10   attorneys in the action in which this proceeding was

11   taken, and further that I am not financially or

12   otherwise interested in the outcome of the action.

13       Certified to by me this _____ day of

14   _____, 2021.

15

16

17                    _____

18                    Jordana Hodges, Texas CSR # 8887
                     Expiration Date:  07/31/2021
                     Firm Registration No. # 728
19                    Infinity Reporting Group
                     11200 Richmond Avenue
20                    Suite 410
                     Houston, Texas  77082
21                    832.930.4484

22

23

24

25