1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF TEXAS
2                         GALVESTON DIVISION

3     STACEY KIBODEAUX, a/k/a      )
      "ILLUSION,"et al.,           )
4     individually, and on         )
      behalf of all others         )
5     similarly situated,          )
                                   ) CIVIL ACTION
6           PLAINTIFFS,            )
                                   ) NO.: 3:20-cv-00008
7     VS.                          )
                                   )
8     A&D INTERESTS, INC.,         )
      d/b/a HEARTBREAKERS          )
9     GENTLEMAN'S CLUB, et al.,    )
                                   )
10          DEFENDANTS.            )

11          ------------------------------------
                       ORAL DEPOSITION OF
12                   ROXANNE RENEE MURILLO
                        April 27, 2021
13                         Volume 1
                      (Reported Remotely)
14          ------------------------------------

15          ORAL DEPOSITION OF ROXANNE RENEE MURILLO, produced

16    as a witness at the instance of the DEFENDANTS, and duly

17    sworn, was taken in the above-styled and numbered cause

18    on the 27th of April, 2021, from 1:04 p.m. to 4:39 p.m.,

19    via Zoom, before Caroline Massa, RPR, CSR in and for the

20    State of Texas, reported by machine shorthand, at the

21    witness' residence in Channelview, Texas, pursuant to

22    the Federal Rules of Civil Procedure, the Current

23    Emergency Order regarding the COVID-19 State of

24    Disaster, and the provisions stated on the record or

25    attached hereto.

1                    A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4         Ms. Ghazzaleh Rezazadeh (Via Videoconference)
          ELLZEY & ASSOCIATES, PLLC
5         1105 Milford Street
          Houston, Texas 77006
6         Phone:  (888) 350-3931
          Email:  ghazzaleh@ellzeylaw.com
7

8

9    FOR THE DEFENDANTS:

10        Mr. William X. King (Via Videoconference)
          WALLACE & ALLEN, LLP
11        440 Louisiana
          Suite 1500
12        Houston, Texas 77002
          Phone:  (713) 227-1744
13        Fax:    (713) 227-0104
          Email:  wking@wallaceallen.com
14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX

 2                                                  PAGE

 3   Appearances.................................... 2

 4   Stipulations.................................. 5

 5   ROXANNE RENEE MURILLO
         Examination by Mr. King................... 5
 6
     Signature and Changes.........................146
 7
     Reporter's Certificate........................148
 8
                          EXHIBITS
 9
     NO.  DESCRIPTION                             PAGE
10
     Exhibit 1   Photos.......................... 50
11   Exhibit 2   Hours and Earnings Detail Report 113
     Exhibit 3   2019 entertainer license agreement 141
12   Exhibit 4   2015 entertainer license agreement 142
     Exhibit 5   2019 Form 1099................. 142
13   Exhibit 6   2018 Form 1099................. 143
     Exhibit 7   2017 Form 1099................. 144
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                P R O C E E D I N G S

 2              (Witness was sworn.)

 3              THE REPORTER:  Today's date is April 27th,

 4      2021.  The time is 1:04 p.m.  This is the oral

 5      deposition of Roxanne Murillo.  It is being taken in the

 6      case styled the United States District Court for the

 7      Southern District of Texas, Galveston Division, Stacey

 8      Kibodeaux, a/k/a "Illusion," et al., versus A&D

 9      Interests, Inc., d/b/a Heartbreakers, Civil Action

10      Number 3:20-cv-00008.  This deposition is being

11      conducted remotely in accordance with the current

12      Emergency Order Regarding the COVID-19 State of

13      Disaster.

14              The witness is located in Channelview,

15      Texas.

16              My name is Caroline Massa, Certified

17      Shorthand Reporter, CSR Number 6226.  I'm administering

18      the oath and reporting the deposition remotely by

19      stenographic means from my residence within the state of

20      Texas.

21              Would Counsel please state their

22      appearances and any agreements for the record?

23              MR. KING:  Will King for defendants.

24              MS. REZAZADEH:  Ghazzaleh Rezazadeh for

25      plaintiffs.
```

 1          THE REPORTER:  And just proceeding under

 2   federal rules today?

 3               MR. KING:  Yes.

 4                ROXANNE RENEE MURILLO,

 5   having been first duly sworn, testified as follows:

 6                    EXAMINATION

 7   BY MR. KING:

 8        Q.  All right.  Good afternoon.  How are you today?

 9        A.  Just fine.  How are you?

10        Q.  Doing well, thank you.  I want to make sure

11   that I pronounce your name correctly.  Is it Murillo or

12   Murillo?

13        A.  Murillo.

14        Q.  Murillo, all right.  Ms. Murillo, could you

15   state your full name for the purposes of the record

16   today?

17        A.  Roxanne Renee Murillo.

18        Q.  And have you ever gone by any other names?

19        A.  My maiden last name, Walden.

20        Q.  Any other names?

21        A.  Delagarza, my mom's last name.

22        Q.  Any other names?

23        A.  No.

24        Q.  What about Cepeda?

25        A.  Oh, that -- oh, and my first marriage, sorry.

 1      Q.   No problem.  So Walden and Cepeda were your

 2   names from prior marriages?

 3      A.   Walden is my birth last name, my maiden last

 4   name.

 5      Q.   Got it, okay.

 6      A.   Cepeda is my first marriage, yeah.

 7      Q.   And Murillo is your -- your current married

 8   last name?

 9      A.   Last name, yes.

10      Q.   Understood.  What stage names have you gone by?

11      A.   Unique.

12      Q.   Any others?

13      A.   Roxanne.

14      Q.   Have you ever been deposed before?

15      A.   No.

16      Q.   You never sat -- well, we're doing this by

17   Zoom, but have you ever been asked a bunch of questions

18   by lawyers with a court reporter present?

19      A.   No.

20      Q.   Have you ever testified in court before?

21      A.   No.

22      Q.   Well, since you haven't testified before in

23   court or been deposed, I just want to cover a couple of

24   quick ground rules.  The first one is since we're doing

25   this by Zoom, I know my video has a little bit of lag,

1  so just make sure to let me finish my question before

2  you start giving your answer.  That will allow the court

3  reporter to take down, you know, who's talking, and it

4  will also permit your lawyer to lodge any objections

5  that she might have.  Okay?

6      A.  Okay.

7      Q.  If you don't understand a question that I ask

8  you, please ask me for clarification.  Sometimes I ask

9  bad questions that just come out completely mangled,

10  like word salad, so feel free to ask me for

11  clarification.

12      A.  Okay.

13      Q.  Everyone has a habit of going uh-huh or huh-uh,

14  especially once the deposition starts going, so please

15  don't be offended if I remind you to give an audible

16  answer like yes or no and what have you, okay?

17      A.  Okay.

18      Q.  All right.  What have you done to prepare for

19  today's deposition?

20      A.  I just met with the lawyer and went over, you

21  know, our paperwork and things like that.

22      Q.  What paperwork did you go over?

23      A.  I guess like to sign to -- that they were gonna

24  be my attorney and things like that, you know, paperwork

25  to sign.

1      Q.   Your fee agreement with your lawyers?

2      A.   Yes.

3      Q.   Anything else?

4      A.   No.

5      Q.   Did you go over the responses to Heartbreakers'

6  discovery requests?

7      A.   Yes.

8      Q.   Did you review the interrogatory responses

9  which you gave?

10      A.   What is the interrogatory or --

11      Q.   Sure.  I'll just -- I'll put it on my screen so

12  you can see what I'm talking about.

13      A.   Okay.

14      Q.   Can you see my screen?

15      A.   Yes.

16      Q.   Okay.  Have you -- have you seen this document?

17      A.   Yes.  That's like the lawsuit or -- yes, I've

18  seen it.

19      Q.   Okay.  Did you review the lawsuit itself?

20      A.   Yes.

21      Q.   Have we covered all the documents that you

22  reviewed in anticipation of your deposition?

23      A.   Yes.

24      Q.   Aside from your attorneys, have you spoken with

25  anyone else about your deposition today?

1        A.   No.

2        Q.   You haven't talked to any friends or family

3   about it?

4        A.   No.

5        Q.   Have you spoken with any of the other

6   plaintiffs in this case about your deposition?

7        A.   No.

8        Q.   Do you know who the other plaintiffs are in

9   this case?

10        A.   I've vaguely seen their names, but I'm not too

11   sure who exactly they are.

12        Q.   Have you ever met any of the other plaintiffs

13   before?

14        A.   I'm not 100 percent for sure if -- I don't know

15   them personally.

16        Q.   And I appreciate your --

17        A.   I'm sorry, you cut out.

18        Q.   Oh.  It says my internet connection is

19   unstable.  Great.

20        A.   Sorry.

21        Q.   All right.  I think it's cleared up.

22        A.   Okay.  What was that again?

23        Q.   Let me just go through their names, and just

24   let me know if you ever met them or talked to them.

25        A.   Okay.

Case 3:20-cv-00008   Document 82-3   Filed on 05/21/21 in TXSD   Page 15 of 149

**EXHIBIT C**

Deposition of Roxanne Murillo                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

1      Q.  First one, Stacey Kibodeaux, also known as

2   Illusion?

3      A.  I'm not sure if she was the one who is dating

4   Mike Armstrong.  Stacey, when I heard the name, that's

5   what I -- that's who I thought she was.  I'm not sure if

6   she is or --

7      Q.  Have you ever met her?

8      A.  Just heard about her.

9      Q.  So you never talked to her?

10      A.  No.

11      Q.  Have you ever met or talked to Hailey Chapman

12   before?  She went by Daisy.

13      A.  I think I've seen her once or twice, but never

14   really associated myself with them.

15      Q.  Have you ever met Jean Hoffmeister, also known

16   as -- I think it's Johne?

17      A.  I'm not sure about her.

18      Q.  Is your current number (713) 498-2317?

19      A.  2311.

20      Q.  2311?

21      A.  Yes.

22      Q.  And how long have you had that phone number,

23   ma'am?

24      A.  I've had that number, I guess, about four years

25   maybe, five years.  I'm not sure the exact amount.

1   Q.   Sure, I understand.  I don't remember what I,

2   you know, ate for breakfast last Friday.

3   A.   I've had it a while, though.  That's for sure.

4   Q.   Okay.  Who's your current cell phone carrier?

5   A.   AT -- I mean, T-Mobile.

6   Q.   Do you have any other cell phone numbers?

7   A.   No.  That's the only number I have.

8   Q.   Fair enough.  Just thought I'd ask.  Is your

9   e-mail address MurilloRoxanne77@gmail.com?

10   A.   Yes.

11   Q.   Do you have any other personal e-mail

12   addresses?

13   A.   No.  That's the only one that I use.

14   Q.   No business e-mail addresses?

15   A.   No.

16   Q.   Since 2015, what -- what jobs have you held

17   starting back in 2015?

18   A.   You mean like dancing, like at Heartbreakers

19   and then -- like any other -- are you asking any other

20   clubs or any other type of employment?

21   Q.   Any other type -- so -- for -- for example,

22   it's my understanding that you were a phlebotomist for a

23   while, right?

24   A.   Right.

25   Q.   Okay.  So any other jobs, occupations that

1  you've had since 2015, beginning with the earliest, and

2  we can do it in chronological order?

3      A.  Well, the phlebotomy was before 2015, I

4  believe.  2015 I did do a little bit of, like, safety

5  inspections, but that was very short; and I went back to

6  dancing.

7      Q.  And so in 2015, you worked as a safety

8  inspector?

9      A.  Uh-huh.

10     Q.  Was that a yes?

11     A.  Yes, sorry.

12     Q.  No problem.  What kind of safety were you

13  inspecting?

14     A.  Oil field.  I worked at --

15     Q.  Do you --

16     A.  -- a chemical plant.

17     Q.  Sorry?

18     A.  Chemical plant.

19     Q.  And from about when to when did you work as a

20  safety inspector at chemical plants?

21     A.  I did it for a short time, maybe about six

22  months.

23     Q.  All right.  And then what?

24     A.  I went back to dancing.

25     Q.  So in 2015 you worked for a brief time as a

EXHIBIT C

Deposition of Roxanne Murillo                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

1   safety inspector, and then you went to go work as a

2   dancer?

3        A.   Yes.

4        Q.   And where did you work as a dancer?

5        A.   Heartbreakers.

6        Q.   Do you recall when in 2015 you started working

7   at Heartbreakers?

8        A.   Well, I -- not exactly the exact date.  I've

9   worked there since I was 18, so I'm not for sure -- I

10  mean, I've worked there since 2002.

11       Q.   All right.  So you worked at Heartbreakers for

12  the past, what, 19 years?

13       A.   18 years, yes.

14       Q.   18 years?

15       A.   (No response.)

16       Q.   Well, let's go back to 2002 then.

17       A.   Okay.

18       Q.   So was -- was Heartbreakers your first job out

19  of high school?

20       A.   Yes.

21       Q.   And how long did you work at Heartbreakers

22  during your first time there, from when to when?

23       A.   I worked there till I had my first kid, till I

24  was 21.

25       Q.   So from approximately 2002 to 2005?

1    A.   Uh-huh.

2    Q.   Is that a yes?

3    A.   Then I had a baby, went back.

4    Q.   And when did you return back to Heartbreakers

5  after you had your first child?

6    A.   So I had him October 2009, and I probably went

7  back around 2010, beginning of the year.

8    Q.   So between 2005 and 2010, did you have any

9  other jobs or occupations?

10   A.   No.  I did do the phlebotomy, but I'm not

11 exactly what -- sure.  I think I started -- I'm not

12 exactly what year I started.

13   Q.   So you returned to Heartbreakers in 2 --

14 sometime in early 2010, right?

15   A.   Right.

16   Q.   And how long was that second stint?

17   A.   The second -- what was that, I'm sorry?

18   Q.   The second stint at Heartbreakers.

19   A.   I stayed at Heartbreakers until my next kid,

20 another two years.

21   Q.   Okay.  Do you recall about when that was in

22 2012?

23   A.   So he was born in April.  I'm -- I'm not sure

24 exactly on those dates.  I'd have to sit down and

25 brainstorm -- I mean, you know, write the dates down and

 1  stuff.

 2       Q.  I understand.  I'm just trying to get general

 3  time frames.

 4            So you worked at Heartbreakers between 2010

 5  and approximately spring 2012?

 6       A.  I'm not exactly sure on the exact dates, but I

 7  would say yes.

 8       Q.  All right.  After your second child was born,

 9  you left Heartbreakers.  What did you do for work or

10  occupation?

11       A.  After the second child was born, I went back to

12  Heartbreakers.

13       Q.  When did you return to Heartbreakers

14  approximately?

15       A.  So he was born in April 2009, so probably

16  July/August, sometime around there.

17       Q.  July/August what year?

18       A.  2009.

19       Q.  Okay.  And then did you perform at

20  Heartbreakers until 2012?

21       A.  I stayed there until 2011.

22       Q.  Okay.  And then what?

23       A.  And then I had another child.

24       Q.  Uh-huh.

25       A.  And then I went back to dancing again.

1     Q.   When did you return to dancing?

2     A.   It's just a few months after.  So let's see,

3  she was born in January 2011.

4     Q.   Uh-huh.

5     A.   So shortly after that.

6     Q.   So in early 2011, after your third child was

7  born, you returned to go perform at Heartbreakers,

8  right?

9     A.   Right.

10    Q.   And how long was your -- so that was your third

11  time at Heartbreakers, right?

12    A.   Right.

13    Q.   And how long was your -- your third experience

14  at Heartbreakers?  From when to when approximately?

15    A.   So I stayed there until I did the -- I did the

16  phlebotomy in about -- I don't remember exactly what

17  year I did phlebotomy.  But I did that for about a year,

18  and I worked at Heartbreakers at night, or if I

19  worked -- if I was off on the phlebotomy job, I would go

20  during the day.

21    Q.   And how long is that third stretch of time at

22  Heartbreakers?

23    A.   I'm not sure.  I -- I worked there until 2017.

24    Q.   Did you take any -- like, did you have any

25  hiatuses at Heartbreakers between 2011 and 2017?

1      A.   What is a hiatus?  Like a time off?

2      Q.   Yeah, like extended periods of time where you

3   didn't perform.

4      A.   Just at the time when I did the oil -- the oil

5   field.  That's the only time that I kind of took off.

6   'Cause I worked 12-hour shifts, so I didn't really have

7   time to go work two jobs.

8      Q.   12-hour shifts at the refinery?

9      A.   Yes.

10      Q.   All right.  So between 2011 to 2017, you were

11   performing at Heartbreakers.  Is that accurate?

12      A.   Yes.

13      Q.   And -- and so you performed in 2016 at

14   Heartbreakers, true?

15      A.   2016, yes.

16      Q.   And you performed at Heartbreakers in 2017?

17      A.   Yes.

18      Q.   Between 2011 and 2017, did you perform at any

19   other gentlemen's clubs?

20      A.   I would work every now and then at the Ritz,

21   but that was a Heartbreakers rival, so we couldn't --

22   like, if they found out we worked there, we would kind

23   of get in trouble or told not to come back.

24      Q.   Okay.

25      A.   Or stay over there, something like that.

Case 3:20-cv-00008  Document 82-3  Filed on 05/21/21 in TXSD  Page 18 of 149   **EXHIBIT C**

Deposition of Roxanne Murillo                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

 1              MR. KING:  I'll object to the nonresponsive

 2    portion of that.

 3         Q.  (BY MR. KING)  Any other clubs that you

 4    performed at between 2011 and 2017 other than

 5    Heartbreakers?

 6         A.  The Ritz.

 7         Q.  That was it?

 8         A.  Yes.

 9         Q.  Between 2017 and 2019, did you perform at any

10    other gentlemen's clubs aside from Heartbreakers?

11         A.  The Ritz.

12         Q.  Did you ever perform at Double Shoe?

13         A.  Double who?

14         Q.  Double Shoe.

15         A.  Double Shoe, probably like one night, and I

16    mean, I just dropped in and out, so I don't know what

17    year that was or anything.

18         Q.  What about XTC?

19         A.  I did work there as well.  Sorry.

20         Q.  From when to when?

21         A.  I have no idea.  Like no -- I couldn't even

22    tell you.

23         Q.  Was it in the last four years?

24         A.  No.

25         Q.  So at some point before 2017?

1    A.  Before.

2    Q.  All right.  Did you ever work at Treasures?

3    A.  No.

4    Q.  Paradise City?

5    A.  Yes.

6    Q.  From about when to when?

7    A.  I have no idea.  'Cause those weren't the

8    main -- I mean, if I went, I went like one night, and

9    that was it.  My main club I worked at was

10   Heartbreakers.

11   Q.  I understand.  Heartbreakers was kind of your

12   home base, right?

13   A.  Right.  That was the place where I worked.

14   Q.  And there were times where you would try out

15   other clubs, right?

16   A.  Right.  Like, with other girls or, you know, we

17   would just try other clubs, but it was, like, a night or

18   two, not nothing --

19   Q.  Ongoing?

20   A.  Right.  Not nothing to say that was my -- where

21   I worked.

22   Q.  I'm trying to think of what else.

23           Fantasy Plaza, ever perform there?

24   A.  Not -- I don't recall that name.

25   Q.  Have you ever performed at any Buck Wilds?

Deposition of Roxanne Murillo                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

```
 1        A.   I don't recall that name either.

 2        Q.   What about Moments in Pasadena?

 3        A.   I think I worked there a night or two.

 4        Q.   Do you recall when that might have been?

 5        A.   No.

 6        Q.   Other -- have you ever worked at Splendor?

 7        A.   What is it?

 8        Q.   Splendor.

 9        A.   No.

10        Q.   Glamour Girls?

11        A.   No.

12        Q.   Can you recall any other clubs that you

13   performed at in the last three years?

14        A.   No, no.  Just Heartbreakers.

15        Q.   All right.  What -- what brought you back to

16   Heartbreakers over, you know, 18 years?

17        A.   Well, I worked off and on between those 18

18   years, so it's not like I took off 18 years and then

19   came back.

20        Q.   Sure, I understand.

21        A.   Yeah.

22        Q.   But for 18 years you -- you worked at

23   Heartbreakers, right?

24        A.   Right.

25        Q.   Why did you keep going back?
```

1      MS. REZAZADEH:  Objection; vague.

2      Q.  (BY MR. KING)  Go ahead.

3      A.  The money.

4      Q.  Is there anything about the club that brought

5  you -- caused you to return over 18 years?

6      MS. REZAZADEH:  Objection; vague.

7      Go ahead, Roxy.

8      A.  Anything that brought me back?  Just the big

9  spenders, I mean --

10     Q.  (BY MR. KING)  That's fair enough.  I mean, I

11  don't know.  I'm just asking you.  I've heard from other

12  dancers that they have kind of like a preferred club

13  that they like to go to, so I'm trying to understand

14  from you, you know, what it was about Heartbreakers that

15  caused you to return since the early 2000s.

16     A.  Oh, and also on the other clubs, we couldn't --

17  we had to wear full bottoms, and Heartbreakers you could

18  wear costumes, like, you know --

19     Q.  So Heartbreakers --

20     A.  -- you have to keep fully covered up.

21     Q.  So Heartbreakers let you wear costumes?

22     A.  Yes.

23     Q.  So since you worked at Heartbreakers since

24  2002, have you become familiar with the managers there?

25     A.  Yes.

1    Q.   Do you know who Carl Arceneaux is?

2    A.   Carl?

3    Q.   Yeah.

4    A.   Yes.  A bartender?

5    Q.   Yeah.  He was a bartender, and then --

6    A.   And then he switched to manager, yeah.

7    Q.   Right.  Did you ever perform as a dancer when

8  Carl was a manager?

9    A.   Yes.

10    Q.   What about Gary Wasek?  Did you ever perform as

11  a dancer when Gary was on duty?

12    A.   Yes.

13    Q.   Same question for Damon Jackson?

14    A.   Yes.

15    Q.   And I assume you performed as a dancer when

16  George Forster or Whitey was --

17    A.   Yes.

18    Q.   -- on duty, right?

19    A.   Uh-huh.

20    Q.   What about Jeremy Goldsboro?

21    A.   Yes, Jeremy as well.

22    Q.   Okay.  Did you ever work at the Rodeo Goat?

23    A.   Yes.  Sorry.

24    Q.   When did you work at the Rodeo Goat?

25    A.   I worked there just before the pandemic.

 1      Q.  All right.  From approximately when to when?

 2      A.  So February of 2021, right -- is that when --

 3  or 2020, February of 2020, and a year prior to that.

 4      Q.  Did you start working at the Rodeo Goat in or

 5  about November of 2019?

 6      A.  I don't remember exactly what date, but I

 7  worked there about a year, approximately.

 8      Q.  Do you recall roughly -- I don't know, like the

 9  season and the year that you started working there?

10      A.  I don't.  I don't, sorry.

11      Q.  That's all right.  You worked at the Rodeo Goat

12  as a server?

13      A.  Yes.

14      Q.  Is the Rodeo Goat a bar, a restaurant?

15      A.  It's a burger joint.

16      Q.  Did you ever work at the Rodeo Goat at the same

17  time that you performed at Heartbreakers?

18      A.  No.

19      Q.  Between 2017 and the time that you left

20  Heartbreakers, was that the only source of income that

21  you had?

22      A.  Yes.

23      Q.  You didn't work anywhere else, right?

24      A.  Right.

25      Q.  Have you ever met Peggy Armstrong?

1       A.   Yes.   In the club.

2       Q.   And I'm just talking about just in the past

3  three years -- actually, four years, I take that back.

4  So since January of 2017, have you ever had any

5  interactions with Peggy?

6       A.   Since January 2017?

7       Q.   Uh-huh.

8       A.   Not any, like, personal interactions, just in

9  the club.

10       Q.   So you've seen her in the club?

11       A.   Yes.

12       Q.   What sort of operational control does Peggy

13  have over the club?

14       A.   Like what we wear, how we look, whether we're

15  inactive or not.

16       Q.   How did she observe -- those sorts of control

17  you say?

18       A.   She would come into the club and sit and watch

19  like throughout -- a couple hours throughout the day,

20  every now -- just pop in.  You know, we never knew when

21  she would pop in.  She would just come in.

22       Q.   Would she tell people what to do?

23       A.   So if -- she would make sure we were doing what

24  we were supposed to, and if we didn't, she would let the

25  manager know to come and --

1      Q.   Did you ever have any experience with that?

2      A.   Yeah.  There was a time where I was on stage,

3  and I didn't have my top off.  I had it on.

4      Q.   Uh-huh.

5      A.   And so I kind of got in trouble for that.

6      Q.   By Peggy?

7      A.   And I couldn't -- yeah, she sent Whitey over,

8  and I couldn't, like, sit down on stage.  I had to be up

9  moving.  I couldn't --

10      Q.   Do you recall when that happened?

11      A.   No.  I've been there -- I've worked there so

12  many years.  It's like I don't --

13      Q.   Sure.  Again, so this could have been back in

14  2003 or 2012; you just don't know?

15      A.   I mean, those were the rules.  Like, either --

16  it's just when I did it, I got in trouble so severely

17  that I never did it again.  Like, I knew what to do what

18  not to do -- what I couldn't do.

19      Q.   I understand.  I'm just trying to figure out

20  when this instance that you're telling me about, like,

21  when it might have happened.

22      A.   I have no idea.  I worked there 18 years, so --

23      Q.   So it could have happened before 2017?

24      A.   It could have, and it could have not.  I mean,

25  it did happen before 2017, for sure because I already

1    knew in 2017 I couldn't do that.

2         Q.  Sure.  What other kinds of control did Peggy

3    exercise?

4                   MS. REZAZADEH:  Objection; vague.

5                   Go ahead, Roxy.

6         A.  Oh, what other control?  Just like what we

7    wore, you know, if we were sitting down, we couldn't be

8    sitting down.  If we had clothes on, we had to take them

9    off.

10        Q.  (BY MR. KING)  Did Peggy ever tell you that you

11   couldn't wear something?

12        A.  Like, if we had too much clothes on, like we

13   had to take it off, like, while we were on stage and

14   stuff like that.

15        Q.  Did she ever tell you that you had to take your

16   clothes off?

17        A.  She would always tell the manager, and the

18   manager would tell us, but we knew it was coming from,

19   you know, an upper -- an owner.

20        Q.  How did you know that?

21        A.  You could just -- we just -- you knew.  Like,

22   once she walked in the door, like, get off your phone.

23   You know, I mean, other girls would say, like, get off

24   your phone.  Peggy is here or, you know, get up, walk

25   around, don't sit down, you know, things like that.

1      Q.   Sure.  Did anyone ever tell you that Peggy had

2    an issue with any of the things you just described?

3      A.   Yeah.  Like, we would get in trouble.

4      Q.   Right.  So my question was:  Did anyone ever

5    tell you, Hey, Peggy sent me over to tell you do XYZ, or

6    not do XYZ?

7      A.   Well, no, they never said -- like he never

8    said, she said directly, but it was understood, I guess.

9    You know, when she came in, it's -- they were on the

10   prowl.  So if somebody was doing something wrong, it was

11   'cause she walked in the door, and then we were getting

12   on to, you know.

13     Q.   So is it -- is it true that if she wasn't

14   there, the managers wouldn't be telling you what to do?

15     A.   Oh, no.  They would tell us what to do.  But

16   they would be more like -- more on it when she was there

17   or Mike was there or Whitey was there.  When any of

18   those three were there, they were extra, like --

19     Q.   Extra what?

20     A.   I guess strict on what we could and can't do --

21   can and can't do.

22     Q.   Do you know how Peggy controlled the -- your

23   pay structure?

24     A.   So, like, we did -- if we got paid on credit

25   cards, they would take extra money from us.  Like, we'd

1   have to -- they would set a pay -- like, a charge.  They

2   set a charge, how much to charge the -- the client.  So

3   $25 --

4        Q.  You --

5        A.  -- and that was set from the club, and then

6   they would take 5, and we would get 20.  And then if we

7   needed to cash it into cash, we would -- they would take

8   another dollar.

9             MR. KING:  Objection; nonresponsive.

10       Q.  (BY MR. KING)  So here is my question --

11       A.  Uh-huh.

12       Q.  -- how did Peggy control your pay structure, if

13   you know?

14       A.  How did Peggy control the -- I mean, it was the

15   rules, you know, with the money.

16       Q.  Right.  So did -- was there ever an instance in

17   which Peggy told you something about your pay structure?

18       A.  It was the managers.

19       Q.  Okay.  And that's -- that's what I'm getting at

20   is I'm trying to figure out where this stuff came from.

21             So do you have any information as far as

22   whether Ms. Armstrong, Peggy, controlled your pay

23   structure?

24       A.  Well, they're the ones who set the rules.

25       Q.  Okay.  And how --

Deposition of Roxanne Murillo                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

 1      A.  And --

 2      Q.  Go ahead.

 3      A.  I'm sorry.

 4      Q.  No, go ahead.  Finish your answer.

 5      A.  It was just they were the ones who set the

 6  rules, and the managers were the ones who made sure

 7  those rules were in place.  So if money -- if they were

 8  charging us money, it was from Peggy and Mike and

 9  Whitey, and then the managers would just come and make

10  sure we paid or money was taken or, you know, the

11  managers were switched often.

12      Q.  They were switched often?

13      A.  They were the same rules, you know, it doesn't

14  matter.  We still have the same rules, so no matter what

15  manager was on shift that day, the rules still were the

16  same.

17      Q.  I understand.  I'm --

18      A.  So --

19      Q.  Go ahead.

20      A.  So I believe that the money -- I mean, the

21  rules were coming from Peggy.  You know, she was the one

22  who ran the whole, you know, I guess the -- I guess the

23  business part of it, you know, the money part.

24      Q.  All right.  What I want to know is where that

25  knowledge came from, how you came to learn that?

Case 3:20-cv-00008   Document 82-3   Filed on 05/21/21 in TXSD   Page 30 of 149

**EXHIBIT C**

Deposition of Roxanne Murillo                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

```
 1      A.  That's what I'm saying.  So, like, when I first

 2  started working there and these rules were set for this

 3  money that was being taken, you know, the managers would

 4  tell us, but it doesn't matter which manager would tell

 5  us.  It was always the same rules, so it had to come

 6  from bigger, you know, the upper -- the owners.

 7      Q.  Am I understanding you correctly that you

 8  basically inferred that whatever the managers told you

 9  came from Peggy Armstrong?

10          MS. REZAZADEH:  Objection --

11      A.  Yes.

12          MS. REZAZADEH:  -- misquoting the deponent.

13      Q.  (BY MR. KING)  And have you made -- was your

14  inference based on the fact that she's an owner of

15  Heartbreakers?

16          MS. REZAZADEH:  Same objection.

17      Q.  (BY MR. KING)  Go ahead.

18      A.  What's the question again?  I'm sorry.

19      Q.  Sure.  So it's -- what you've been telling me

20  about where you're inferring that these rules have came

21  from --

22      A.  Yeah.

23      Q.  -- is that based on the fact that she's an

24  owner of the club?

25          MS. REZAZADEH:  Same objection.
```

Case 3:20-cv-00008   Document 82-3   Filed on 05/21/21 in TXSD   Page 31 of 149   **EXHIBIT C**

Deposition of Roxanne Murillo                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

```
 1              Go ahead, Roxanne.  Sorry to throw you off

 2   with my objection.

 3              THE WITNESS:  It's okay.

 4        A.  Yes, I -- yes.

 5        Q.  (BY MR. KING)  But otherwise, you don't have

 6   any firsthand knowledge of Peggy setting your pay

 7   structure, right?

 8              MS. REZAZADEH:  Objection; misleading the

 9   deponent.

10        A.  Other than the girls talking about it, saying

11   that it was from Peggy, like, you know --

12        Q.  (BY MR. KING)  Like locker room chat --

13        A.  Right.

14        Q.  -- with the other dancers?

15        A.  Right.  Saying that Peggy is the one

16   responsible for the money being taken 'cause, you know,

17   we get a lot of money taken from us.

18        Q.  And we'll get to that.  Don't worry.  I'll give

19   you an opportunity to tell me everything you want to

20   say.

21              Can you think of any other instances in

22   which Ms. Armstrong directed your work as a dancer?

23        A.  No, not like one-on-one, you know, incidents

24   with her.

25        Q.  Did Peggy ever give you a schedule?
```

EXHIBIT C

Deposition of Roxanne Murillo                Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

1    A.   No, they never gave me a schedule.

2    Q.   Did Peggy ever fire you?

3    A.   No.

4    Q.   Did Peggy hire you?

5    A.   No.

6    Q.   Did you ever tip Peggy?

7    A.   No.

8    Q.   Did Peggy ever give you any kind of employment

9  sorts of records or information?

10   A.   So if -- so if I needed anything of records or

11  days that I worked, it had to come from Peggy.

12   Q.   Can you give me an example?

13   A.   So I was going to court for the -- my kids, and

14  they wanted, I guess, the days and nights I worked, and

15  so it had to come from Peggy what days I worked and

16  what -- you know, whatever schedule the lawyer needed,

17  it came from Peggy.

18   Q.   Did you receive that information from Peggy?

19   A.   Yes.

20   Q.   And in what format did that information come?

21  Did she give you a piece of paper?  What was it?  A

22  statement?

23   A.   I believe it was paper.  It was -- yeah, it was

24  on paper.

25   Q.   Do you still have that paper?

1        A.  No.  I was looking for it.

2        Q.  Do you know if that paper was filed with the

3   Court in the family proceeding you're referring to?

4        A.  I believe it was.

5        Q.  Was that in about 2014?

6        A.  I -- I have no -- I mean, I'd be guessing.  I

7   have no idea what year.

8        Q.  Was this in a -- like a custody dispute?

9        A.  Yes, uh-huh.

10        Q.  All right.  Do you recall kind of the general

11   substance of information that you got?

12        A.  It was just the days that I worked, mornings,

13   nights, you know, the hours I worked, just things like

14   that.  When I started working, you know.

15        Q.  Got it.  So Heartbreakers never paid you for

16   the hours that you worked, right?

17        A.  No.

18        Q.  Okay.  And just so that -- to make sure we're

19   on the same page, all my questions are going to be about

20   on or after January 1st, 2017 forward --

21        A.  Okay.

22        Q.  -- because I know you worked at Heartbreakers

23   for a long time.

24        A.  Yeah.

25        Q.  So I just want to make sure we've got a clear

```
 1    record.

 2         A.   Okay.

 3         Q.   So they never paid you for your hours worked.

 4    They never paid you for the number of dances that you

 5    performed, right?

 6         A.   Right.

 7         Q.   You never got money for selling a hamburger or

 8    anything like that, right?

 9         A.   No.

10         Q.   Never got money because a customer bought a

11    beer or a Jack and Coke?

12         A.   I never got money, no.

13         Q.   The club never cut you in on the money it made

14    from cover charges, right?

15         A.   No.

16         Q.   So how -- how did you make money at

17    Heartbreakers?

18         A.   On stage, we would make money and doing dances.

19         Q.   So as -- as a dancer, would you agree with the

20    statement that the way you made money was by selling

21    your entertainment services to customers?

22         A.   The way we made money was by dancing.  Is that

23    what you're --

24         Q.   By dancing.  Did you make money by spending

25    time with customers?
```

Deposition of Roxanne Murillo                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

 1        A.   Well, the more time we spent with customers,

 2   the more money we made and the club made as well.  So we

 3   were --

 4        Q.   How did --

 5        A.   -- encouraged to keep them spending, you know.

 6        Q.   How would you make money by spending time with

 7   customers?

 8        A.   Well, they would buy food, drinks, just the

 9   longer time we spent, you know, the more dances they

10   would buy, the more money they would spend.

11        Q.   Did customers ever pay you just to sit and chat

12   with them?

13        A.   If we were there -- if I was there with so

14   much -- like so much time, yes, they'd pay me.

15        Q.   How would they pay you?

16        A.   Sometimes it'd be cash, or sometimes it would

17   be a credit card.

18        Q.   Did you have a preference?

19        A.   No.

20        Q.   So you said that you performed for customers on

21   stage obviously, right?

22        A.   Right, yes.

23        Q.   Did you agree to perform on stage for

24   Heartbreakers?

25        A.   So that was the thing, is like whenever I did

1    agree to work there, I never agreed to be on stage, but

2    when we got -- when we were hired, we were told we had

3    to get on the stage.

4         Q.  So are you talking about back in 2002?

5         A.  At any time.  Yeah -- well, yeah, the first

6    time I was hired.

7         Q.  So the first time you were hired, you didn't

8    agree to perform on stage?

9         A.  Right.

10        Q.  At any point thereafter, did you agree to

11   perform on stage?

12        A.  Well, it wasn't like -- so whenever I worked

13   there later, I mean, I knew that I was gonna have to

14   work on a stage, but I never got a description, like,

15   hey, you're gonna do this, this, and this, and you

16   have -- like, you know, it was never assigned.  I never

17   signed and said, Yeah, I'm gonna work on the stage, you

18   know.

19        Q.  Did you not want to perform on stage as a

20   dancer?

21        A.  No.

22        Q.  You didn't like to perform on stage?

23        A.  (Witness moves head from side to side.)

24        Q.  Why is that?

25        A.  Because I -- I don't know.  I just -- I would

1   make more money sitting with a customer than on stage.

2        Q.  Do some dancers prefer to perform on stage, in

3   your experience?

4        A.  I'm sorry?

5        Q.  Do -- in your experience, do some dancers

6   prefer to perform on stage?

7        A.  I'm not -- most of the girls complained about

8   it, but I mean, nobody really likes getting on stage.

9   It was something we had to do.

10       Q.  So you saw no benefit from performing on stage

11  whatsoever?

12       A.  No.

13       Q.  So you disagree with the statement that

14  performing on stage was a way to kind of, like,

15  advertise your presence within the club, right?

16       A.  Well, it was a way to advertise for the club.

17  It wasn't a way to advertise for ourselves, you know.

18       Q.  Okay.  In what way was it advertising for the

19  club?

20       A.  Well, it was kind of giving -- you know,

21  showing them what girls they had there, so if, you

22  know -- like, if I was busy the whole night, they would

23  have never known I was there, or maybe I was their

24  preference or, you know, so if they don't know which

25  girls are there, then they're not gonna stay, or, you

 1    know, if they walk in, they don't like what they see,

 2    they don't like the vibe, you know, they're gonna leave.

 3    So if you're walking out and you see this pretty girl on

 4    stage, you're going to stay, and you're going to spend

 5    money.

 6         Q.   Because dancers are what keep customers there,

 7    right?

 8         A.   I'm sorry?

 9         Q.   Dancers are what keep customers at the club,

10    right?

11         A.   Well, it's everything.  You know, it's the

12    music, it's the food, it's the drinks.  I mean, it's all

13    of it combined together, I would say.

14         Q.   If there weren't any dancers at the club, do

15    you think that customers would still go?

16         A.   Yeah, of course, but what I'm saying is when

17    you see a pretty girl, it's gonna make you want to stay.

18         Q.   Sure.  And so if the club doesn't have any

19    dancers --

20         A.   And spend more money.

21         Q.   Pardon?

22         A.   And spend more money.

23         Q.   Right.  So if the club doesn't have dancers

24    there, customers aren't going to stick around to pay for

25    stuff, the food and booze?

```
 1              MS. REZEZADEH:  Objection; asked and

 2  answered.

 3      A.  Well, they would if they were drinking at the

 4  bar or, you know, having drinks and stuff they would

 5  stay.

 6              THE REPORTER:  Can you repeat your

 7  objection, please?  I couldn't hear the last words.

 8              MS. REZEZADEH:  Asked and answered.

 9              THE REPORTER:  Thank you.

10      Q.  (BY MR. KING)  So I'm just trying to figure

11  out, you know, how Heartbreakers works.  Different clubs

12  have different kinds of customers that come in, right?

13      A.  Okay.

14      Q.  Do you agree with that or disagree?

15      A.  That -- I would agree that they have all the

16  same kind of -- I mean, they're all the same.

17      Q.  Do customers all go to Heartbreakers for the

18  same reason?

19      A.  I'm sorry?

20      Q.  Do -- do all customers go to Heartbreakers for

21  the same reason, in your experience?

22      A.  Like, to hang out.

23              MS. REZAZADEH:  Objection; vague.

24      A.  Like, to hang out, drink, have fun.

25      Q.  (BY MR. KING)  Okay.  So some customers go to
```

1   drink, hang out and have fun, right?

2        A.  Uh-huh.

3        Q.  Do those customers also -- well, let me back

4   up.

5              Do some customers just go to hang and drink

6   and have fun?

7        A.  Yes, some just go hang out.

8        Q.  Did you ever have customer who -- sorry?

9        A.  Some just go hang out.

10       Q.  And they don't pay the dancers, right?

11       A.  No.

12       Q.  Okay.  What are other reasons that the

13  customers go to Heartbreakers?

14       A.  They would go, like, they would have a steak

15  night or things like that, and so the customers would

16  come in for that.

17       Q.  Do you recall Heartbreakers ever running any

18  promotions in the past three years?

19              MS. REZAZADEH:  Objection; vague.

20       A.  So the only things I recall is, like, steak

21  night, ladies' night, things like that.

22       Q.  (BY MR. KING)  Did you ever have to participate

23  in any of those promotions?

24       A.  If I was working there, I mean --

25       Q.  How so?

 1        A.   So if it was ladies' night and the dances were

 2   cheaper or things like that, I mean, I would participate

 3   in that.

 4        Q.   How often was ladies' night?

 5        A.   I think they -- I think they ran once a week,

 6   just like steak nights.

 7        Q.   And you said that during ladies' night, dances

 8   were cheaper?

 9        A.   Yes.

10        Q.   Are you talking about dances like on the floor?

11        A.   Yes.

12        Q.   How much cheaper were they?

13        A.   Well, it's up to the dancer, whatever they made

14   their price.

15        Q.   So was ladies' night like, all right, hey,

16   guys, bring your girlfriends or wives to the club, or

17   something like that?

18        A.   Yeah.  It was kind of like something like that,

19   you know.

20        Q.   I guess I'm just trying to figure out --

21        A.   I guess, like, couples.

22        Q.   Couples?

23        A.   Yeah.  And they would get in, the girl -- the

24   couples, spouse or whatever would get in free.

25        Q.   Sure.  And so how much were your dance services

1  on ladies' nights?

2      A.  20 -- 15 to 20, and then they were -- stayed 25

3  if they were on a credit card, but for cash, 15 or 20.

4      Q.  Okay.  If it was on a credit card it was 25,

5  right?

6      A.  Yes.

7      Q.  And so you would get the 20, and the club would

8  keep -- keep 5?

9      A.  5.  Well, I would get 20 in funny money.  So we

10  had, like, this paper money that they would give us, and

11  then if we cashed it in, they would take a dollar from

12  every 20.

13      Q.  And what -- what affected whether a -- a dance

14  on ladies' night would be 15 or $20?

15          MS. REZAZADEH:  Objection -- objection;

16  vague.

17      Q.  (BY MR. KING)  Go ahead.

18      A.  I mean, it would be, like, if you got so many,

19  like -- if you got, like, over 20 dances, I'd give them

20  to you for 15 or, you know, like --

21      Q.  So you -- you would sell basically like a bulk

22  package of dances, right?

23          MS. REZAZADEH:  Objection --

24      A.  Depending on the price.  So like --

25      Q.  (BY MR. KING)  Okay.  Explain.

1      A.   Yeah.   Just depending on the price.   So, like,

2    if I sat with somebody for a very long amount of time.

3         Q.   You would say what?   Give me an example.

4         A.   So if I sat with them for a long time, I would

5    charge them 15 on ladies' night, or if it was just, you

6    know, a dance here or there, then it would just be 20.

7         Q.   How long is a long time?

8         A.   An hour is a long time.

9         Q.   I'd agree.

10              Okay.   Aside from ladies' night, what other

11   promotions -- well, you mentioned steak night, right?

12        A.   Uh-huh.

13        Q.   When Heartbreakers would run steak night, did

14   you sell any steaks?

15        A.   Yes.   Well, yeah.

16        Q.   All right.   How did you --

17        A.   When we deal with the customers, you know, we

18   would promote the steaks, like, Hey, get a steak, buy me

19   one, too.

20        Q.   Okay.

21        A.   Buy her one too, you know.

22        Q.   Right.   And did you make any money if they

23   bought a steak?

24        A.   I didn't make any money off of it.   I

25   personally didn't, but the club did.

 1        Q.   Right.

 2        A.   We were kind of encouraged, like, to sell the

 3   steak, like, promote the steak, sell the steak.

 4        Q.   And what would you get in exchange for that?

 5        A.   We wouldn't get any cash off of that.  It was

 6   just, you know, they would walk through the club saying,

 7   Hey, you know, it's steak night.  Go sell the steak.

 8   You know, get yourself a steak.  Have your customer buy

 9   us a steak, stuff like that.

10        Q.   Would anything happen if you -- you didn't

11   pitch steaks?

12             MS. REZAZADEH:  Objection; vague.

13        A.   I -- it's just the manager would, like -- like,

14   we would get in trouble if we didn't at least try or,

15   you know, we would get in trouble.  Like, we knew

16   whatever the manager told us to do, we had to do, or we

17   weren't going to be working there the next day.

18        Q.   (BY MR. KING)  How would you get in trouble if

19   you weren't pitching steaks?

20        A.   Well, I mean, so they would just -- I guess the

21   waitresses would tell them, you know, like, Hey, Roxanne

22   is not trying to sell anything, or she hasn't -- you

23   know, so then they would come and tell us, like, Hey,

24   why are you not doing this?  Why are you not -- and then

25   I would just say -- I mean, I don't know.  I'm just

```
 1    giving you an example.
 2         Q.  I know.  That's all I'm asking for is what --
 3    how was this encouraged.  So a manager would say, Hey,
 4    pitch some steaks?
 5         A.  Yeah.  They would come and say, Hey, you know,
 6    get them to buy us a steak.  Get them to buy you a
 7    steak.  You know, you're making money.  We're making
 8    money.  Just keep the ball going, you know, things like
 9    that.
10         Q.  Right.  You're making money off of dances.  The
11    club is making money off of steaks, right?
12         A.  And drinks and stuff, and they make money off
13    of dances as well if I'm on a credit card, you know.
14         Q.  Sure.  But you make money off of dances.  The
15    club makes money off of selling food and booze
16    primarily, right?
17         A.  I guess.  I mean, I'm not sure what they make
18    their money off of.  I mean, I don't have, like, this,
19    you know, accounting that says, you know --
20         Q.  I understand.  But you worked there for 18
21    years.
22         A.  Yes.
23         Q.  So you know how the club works, right?
24         A.  Primarily.
25         Q.  I mean, you -- I assume you spent a lot of time
```

 1  with Whitey and -- I think we lost your lawyer.

 2             MR. KING:  You want to go off the record?

 3  We'll go off the record so your lawyer can log back in.

 4             THE WITNESS:  Okay.

 5             (Recess from 1:56 p.m. to 2:06 p.m.)

 6             (Requested portion was read.)

 7             MS. REZAZADEH:  I just want to state for

 8  the record I got disconnected for that last, you know,

 9  three, five minutes.  My internet cut out.  There were

10  some questions that were asked and answered that I

11  wasn't on the Zoom to object to, but at this time, I

12  don't have any objections to the ones that were read

13  back to me by the court reporter.  Thanks.

14             MR. KING:  Okie-doke.

15     Q.  (BY MR. KING)  Heartbreakers never trained you

16  how to -- how to dance, did they?

17     A.  No.

18     Q.  No one at Heartbreakers ever told you how to

19  perform on stage?

20     A.  No.

21     Q.  Heartbreakers never told you how to chat up a

22  customer?

23     A.  How to what?

24     Q.  How to chat up a customer to try to sell a

25  dance?

```
 1              MS. REZAZADEH:  Objection; vague.

 2       A.  I mean, they would just instruct us to keep

 3  them, you know, spending or keep them longer buying

 4  drinks, you know, things like that.  I mean, I guess

 5  that would be taught -- teaching me how to --

 6       Q.  (BY MR. KING)  Okay.  So I just want to --

 7       A.  Yes.

 8       Q.  -- make sure we're on the same page.

 9       A.  Yes.

10       Q.  The answer is yes?

11       A.  That they would show me how?  Can you repeat

12  the question?  I'm sorry.

13       Q.  Sure.  Your -- your work as an exotic dancer

14  was to entertain customers, right?

15       A.  Right.

16       Q.  And you would entertain customers by performing

17  dances for customers on the stage, right?

18       A.  (Witness moves head up and down.)

19       Q.  Right?

20       A.  And off the stage, yes.

21       Q.  And off the stage, right?

22       A.  Yes.

23       Q.  You would perform dances in the VIP area,

24  right?

25       A.  Yes.
```

1    Q.  You would perform dances in the booth area,

2    right?

3    A.  Right, yes.

4    Q.  You would also make money from customers who

5    wanted to hang out with you, right?

6    A.  Yes.

7    Q.  Okay.  And so what I'm asking you is if you

8    ever received any training on how to do the things that

9    we've just talked about?

10   A.  Yes.

11   Q.  You did?  Please tell me.

12   A.  Like, they would -- like, how I said, they

13   would tell us how to -- well, on stage, you know, they

14   would tell us how to take -- take your clothes off.  So

15   by the second song we had to take our clothes off.  We

16   could only be in a thong.

17   Q.  Okay.  Did anyone ever tell you how to do a

18   pole dance?

19   A.  The girls would show each other.

20   Q.  But no one at Heartbreakers taught you how to

21   do a pole dance?

22   A.  The girls at Heartbreakers.

23   Q.  What I mean by anyone at Heartbreakers, I mean

24   any managers or other personnel.

25   A.  No.  They would just tell us, like, what to

1   wear and just to keep the -- keep them spending, or they

2   would tell us where to go sit, where the big spenders

3   were.

4        Q.   Okay.  So I take it from your answer that

5   somebody at Heartbreakers would point -- point your

6   attention to customers who were willing to spend a lot

7   of money on your services?

8        A.   Yes.

9        Q.   Why would they do that?

10        A.   Because they would make -- everybody money, to

11   make the club money.

12        Q.   Did it make you money?

13        A.   If I danced for them, yes.

14        Q.   You mentioned that they told you what to wear.

15        A.   Yes.

16        Q.   Tell me about that.

17        A.   So like I said, if I was on stage and I was

18   wearing what I wanted to wear, they would come and say,

19   Hey, you need to take that off, or, Hey, get down to

20   your thong.  You can't have nothing on.

21        Q.   What -- what would they tell you you had to

22   wear?

23        A.   Just the thong.

24        Q.   Anything else?

25        A.   No.  You'd have to take everything -- so if I

 1  had what I wanted to wear, they would come and tell me:

 2  Take it off.

 3       Q.  Right.  Aside from that, though?

 4       A.  No, that was it.

 5       Q.  Okay.  Okay.  I'm gonna show you Exhibit 1.

 6  This is a photo that you produced, I believe, or a set

 7  of photos.  Can you see my screen, ma'am?

 8              (Exhibit 1 shared.)

 9       A.  Yes.

10       Q.  All right.  This is Kibodeaux 81.  Is this a

11  selfie of yourself?

12       A.  Yes.

13       Q.  All right.  And is that the kind of attire that

14  you'd wear out when you'd start performing?

15       A.  Somewhat, yes.

16       Q.  So you're wearing boy shorts and looks like a

17  bikini top?

18       A.  A bra.

19       Q.  Bra, okay.  Kibodeaux 82 looks like you have

20  kind of a mask thing going on there?

21       A.  It was a costume.

22       Q.  A costume.  So you could wear a costume that

23  looks like this, right?

24       A.  Right.

25       Q.  Kibodeaux 83, I'm gonna -- did you take this

 1   picture?

 2        A.  Yes.

 3        Q.  Did you take this picture at Heartbreakers?

 4        A.  Yes.

 5        Q.  What was the intent of this picture?

 6        A.  I was just taking a picture of my outfit that

 7   day.

 8        Q.  Fair enough.  So in any of these three pictures

 9   that we've seen, are you out of compliance with any

10   attire rules that you've learned?

11        A.  Only when we're on stage.  So if we were on

12   stage, I would be out of attire.

13        Q.  In what way?

14        A.  I'd have to have my top off.  Like I could only

15   have my bottoms.

16        Q.  But --

17        A.  But any -- even if the mask, like the mask

18   would have to come -- everything would have to come off

19   on the second song.

20        Q.  Okay.  But no one ever told you you couldn't

21   wear a floral print top?

22        A.  No.

23        Q.  No one ever told you you can't wear kind of

24   like a sheer top?

25        A.  No.

**EXHIBIT C**

Deposition of Roxanne Murillo                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

1      Q.  Okay.  So that's what I'm asking, is what sort

2   of control did they exercise over you, or what sort of

3   control do you say they exercised over you over your

4   choice of attire, aside from --

5      A.  When we were working on stage, yes.

6      Q.  All right.  But otherwise they didn't care,

7   though, did they?

8      A.  So they didn't care, as long as we were showing

9   enough.  So if we had a jacket or something, we couldn't

10  wear that, you know.  If we had our shoes off, we

11  couldn't not have our shoes off.  Like, we've got to

12  have shoes on.  You know, there were -- there were some

13  rules.

14     Q.  You couldn't walk around in the club barefoot,

15  right?

16     A.  No, or even sit with your customer barefoot.

17  Like you had -- you know, I mean, after so many dances,

18  your feet get blisters.

19     Q.  Sure.

20     A.  You know, so you'd want to take your shoes off,

21  but we couldn't, even with blisters.

22     Q.  Okay.  You could have bought other kinds of

23  shoes, though, aside from dancer heels, right?

24     A.  No, you have to have dancer heels.  There's no

25  other.

Deposition of Roxanne Murillo

1    Q.  I take it the club prohibited you from wearing

2   closed-toed shoes?

3    A.  Any -- like you couldn't wear flats or, you

4   know, like -- you know what I mean?  Like flat shoes,

5   sandals.  You couldn't wear sandals.  You couldn't wear

6   flats.  You'd have to wear heels, dancer heels.

7    Q.  You never saw anyone wear flats?

8    A.  No.

9    Q.  You never saw anyone wear tennis shoes?

10   A.  No.

11   Q.  You never saw anyone wear cowboy boots?

12   A.  No.

13   Q.  Did anyone at Heartbreakers ever tell you how

14  to entertain customers?

15       MS. REZAZADEH:  Objection; vague, asked and

16  answered.

17   A.  Could I get, like, a more detailed question

18  'cause -- can you ask the question again differently?

19   Q.  (BY MR. KING)  Yeah.  Did anyone at

20  Heartbreakers ever tell you, You need to entertain this

21  customer in some better way?

22       MS. REZAZADEH:  Objection; vague.

23   A.  They would just say like, Go sit with them.

24  They have the money, or they're big spenders, go, you

25  know, see what you can get or, you know, things like

 1   that.

 2        Q.  (BY MR. KING)  Did Damon ever tell you that

 3   kind of stuff?

 4        A.  Damon?

 5        Q.  Uh-huh.

 6        A.  Yes.

 7        Q.  What would he tell you?

 8        A.  He would just tell me like -- well, Damon was

 9   the main one who would tell me, look where the big

10   spenders were, or his friends were from a different

11   club, and they were coming in to spend money and things

12   like that.

13        Q.  Did you resent his suggestions?

14        A.  Well, if I was busy, you know, I wouldn't want

15   to go or, you know, things like that, but if they told

16   you to go somewhere, you kind of had to stop what you

17   were doing and go.

18        Q.  What else would you be busy with?

19        A.  Another customer.

20        Q.  Another customer?

21        A.  Yes.

22        Q.  What else would Damon tell you?

23             MS. REZAZADEH:  Objection; calls for a

24   narrative.  Vague.

25             Go ahead.

1    A.  I mean, I don't know right off the top of my

2  head.  I was just answering a question.  Sorry.

3    Q.  (BY MR. KING)  Well, that's why we're here, so

4  you can answer questions.

5    A.  Yeah.

6    Q.  So that's all right.

7    A.  Yeah.

8    Q.  Okay.

9    A.  I mean, I just don't know what other stuff he

10  told me.  I mean, I worked there a long time, so --

11    Q.  Sure.  And again, my focus is on the past three

12  years.

13    A.  Okay.  Okay.

14    Q.  Did you -- did you ever perform for customers

15  who were wearing, like, sweat-stained clothing?

16    A.  What -- what was that?  Sweat-stained?

17    Q.  Did you ever perform for customers who wore

18  sweat-stained clothing?

19    A.  Sweat-stained, like they had a sweat, like

20  sweat, body odor?

21    Q.  Yeah, like dirty clothing.

22    A.  Yes.

23    Q.  You did?

24    A.  Yes.

25    Q.  So the club let in customers who wore dirty

```
 1   clothing?

 2        A.  That smelled like sweat and stuff, yes, and

 3   there was this one older guy who came in and was always

 4   like dirty, but because he was a big spender, they would

 5   allow him in.

 6        Q.  Okay.

 7        A.  His name was Mr. Whiteman or something like

 8   that.  He was a well-known customer.

 9        Q.  He was a well-known customer.  So the club

10   didn't, like, restrict who came in based on how they

11   dressed?

12        A.  I guess, like, if they knew you were big

13   spenders, they'd let them in, you know.

14        Q.  I take it you didn't want to perform for

15   customers who wore dirty clothing, right?

16        A.  There was him, the one that I'm talking about

17   specifically that I didn't want to perform for.

18        Q.  Were there any others -- any other types of

19   customers you didn't want to perform for?

20        A.  Yes.  I mean, yeah, if I was busy, you know, so

21   if I was busy and I got instructed to go somewhere else

22   and I didn't want to, I mean, I still had to.

23        Q.  Okay.  I'm just talking about customer types.

24   Customers wearing sweatpants, for example, dancers -- a

25   lot of dancers don't like to perform for those guys.  Is
```

Deposition of Roxanne Murillo                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

1   that your case, or do you just not care?

2        A.   I mean, sweatpants, I don't -- I don't recall

3   like having a problem with sweatpants.

4        Q.   Okay.  Did the club give you a -- ever give you

5   a roster of customers you had to go perform for?

6        A.   A roster, no.

7        Q.   Did they ever give you like a list of, go

8   perform for John, Gary, Roger, in that order?

9        A.   A list, no.  They would just tell us.

10       Q.   Tell you what?

11       A.   Like who to go sit with.

12       Q.   Okay.

13       A.   Sometimes, you know, like if they knew one of

14   their friends were coming in, or they knew a big spender

15   was coming in, they'd send whoever they thought would

16   make the most money, like get them to spend the most

17   money, whoever they were interested in.

18       Q.   Got it.  So managers would tell dancers -- they

19   would handpick a dancer and say, Hey, go perform for

20   that guy?

21       A.   Yes.

22       Q.   And so what would they -- how would they pick

23   the dancer to, you know, go direct to some customer?

24               MS. REZAZADEH:  Objection; calls for

25   speculation.

Deposition of Roxanne Murillo                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

```
 1        A.  I don't know how they would -- I don't know how

 2   they would pick them.  They would just -- I guess

 3   whatever they thought was -- they would like or -- I

 4   mean, I don't know.

 5        Q.  (BY MR. KING)  So it was kind of based on the

 6   dancer's appearance?

 7        A.  Yes.

 8        Q.  Dancer personality?

 9        A.  Yes.

10        Q.  Anything else?

11        A.  And who was available, you know.

12        Q.  Okay.

13        A.  Who was there, you know.

14        Q.  Sure.  So it wasn't totally random, in other

15   words, right?

16        A.  Like a random pick?

17        Q.  Yeah.

18        A.  I guess they would send certain girls that they

19   knew -- I guess more experienced or, you know.

20        Q.  They wouldn't send a newbie over to perform for

21   some customer, right?

22              MS. REZAZADEH:  Objection; calls for

23   speculation.

24        A.  If the customer asked for her, yes, they would.

25        Q.  (BY MR. KING)  Sure.  How often did that happen
```

1  in your situation?

2      A.  I mean, it happened quite often.  We always

3  had, you know, their friends come in or people that they

4  knew were regular customers, so I mean, we -- it was

5  happening often.

6      Q.  Okay.

7      A.  It wasn't like --

8      Q.  Was it, like, once a week, once a month?

9      A.  No.  It was like any shift we worked and

10  somebody was there, you know, they would send us.

11      Q.  Every shift?

12      A.  If somebody was there that they wanted us to go

13  sit with, if it was every shift, yes.

14      Q.  I'm just trying to figure out how common this

15  was.

16      A.  It was pretty common.  Like, you know, if they

17  knew their friends were there or their big spenders were

18  there, they'd go grab the girls and make them go get

19  them to spend money.

20      Q.  Sure.  And -- and correct me if I'm wrong.

21  This -- this process happened from some dancers more

22  than others, right?

23      A.  Yes.

24          MS. REZAZADEH:  Objection; calls for

25  speculation.

Case 3:20-cv-00008   Document 82-3   Filed on 05/21/21 in TXSD   Page 60 of 149   **EXHIBIT C**

Deposition of Roxanne Murillo                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

1    Q.  (BY MR. KING)  Were some dancers kind of like

2  left out in the cold -- left -- yeah, out in the cold?

3              MS. REZAZADEH:  Objection; vague.

4    A.  I -- I don't -- I don't know.

5    Q.  (BY MR. KING)  Were there favorites that the

6  managers had?

7    A.  No.  I mean, they were -- everybody was treated

8  pretty much the same.  I mean, there wasn't like a

9  favorite, you know.  We were all dancers.  We were all

10  pretty much treated the same.  It's just some got called

11  on more than the others.

12    Q.  And why is that?  That's what I'm trying to get

13  at, is why some got called on more than others.

14    A.  Maybe -- I mean, I don't know.  I don't know.

15  But we were all -- we were all treated the same.  Like,

16  you know, we all had to wear shoes.  We all had to

17  follow the rules.  It was -- it was nothing.  We all had

18  to pay skip fees.  Even the DJ was dating one of the

19  dancers.  She still had -- I mean, the rules were the

20  same.

21              MR. KING:  Objection; nonresponsive.

22    Q.  (BY MR. KING)  I'm just trying to figure out

23  how some dancers got picked to go perform for certain

24  customers more than others.  That's all.

25    A.  I mean, I guess they were there more than the

1    others or something 'cause some girls worked more.

2        Q.   Some performers worked less?

3        A.   Some worked less than the other.  Some were

4    there all the time.  Some came -- you know.

5        Q.   Some worked in the day more than night shifts?

6        A.   Some worked in the day; some worked in the

7    night.

8        Q.   Some performers like yourself worked for 18

9    years, or over the course of 18 years, and others

10   performed for, like, just a week, right?

11       A.   Yes.

12       Q.   Dancers come and go at Heartbreakers, true?

13       A.   They are more dispensable.  Like, they would

14   get fired, you know, more if, like -- I mean, we were

15   just scared to do anything really because they would

16   fire us if we didn't follow the rules.

17              MR. KING:  Objection; nonresponsive.

18       A.   We couldn't -- okay.  Go ahead.

19       Q.   (BY MR. KING)  I'm just asking if dancers

20   had --

21       A.   Okay.  Go ahead.  Sorry.

22       Q.   -- variable lengths of time at Heartbreakers.

23   I get you want to tell me all the stuff that is in this

24   lawsuit, but I'll give you an opportunity for that.

25   This will go a lot faster if you just answer my

1   questions.

2       A.  Okay.

3           MS. REZAZADEH:  Do dancers come and go at

4   Heartbreakers?  Sure.

5           MR. KING:  What?

6           MS. REZAZADEH:  Nothing.

7           Go ahead.

8       Q.  (BY MR. KING)  All right.  How does the house

9   fee amount affect your -- your work as a dancer?

10      A.  Well, sometimes I would go in and there --

11  like, let's say I went in on a slow shift, and there

12  weren't very many customers.  So I would already owe on

13  top of just walking in the door; I would already owe.

14  So if I didn't make any money, I'd come out negative.

15      Q.  I take it you worked slow shifts?

16      A.  The day -- sometimes I would work the morning

17  shift.

18      Q.  And sometimes you'd work busier shifts, right?

19      A.  Night shifts.

20      Q.  Night shifts were busier?

21      A.  Yes.

22      Q.  How did you determine when to work a slower

23  shift or a busier shift?

24      A.  It was when I was available.  So most of the

25  time, if I -- like, if I was at the other job and I had

1  a day off, I would work the daytime, but other than

2  that, I would work weekends, the busy shifts, like,

3  Wednesday -- Thursday through Sunday.

4      Q.  Did you prefer working the busier shift?

5      A.  Just whatever days I could work, really, I

6  would work.  It wasn't a preference.  It was just

7  whenever I could get there.

8      Q.  Based on your other occupation and the schedule

9  you had with your other job?

10     A.  With my kids.

11     Q.  Based on your kids?

12     A.  Based on kids, yeah.

13     Q.  So Heartbreakers offered you that flexibility,

14  right?

15     A.  I mean, to -- to work on whatever days we

16  decide, yes, but the hours, no.

17     Q.  Okay.

18     A.  Once we went in for a shift, we had to work the

19  full shift.  There was no ifs, ands, or buts.

20     Q.  Right.  And so you could decide when to show

21  up, right?

22     A.  Yes.

23     Q.  All right.  And you knew what the house fee

24  would be, depending on when you'd show up, right?

25     A.  The house fee would vary, yes.

1      Q.   Based on the time of day that you would show

2  up?

3      A.   Based on the time of day, and then based on if

4  I got skipped during the shift or things like that.  So

5  if we got skipped, we had to pay, so my house fee would

6  accumulate.

7      Q.   All right.  Did you ever decide not to work on

8  a shift because the house fee was too much?

9      A.   Well, they would just put it, like, on our

10  books, like an IOU.  So I mean, I would still work --

11  even though it was too much, I would still work, and

12  they'd just put an IOU.

13          MR. KING:  Objection; nonresponsive.

14      Q.   (BY MR. KING)  So just what I'm asking is, was

15  there ever an instance where you said, you know, I don't

16  feel like paying $57 for the house fee tonight.  I'm not

17  going to go in?

18      A.   Yes.

19      Q.   Okay.  How often would that be?

20      A.   I'm not sure, I mean, an exact amount, but I

21  mean, if I went in during the day and I knew it was

22  gonna be a certain amount and I -- I mean, I was taking

23  a chance, you know.

24      Q.   Sure.

25      A.   I didn't want to work to pay the 50, but I

 1    mean, I'd still have to.

 2         Q.   And so what I'm getting at is, I'm trying to

 3    figure out how you factored in the amount of the house

 4    fee into your scheduling decisions, or I don't know, did

 5    it play a role at all?  You tell me.

 6         A.   I mean, it played a role, but I knew if I

 7    didn't have the money or wasn't gonna be able to pay, I

 8    knew it would go in the IOU.  I mean, it did play a

 9    role.

10         Q.   How else did it play a role in your scheduling

11    decisions?

12         A.   I'm not sure.

13         Q.   Did it not play a role in your scheduling

14    decisions?

15              MS. REZAZADEH:  Objection; asked and

16    answered.

17              You can answer, Roxanne.

18         A.   It did play a role, but I mean, I knew I still

19    had to work, whether I wanted to or not because of the

20    fee.  Like, I knew I was gonna go in there having to pay

21    money already, and I didn't have that money.

22         Q.   (BY MR. KING)  Did managers ever waive the

23    house fee if you didn't make any money during a shift?

24         A.   No.  They would put it on an IOU, and

25    then whenever --

1      Q.   Not once, they never waived it?

2      A.   No.

3      Q.   Damon never waived it, not once?

4      A.   No.

5      Q.   Whitey never waived it once?

6      A.   Not by -- no.  Like, he would have never --

7   like, they don't -- they don't waive house fees.

8      Q.   Gary Wasek never waived it for you?

9      A.   (Witness moves head from side to side.)

10          MS. REZAZADEH:  Objection; asked and

11   answered.

12          MR. KING:  I didn't ask about Gary.

13     Q.   (BY MR. KING)  Gary Wasek never waived it for

14   you?

15     A.   (Witness moves head from side to side.)

16     Q.   No?  Did you ever ask anybody to waive the

17   house fee?

18     A.   I mean, I did tell them, like, Hey, I didn't

19   make any money.  And then they just put it on the IOU,

20   and you pay next time you come, or whenever you cashed

21   in your dance tickets, they would take that money from

22   that, whatever you owed them, before you could cash out.

23     Q.   Aside from the time of day, how much did you --

24   or did the house fee vary in amount -- in the amount?

25     A.   Not aside from the time of the day.

Case 3:20-cv-00008  Document 82-3  Filed on 05/21/21 in TXSD  Page 67 of 149    **EXHIBIT C**

Deposition of Roxanne Murillo                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

1      Q.  What -- what was your preference for working

2  days or nights?  Which one did you prefer?

3      A.  I didn't have a preference.  Whenever I was

4  available.

5      Q.  Did you find that you made more money during

6  one sort of shift than another?

7      A.  It would vary.

8      Q.  It would vary?

9      A.  Yeah.  It just depends.

10      Q.  So if you worked a slow shift and there weren't

11  very many customers there, you might actually make more

12  money than a busy night; right?

13      A.  It just depends.  The money depends --

14  depended.  I mean, whether it was slow -- I mean, I

15  could make money depending, slow or busy.

16      Q.  So what did your ability to make money depend

17  on?

18              MS. REZAZADEH:  Objection; vague.

19      Q.  (BY MR. KING)  If it wasn't -- if it didn't

20  depend on whether it was slow or busy, like, what were

21  the other things it would depend on?

22      A.  Like, my music, if I had bad music, I mean, I

23  wouldn't make any money.

24      Q.  What sort of bad music would decrease your

25  ability to make money?

1     A.  You know, like, depressing music or, like, a

2  dragging song or, like, this '40s song that they would

3  sometimes make us play.

4     Q.  A '40s song?

5     A.  Yeah, like you had to -- it couldn't be a

6  modern or an up-to-date song.  It had to be from way

7  back.

8     Q.  Like what, they'd play Frank Sinatra in the

9  club?

10    A.  Yeah, something like that.

11    Q.  And that would affect your ability to make

12 money?

13    A.  Yes.

14    Q.  Would they play oldies like during --

15 throughout an entire shift?

16    A.  Yes.

17    Q.  So there were instances in which Heartbreakers

18 would play Frank Sinatra and like --

19    A.  When I got on the stage, me personally, I got

20 on the stage and I didn't like -- if the DJ had it out

21 for me, the manager had it out for me, they put me on

22 stage with, like, the most dragging song, and I'd have

23 to dance to it.

24    Q.  Okay.  What about when you were on the floor?

25 Did the music playing affect your ability to earn money?

 1      A.  The music did, yes.  If the music was still on

 2   the '40s music, then yes, I mean, it would be -- it

 3   wasn't more of an entertaining song.

 4      Q.  So what -- what would deter customers from

 5   paying you in those instances in which unfavorable music

 6   was played?

 7              MS. REZAZADEH:  Objection; calls for

 8   speculation.

 9      A.  Can you say it again?

10              MR. KING:  Go ahead.  Yeah, can you read

11   back the question, ma'am?

12              (Requested portion was read.)

13      A.  They wouldn't want to dance.  They would just

14   want to conversate, you know.  It wasn't a song that

15   they would like a dance to.

16      Q.  (BY MR. KING)  Okay.  Could you just wait for

17   the next song?

18      A.  Yes, but it would cut into my money I could

19   have made another dance for.

20      Q.  So waiting for the next song to play that a

21   customer wanted a dance for, that would cut into your

22   time, right?

23      A.  Yes.

24      Q.  And that would -- and by cutting into your

25   time, that would, in fact, reduce the amount of money

 1   you would make, right?

 2        A.   It would take the money away, yes.

 3        Q.   Do you agree with the statement that managing

 4   your time wisely when you're on the floor affects the

 5   ability -- your ability to make money?

 6             MS. REZAZADEH:   Objection; vague.

 7        Q.   (BY MR. KING)   You can answer.

 8        A.   Can you say it again?

 9        Q.   Well, I got a question for you.   Are you

10   looking at something else on your screen?

11        A.   No.

12        Q.   No?

13        A.   I'm looking at you 'cause you're on my screen,

14   so I'm looking at --

15        Q.   Fair enough.   I'm sorry you have to look at me.

16        A.   I'm not looking at anything else.   I'm just

17   looking at -- so it switches.   You know, when somebody

18   speaks, you're on the bigger screen, and then when we're

19   on littler --

20        Q.   Okay.

21        A.   -- on top.

22        Q.   Yeah, that's distracting.   I just set mine up

23   on a grid.

24        A.   Yeah.   So that's what it's doing.   So we're on

25   the top in little squares, but when you talk or whoever

1  talks, it comes in a bigger picture.

2        Q.   Got it.  So what I'm just trying to figure out

3  is, you mentioned that if the club played music that was

4  bad or slow, you would have to sit with the customer,

5  right?

6        A.   (Witness moves head up and down.)

7        Q.   And he might not pay you for a dance, right?

8        A.   Right.

9        Q.   And so you'd have to wait until the next

10  favorable song comes up, right?

11        A.   Yeah.

12        Q.   And while you're waiting, the customer is not

13  paying you, right?

14        A.    It just depended on the customer, you know.  I

15  mean, if they wanted to give you money, then yeah, and

16  if not, then no.

17        Q.   And that was something you'd just have to work

18  out with that customer, right?

19        A.   What was that?

20        Q.   You would just have to work that out --

21        A.   It was something we'd have to work it out?

22        Q.   With the customer.

23        A.   Yes.

24        Q.   You probably didn't appreciate customers who

25  would just sit and talk and not pay you at all, right?

 1        A.   Yes.

 2        Q.   Your time on the floor is valuable to you,

 3   right?

 4        A.   Yes.

 5        Q.   You made money based on selling dance

 6   performances that are, what, three to five minutes long

 7   on average?

 8        A.   Approximately.

 9        Q.   Okay.  So how would the club manage your time

10   spent on the floor?

11        A.   They would -- so if we were -- if I was busy

12   with someone else, you know, and they had somebody come

13   in, they would make me leave where I was at to go

14   fulfill whoever they wanted me to dance for, or if I was

15   just sitting down in the back on the phone, you know, we

16   weren't allowed to do that.

17        Q.   Okay.  So the club wouldn't allow you to make

18   money by -- not make money by sitting in the corner on

19   your phone, right?

20        A.   Yes.

21        Q.   Did you ever just want to sit around and not

22   make money?

23        A.   I mean, sometimes when I was, like, tired or,

24   you know, from being on all stages and getting off,

25   like, I would want a break in between, but I just never

```
 1   could.

 2        Q.   Every club that you performed at has a house

 3   fee, right?

 4        A.   Yes.

 5        Q.   Heartbreakers is not unique in charging dancers

 6   a house fee, true?

 7        A.   Well, based on the time.  So theirs would vary.

 8   It would be more or -- based on the time you got there.

 9        Q.   Are other clubs different?

10        A.   Yeah.  It would just be, like, $20, you know.

11        Q.   It was, like, a flat amount?

12        A.   Right.  It wouldn't be, like, you got here at

13   7:00; you're gonna give us 56, or --

14        Q.   Do you recall which club that was at that

15   you're referring to?

16        A.   Just the other clubs that I worked at.

17   Heartbreakers was just more -- they were just more --

18   more rules.  There was more rules there.

19        Q.   About the house fee?

20        A.   About house fees, yes.

21        Q.   If Heartbreakers had more rules than the other

22   clubs that you performed at, why did you continue to

23   perform there for 18 years?

24        A.   Because you could wear the thong -- you know,

25   the -- not a full bottom.  So the other clubs you had to
```

1   wear pasties and full bottoms.

2        Q.   All right.   I take it you did not have a

3   preference for wearing latex pasties?

4        A.   Well, sometimes, yes, I did have a preference,

5   which is why I would stay at Heartbreakers.

6        Q.   Aside from that, if Heartbreakers had more

7   rules and restrictions, why continue performing there?

8   Is there any other reason?

9        A.   Just the money.   I mean, the quick money, and

10  then just -- that was the main reason is that we didn't

11  have to cover the nipples with the pasties.

12       Q.   Yeah.   That was it?

13       A.   And the full bottoms.

14       Q.   And the bottoms?

15       A.   Right.

16       Q.   Okay.   Did Heartbreakers attract a customer

17  base that paid more than other clubs?

18       A.   They paid more in the -- on the credit card.

19       Q.   So as compared to other clubs, the customers at

20  Heartbreakers tended to pay dancers more with credit

21  cards than customers at other clubs?

22       A.   Yes.

23       Q.   True?

24       A.   Yes.

25       Q.   How would that make you more money?

1    A.   No.   So you said that why would I stay at

2    Heartbreakers versus going to the other clubs if they

3    had more rules.

4        Q.   Yeah.

5        A.   Because of the -- the thong and the -- the

6    pasties.

7        Q.   So you're willing to put up with Heartbreakers'

8    greater restrictions because they didn't require wearing

9    pasties?

10       A.   Yes.

11       Q.   Okay.   Did Heartbreakers present you with

12   greater opportunities to make money versus other clubs?

13       A.   What do you -- what do you mean?

14       Q.   Did you find that Heartbreakers was a more

15   profitable club as opposed to other places that you

16   performed at?

17       A.   The only -- I mean, I'm not sure.   The only

18   reason why I stayed at Heartbreakers versus the other

19   ones was because, again, of the pasties and the --

20       Q.   The bottoms?

21       A.   Uh-huh.

22       Q.   So even if you could have made more money at

23   another club, you still would have performed at

24   Heartbreakers because they didn't require pasties?

25       A.   Yes.

1      Q.   Why?  I guess I'm just confused.  Like, why was

2    the pasty thing so important?

3      A.   I mean, it's just irritated -- it's like -- I

4    don't know.  It's like an irritation, or like you have

5    it cover -- I mean, I don't know.  It's just something

6    that I didn't like.

7      Q.   Okay.  How often did Heartbreakers require you

8    to use the VIP area?

9      A.   As often as we could.

10     Q.   How often is that?

11     A.   Each dance.

12     Q.   Each dance?

13     A.   Yeah.  So the dances you couldn't do on the

14   regular floor.  You had to go to the booth.

15     Q.   I'm talking about the VIP area, or the

16   executive room.

17     A.   It was just encouraged to do your dances there.

18     Q.   So how often were you required to perform in

19   the executive room?

20     A.   As often as we could.

21     Q.   And so how often was that in practice?

22     A.   Probably to each customer.

23     Q.   Every customer?

24     A.   If -- if we could get them to buy the band,

25   yes.

1    Q.  So the club required you to perform in the

2    executive room?

3    A.  They wanted us to perform there.  It was -- it

4    was wanted more to perform there to buy the band -- to

5    sell the band.

6    Q.  Were you penalized if you did not perform in

7    the executive room?

8    A.  We would just get like -- like I said, bad

9    music or an attitude or like -- I mean, they would be on

10   top of us, like looking for a reason.

11   Q.  Did you -- did the club give you any money for

12   performing in the executive room?

13   A.  No.

14   Q.  They didn't give you $5 or anything for every

15   customer you took up there?

16   A.  They took the $5 for every customer I took.

17   Q.  And how much did you have to pay to access the

18   executive room?

19   A.  It was mandatory 20.

20   Q.  That you paid, right?

21   A.  That I paid or the customer paid, whoever,

22   which one of us.

23   Q.  And how would it be determined who would pay?

24   A.  Well, if I didn't pay it, then -- if he didn't

25   pay it, then I had to pay it if we went.

1    Q.  So what if you had a customers who was like,

2  no, I'm not paying, but you still wanted to go to VIP?

3    A.  Then I would have to pay it.

4    Q.  Okay.  So you would have to negotiate that with

5  the customer?

6    A.  Yes.

7    Q.  What about in the booth areas?  You would have

8  to pay the club to access the booth areas, right?

9    A.  Right.

10    Q.  Okay.  And you would have to pay about $20 for

11  every customer that you took to the booth area, right?

12    A.  Yes.

13    Q.  Okay.  And the customer would never pay that

14  $20, right?

15    A.  Depending.  So, like, the customer would either

16  give us the money or pay it or -- I mean, it just

17  depended.  We always had to pay it, though.

18    Q.  So the dancer always had to pay to get to

19  the -- to use the booth area --

20    A.  Yes.

21    Q.  -- right?

22    A.  Yeah.

23    Q.  And you could negotiate with the customer

24  whether --

25    A.  He paid or I paid.

**EXHIBIT C**

Case 3:20-cv-00008   Document 82-3   Filed on 05/21/21 in TXSD   Page 79 of 149
Deposition of Roxanne Murillo          Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

1    Q.  Okay.  And the $20 that the club required was

2    per customer that you took back to the booth --

3    A.  Per --

4    Q.  -- true?

5    A.  Each customer, yes.

6    Q.  Okay.  So there was never an instance in which

7    Heartbreakers said, okay, well, $20, and you can use the

8    booth for the entire shift?

9    A.  No.

10    Q.  Not once?

11    A.  No.

12    Q.  And --

13    A.  It was per customer.

14    Q.  And if another dancer said that it was 20 per

15    shift, would they be lying?

16    A.  Yes.

17    Q.  Okay.  If another dancer said that the club

18    charged customers to access the executive room, they

19    would be lying?

20          MS. REZAZADEH:  Object to an incomplete

21    hypothetical.

22    A.  Can you ask the question again?

23    Q.  (BY MR. KING)  Sure.  Sorry, I was going a

24    little fast.

25          If another dancer has testified in this

**EXHIBIT C**

Case 3:20-cv-00008   Document 82-3   Filed on 05/21/21 in TXSD   Page 80 of 149

Deposition of Roxanne Murillo                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

 1    case --

 2         A.   Uh-huh.

 3         Q.   -- that the club charges customers a certain

 4    amount to access the executive room, would they be

 5    telling the truth?

 6         A.   Well, they charged both of us.  I mean, the

 7    customer gets charged; I get charged.  It's just who's

 8    gonna pay it.

 9         Q.   And if another dancer testified that the club

10    would pay dancers a certain amount of money, 5 or $10 to

11    use the executive room, would they be telling the truth?

12         A.   The club would pay --

13              MS. REZAZADEH:  Objection; incomplete

14    hypothetical.

15         A.   -- us?

16         Q.   (BY MR. KING)  Yes.

17         A.   No.  I mean, they would not be telling the

18    truth, no.

19         Q.   Okay.  Did you use the VIP or the executive

20    room area sporadically?

21         A.   Sporadically, meaning often or --

22         Q.   Opposite of often.

23         A.   Oh, like -- I used it often.

24         Q.   You used it often.  Was that the practice of

25    other dancers that you saw?

1      A.  Yes.

2      Q.  So the VIP area wasn't -- sorry, I keep saying

3  VIP area.  The executive room was in high demand then

4  among dancers, right?

5      A.  Yes.

6      Q.  What about the booth area?  Did you use the

7  booth area often or sporadically?

8      A.  Often.

9      Q.  How often on average during your shift did you

10  use the booth area?

11      A.  Pretty often.  I mean, I don't -- I don't know

12  like an exact amount, but often.

13      Q.  Like, more than five times a shift?

14      A.  Yes.

15          MS. REZAZADEH:  Objection; asked and

16  answered.

17      Q.  (BY MR. KING)  More than 10?  On average,

18  again.

19      A.  More than five.  I don't know.

20          MS. REZAZADEH:  Objection; asked and

21  answered.

22      A.  I don't know exactly how many, but, yes.

23      Q.  (BY MR. KING)  Yeah, I know.

24      A.  Any time we would dance, it was always in a

25  booth or an executive.  Like it was never on the floor.

1    We always had to occupy those rooms.

2         Q.   Okay.  I'm just trying to figure out on

3    average.  Let's use a night shift, a busy night shift.

4         A.   I mean, it would vary, depending on how many

5    customers I would sit with, you know, so if I sat with

6    20 customers, it would be 20 times.  You know, it just

7    depends.

8         Q.   Right.  So it would depend on how many

9    customers are there?

10        A.   No.  How many I took back there, like, how many

11   I sat with.

12        Q.   How many customers you approached would dictate

13   how many you got back to the booth?

14        A.   Yes.

15        Q.   Okay.  In order to start a shift at

16   Heartbreakers, you'd have to check-in with the DJ,

17   right?

18        A.   Yes, and the door girl.

19        Q.   And the door girl?

20        A.   Uh-huh.

21        Q.   Right?

22        A.   Yes.

23        Q.   Okay.  How did the check-in procedure affect

24   your work as a dancer?

25                  MS. REZAZADEH:  Objection; vague.

1    A.  The check-in process, I don't know.  We were

2  just rushed to get ready and get on the floor, like it

3  was mandatory.  You're in here, get ready and get out.

4    Q.  (BY MR. KING)  Okay.  So how did the check-in

5  procedure affect your ability to work?

6          MS. REZAZADEH:  Objection; vague.

7    Q.  (BY MR. KING)  If at all?

8    A.  It -- it affected it.  I'm just -- I'm just not

9  understand -- like, I don't know how to word or how to

10  explain it to you, you know, how it affected.

11    Q.  Okay.  Did you view the check-in requirement at

12  Heartbreakers as some sort of control over your work as

13  an exotic dancer there?

14    A.  Yes.  And it would determine on how much I was

15  paid.  So if I wasn't -- if I was there at 4:00, but I

16  wasn't ready at 7:00, they would charge me the 7:00, not

17  the 4:00.

18    Q.  Why would you be there at 4:00 if you weren't

19  ready until 7:00?

20    A.  So if I got there -- I mean, we take a long

21  time to get ready, right?  We take a couple of hours.

22    Q.  Uh-huh.

23    A.  So if I got there at 4:00 and I wasn't ready

24  till 7:00, then he would clock me at -- like, charge me

25  the 7:00 tip-out.  It wasn't the 4:00 when I got there.

1    Q.   Okay.  Heartbreakers required you to get ready

2  in the dressing room, right?

3    A.   Yes.

4    Q.   Okay.  You were prohibited from putting on your

5  makeup and attire at home and then appearing for work or

6  clocking in?

7    A.   I never --

8         MS. REZAZADEH:  Objection --

9    A.   It was never like a clock-in.  We just checked

10  in and let them know that we were there.

11    Q.   (BY MR. KING)  Or checked in, right?  So

12  Heartbreakers prohibited you from, you know, putting on

13  your makeup and attire at home and then clocking in,

14  right?

15         MS. REZAZADEH:  Objection; misquoting the

16  deponent.

17         Go ahead.

18    A.   We could get ready anywhere we wanted to.  It's

19  just depending on the time we were ready is the time --

20  is the amount we were gonna get paid.

21    Q.   (BY MR. KING)  Heartbreakers restricted the

22  amount of time that you could spend in the dressing area

23  or the locker room before you clocked in, right?

24    A.   It would just go on our pay, like, however much

25  we were gonna pay.

1     Q.  Okay.  Whitey would come in and tell you,

2  You've only got 15 minutes to put your stuff on, right?

3     A.  Whitey would come in and say, Hurry up, get out

4  on the floor.

5              MS. REZAZADEH:  Objection.

6              MR. KING:  What's the objection?

7              MS. REZAZADEH:  No, go ahead.

8     Q.  (BY MR. KING)  Go ahead, ma'am.

9              MS. REZAZADEH:  She said -- she answered.

10    Q.  (BY MR. KING)  Whitey would --

11             MS. REZAZADEH:  You want to read it back,

12 Caroline?

13    Q.  (BY MR. KING)  Whitey would come in and tell

14 you how long you've got to put your stuff on?

15    A.  He would come back and tell us to hurry up and

16 get out on the floor.

17    Q.  Okay.  Same thing with Damon?

18    A.  Uh-huh, yes.

19    Q.  Okay.  So if you took two hours to put your

20 makeup and attire on, that would be a problem, right?

21    A.  Yes.

22    Q.  So was that a problem every day that you

23 performed at Heartbreakers?

24    A.  Yes.

25    Q.  So over the course of 18 years, it was a -- it

1    was a problem for you to spend two hours in the dressing

2    room putting on your attire 'cause that was taking too

3    long --

4          A.  Yes.

5          Q.  -- right?

6          A.  (Witness moves head up and down.)

7          Q.  Okay.  And how many times did you get fired

8    over that?

9          A.  Fired over not getting ready?

10         Q.  Uh-huh.

11         A.  I didn't get fired for that.

12         Q.  How many times did Whitey tell you that you had

13   to tip him for taking too long in the dressing room?

14         A.  We would just tip at the end, and they would

15   split, like whatever, depending on however [sic] money

16   we made.

17         Q.  Okay.  So -- so again, my question was:  How

18   many times did Whitey, or any other manager, for that

19   matter, fine you for spending too much time in the

20   dressing room?

21         A.  None.

22         Q.  None?

23         A.  No, not like a fine.

24         Q.  Well, what would it be then?

25         A.  We would just get asked -- like, they would get

1  after us.

2       Q.   Okay.   Heartbreakers drew customers to the club

3  because of its atmosphere, right?

4       A.   Yes.

5       Q.   And Heartbreakers drew customers -- or

6  customers came to Heartbreakers because of its selection

7  of decor, like furniture and curtain colors and stuff

8  like that, right?

9       A.   Yes.

10       Q.   Customers went to Heartbreakers because of the

11  kinds of liquor it had on stock, right?

12       A.   Yes.

13       Q.   Heartbreakers came to -- or customers went to

14  Heartbreakers because of the ads it -- it put out there,

15  right?

16       A.   Yes.

17       Q.   All right.   What ads?

18       A.   Like steak night, things like that.

19       Q.   Yeah.   Did you ever see any of those ads?

20       A.   Yes.

21       Q.   Where were they put -- published?

22       A.   They have like a big -- like a welcome sign, I

23  guess, and it has, like, this digital -- so that would

24  fly through there daily, and then on the tables, you

25  know, they would have, like, little fliers, like little

 1   cards type...

 2       Q.  How many customers in your experience came to

 3   Heartbreakers because of the kind of decor and furniture

 4   it has?

 5       A.  Often.  I mean, they enjoyed being there.  You

 6   know, the way it was set up, people enjoyed being there.

 7   You know, it was more like a cowboy-ish or

 8   western-style, you know, like the decor.  I mean, they

 9   enjoyed it.

10       Q.  Yeah.  How many customers told you that they

11   really liked Heartbreakers' sofas?

12       A.  Heart -- their sofas?

13       Q.  Uh-huh.

14       A.  I mean, they just -- they enjoyed everything

15   about Heartbreakers.  Not like they said, Hey, I really

16   loved this seat.  I mean, they just loved the whole

17   atmosphere.  Like, they loved, you know, all of it going

18   together.  It wasn't just, like, a seat.

19       Q.  Right.  And those customers who came to

20   Heartbreakers because they liked just kind of the

21   overall atmosphere, they paid you more money, didn't

22   they?

23           MS. REZAZADEH:  Objection; misquoting the

24   deponent.  Too general.

25           You can answer, Roxanne.

1      A.   No.

2      Q.   (BY MR. KING)   No?

3      A.   You said they paid me more money?

4      Q.   Yeah.   Were they more lucrative customers?

5      A.   I'm sorry?

6      Q.   Were they -- were they more lucrative

7  customers, the customers who came for the atmosphere?

8      A.   The ones who enjoyed the atmosphere and stuff,

9  they would be big spenders.   They would spend more

10  money.

11      Q.   They would be big spenders.   Who would come to

12  the club who wasn't a big spender?

13      A.   More like the younger generation, you know, the

14  younger guys.

15      Q.   Would they come for the atmosphere too?

16      A.   They would come just to -- for the atmos- --

17  they were the main ones that would come, just -- you

18  know, not spend any money.   They would just hang out.

19      Q.   So the big spenders and the younger guys who

20  were not big spenders, they would both come for the

21  atmosphere?

22      A.   Yes.

23      Q.   So how would the atmosphere affect who -- you

24  know, how much money you would make if it attracted both

25  of these groups?

1    A.  Well, it attracted the younger generation, and

2  they wouldn't really spend much.  You know, they would

3  just -- they just liked to be there and the atmosphere.

4    Q.  Sure.

5    A.  And the big spenders, they would spend more

6  money.

7    Q.  Right.  So, again, I guess my question is -- I

8  guess I'm just sort of confused.

9    A.  Yeah.  You're confusing me.  You're kind of --

10    Q.  'Cause I'm just trying to figure out how the

11  atmosphere of the club -- let me back up.

12         The club controls its own atmosphere,

13  right?

14    A.  Uh-huh.

15    Q.  And so how does the club's exercise of control

16  over its atmosphere affect the amount of money you could

17  make?

18    A.  Well, I guess if they were enjoying themselves,

19  they would spend more money, and if they weren't

20  enjoying themselves --

21    Q.  Right.  Once they're already in the club,

22  right?

23    A.  Yes.

24    Q.  Okay.  Did customers ever pay you because they

25  enjoyed the atmosphere at the club?

Deposition of Roxanne Murillo                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

1      A.  Oh, they would just pay me, like, just sitting

2  there.  I mean, if we -- you know, we just had time, you

3  know, like, talking --

4      Q.  Right.

5      A.  -- they would be --

6      Q.  So is it fair then to say that it didn't really

7  matter what you did as far as your interactions with

8  customers because the atmosphere is what caused them to

9  pay you?

10     A.  They had a --

11          MS. REZAZADEH:  Objection; argumentative,

12 vague.

13     Q.  (BY MR. KING)  Go ahead.

14     A.  I would say I had a play in it, you know.

15     Q.  But it wasn't a very important part, right?

16          MS. REZAZADEH:  Objection; misquoting the

17 deponent.

18     A.  I would say it is important to have a nice

19 atmosphere.

20     Q.  (BY MR. KING)  I was just talking about the

21 part that you play.

22     A.  Working there?

23     Q.  No.  The part that you -- you play in getting a

24 customer to pay for your dance services.

25     A.  So you think that the atmosphere doesn't have

1   part on that?  Is that what you're saying?

2        Q.  I'm just asking you.

3        A.  It does.  It has a part on it.

4        Q.  Right.  And what I'm asking you is if you also

5   play any part in that, in getting customers to pay you

6   for dances?

7        A.  Okay.

8        Q.  Do you, or did you?

9        A.  Did I play in getting them to pay me?

10       Q.  Yeah.

11       A.  Yeah.  I mean, I work there.

12       Q.  Well, how'd you do it?

13            MS. REZAZADEH:  Objection; vague.  Too

14   general.

15       A.  I don't know.  I mean --

16            MS. REZAZADEH:  You can answer, Roxanne, if

17   you can.

18       Q.  (BY MR. KING)  I'll move on in a second.  I'm

19   just trying to figure something out here.

20            THE WITNESS:  I didn't hear what you said,

21   Ellzey, on the last -- I didn't hear before he said

22   he'll move on in a second.

23            MS. REZAZADEH:  Oh, I was just saying you

24   can answer it --

25            THE WITNESS:  Oh, okay.

```
 1              MS. REZAZADEH:  -- if you can.

 2         Q.  (BY MR. KING)  In your line of work, how

 3    important is it that the club, you know, advertises or

 4    spends promotions in relation to the amount of money

 5    that you can make?

 6         A.  It's important.

 7         Q.  Okay.  Why?

 8         A.  I mean, 'cause they're the ones who draw --

 9    their atmosphere is the one who brings the customers in.

10         Q.  Okay.  The club has customers that it has drawn

11    in.  Are those customers guaranteed to pay you?

12         A.  No.

13         Q.  Why?  Why aren't they guaranteed to pay you?

14              MS. REZAZADEH:  Objection; too general.

15              Go ahead, Roxanne.  You can answer.

16         A.  I mean, it's not a guarantee that they're gonna

17    pay me.

18         Q.  (BY MR. KING)  Right.  So what would make them

19    pay you?

20              MS. REZAZADEH:  Same objection.

21         A.  Sitting with them, dancing with them.

22         Q.  (BY MR. KING)  And is that something that you

23    control?

24         A.  I don't -- I don't know the answer to that.  I

25    mean, I don't know.
```

 1      Q.  You don't know, even though you worked there

 2  for 18 years?

 3      A.  Yeah.

 4      Q.  They just -- some customers paid you, and some

 5  didn't, right?

 6      A.  Some customers paid; some didn't.

 7      Q.  And you had no part to play in that, right?

 8              MS. REZAZADEH:  Objection; misquoting the

 9  deponent.

10      Q.  (BY MR. KING)  Right?

11      A.  I -- I don't know.  I don't know.  I'm confused

12  on the question, I guess.

13      Q.  There's nothing you could do that might cause a

14  customer to pay -- pay you, right?

15      A.  There's nothing I can do to cause a customer to

16  pay me?

17      Q.  Uh-huh.

18      A.  I mean, I can dance.

19      Q.  Right.  Customers don't have to pay for your

20  dance.  We've already established that, right?

21      A.  Well, they have to pay for the dances.

22      Q.  What if they don't want any?

23      A.  If they don't want any dances?

24      Q.  Uh-huh.

25      A.  Well, the club would handle it, I guess.

1    Q.   The club would handle it?  How?

2    A.   I mean, if I sat with someone and they are not

3  wanting to pay me my money, or I mean, they would handle

4  it.

5    Q.   How would the club handle it?

6    A.   Either make them leave or make them pay.  I

7  mean --

8    Q.   So there were instances in which the club would

9  force customers to pay you for dances?

10   A.   If they didn't pay me my money, yes, they would

11  make them pay me.

12   Q.   Like, if you had negotiated an amount for

13  dances and a customer said, No, I'm not gonna pay her,

14  the club would help you recover that money?

15   A.   They would talk to them and have them help pay

16  me.

17   Q.   Okay.  All right.  And we already established

18  that -- well, I shouldn't say we've established.  I just

19  can't remember.

20         Is it your position that without exotic

21  dancers, no one would go to Heartbreakers?

22   A.   I didn't say that.

23   Q.   You did?

24   A.   No.

25   Q.   No, you did not?

```
 1        A.   No.

 2        Q.   Customers would still go to Heartbreakers

 3   without any dancers?

 4        A.   Yeah.  Just like an ordinary bar or --

 5        Q.   Okay.  Oh, I forgot to ask you, do the number

 6   of dancers affect its atmosphere?

 7        A.   Does the number of dancers affect -- yes.  So

 8   if there was only five dancers, the rotation would be

 9   numerous, like over and over and over.

10        Q.   Right.

11        A.   And then if there was, you know, a lot of

12   girls, then we would be spread out.  Like, it would be

13   less amount of time.

14        Q.   So would more customers go to the club if there

15   were more dancers there?

16        A.   I mean, I don't know.

17        Q.   You work shifts where there might have only

18   been a handful of dancers, right?

19        A.   Yes.

20        Q.   Like during the daytime?

21        A.   Yes.

22        Q.   What was the least number of dancers that you

23   can recall ever seeing at the club?

24        A.   That I recall, three.

25        Q.   Yeah.
```

  1      A.   Three to five maybe.

  2      Q.   Three to five.  What's the most amount that you

  3  recall?

  4      A.   A lot, probably like 30, 40.

  5      Q.   Upwards of 30, 40?

  6      A.   (Witness moves head up and down.)

  7      Q.   Do customers like going when there aren't very

  8  many dancers?

  9      A.   Yeah, they like going.  It doesn't -- they like

 10  going when there's just a few -- some like it, you know,

 11  when it's calm and collective and, you know, they get to

 12  have a little bit more quiet time, you know, like more

 13  personal than when it's more loud.  I mean, I guess it

 14  just depends.

 15      Q.   Some customers go to Heartbreakers if they

 16  want, like, the party vibe, right?

 17      A.   Right.  And then some go whenever there's less

 18  dancers just for the mellow vibe.

 19      Q.   The guys that really just want to, like, chat

 20  and have a drink and --

 21      A.   Just hang out.

 22      Q.   Right.  And some dancers cater to the party

 23  group, right?

 24      A.   I mean, it was just sporadically.  I mean, I

 25  don't know.  I don't know what other dancers did.  I

 1   don't know.

 2       Q.  What was your preference?  Who did you like to

 3   cater to?

 4       A.  Whoever was paying really.  I mean, it didn't

 5   really matter.

 6       Q.  Did you find --

 7       A.  I like -- what was that?

 8       Q.  Did you find more success with, like, the guys

 9   who wanted the quiet atmosphere?

10       A.  Really, it was just -- it just depends.  It

11   wasn't -- it wasn't like, a preference, like, night or

12   day or wild or slow.  Like, it wasn't a preference.  It

13   just really depended.

14       Q.  It just depended on your ability to cater to

15   whatever that customer wanted, right?

16       A.  On the customer, whatever they wanted.

17            MS. REZAZADEH:  Misquoting the deponent.

18       Q.  (BY MR. KING)  And a lot of it depended on what

19   the customer liked, what he or she sees, right?

20       A.  Yes.

21       Q.  Can you -- can you tell me about how much you

22   spent on makeup, attire, all the dancer stuff, just on

23   a -- I don't know, like on a monthly basis?

24       A.  I mean, I don't have a certain amount, but it

25   was very expensive.  Like, just the heels were $200, you

Case 3:20-cv-00008  Document 82-3  Filed on 05/21/21 in TXSD  Page 99 of 149
EXHIBIT C
Deposition of Roxanne Murillo
Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

```
 1   know.  The outfits were 2- to $300 as well.  Makeup,

 2   hair, another 3-, $400, you know.

 3       Q.  And the club never reimbursed you for any of

 4   that, right?

 5       A.  No, no.

 6       Q.  About how much on average would you spend on,

 7   you know, dancer gear, for lack of a better term?

 8               MS. REZAZADEH:  Objection; asked and

 9   answered.

10               Go ahead.

11       A.  Yeah.  I don't know a specific amount.  It was

12   just very expensive, I know.  I know that.

13       Q.  (BY MR. KING)  Can you --

14       A.  It costs to maintain.

15       Q.  Can you ballpark on a yearly basis?

16       A.  Thousands, I mean...

17       Q.  Thousands?

18       A.  Yes.  It was very expensive.  I mean, makeup

19   alone is expensive, you know.

20       Q.  My wife tells me.

21       A.  You should check your credit card.

22               MR. KING:  Caroline, do you need a break?

23               THE REPORTER:  No, I'm okay.

24               MR. KING:  Okay.

25               MS. REZAZADEH:  I could take a break.
```

Case 3:20-cv-00008   Document 82-3   Filed on 05/21/21 in TXSD   Page 100 of 149

**EXHIBIT C**

Deposition of Roxanne Murillo                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

```
 1              MR. KING:  Okay.

 2              (Recess from 3:11 p.m. to 3:31 p.m.)

 3      Q.  (BY MR. KING)  Okay.  Ms. Murillo, we are back

 4  on the record.

 5              Before the break, you were talking about

 6  how you spent thousands of dollars on attire,

 7  appearance, makeup, those sort of things, right?

 8      A.  Right.

 9      Q.  Okay.  Were all those things essential for your

10  work as an exotic dancer at Heartbreakers?

11      A.  Yes.

12      Q.  Why were they essential?

13      A.  Because we were required to wear certain

14  things.  Like, we couldn't wear a T-shirt and pants, you

15  know.  We had to wear the costumes.  We had to wear

16  heels.  We had to be dressed and ready.  Like, we

17  couldn't just walk out there.

18      Q.  All right.  So the club made you buy $200

19  shoes?

20      A.  Yes.

21      Q.  All right.  And the club made you buy multiple

22  pairs of $200 shoes, right?

23      A.  Yes.

24      Q.  The club didn't like it if you used the same

25  shoes on two consecutive nights, right?
```

1          MS. REZAZADEH:  Objection; misquoting

2    deponent.

3          A.  We can wear them two nights, but if they

4    started to get, like, dirty and dingy, then, yeah, we

5    had to get new ones.

6          Q.  (BY MR. KING)  You probably wouldn't make very

7    much money as a dancer if you were wearing dirty or

8    dingy shoes, would you?

9          A.  I don't know.  I don't know.  They -- I don't

10   know.

11         Q.  The club required you to buy expensive makeup?

12         A.  They required us to wear makeup, so -- I mean,

13   to look good.

14         Q.  The club didn't let you buy kind of cheaper

15   cosmetics?

16         A.  Well, the cheaper cosmetics don't work as good

17   as the expens- -- you know, the high dollar.  You're in

18   a bright light, so --

19         Q.  So you were forced to buy expensive cosmetics

20   by the club, right?

21              MS. REZAZADEH:  Objection; misquoting

22   deponent.

23         A.  We had to buy makeup.

24              MS. REZAZADEH:  You can answer, Roxanne.

25         A.  Yeah, we had to buy --

1          MR. KING:  I'll just state on the record

2     that the deponent looks like she just got up.

3          THE WITNESS:  I had to close the door so

4     you don't hear the baby.  Sorry.

5      A.  So yeah, we had to buy makeup, and the makeup

6     couldn't be cheap makeup because it's in the bright

7     lights.  So I mean, you know, with the customers

8     approaching, it won't -- you won't look good.

9      Q.  (BY MR. KING)  Okay.  And so Whitey would tell

10    you to go -- Whitey, for example, would tell you to go

11    buy better makeup, right?

12          MS. REZAZADEH:  Objection; misquoting the

13    deponent, argumentative.

14          You can answer, Roxanne.

15     A.  I mean, he didn't say, like, Go buy more

16    expensive makeup, but it was, like, You've got to look

17    good.  Like, you've got to wear makeup, you know.

18    You've got to wear heels.  You have to have your hair

19    done.

20     Q.  (BY MR. KING)  So how would you decide how much

21    to spend on all of these things that we've been

22    discussing?

23     A.  Like, whatever I needed.  I mean, if I needed

24    it for work to make money, I mean, I had to get it.

25     Q.  Is that left up to you, or did the club tell

1  you how much to spend on these items for your job?

2      A.  I mean, they played a part in it, but they

3  didn't, like, tell us exactly, like, you have this X

4  amount of money to spend on it.  You know, it was just

5  get what, you know -- these are the things you need and,

6  you know, I mean, we bought it.

7      Q.  You maintain a Facebook page, correct?

8      A.  Yes.

9      Q.  And that's Roxanne Renee 007, right?

10      A.  Yes.

11      Q.  Do you maintain any other social media

12  accounts?

13      A.  Instagram.

14      Q.  So we've got Instagram.  What's your user name

15  on Instagram?

16      A.  Instagram is Pink Lady 38 SPC.

17      Q.  What about Twitter?

18      A.  I mean, I have it, but it's not -- I don't use

19  it.  I don't know how.

20      Q.  OnlyFans?

21      A.  No.

22      Q.  Model Mayhem?

23      A.  No.

24      Q.  So the only -- only two social media accounts

25  that you maintain are on Instagram and Facebook, right?

```
 1        A.   Yeah, yes.

 2        Q.   What about Snapchat?

 3        A.   I rarely.

 4        Q.   All right.  What's your user name on Snapchat?

 5        A.   Roxanne Renee.

 6        Q.   On any of these social media accounts that

 7   we've now discussed, have you ever posted anything about

 8   your work at Heartbreakers?

 9        A.   No.  No.

10        Q.   Have you ever communicated with any other

11   dancers about Heartbreakers using these social media

12   accounts?

13        A.   No.

14        Q.   Have you ever sent any direct messages to any

15   other dancers on Facebook or -- or Instagram about

16   Heartbreakers?

17        A.   No.  It's not for, like, those -- it's not for

18   dance -- it's just for family.  It's not --

19        Q.   Got it.  I just wanted to make sure that I

20   understand what's out there.

21             Have any of Heartbreakers' personnel,

22   meaning DJs, bartenders, waitresses, managers, owners,

23   have any of those individuals communicated with you on

24   social media in the past three years?

25        A.   No.  I don't -- I don't use social media for
```

```
 1    that.  It's just for family and my kids.

 2         Q.   Understood.  Have any of these Heartbreakers

 3    people that I've just described texted you in the past

 4    three years about your work at Heartbreakers?

 5         A.   No.

 6         Q.   So you have no text messages with any managers

 7    about performing, right?

 8         A.   No.  Right.

 9         Q.   And the same goes with Heartbreakers' owners;

10    you've never texted Peggy or Mike?

11         A.   No.

12         Q.   All right.  What about other dancers?  Have you

13    texted any dancers in the past three years about your

14    work at Heartbreakers?

15         A.   No.

16         Q.   Not once?

17         A.   No.

18         Q.   Have you contacted any other performers about

19    joining this lawsuit against Heartbreakers?

20         A.   No.

21         Q.   How did you find out about this lawsuit?

22         A.   An aunt or a cousin, somebody had told me about

23    it, and so I contacted a lawyer to see if -- you know,

24    what was going on, like, if there was a case or if I had

25    a case or --
```

Deposition of Roxanne Murillo                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

1     Q.  Is your aunt or cousin a performer at

2  Heartbreakers?

3     A.  No.  I'm not sure where they got it from.  They

4  just called me one day and said that there is something

5  out there like that, and for me to -- you know, they

6  knew I was dancing, so --

7     Q.  Sure.  Okay.

8          So a family member saw something on the

9  internet?

10    A.  Yes.

11    Q.  Okay.

12    A.  I mean, I'm not sure where they seen it.  I

13  don't know where they heard it or seen it.  They just

14  let me know, and then I contacted a lawyer.

15    Q.  That's fine.  And since learning about this

16  lawsuit, again, your testimony is you haven't contacted

17  any other performers at Heartbreakers about joining the

18  lawsuit?

19    A.  Correct.

20          MS. REZAZADEH:  Objection; asked and

21  answered.

22    Q.  (BY MR. KING)  Have you attempted to contact

23  any other dancers?

24    A.  No.

25    Q.  Do you want other dancers to join this lawsuit

1   with you?

2        A.   Yes.

3        Q.   Why?

4        A.   Well, I mean, I feel like if I was -- if I was

5   mistreated or, you know, what -- if it wasn't what we

6   signed up for, I believe we're all into it.  Like, I

7   believe it's fair for everybody to know, you know,

8   what -- the way we were treated was wrong.

9        Q.   Do you want, as part of this lawsuit, for

10  Heartbreakers to treat all of its dancers as employees

11  who receive a schedule?

12             MS. REZAZADEH:  Objection; vague.

13  Incomplete hypothetical.

14       A.   Can you ask the question again?

15       Q.   (BY MR. KING)  As part of this lawsuit, do you

16  want Heartbreakers -- let me back up.

17             As a result of this lawsuit, do you want

18  Heartbreakers to treat all of its performers as

19  employees who will receive schedules?

20             MS. REZAZADEH:  Objection; incomplete

21  hypothetical.

22       A.   I mean, I just wanted to be treated fair.

23  Like, if we are what they say we are, then treat us as

24  what we signed up for, you know.  Not sign up for one

25  thing and it's a whole other ball game once you're on.

```
 1   Again, I would want them to -- I would want there to be

 2   rules, like, legally rules for this not to happen again.

 3        Q.  (BY MR. KING)  Right.

 4        A.  I mean, I worked there 18 years, you know.

 5        Q.  Right.  That's a long time.

 6             So did anyone at Heartbreakers bully or

 7   mistreat you before you left?

 8        A.  Well, I was just -- so the day that I left, I

 9   needed to -- something happened with my babysitter.  I

10   wasn't able to work, so I needed to leave, and I had

11   only been there not even two hours into the shift.  I

12   asked to leave, and I mean, it was like -- I was -- it

13   was like wrath.  You know, I opened up a book of wrath,

14   and so, like, I knew that I was fired, and I couldn't go

15   back.

16        Q.  Who opened --

17        A.  I would say I was bullied out of there.

18        Q.  Who opened up the book of wrath?

19        A.  Whitey.

20        Q.  And what did he tell you?

21        A.  He just said, like, you know, I know the rules.

22   You know, once you're there, you're there.  There's no

23   leaving early.  If I want to leave early, that just not

24   to come back.

25        Q.  Okay.  Was that experience what caused you to
```

1    file suit?

2         A.   No.   The -- what caused me to file suit is just

3    all these years of being not treated the way we're

4    supposed to.

5         Q.   Do you have any other pending lawsuits?

6         A.   No.

7         Q.   You haven't sued any other clubs?

8         A.   No.

9         Q.   You -- you understand that you had sued Mike

10   Armstrong, Peggy Armstrong and A&D Interests,

11   Incorporated, doing business as Heartbreakers, right?

12        A.   Yes.

13        Q.   What damages are you seeking?

14        A.   I'm not sure.   I -- that's -- I'm not sure.

15        Q.   Okay.

16        A.   Whatever is -- whatever it is that, you know,

17   I'm owed.

18        Q.   Okay.   Well, what are you owed?

19        A.   I don't -- I mean, I don't know.

20        Q.   Do you -- do you want a jury to find that you

21   are entitled to receive $7.25 an hour for all hours that

22   you worked at Heartbreakers?

23        A.   That -- I want what was fair.   I mean, I don't

24   think $7.25 minimum wage is fair for -- fair for that.

25        Q.   Exotic dancing is not easy work, is it?

Deposition of Roxanne Murillo            Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

1       A.  No.

2       Q.  You would not take off your clothes and perform

3   for customers if you were paid $7.25 an hour, would you?

4               MS. REZAZADEH:  Objection; incomplete

5   hypothetical.

6       Q.  (BY MR. KING)  Right?

7       A.  No.

8       Q.  So are you -- are you going to ask the jury to

9   award you more than $7.25 an hour for the time that you

10  worked at -- at Heartbreakers?

11              MS. REZAZADEH:  Objection; asked and

12  answered.

13              Roxanne, you can answer if you know the

14  answer.

15      A.  I mean, I don't know an amount, or I mean, I

16  don't know what I would be owed.  That's what we're here

17  for.

18      Q.  (BY MR. KING)  I understand.  But you have been

19  listed as an individual who has knowledge of her

20  damages, and you filed a lawsuit because you want money,

21  right?

22      A.  I want --

23      Q.  True?

24      A.  -- what's owed.

25      Q.  Right.  Because that's the point of this

EXHIBIT C

Deposition of Roxanne Murillo                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

1   lawsuit is you want Heartbreakers to pay you some amount

2   of money, right?

3        A.  I want to be what's -- like, I want this to

4   stop.  Like, these rules that, you know, that is what I

5   am mainly shooting for, is, like, I want these rules to

6   be corrected and stopped.  I want the girls not to be

7   badgered the way we've been all these years.

8        Q.  Okay.  So you want the badgering to stop.

9             So the -- and you correct -- tell me if I'm

10  putting words in your mouth.  Is money beside the point?

11       A.  I mean, if I -- what I'm owed, like, if I

12  worked there and I was being taken advantage of and I

13  was -- you know, they took all this money from me, I

14  want what I'm owed.  I mean, I don't know what it is.

15  We'd have to figure that out, but --

16       Q.  Okay.  Well, let's talk about that.

17       A.  Okay.

18       Q.  How -- in 2019, how many days did you perform?

19       A.  I'm not sure.  I mean --

20       Q.  Was it more than seven days?

21       A.  No.  It was five -- five to six maybe

22  sometimes.

23       Q.  Okay.  You say that you worked five to six days

24  in 2019?

25       A.  Yes.  Wait, 2019?  I don't know when's the last

 1    time I worked?  When was the last day I worked there?

 2                   MS. REZAZADEH:  Sorry, I just got

 3    disconnected again.  Can y'all hear me?

 4                   MR. KING:  Yes.

 5                   MS. REZAZADEH:  Okay.  I got disconnected

 6    for a second.  It came right back on.  I don't know what

 7    I missed.

 8                   MR. KING:  I just -- can you read the last

 9    question back, ma'am?

10                   (Requested portion was read.)

11                   MS. REZAZADEH:  Okay.  That's fine.

12        Q.  (BY MR. KING)  Do you recall the last day that

13    you worked there?

14        A.  No.  That's what I was trying to -- I mean, I

15    don't remember -- I know -- I mean, I don't remember the

16    last day.

17        Q.  Okay.  Do you remember approximately how many

18    days you worked in 2019?

19        A.  I don't know if I worked there in 2019.

20        Q.  Okay.

21        A.  'Cause I worked at Rodeo Goat, so I'm not sure.

22        Q.  Let me see if I can get this.  Maybe this will

23    help.  Did you have difficulty driving to Heartbreakers?

24        A.  No.

25        Q.  No?  Was your driver's license ever suspended?

1    A.   Oh, yes.

2    Q.   How did you get to Heartbreakers?

3    A.   When it was suspended?

4    Q.   Uh-huh.

5    A.   Uber, a cousin.

6    Q.   When was your driver's license suspended; do

7  you recall?

8    A.   No.  I'm sorry.

9    Q.   All right.  I'm gonna share my screen with you.

10         MR. KING:  Counsel, this is the document

11  that I e-mailed to you, and I'll put it on the record

12  that I just gave this to you.

13         (Exhibit 2 shared.)

14    Q.  (BY MR. KING)  Okay.  I'm showing you a

15  document titled Hours and Earnings Detail Report.

16         Do you see this, ma'am?

17    A.  I can see it.

18    Q.  Okay.  And this report shows that you worked

19  one day in 2019, on October 12th.  Is there anything

20  about what this record shows that is inaccurate?

21    A.  I don't -- I don't know what this is.

22    Q.  Okay.  Fair enough.  I'll back up.

23         I will represent to you this is a document

24  from Heartbreakers that shows the date that you

25  performed right here --

```
 1        A.  Okay.

 2        Q.  -- the time that you clocked in, quote/unquote,

 3   and the time that you clocked out.  Okay?

 4        A.  Okay.

 5        Q.  And so earlier you were telling me that on the

 6   last day that you performed at Heartbreakers, Whitey

 7   read to you from the book of wrath because you had to

 8   go?

 9        A.  Yes.

10        Q.  Okay.  And you earlier testified that this was

11   about two or three hours into your shift, right?

12        A.  Uh-huh.

13        Q.  Right?

14        A.  Yes.

15        Q.  Okay.  And so here we have on October 12th,

16   2019, Heartbreakers' records show that you were there

17   for about three and a third hours.

18        A.  Okay.

19        Q.  Does that square with your recollection?

20             MS. REZAZADEH:  Objection; calls for

21   speculation.

22             THE WITNESS:  I answer?

23        Q.  (BY MR. KING)  Yes.

24             MS. REZAZADEH:  Yes, of course.

25        A.  I don't -- I mean, I really don't -- I really
```

**EXHIBIT C**

Case 3:20-cv-00008   Document 82-3   Filed on 05/21/21 in TXSD   Page 115 of 149
Deposition of Roxanne Murillo                    Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

 1  have no idea what I'm looking at or the date.  Like, I

 2  have no idea when was the last date that I worked there.

 3       Q.  (BY MR. KING)  Okay.  Do you have any reason to

 4  believe that this record is false?

 5       A.  I've never seen this record, so --

 6       Q.  Okay.  Do you -- is it false that you worked on

 7  October 12th, 2019?

 8       A.  I'm -- I don't remember if I worked that exact

 9  date.

10       Q.  Let me see.

11       A.  'Cause I know before they were saying that I

12  only worked there one day, and now it's like -- I mean,

13  I don't know.

14       Q.  Okay.  So I'm showing you maybe a document that

15  you've seen before.

16       A.  Okay.

17       Q.  This is a document labeled Heartbreakers 36,

18  the same thing we were looking at earlier.  Have you

19  ever seen this record before?

20       A.  No.

21       Q.  All right.  So yes or no, did you work more

22  than one day in 2019 at Heartbreakers?

23       A.  Yes.

24       Q.  Okay.  How many days did you work in 2019?

25       A.  I don't remember.

1    Q.  Do you recall how many days per month on

2   average that you performed at Heartbreakers?

3    A.  I mean, I would work at least five to six days,

4   so I mean, on average -- I would -- I don't know, 15,

5   20, I mean --

6    Q.  15, 20 days a month?

7    A.  Yes.

8    Q.  And how long would your shifts last at

9   Heartbreakers during these days that you say you

10  performed?

11   A.  They were eight hours, sometimes a little bit

12  more, depending on when the door girl got there.

13   Q.  Okay.  So if Heartbreakers' records show that

14  you only worked one day in 2019, that record would be

15  incorrect, right?

16   A.  Yes.

17   Q.  What other sources of information could we look

18  at to determine how many days you, in fact, performed at

19  Heartbreakers in 2019?

20   A.  I don't know.

21   Q.  Did you keep any kinds of calendars, records,

22  diaries, anything of that nature?

23   A.  No.

24   Q.  Okay.  Did you ever post things on Instagram or

25  Facebook that might give us some hint as to when you

1   performed at Heartbreakers in 2019?

2        A.  No.  I don't --

3        Q.  Did you ever tell any other people when you

4   performed at Heartbreakers in 2019?

5        A.  No.

6        Q.  Okay.  Would your Uber receipts show when you

7   went to Heartbreakers?

8        A.  I don't know.  I can check, but I don't -- I

9   don't know.

10        Q.  Okay.  In 2019, did you get to Heartbreakers by

11   taking Uber or a cab or something?

12        A.  I'm not sure if it was in that year, 2019 or

13   '18.  I mean, I don't -- I don't know an exact date.

14   Sorry.

15        Q.  Is it possible that you only worked one day in

16   2019?

17        A.  No.

18        Q.  Okay.  All right.  Let's go on to the first

19   page of this document, which shows this record was run

20   for the time period between January 1st, 2017 through

21   January 14th of 2021.

22              All right.  So the first date here is May

23   22nd, 2017.  All right?

24        A.  Uh-huh.

25        Q.  Do you recall working at Heartbreakers on any

1   date in January, February, March or April of 2017?

2        A.  I would say yes, but I'm not -- I would say

3   yes, but I'm not for sure.  I mean --

4        Q.  Okay.

5        A.  -- I would literally have to sit down and --

6        Q.  And think about it, right?

7        A.  Right.

8        Q.  How would you refresh your memory?

9        A.  I don't know, honestly.

10       Q.  There's nothing you can think of that would

11  help refresh your memory about whether you may have

12  worked at Heartbreakers between January and April of

13  2017?

14       A.  January and April -- no.  I mean, I would

15  have -- no.

16       Q.  This record shows that you performed one, two,

17  three, four -- four days in May of 2017.  Is that

18  inconsistent with your recollection?

19       A.  Yes.

20       Q.  Okay.  So this record we're looking at, is it

21  inaccurate?

22       A.  Yes.

23       Q.  Okay.  And same question:  Are there any other

24  records out there that you know of that might show us

25  how many days you may have worked in 2017 -- May of

1    2017?

2        A.   No.

3            MS. REZAZADEH:   Objection; calls for

4    speculation.

5        Q.   (BY MR. KING)   Okay.   And, again, records that

6    you have or have access to.   That's what my question was

7    about.

8        A.   Yeah.   No, I don't.

9        Q.   In June of 2017, Heartbreakers' records showed

10   that you clocked in one, two, three, four, five, six,

11   seven days total in that month.   Is that inconsistent

12   with your recollection?

13       A.   Yes.

14       Q.   And -- and your earlier testimony was that it

15   was your habit or routine to work at least five to six

16   days at Heartbreakers every week of every month, right?

17       A.   Yes.   I would work at least five days.

18       Q.   At least five days?

19       A.   (Witness moves head up and down.)

20       Q.   And those shifts were at least seven to eight

21   hours long, right?

22       A.   Eight hours or more, yes.

23       Q.   Eight hours or more?

24       A.   Yes.

25       Q.   Okay.   This record shows that in July of 2017,

1    the first day that you clocked in, according to

2    Heartbreakers's records -- can you see it there?

3        A.  Yes.

4        Q.  -- was July 10th, 2017, and that thereafter,

5    you worked one, two, three, four, five, six, seven,

6    eight -- eight days in July of '17.

7                Is that inconsistent with your

8    recollection?

9        A.  Yes.

10       Q.  Okay.  So just to wrap this up, if we were to

11   look at this record and it shows that you worked less

12   than five days in a given week --

13       A.  Uh-huh.

14       Q.  -- the record would be inaccurate?

15       A.  Yes.

16       Q.  Okay.  But you were not aware of any other

17   records in your possession or sources of information in

18   your possession from which we could determine the number

19   of days and hours that you, in fact, worked, true?

20              MS. REZAZADEH:  Objection; vague.

21       Q.  (BY MR. KING)  Is that true?

22       A.  Right.

23       Q.  Okay.  The last question on all of this date

24   stuff --

25       A.  Okay.

1    Q.  -- the record shows that in 2018 -- and by the

2    record, I mean Heartbreakers' records that I'm showing

3    you --

4    A.  Okay.

5    Q.  -- you worked January 5th, February 10th, June

6    15th, July 21st, July 26th and August 11th, 2018, and

7    that was it for 2018.

8    A.  Uh-huh.

9    Q.  You -- I assume you recall working more hours

10   and days than what I've just shown you, right?

11   A.  Yes, yeah.

12   Q.  All right.  Okay.

13           And you wish to be paid for every hour that

14   you worked at Heartbreakers --

15           MS. REZAZADEH:  Objection; misquoting the

16   deponent.

17   Q.  (BY MR. KING)  -- as your damages, right?

18   A.  I mean, I don't know if it's, like, every hour

19   or -- I mean, I don't know what it is.  I don't know

20   what it -- I don't know.

21   Q.  What are you gonna tell the jury you should be

22   paid?

23   A.  I mean, like, what if there were more hours

24   that were overtime or time and a half, I mean --

25   Q.  That's fine.  I just need you to tell me what

Case 3:20-cv-00008   Document 82-3   Filed on 05/21/21 in TXSD   Page 122 of 149
**EXHIBIT C**
Deposition of Roxanne Murillo          Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

```
 1    it is.

 2          A.   I mean, I don't know.  Honestly, I don't know.

 3          Q.   Okay.  Are you claiming that you worked

 4    overtime hours?

 5          A.   I mean, if I actually sat and thought, I mean,

 6    I think it would be over 40 hours.  I mean, I don't

 7    know.

 8          Q.   Do you recall an instance in which you worked

 9    in excess of 40 hours in any seven-day period of time

10    since 2017?

11          A.   What was it again?

12          Q.   Sure.  That was kind of a long question.

13          A.   Yeah.  Sorry.

14          Q.   Since 2017, do you recall working at

15    Heartbreakers in excess of 40 hours in any seven-day

16    period of time?

17          A.   I would say yes.

18          Q.   Okay.

19          A.   I worked there a lot -- I worked a lot of hours

20    there.

21          Q.   All right.  And can you remember a week in any

22    year since you worked there, so in 2017, 2018 or 2019,

23    in which you worked overtime?

24          A.   No, not an exact week or month.  I just know

25    that I worked there a lot.
```

1    Q.  Can you recall the season of the year in which

2  you worked overtime?

3    A.  No.

4    Q.  Can you recall approximately the number of

5  hours that you may have worked in excess of 40?

6    A.  No.

7    Q.  Could it have been 45 hours in a given work

8  week?

9    A.  I mean, I honestly --

10        MS. REZAZADEH:  Objection; form.  Calls for

11  speculation.

12    A.  -- don't know.

13    Q.  (BY MR. KING)  So just to shortcut this whole

14  line of questions, you have absolutely no way of telling

15  me if you might have worked overtime and how much,

16  right?

17    A.  Right.

18    Q.  Okay.

19        MS. REZAZADEH:  Objection; argumentative.

20    Q.  (BY MR. KING)  Are you seeking any compensation

21  in this case for any time that you spent in the dressing

22  room before you clocked in?

23        MS. REZAZADEH:  Objection; vague.

24    A.  I don't know.

25    Q.  (BY MR. KING)  Is it your contention that

1   Heartbreakers should have paid you for the time that you

2   spent in the dressing room preparing for performing?

3               MS. REZAZADEH:   Objection; vague.

4   Incomplete hypothetical.

5       A.  I don't know.

6       Q.  (BY MR. KING)  I guess I'm just kind of

7   confused why you don't know.

8               What do you want a jury to give you?

9       A.   I mean, I don't know if it's time that I spent

10  in the dressing -- I mean, I don't -- I don't -- I don't

11  know what it is that...

12      Q.  Well, you claim in the lawsuit that

13  Heartbreakers owes you for the -- the time that you

14  spent performing and working there.

15      A.  Yes.

16      Q.  We agree on that, right?

17      A.  Yes.

18      Q.  Okay.  And so what I'm trying to get at with my

19  questions is how we figure out how many hours --

20      A.  I would say it is from the time I walked in the

21  door.

22      Q.  Okay.  So from the time that you walked in at

23  Heartbreakers --

24      A.  Yes, till the time I left.

25      Q.  Till the time you left, and the time that you

1   worked -- or the time that you walked in the door is

2   different from the time that you actually clocked in,

3   right?

4        A.  I was preparing, getting ready.

5        Q.  Okay.  So how long from the time that you

6   walked in the door to the time that you would clock in

7   would you spend at Heartbreakers --

8                MS. REZAZADEH:  Objection --

9        Q.  (BY MR. KING)  -- on average?

10               MS. REZAZADEH:  -- vague.

11       A.  Sometimes it would be different.  I mean,

12  sometimes I'd take longer than others.  Sometimes I have

13  to hurry it up because I was getting in trouble for

14  spending too much time.  It just depends.

15       Q.  (BY MR. KING)  Okay.  Could you give me at

16  least a ballpark range, 15 minutes to an hour?

17               MS. REZAZADEH:  Objection; asked and

18  answered.

19       Q.  (BY MR. KING)  Five minutes to two hours?

20  What?

21               MS. REZAZADEH:  Objection; asked and

22  answered.

23       A.  I don't know.  It would -- it just depends.  It

24  would be hours sometimes.

25       Q.  (BY MR. KING)  Could it be minutes sometimes?

```
1        A.  No.

2        Q.  Okay.  So it would at least be hours, right?

3        A.  At least an hour.

4        Q.  At least an hour?

5        A.  Yes.

6        Q.  All right.

7        A.  At least.

8        Q.  Every day that you performed at Heartbreakers,

9   true?

10        A.  Yes.

11        Q.  And what was the maximum amount of time that

12   you recall putting your -- yourself together in order to

13   perform for which you seek compensation?

14        A.  A maximum three to four hours.  I'm not sure.

15        Q.  Okay.  So we've established a range.  One to

16   three or four hours spent preparing yourself to perform,

17   true?

18        A.  Yes.

19        Q.  Okay.  And this would be every day, right?

20        A.  Yes.

21        Q.  All right.  Based on your own observations, how

22   much time would other performers spend preparing

23   themselves in the locker room prior to clocking in or

24   checking in?

25        A.  I mean, we're all women and, you know, we all
```

1  take a long time, so it was all pretty much -- I mean,

2  we took a while to get ready.

3      Q.  Right.  Are you seeking recovery of tips that

4  you say you paid to Heartbreakers' personnel?

5      A.  Yes.

6      Q.  Okay.  Is there any way to quantify how much

7  those -- those tips were in any given month?

8      A.  No.

9      Q.  No?

10      A.  (Witness moves head from side to side.)

11      Q.  Would it just depend?

12      A.  It would just depend.

13      Q.  What would it depend on?

14      A.  It depends, did I get skipped that day, how

15  many days -- how many times did I get skipped, how

16  much -- you know, how much money did I tip, how much --

17  it just depends.  If I made a lot of money, I had to tip

18  them more.  If I made less money, I tipped them less.

19      Q.  Okay.  Was there any kind of percentage that

20  was applied to the amount of money that you made that

21  you would have to tip?

22      A.  On the credit cards, there would be a

23  percentage.

24      Q.  Right.  But I -- when I'm talking about tips, I

25  understand from your lawsuit that you allege that the

1    personnel at Heartbreakers would impose fees and fines

2    on you for various violations of different kinds of

3    rules, right?

4         A.   Right.

5         Q.   So if a manager didn't like the color of the

6    top you were wearing, you could be fined for that,

7    right?

8         A.   I don't know about the color of the top, but I

9    mean, depending --

10        Q.   If they didn't like it, for whatever reason

11   they don't like your top, they could fine you for that,

12   right?

13        A.   I don't know.

14        Q.   Okay.  Aside from the credit card fees and the

15   house fees, what other forms of forced tipping are you

16   claiming that Heartbreakers imposed upon you?

17        A.   Other than -- what was --

18        Q.   Aside from credit card transaction fees and

19   dance dollars and the house fee that we --

20        A.   What about, like, the skipping?  So, like, if

21   we were busy, we couldn't get on stage, we'd have to

22   skip, and we'd have to pay every single time.  So --

23        Q.   Okay.  How much was that?

24        A.   $20 each skip.

25        Q.   All right.  And how often did you skip the

1   stage rotation?

2       A.   Pretty often if I was busy.

3       Q.   Is there any way that you can provide me some

4   sort of quantification of how often that was?

5       A.   No.   I mean, there's nothing to, like, give you

6   a specific number of how many times, but I did it often.

7   Like, I was one of the ones that stayed busy.

8       Q.   All right.   Was it, like, more than twice every

9   shift?

10      A.   It was more than twice, for sure.

11      Q.   Okay.   So your practice was that you would skip

12  stage more than twice every shift --

13      A.   Yes.

14      Q.   -- right?

15      A.   Yes.

16      Q.   And so you would pay at least $40 per shift to

17  skip stage, right?

18      A.   Yes.

19      Q.   Was that the same for other dancers?

20      A.   Yes.

21      Q.   So all the dancers skipped stage at least twice

22  per shift?

23      A.   Yeah.   If they were busy, yes.   I mean, if you

24  were skipping, you were gonna skip a number of times.

25  It wasn't just gonna be a one-time skip.   You know, you

 1   were busy, you're gonna skip.  And then depending on how

 2   many dancers were there is how many times you go up.  So

 3   if there's only five, we're gonna go up every single 20,

 4   30 minutes, you know.

 5       Q.  Right, okay.  And no manager at any point ever

 6   said, Well, there really aren't a lot of customers here,

 7   so I don't care if you're on the stage rotation, right?

 8       A.  Oh, no, we had to.  Like we had to.

 9       Q.  So a manager like Carl Arceneaux, if he said

10   that if it's not busy at the club, that he doesn't care

11   if dancers are on the stage -- he would be lying if he

12   said that?

13       A.  Yeah.  Like if -- whether there was a lot of

14   customers or a little bit of customers, we always had to

15   dance the stage because in case somebody walked in.

16       Q.  All right.  So there could be zero customers in

17   the club --

18       A.  Yes.

19       Q.  -- and you would still have to be on stage?

20       A.  Yes.  Because in case somebody walks in, you

21   don't -- they didn't want it to look like there was

22   nobody there.

23       Q.  All right.  So aside from the stage fee that

24   you say Heartbreakers made you pay, are there any other

25   fines, fees or penalties, monetary penalties?

 1     A.  If we left early, if we needed to leave before

 2  our eight-hour shift, we had to pay $50 plus, and that

 3  would get split in between the managers and the DJ.

 4     Q.  Okay.  $50 plus what?

 5     A.  Whatever else we owed.

 6     Q.  What else would you owe for?

 7     A.  Like, if we owed our -- it would just -- $50 or

 8  more.  Like, it would just vary.  Sometimes it would be

 9  50; sometimes it would be 60.  It just depends, like, if

10  there was enough girls, and then they'd say, okay, give

11  me $60, you can leave, like --

12     Q.  So it just depended on, like, whatever that

13  manager told you?

14          MS. REZAZADEH:  Objection; misquoting the

15  deponent.

16     Q.  (BY MR. KING)  Right?

17     A.  It was just $50 or more.

18     Q.  $50 or more?

19     A.  Yes.

20     Q.  And so the amount over $50 just depended on the

21  manager, right?

22     A.  Yes.

23          MS. REZAZADEH:  Objection; misquoting the

24  deponent.

25     Q.  (BY MR. KING)  Sorry, did you say yes?

1      A.  It just depended, yes.

2      Q.  Okay.  So there was not some set amount for

3   leaving early --

4      A.  There was a set amount at 50.  The set amount

5   was 50, but if they were, like, okay, you give me $60,

6   I'll let you go, or, like, you know.

7      Q.  Okay.

8      A.  Or if they seen that we made a lot of money and

9   we wanted to leave early, it was, like, no, you're gonna

10  give me some of your money, you know.

11     Q.  And how much of that -- how much would be

12  demanded from you based on how much you earned?

13     A.  So they would basically just see how much I

14  made, and then they would be, like, no, I seen you with

15  that customer all night.  You made this amount, and give

16  me this amount or, you know.

17     Q.  Okay.  So you would have managers hovering over

18  you with customers --

19     A.  Yes.

20     Q.  -- tracking how much money they paid?

21     A.  For sure.

22     Q.  For sure?

23     A.  Yes.

24     Q.  Okay.  Speaking of which, Heartbreakers tracks

25  the number of dances that you gave to customers, right?

1          MS. REZAZADEH:  Objection; vague.

2     A.   They kept track on -- I guess just, like, so

3  they could see how much time I spent over there.

4     Q.   (BY MR. KING)  Over where?

5     A.   Oh, with the customer.  Like -- like, I seen

6  you over there, and you skipped this many times, like,

7  you know, things like that.

8     Q.   Okay.

9     A.   I seen you over there all night long.  You

10  skipped ten times, which means you made X amount of

11  dollars, you know.

12     Q.   Okay.  Managers tracked the number of dances

13  that you performed each shift, right?

14          MS. REZAZADEH:  Objection; asked and

15  answered.

16     A.   I mean, yes, to an -- somewhat they did keep an

17  eye on if we were making money to know I guess how much

18  to charge us, or how much we tipped out.

19     Q.   (BY MR. KING)  And how did they track the

20  number of dances that you performed each shift?

21     A.   That's how they would tell me, like, you know,

22  I seen you over there all night long, or you skipped

23  this amount of times, which means you stayed busy this

24  whole time.

25     Q.   Were they writing down the number of lap dances

1  you gave on the floor or in a booth?

2      A.  No.  They were just a general amount of time,

3  like, you know.

4      Q.  I don't.  That's why -- I mean, I'm asking

5  you --

6      A.  I mean, it wasn't like a tally, like Roxanne

7  did one, or, you know, it wasn't like a tally mark.  It

8  was more like, I know -- I mean, we kind of know, like,

9  once you're with a customer, you've been with him for X

10  amount of hours, you made money.  You weren't just

11  sitting there for -- for -- you know, like, you were

12  going to make -- you made money, so we had to give them

13  a percentage of it.

14      Q.  Okay.  What's a fee split?

15      A.  It was just split in between whatever was

16  collected from our fines and skips.  It was split in

17  between the manager and the DJ.

18      Q.  And what was that split?

19      A.  50/50.

20      Q.  How do you know that?

21      A.  Just by -- I mean, we -- we've seen it, like,

22  we see the managers get money from the DJ.  I mean, the

23  girls talk about it.  It's -- it's known.

24      Q.  Okay.  Did anyone ever tell you specifically

25  it's 50/50?

1    A.  One of the girl -- I mean -- so one of the

2  girls dated the DJ --

3    Q.  Okay.  And what was --

4    A.  -- and she was the one who kind of --

5    Q.  Go ahead.

6    A.  She was the one that kind of told us, you know,

7  that they get 50/50 straight down the middle.

8    Q.  And what was this individual's name, the

9  dancer?

10   A.  I don't remember her stage -- I can't remember

11 her name.

12   Q.  Do you remember the name of the DJ she was

13 dating?

14   A.  Oh -- darn it.  I forgot his name.  I forgot

15 his name.

16   Q.  Was it Vonic?

17   A.  Vonic, no.

18   Q.  Benjamin Brantley, was that the name of the DJ?

19   A.  No, not him.

20   Q.  Ray Sharp?

21   A.  No.  I think it was --

22   Q.  James Vonic?

23   A.  Honestly, I don't even -- I don't remember his

24 name.

25   Q.  All right.  Do you recall --

1    A.   (Indiscernible.)

2    Q.   -- when you learned this information from this

3  unidentified dancer?

4    A.   Uh-huh.

5    Q.   Do you recall when this unidentified dancer

6  told you this information about fee splits?

7    A.   Like, do I remember a date or --

8    Q.   Like a time frame.

9    A.   No.

10   Q.   Was it in 2002, 2018?

11   A.   I don't remember.

12   Q.   Could have been at any point since 2002?

13   A.   It wasn't that far back, I know that, but --

14   Q.   Was it in the past ten years?

15   A.   Yes.

16   Q.   Okay.  Any other fees, fines or monetary

17  penalties that we have not yet discussed?

18   A.   I think we've covered them, but I mean, I'm not

19  for sure.

20   Q.   You worked at Heartbreakers for 18 years.  Are

21  these the only ones that -- only kinds of fees, fines or

22  penalties that you allege you were required to pay?

23        MS. REZAZADEH:  Objection; asked and

24  answered.

25   A.   I think we've covered them.  I'm not really --

```
1   I'm not sure which ones we covered.

2       Q.  (BY MR. KING)  We've covered house fees, stage

3   fees, leaving early fees.

4       A.  House fees, stage fees, leaving early,

5   skipping.

6       Q.  House fees?

7       A.  Yeah, we did that -- that was the first one.

8       Q.  Right.  Anything else?

9       A.  Early, skipping, the funny money.  I think

10  that's it.

11      Q.  And you have no way to tell me on any

12  approximate basis how much money you were forced to pay

13  over to DJs or house moms for anything, right?

14          MS. REZAZADEH:  Objection; calls for

15  speculation.  Asked and answered.

16      A.  It was all cash, so I don't really have a way.

17          MR. KING:  If we can go off the record for

18  a couple minutes, I can probably wrap up.

19          MS. REZAZADEH:  Okay.

20          (Recess from 4:20 p.m. to 4:28 p.m.)

21      Q.  (BY MR. KING)  I've just got a couple more

22  questions for you, and then I'll let you go.

23          Do you know Frankie Anderson?

24      A.  Do I know who?

25      Q.  Frankie Anderson.
```

1    A.   Frankie?

2    Q.   (Moves head up and down.)

3    A.   The name doesn't ring a bell.

4    Q.   Do you know Caitlyn Jersey?

5    A.   (Moves head from side to side.)  Not by the

6    name.

7    Q.   Do you know Stephanie Toporcer?

8    A.   (Witness moves head from side to side.)

9    Q.   And we've already established that you don't

10   know any of the other plaintiffs in this case, right?

11   A.   Right.

12   Q.   Okay.  And we've already established that you

13   don't know if any other dancers wish to join this

14   lawsuit?

15           MS. REZAZADEH:  Objection; misquoting the

16   deponent.

17   Q.   (BY MR. KING)  Sorry?

18   A.   Do I know of any dancers?

19   Q.   (Moves head up and down.)

20   A.   No.  I mean, I don't -- I haven't spoke to

21   anybody about it, so I don't know.

22   Q.   Okay.  How do you know if management -- or

23   excuse me.  How are you aware that other exotic dancers

24   or entertainers fear retaliation for voicing concern

25   over defendant's FSLA violations and for opting in as

1   plaintiffs in this lawsuit?

2       A.  Can you read the first part again?  Just the

3   first little --

4       Q.  Sure.  How are you aware that other exotic

5   dancers fear retaliation for voicing concern over

6   defendant's FSLA violations and for opting in as

7   plaintiffs for this lawsuit?

8       A.  You mean, like, would they be scared to speak

9   up --

10      Q.  Yes, if you --

11      A.  -- is that what you're saying?

12      Q.  Yes.

13      A.  Yes.

14      Q.  How are you aware of that?

15      A.  Just -- I mean, I was scared to speak up, but

16  since I'm never gonna return, I spoke up.

17      Q.  Okay.  How are you aware that others fear that

18  retaliation?

19      A.  I mean, I would -- I would say yes.  I haven't

20  spoke to anyone for them to tell me, but I would say

21  yes, like, we -- we knew what they would do.  We knew

22  what Whitey would -- you know, he was -- when I say open

23  up a book of wrath, I mean, literally.  He was -- I

24  would avoid him.  If I didn't have to talk to him, I was

25  not talking to him.

1    Q.  Was he -- were all the other managers just like

2  Whitey?

3    A.  They were like him, but not, like, not as

4  wrath.  Like, he was like (descriptive noise), you know,

5  but the other ones, they were very strict.  They had all

6  the rules, same rules.  It's just Whitey was a little

7  bit more -- you couldn't go to him.  I could go to

8  Damon, you know, and talk to Damon or, you know, I would

9  approach him and ask him if I had any questions.  But if

10  I had to go to Whitey, I wouldn't ask questions.

11    Q.  Damon was much more approachable, wasn't he?

12    A.  Yes.

13    Q.  Damon was a lot easier to work with, wasn't he?

14        MS. REZAZADEH:  Objection; form.

15    A.  He was more approachable.  He was approachable.

16        MR. KING:  Okay.  Counsel, I put into the

17  chat window Exhibit 3 and Exhibit 4.  Exhibit 3 is the

18  license agreement.  Do you see it?

19        MS. REZAZADEH:  Have these been produced?

20        MR. KING:  Yes.

21        MS. REZAZADEH:  Can you give me Bates

22  numbers?  It might be easier than having to go through

23  the download process.

24        MR. KING:  It's Bates 31 -- Heartbreakers

25  31, and it ends Bates 35.

```
 1              (Exhibit 3 shared.)
 2       Q.  (BY MR. KING)  All right.  Ms. Murillo, have
 3  you ever seen this document before?
 4       A.  Yes.
 5       Q.  What is it?
 6       A.  It was an agreement to work.
 7       Q.  With Heartbreakers, right?
 8       A.  Yes.
 9       Q.  All right.  And at the bottom here on
10  Heartbreakers 35, is that your signature right here?
11       A.  Yes.
12       Q.  Okay.  I just wanted to make sure.  You're not
13  claiming anyone forged your signature or anything like
14  that, right?
15       A.  No.
16       Q.  Okay.  Have you ever heard that happening?
17       A.  Forge -- no.  I mean, I don't know.
18       Q.  Do you know if any --
19       A.  I really just went to work, did what I had to
20  do, and left.  Like I didn't really -- I mean, I don't
21  know if there was, like, forged -- I don't know.
22       Q.  You never heard of it happening from any other
23  dancer, right?
24              MS. REZAZADEH:  Objection; asked and
25  answered.
```

1      A.  I don't know.

2      Q.  (BY MR. KING)  It's a yes or no, either you did

3  or you didn't.

4      A.  No.

5           (Exhibit 4 shared.)

6      Q.  All right.  All right.  Exhibit 4 is

7  Heartbreakers 149 through 153.  All right.  This is

8  basically the same agreement, I'll represent to you, but

9  it's dated September 2nd, 2015.

10     A.  Uh-huh.

11     Q.  Does this document also bear your signature?

12     A.  Yes.

13     Q.  Okay.  And you're not claiming that somebody

14  falsified your signature or anything like that, true?

15     A.  No.

16     Q.  Okay.  Did you receive 1099s from

17  Heartbreakers?

18     A.  No.

19          MR. KING:  Counsel, this is Heartbreakers

20  37.

21          (Exhibit 5 shared.)

22     Q.  (BY MR. KING)  Have you ever seen your 2019

23  1099 wage form from Heartbreakers?

24     A.  No.

25     Q.  Never received it?

```
 1        A.  No.

 2        Q.  Is 11527 Bedford Street your address?

 3        A.  11527, yes.

 4        Q.  Okay.  Have you seen this document in the

 5   course of this lawsuit?

 6        A.  Oh, I'm sorry, it's 15227 is my address.

 7        Q.  15227.  So the address here is just incorrect?

 8        A.  Yes.

 9        Q.  Okay.

10        A.  And Channelview, not Houston.

11        Q.  Got it.

12             MS. REZAZADEH:  Bates number on that one?

13             MR. KING:  37.

14        Q.  (BY MR. KING)  All right.

15             MS. REZAZADEH:  And that was Exhibit 4, 5?

16             MR. KING:  Exhibit 5.  And here's Exhibit

17   6.

18             (Exhibit 6 shared.)

19             MR. KING:  This is Heartbreakers 157.  I'm

20   sorry, I said 157.  I meant 158.

21        Q.  (BY MR. KING)  Okay.  Have you ever received

22   this 1099 form?

23        A.  No.

24        Q.  Did you live at 3701 Luella in La Porte?

25        A.  Yes.
```

```
 1        Q.  And you've never seen this document in the

 2   course of this lawsuit?

 3        A.  No.

 4                 MR. KING:  Okay.  Last 1099.  This is

 5   Exhibit 7, and it's Heartbreakers 154.

 6                 (Exhibit 7 shared.)

 7        Q.  (BY MR. KING)  Have you ever seen this

 8   document, ma'am?

 9        A.  No.

10        Q.  You do not recall ever receiving a 1099 form

11   from Heartbreakers at any point, basically?

12        A.  No.

13        Q.  Did you report your income to the IRS that you

14   made from Heartbreakers?

15        A.  No.

16        Q.  Have you searched for all documents that might

17   reflect your experiences at Heartbreakers to your

18   counsel?

19        A.  I'm sorry?

20        Q.  Have you searched for -- have you completed

21   your search for any documents that you wish to show what

22   your experience has been like at Heartbreakers?  Have

23   you given all --

24        A.  I've given it all to her.

25        Q.  Got it.  Okay.  The only reason I'm asking you
```

**EXHIBIT C**

Case 3:20-cv-00008   Document 82-3   Filed on 05/21/21 in TXSD   Page 145 of 149
Deposition of Roxanne Murillo                   Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

 1   is just 'cause I'm just trying to figure out if there's

 2   more stuff out there.

 3        A.   Okay.  I've given her everything that I have.

 4        Q.   Fair enough.  My client just gave me new stuff

 5   for you yesterday, so I'm just trying to find out.

 6        A.   Okay.

 7        Q.   Oh, dancing is unskilled work, isn't it?

 8             MS. REZAZADEH:  Objection; vague.

 9        A.   Yes.

10        Q.   (BY MR. KING)  It doesn't require any kind of

11   special training, right?

12        A.   No.

13        Q.   Anybody could do it?

14        A.   Yes.

15             MR. KING:  All right.  Pass the witness.

16             MS. REZAZADEH:  Reserve for trial.

17             (Deposition concluded at 4:39 p.m.)

18

19

20

21

22

23

24

25

```
 1                 CHANGES AND SIGNATURE

 2   WITNESS NAME:  ROXANNE RENEE MURILLO

 3   DATE OF DEPOSITION:  April 27, 2021

 4   PAGE LINE        CHANGE           REASON

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

Stacey Kibodeaux a/k/a Illusion v. A&D Interests, Inc.

1  _____

2  _____

3  _____

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10         I, ROXANNE RENEE MURILLO, have read the

11  foregoing deposition and hereby affix my signature that

12  same is true and correct, except as noted above.

13

14

15

16

17

18

19

20

21

22

23

24

25                      _____
                        ROXANNE RENEE MURILLO

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      GALVESTON DIVISION

 3    STACEY KIBODEAUX, a/k/a     )
      "ILLUSION,"et al.,          )
 4    individually, and on        )
      behalf of all others        )
 5    similarly situated,         )
                                  ) CIVIL ACTION
 6          PLAINTIFFS,           )
                                  ) NO.: 3:20-cv-00008
 7    VS.                         )
                                  )
 8    A&D INTERESTS, INC.,        )
      d/b/a HEARTBREAKERS         )
 9    GENTLEMAN'S CLUB, et al.,   )
                                  )
10          DEFENDANTS.           )
```

```
11              REPORTER'S CERTIFICATION
            DEPOSITION OF ROXANNE RENEE MURILLO
12                   April 27, 2021
```

13       I, Caroline Massa, RPR, a Certified Shorthand

14   Reporter in and for the State of Texas, hereby certify

15   to the following:

16       That the witness, ROXANNE RENEE MURILLO, was duly

17   sworn by the officer and that the transcript of the oral

18   deposition is a true record of the testimony given by

19   the witness;

20       That the original deposition transcript was

21   delivered to Mr. William X. King.

22       That a copy of this certificate was served on all

23   parties and/or the witness shown herein on

24   _____.

25       I further certify that pursuant to FRCP Rule

1  30(f)(1) that the signature of the deponent:

2      X was requested by the deponent or a party before

3  the completion of the deposition and that the signature

4  is to be before any notary public and returned within 30

5  days from date of receipt of the transcript.  If

6  returned, the attached Changes and Signature Page

7  contains any changes and the reasons therefore;

8      _____ was not requested by the deponent or a party

9  before completion of the deposition.

10      That the amount of time used by each party at the

11  deposition is as follows:

12          Ms. Ghazzaleh Rezazadeh...00:00

13          Mr. William X. King.....02:53

14      I further certify that I am neither counsel for,

15  related to, nor employed by any of the parties or

16  attorneys in the action in which this proceeding was

17  taken, and further that I am not financially or

18  otherwise interested in the outcome of the action.

19      Certified to by me on this, the 14th of May, 2021.

20

21

22          _____
            Caroline Massa, RPR, Texas CSR 6226
            Expiration Date:  10/31/2021
23          Firm Registration No. 782
            Infinity Reporting Group, LLC
24          11200 Richmond Avenue, Suite 410
            Houston, Texas  77082
25          (832) 930-4484