Peggy Armstrong
April 30, 2021                                    **EXHIBIT E**          1

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    GALVESTON DIVISION

 3  STACEY KIBODEAUX aka ILLUSION, ) Case No.: 3:20-CV-00008
    HAILEY CHAPMAN aka DAISY,      )
 4  JEAN HOFFMEISTER aka JOHNE and )  JURY TRIAL DEMANDED
    ROXANNE MURILLO aka            )
 5  UNIQUE/ROXANNE, individuals,   )
                                   )
 6                  Plaintiff,     )
                                   )
 7        VS.                      )
                                   )
 8  A&D INTERESTS, INC. D/B/A      )
    HEARTLEMAN'S GENTLEMAN'S       )
 9  CLUB, MIKE A. ARMSTRONG, PEGGY )
    A. ARMSTRONG AND WHITEY DOE,   )
10  INDIVIDUALS,                   )
                                   )
11                  Defendants.    )

12  *********************************************************
                 REMOTE VIDEOCONFERENCE DEPOSITION OF
13                       PEGGY ARMSTRONG
                        APRIL 30TH, 2021
14  *********************************************************

15  REMOTE VIDEOCONFERENCE DEPOSITION of PEGGY ARMSTRONG,

16  produced as a witness at the instance of the Plaintiffs

17  and duly remotely sworn was taken remotely in the

18  above-styled and numbered cause on the 30th of April,

19  2021, from 10:03 a.m. to 1:09 p.m., before SUSAN L.

20  GRAHAM, CSR in and for the State of Texas, reported

21  remotely by machine shorthand, in the City of Houston,

22  Harris County, Texas, pursuant to the Federal Rules of

23  Civil Procedure, First Emergency Order Regarding COVID-19

24  State of Disaster, Notice and the provisions stated on

25  the record or attached hereto.
```

Page 2

```
1              A P P E A R A N C E S
2
   FOR THE PLAINTIFFS:
3      Leigh Montgomery
       Ellzey & Associates, PLLC
4      1105 Milford Street
       Houston, Texas  77006
5      Phone:  713-554-2377
       E-mail:  leigh@ellzeylaw.com
6      (Appearing remotely)
7
   FOR THE DEFENDANTS:
8      William X. King
       Wallace & Allen, LLP
9      440 Louisiana, Suite 1500
       Houston, Texas  77002
10     Phone:  713-227-1744
       E-mail:  wking@wallaceallen.com
11     (Appearing remotely)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1              I N D E X
2  REMOTE VIDEOCONFERENCE DEPOSITION OF PEGGY ARMSTRONG
                APRIL 30TH, 2021
3
4                                              Page
   Appearances...................................    2
5  Examination-Ms. Montgomery....................    4
   Examination-Mr. King..........................   77
6  Re-Examination-Ms. Montgomery.................  106
   Witness's Correction Page.....................  115
7  Witness's Signature Page......................  116
   Reporter's Certificate........................  117
8
9              EXHIBIT INDEX
10 P. Armstrong        Description          Marked
11 Exhibit   1  Corporate Representative Notice of    114
                Deposition
12 Exhibit   2  Jersey Interim Arbitration Award      114
   Exhibit   3  Heartbreakers' Signs or Rules         114
13 Exhibit   4  Jones Interim Arbitration Award       114
   Exhibit   5  Heartbreakers Policy                  114
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1          THE COURT REPORTER:  The attorneys
2  participating in this deposition acknowledge that I am
3  not physically present in the deposition room and that I
4  will be reporting this deposition remotely.  They further
5  acknowledge that in lieu of an oath administered in
6  person, I will administer the oath remotely.  This
7  arrangement is pursuant to the Texas Supreme Court First
8  Emergency Order Regarding the COVID-19 State of Disaster.
9  The parties and their counsel consent to this arrangement
10 and waive any objections to this manner of reporting.
11 Please indicate your agreement by stating your name and
12 your agreement on the record, counsel.
13         MS. MONTGOMERY:  Leigh Montgomery on
14 behalf the Plaintiffs, I agree.
15         MR. KING:  Will King on behalf of the
16 Defendants, I agree.
17         THE COURT REPORTER:  At this time, Ms.
18 Armstrong, will raise your right hand, please?  I need to
19 swear you in.
20             PEGGY ARMSTRONG
21 having been first duly remotely, testified as follows:
22             EXAMINATION
23 QUESTIONS BY MS. MONTGOMERY:
24     Q.   Good morning.  I am going to show you
25 hopefully what I'm going to mark as Exhibit 1 to your
```

Page 5

```
1  deposition, Ms. Armstrong.  Whenever I have to share
2  exhibits, just so you know, it takes me a minute to get
3  it on the share screen.  Okay.  Now I'm showing you what
4  I'm marking as Exhibit 1 to your deposition, which is the
5  notice for a corporate rep deposition for A&D Interests,
6  Inc.  Can you see that on your screen, Ms. Armstrong?
7      A.   Yes, ma'am.
8      Q.   Okay.  Now I'm going to say we had some snafus
9  yesterday.  Your deposition was originally set to occur
10 yesterday and we agreed to move it to today.  Is that
11 your understanding?
12     A.   Yes.
13     Q.   So what you'll see in front of you it still
14 has a notice for yesterday but because the parties just
15 agreed to move to today because of technical issues.
16 What I'm going to ask you about is the topics which were
17 attached to the notice of the deposition.  Ms. Armstrong,
18 have you ever seen these topics before?  And I can scroll
19 down.
20     A.   Yes.
21     Q.   Okay.  And you're familiar with the topics
22 that we requested a corporate representative for A&D
23 Interests, right?
24     A.   Yes.
25     Q.   And are you the person -- there are 1 through
```

Peggy Armstrong
April 30, 2021

**EXHIBIT E**

6 to 9

Page 6

1  19 topics listed here.  Are you the person that's been
2  designated to testify on behalf of A&D Interests, Inc.
3  for all of the topics listed?
4       A.   Yes.
5       Q.   Ms. Armstrong, have you ever testified as a
6  corporate representative on behalf of A&D Interests, Inc.
7  pre -- prior to today?
8       A.   Yes.
9       Q.   When was the last time that you testified as a
10  corporate representative on behalf of A&D Interests?
11       A.   Oh, goodness.  Several -- well, I'm not
12  exactly sure of the time frame but it's been a few years
13  ago.
14       Q.   Was it in a lawsuit that was instituted by an
15  entertainer?
16       A.   Yes.
17       Q.   Okay.  Was the lawsuit the -- the lawsuit
18  filed by a Frankie Henderson?
19       A.   I'm not sure if it was Frankie Henderson.
20  There were -- there was another entertainer and I can't
21  remember which --
22       Q.   Was it Stephanie --
23       A.   -- entertainer.
24       Q.   Was the other entertainer that you're thinking
25  of Stephanie, I'm going to mess up her last name but

Page 7

1  tope -- Toeprasara?
2       A.   No.
3       Q.   Okay.  When you provided your testimony in the
4  last case as a corporate representative, was it via a
5  deposition like we're doing today or was it in court?
6       A.   Yes.  Like a deposition like today but not on
7  Zoom.
8       Q.   Understood.  Have you ever had to testify in
9  court as a corporate representative on behalf of A&D
10  Interests, Inc.?  Let me -- let me limit it for you
11  because it may take a minute if I don't limit it.
12       A.   Okay.
13       Q.   Let's say in the past ten years?
14       A.   No.
15       Q.   I understand that A&D Interests, Inc. has been
16  around for over 30 years.  Is that accurate?
17       A.   Yes.
18       Q.   A&D Interests, Inc. I also understand owns the
19  club doing business as Heartbreakers; is that right?
20       A.   Yes.
21       Q.   And that the only owners of A&D or that have a
22  interest in A&D Interests, Inc. are yourself and Mike
23  Armstrong; is that accurate?
24       A.   No, it's not.  My husband owns a hundred
25  percent of the stock in A&D Interests, Inc.

Page 8

1       Q.   So Mike Armstrong owns a hundred percent of
2  the stock?
3       A.   Yes.
4       Q.   Do you consider yourself a part owner?
5       A.   I'm the secretary/treasurer of the corporation
6  and, no, I don't consider myself an owner.
7       Q.   Was the -- well, how long have you been
8  married to Mike Armstrong?
9       A.   48 years.
10       Q.   And was the corporate -- corporation A&D
11  Interests, Inc., was that formed in -- during the time
12  that you were married to him?
13       A.   Yes.
14       Q.   Does A&D Interests, Inc. own any other
15  businesses besides Heartbreakers?
16       A.   No.
17       Q.   Now during the time let's say in the past ten
18  years has anyone other than yourself testified as a
19  corporate representative on behalf of, and I'm going to
20  be specific, Heartbreakers?
21       A.   I'm not sure but I believe I'm the only one.
22  My husband might have but I believe I'm usually the
23  corporate representative.
24       Q.   Other than yourself and Mr. Armstrong, has
25  anyone ever testified on behalf -- as a corporate

Page 9

1  representative on behalf of Heartbreakers?
2       A.   No.
3       Q.   I understand that Heartbreakers actually
4  employs or has a staff of, of people helping run, manage
5  the club; is that correct?
6       A.   I'm sorry, I don't understand your question.
7       Q.   I understand that Heartbreakers has staff that
8  it employs to help manage and run the club; is that
9  correct?
10       A.   That is correct.
11       Q.   I understand that managers of the club,
12  including the general manager, Mr. Forster, and other
13  floor managers like Mr. Arceno, have the power to hire or
14  fire other staff, staff being like a bartender or a
15  waitress.  Is that correct?
16       A.   That is correct.
17       Q.   They would not, they being the managers or the
18  general manager, would not have to come to either you or
19  Mr. Armstrong in order to take that action.  That action
20  being either to hire or fire a staff member.  Is that
21  correct?
22       A.   That is correct.
23       Q.   Is there anything that the general manager
24  would have to get permission from Mr. Armstrong in order
25  to do on behalf of Heartbreakers?

Peggy Armstrong
April 30, 2021

Page 10

1      A.   I think that's a little too broad.  I don't
2  really quite know how to answer that.
3      Q.   Well, I mean is there anything that only Mr.
4  Armstrong reserves the power to decide about the club?
5      A.   I really don't know exactly what you mean.
6      Q.   Well, you told me that the general manager,
7  for example, would have the ability to hire and fire
8  staff members without asking Mr. Armstrong, correct?
9      A.   Correct.
10     Q.   Is there other things that he would have to
11  ask Mr. Armstrong in order to do on behalf of the club?
12     A.   Oh, construction, things like that.
13     Q.   If he wanted to change the building per se; is
14  that correct?
15     A.   Yes.
16     Q.   Okay.
17     A.   Yes.
18     Q.   Is there a -- what about like changes in, in
19  food or drink policy, would that be something Mr.
20  Armstrong would be in charge of?
21     A.   No.
22     Q.   So the general manager would be able to make
23  that decision on his own?
24     A.   Yes.
25     Q.   Can you think of anything else other than

Page 11

1  construction or change in the building itself that Mr.
2  Armstrong would need approval over?
3      A.   At this time I can't think of anything.
4      Q.   Now I asked about Mr. Armstrong.  Is there
5  anything that the managers or the general managers would
6  need to run by you before taking action on behalf of the
7  club?
8      A.   No.
9      Q.   Do they report to you, the general managers or
10  the managers, on their duties and responsibilities for
11  the club?
12     A.   No.
13     Q.   Who do they report to?
14     A.   If they report to anybody it's my husband,
15  Mike.
16     Q.   As relates to Heartbreakers, I understand you
17  said your, your position is as secretary and treasurer;
18  is that correct?
19     A.   Yes.
20     Q.   And what does you're position entail?  What do
21  you do on behalf of the club?
22     A.   Well, I close the month and give quarterly
23  reports to our CPA to make quarterly reports for the bank
24  and I go through some of the mail.  Oh, goodness.  I talk
25  to insurance representatives for insurance for the club.

Page 12

1  I just have mainly a supervisory position over our office
2  manager and --
3      Q.   I understand that you then primarily handle
4  the business end of the club as opposed to the
5  operational end.  Does that sound accurate?
6      A.   That's accurate.
7      Q.   And you said that you provide quarterly
8  reports to your CPA?
9      A.   Yes.
10     Q.   Who's the CPA?
11     A.   Wrinkle Gardner, W-r-i-n-k-l-e G-a-r-d-n-e-r.
12     Q.   And is that the name of a company or the name
13  of a person?
14     A.   It's the name of a company and the names of
15  two people, Wrinkle and Gardner.
16     Q.   So that -- Okay.  I, I just couldn't
17  understand if that was a company name or a person's name,
18  sorry.
19     A.   Yes, it's a company name.
20     Q.   And is that company -- where is that company
21  located?
22     A.   On Bay Area Boulevard in Houston.
23     Q.   And how long has Wrinkle Gardner handled your
24  CPA work?  Your being Heartbreakers.
25     A.   For the past two years.  They bought out the

Page 13

1  prior company that did our work for many years.
2      Q.   And when you say that you close the month, can
3  you describe what that means?
4      A.   Well, that means I get a box of paperwork of
5  everything that occurred, the bills that were paid, the
6  payroll, the deposits, the, the bank account
7  reconciliations and I put it altogether and input it into
8  my little computer in, oh, Peachtree system and print out
9  a report and then I -- the CPA wants different things
10  analyzed by me first and so I just send her at the end of
11  the quarter all those reports that I've printed and made
12  for her.
13     Q.   And do you keep those quarterly reports that
14  you send to the CPA?
15     A.   Yes, ma'am.
16     Q.   How long have you kept them?  Like how long do
17  they go back?
18     A.   Oh, several years.  We don't have space to
19  keep everything very long but anywhere from five to seven
20  years we keep things.
21     Q.   It goes back at least through back to 2017.
22  Does that sound fair?
23     A.   Yes.
24     Q.   So do you do a yearly analysis of those same
25  financial records?

Page 14

1     A.   Well, the way it works out, I give them the
2  information quarterly and our year ends April 30th.  So
3  at the end of April 30th all I have to do is give them
4  the April report and they have everything for the whole
5  fiscal year.
6     Q.   They being Wrinkle Gardner?
7     A.   Yes.
8     Q.   And do they provide you with a year end annual
9  financial report?
10    A.   Yes.
11    Q.   I'm guessing that annual financial report for
12 the last year since today is April 30th hasn't been
13 completed yet; is that fair?
14    A.   You are correct.
15    Q.   Okay.  So the prior fiscal year would have
16 been April -- would, would go from May 1st, 2019 through
17 April 30th, 2020; is that correct?
18    A.   That's correct.
19    Q.   And do you know what the -- does the annual
20 report tell you what the gross revenues for the club are?
21    A.   Yes, it does but I only remember how much we
22 lost.
23    Q.   Okay.  Well, let me ask -- yeah.  And, and,
24 and I -- and I'm going to -- it's going to be hard
25 because the fiscal year covered a portion of, of when the

Page 15

1  club was shut down due to the pandemic, correct?
2     A.   Yes, and this year also.
3     Q.   Right.  So I understand the club was closed at
4  least from some period in March of, March of 2020 through
5  the end of May.  Was it, was it longer than that?
6     A.   Well, we were closed when everybody had to
7  close --
8     Q.   Right.
9     A.   -- and then we opened again and then the
10 governor said bars couldn't be open.  So we got a special
11 food permit because we have been a restaurant for the
12 whole 36 -- almost 36 years that we've been open but just
13 didn't have that special permit, so we got that and
14 reopened again so we were actually closed twice.
15    Q.   When did you get the special food permit?
16    A.   I don't know the exact date.
17    Q.   Was it sometime in the summer of 2020?
18    A.   It was either spring or summer.  Is that
19 right?  2020, I'm losing track of time.
20    Q.   That's when -- that's when -- yeah.  I'll
21 represent to you March of 2020 is when people started to
22 shut down due to the pandemic.  I understand almost
23 everybody was closed at least through May and it -- so it
24 sounds like you opened for some period of time and then
25 were shut down again; is that correct?

Page 16

1     A.   Yes.  Yes.
2     Q.   And the second shut down, do you know how long
3  you were closed before you were able to get that food
4  permit?
5     A.   No, I would have to look up the dates.
6     Q.   So I'm going to go back a couple of years.
7  So -- and I know but the relevant period at issue in
8  this, in this lawsuit goes back to 2017.  So I'm going to
9  ask your last annual report you're telling me that there
10 was a loss that you took, correct?
11         THE COURT REPORTER:  They're frozen.
12         MS. MONTGOMERY:  They're frozen.
13    Q.   (By Ms. Montgomery)  We couldn't hear from you
14 for a second.  Okay.  I said -- I said I understand from
15 your last annual report, the one that ended in -- right
16 after the pandemic started in April 30th of 2020, I
17 understand that the club took a loss; is that correct?
18         MR. KING:  Say the last part.
19    Q.   (By Ms. Montgomery)  I understand that the
20 club took a loss; is that correct?
21    A.   Yes.
22    Q.   Okay.
23    A.   At the end of -- at the end of 2020, yes.
24    Q.   Yes.  Well, the -- the end of your fiscal year
25 of 2020 which is April 30th, right?

Page 17

1     A.   Yes.  I, I don't know exact -- what the exact
2  numbers are yet.  I'm still working on the quarter -- the
3  quarterlies for the CPA.
4     Q.   Right.  And I'm not asking about the one for
5  today, the one that would be due today.  I'm talking
6  about the year before.
7     A.   Oh.  Yes.
8     Q.   I understood that your net profitability was a
9  loss in April 30th of 2020, correct?
10    A.   Yes, I believe you are correct.
11    Q.   Do you know what the gross revenue was at that
12 time?
13    A.   No.  I deal with a lot of numbers.
14    Q.   Well, and the -- unfortunately for me the one
15 that I'm interested in is the gross revenue number.  So
16 I -- it is something that I need to know about.  Is there
17 any year for which you can give me the gross revenue
18 number?
19    A.   No, I only look at that bottom line.  That's
20 what I remember.
21    Q.   Is there any -- have you reviewed any
22 documents today to prepare to answer those questions?
23    A.   I don't think I -- I looked at a few of the
24 federal tax returns but I -- I was only looking at the
25 bottom line.  I didn't look at the gross revenue.

Page 18

1     Q.   Do you know what the monthly gross revenue was
2  and I'll say pre pandemic?
3     A.   Oh.  Monthly.
4          THE COURT REPORTER:  She's frozen again.
5          MS. MONTGOMERY:  It's just hers.  I don't
6  know why.
7          THE COURT REPORTER:  Yup.
8          MR. KING:  Her connection dropped out.
9  I'm reconnecting her.  Okay.
10    Q.   (By Ms. Montgomery)  So my question I think
11 was pre pandemic, do you have any idea what the monthly
12 gross revenue numbers were?
13    A.   No, I would just be guessing.
14    Q.   Okay.
15    A.   I don't memorize those things.
16    Q.   And I'm not asking you to.  Unfortunately one
17 of the topics that we're here about today is about
18 revenues and so that's why I'm asking those questions.
19 They are pertinent to several parts of the claims that
20 are at issue and it may be that we need to suspend the
21 deposition until you can have the numbers in front of
22 you, but I'm going to keep asking questions just to see
23 what we can get through.  Okay?
24    A.   Okay.
25    Q.   All right.  Let me ask do you know pre

Page 19

1  pandemic what the average daily revenue for the club
2  would be?
3     A.   Pre pandemic, oh, probably around 4,000 to
4  4500 a day.  I believe that's correct.
5     Q.   And do you know what that number is I'll say
6  post pandemic but also when the club was open obviously?
7  Do you know what the daily revenue is post pandemic but
8  open?
9     A.   Do you mean right now or --
10    Q.   Right now is, is -- yeah, I guess because
11 there's also a time period -- let me back up.  There's a
12 time period where the club reopened post pan -- pandemic
13 but was still under some capacity restrictions; is that
14 correct?
15    A.   Right.
16    Q.   So when did that -- when did the club, you
17 know, get relieved of the capacity restrictions for the
18 COVID pandemic?
19    A.   I don't remember the exact date.
20    Q.   Was it some --
21    A.   You'd have to look back at the -- what the
22 governor said.
23    Q.   Was it sometime in 2021?
24    A.   Yes.
25    Q.   So since that time period, whatever it may be,

Page 20

1  what has been the daily revenue of the club?
2     A.   Oh, goodness.  Probably 2500 to 3500.  It's,
3  it's gone up and down.
4     Q.   But it's not quite back to where it was pre
5  pandemic, right?
6     A.   No, we're not open as many hours anymore for
7  one thing.
8     Q.   Does -- do you intend to go back to the hours
9  that the club had pre pandemic?
10    A.   Probably not but that's not my decision.
11    Q.   Whose decision would that be?
12    A.   My husband.
13    Q.   Mr. Armstrong?
14    A.   Yes.
15    Q.   Let's talk about some of the club's
16 expenditures.
17    A.   Okay.
18    Q.   Do you know what the monthly payroll is for
19 the club?
20    A.   Well, that's changed too because we're open
21 different hours.  I'd say -- and this is just a guess
22 because I don't do the payroll, but I do deposit -- see
23 deposits for the payroll.  Maybe 35,000 a month and I'm
24 not sure right now if that's true or not.
25    Q.   So let me ask, that 35,000 number, is that

Page 21

1  post pandemic?
2     A.   Yes.  That may be just when -- payroll we pay
3  twice a month and I get confused about how much it is a
4  month because I just see that one figure but that may be
5  just for one pay period.
6     Q.   Okay.  Is that number, the 35,000, is that
7  lower than it was pre pandemic?
8     A.   Yes.
9     Q.   Do you know what it -- that number was, the
10 monthly payroll, pre pandemic?
11    A.   More like 75 to 80,000 a month.  So now it's
12 60,000 a month, around that, around that number.
13    Q.   Do you know how much is paid to the -- well,
14 back up.  I understand that there is a maintenance staff
15 for the building; is that right?
16    A.   Well, there's one gentleman that's in charge
17 of maintenance.
18    Q.   Is he actually on the payroll for
19 Heartbreakers?
20    A.   Yes.
21    Q.   And who is -- who's the gentleman that's in
22 charge of maintenance?
23    A.   Edward Gamez, G-a-m-e-z.
24    Q.   And does Mr. Gamez actually perform the
25 maintenance on the building?  Like if there's a plumbing

Peggy Armstrong
April 30, 2021

**EXHIBIT E**

22 to 25

Page 22

1  problem is he the one who addresses it?
2      A.  Yes.
3      Q.  And I'll say that as opposed to would he be a
4  person that would hire someone if there -- if a
5  specialist was needed of some sort, would Mr. Gamez also
6  be the person that hired someone to come make a fix or
7  fix something on the building?
8      A.  Yes, or our general manager could also get a
9  plumber in if Edward was not available.
10      Q.  How long has Mr. Gamez been in charge of
11  maintenance?
12      A.  I believe several years now.
13      Q.  Would you say through 2017?
14      A.  I'm not sure if he went back that far or not.
15      Q.  Is Mr. Gamez like a full-time employee?
16      A.  Yes, he's on salary.
17      Q.  Okay.  Do you know how much is spent on
18  average for the building and maintenance let's say
19  monthly?
20      A.  Well, that changes depending on what goes out
21  and it could be anywhere from 2 to 10,000 a month.
22      Q.  Since 2017, has Heartbreakers done any
23  upgrades or renovations to the interior of the club?
24      A.  Well, I'll have to go back to when was Harvey.
25  So after Harvey we did a lot of renovations because we

Page 23

1  had almost three feet of water in the club.
2      Q.  Okay.  So Harvey was -- I -- I know this
3  because I was supposed to move into my new house on the
4  date of Harvey so it's August 25th, 2017.  So is that --
5  you're saying that during that or after Harvey obviously
6  the club had to undergo some serious renovations because
7  there were three feet of water you said?
8      A.  Almost three feet, yes.
9      Q.  So I'm guessing there's new flooring involved
10  in that?
11      A.  Yes.
12      Q.  Was there new furniture purchased?
13      A.  No, we actually renovated most of the
14  furniture we had.
15      Q.  So I, I guess you're saying you repaired or
16  salvaged the furniture that you had?
17      A.  Yes, most of it could be recovered, could be
18  dried out and recovered.
19      Q.  So you had to spend money to do that
20  recovering though, right?
21      A.  Yes.
22      Q.  Do you know how much the club spent on the
23  post Harvey renovations?
24      A.  No, I don't know the total.
25      Q.  Was the total over 50,000?

Page 24

1      A.  Yes.
2      Q.  Over a hundred thousand?
3      A.  Yes.
4      Q.  Over 200,000?
5      A.  Yes.
6      Q.  Over 300,000?
7      A.  Yes.
8      Q.  Over 500,000?
9      A.  Probably.
10      Q.  So over 600,000?
11      A.  Probably.  We still haven't repaired
12  everything that was damaged to tell you the truth.  We --
13  we had to stop.
14      Q.  Why did you have to stop?
15      A.  Money.
16      Q.  Did -- were you able to make an insurance
17  claim for the renovations?
18      A.  Yes.
19      Q.  The investment was some -- somewhere between
20  five to six hundred, that's the best of your
21  recollection?
22      A.  Well, we probably had a million dollars worth
23  of damage but I think the flood insurance only covers
24  500,000 and they were unwilling to pay us all of that.
25      Q.  So the -- you're saying the club had to cover

Page 25

1  the cost difference between what the, what the flood
2  insurance would cover and, and what needed to be done,
3  right?
4      A.  That is correct.
5      Q.  Did any of the mechanical systems, like HVAC
6  or plumbing or any of that, did that have to be renovated
7  post Harvey?
8      A.  We had to do a lot of things, electrical,
9  plumbing, our walk-in coolers.  It was just devastating.
10      Q.  I'm guessing you were closed for some period
11  of time in 2017 after Harvey?
12      A.  We were closed for three weeks, which was a
13  miracle.
14      Q.  You're saying it's a miracle you were only
15  closed for three weeks, right?
16      A.  Yes.
17      Q.  Since you made the majority, I'll say, of the
18  repairs post Harvey, has there been any other upgrades or
19  investment that you have made into the club facilities
20  themselves, like lighting or paint, anything like that?
21      A.  Well, we painted after Harvey so.  I, I would
22  just have to look through the records to see what else
23  if -- what was done.  Most everything that's been done
24  since Harvey was because of Harvey.
25      Q.  Okay.  Do you know how much the club spends on

Peggy Armstrong
April 30, 2021

**EXHIBIT E**

26 to 29

Page 26

1  average per month, and I'll say pre pandemic, on food?

2       A.   You were breaking out at the beginning of your

3  question so could you repeat it, please?

4       Q.   Sure.  Pre pandemic do you know how much the

5  club spent on average for food?

6       A.   No, I don't.

7       Q.   Do you know how much on average pre pandemic

8  the club spent on alcohol?

9       A.   No, I don't.

10      Q.   That's something that you would be able to

11  look at the financial records and, and answer the

12  question?

13      A.   Yes.

14      Q.   Would you know the answer to that question

15  post pandemic?

16      A.   No.  I know it's less.

17      Q.   Pre pandemic do you know how much on average

18  the club spent on advertising or promotions?

19      A.   We rarely spend anything on advertising or

20  promotions.

21      Q.   And has that been the same since 2017?

22      A.   Yes.  We have an electric messaging unit on

23  premise.

24      Q.   I understand you, you mean the electric

25  messaging unit is a -- is like a sign that's in the

Page 27

1  parking lot, right?

2            THE COURT REPORTER:  She's frozen.

3       Q.   (By Ms. Montgomery)  Okay.  I -- I -- sorry.

4       A.   It keeps saying -- it keeps saying my Internet

5  connection is unstable.

6       Q.   Well, we may -- let me try to ask a few more

7  questions but we may need to come back to this when you

8  have the financials that you can answer the questions

9  about but let me ask a few more and see what we can get

10  through.  The electronic message board that you were

11  talking about, is that like a sign, a billboard kind of

12  sign in the parking lot?

13      A.   Yes.

14      Q.   Who controls the message?  Like who types in

15  the message or who controls that?

16      A.   Our general manager.  He has a computer that

17  does that.

18      Q.   Is that something that Mr. Armstrong would

19  have to approve whatever's put up there?

20      A.   Not necessarily.

21      Q.   So the general manager, Mr. Forster, would be

22  allowed to put the messages himself without approval?

23      A.   Yes.

24      Q.   One of the duties you said you had you were

25  over -- you were a supervisor over the office manager; is

Page 28

1  that correct?

2       A.   That is correct.

3       Q.   And is the office manager's name's Barbara?

4       A.   Yes.

5       Q.   And what, what all does Barbara do for

6  Heartbreakers?

7       A.   Well, she, along with her assistant, we only

8  have one person helping her now, they count the money,

9  they make the daily reports, they do the payroll, they

10  pay the bills.  She goes to Sam's to get supplies.  She

11  goes to cigar stores to get cigars.  She does the main

12  duties.  She and Nora, her assistant, do all the duties

13  of the office so that I don't have to be there on a daily

14  basis.

15      Q.   How often are you at the club?

16      A.   Usually I try to be there Monday through

17  Friday for four to six hours.

18      Q.   Other than A&D Interests, Inc., do you have

19  any ownership in any other corporate en -- corporate

20  entities?

21            MR. KING:  Objection, form, misstates the

22  deponent.  Go ahead.

23      A.   I don't understand the question.

24      Q.   (By Ms. Montgomery)  Do you, Ms. Armstrong, do

25  you have any ownership interests in any entities other

Page 29

1  than A&D Interests, Inc.?

2       A.   Yes.

3       Q.   What other corporate entities do you have a

4  interest in?

5       A.   It's not a corporation.  It's a joint venture

6  I guess it's called.

7       Q.   Oh, I'm sorry.  I thought you were going to

8  tell -- what's the name of it?

9       A.   ADA Investments.

10      Q.   A, D as in dog, A?

11      A.   Yeah, A-D-A.

12      Q.   And what's the purpose of that joint venture?

13      A.   It owns the property that Heartbreakers sits

14  on.

15      Q.   So A&D Interests, Inc. does not own the actual

16  club building; is that right?

17      A.   Right, correct.

18      Q.   ADA Investments owns the building?

19      A.   Yes.

20      Q.   And the -- that plot of land?

21      A.   Yes.

22      Q.   Is there any mortgage on that?

23      A.   Moody National Bank has a -- holds the lien on

24  the property.

25      Q.   And other than yourself is there anyone else

Page 30

1  who is an owner in ADA Investments?
2      A.  No.  At one point we had another owner.  He
3  also owned stock in A&D Interests, Inc. but Mike bought
4  him out many years ago.
5      Q.  Is Mike an owner of ADA Investments?
6      A.  Yes.
7      Q.  We talked about at the beginning that you were
8  deposed as a corporate representative for Heartbreakers
9  in another lawsuit that was filed by an entertainer; is
10  that correct?
11      A.  Yes.
12      Q.  Was that lawsuit similar to the claims that
13  are being alleged in this lawsuit; namely, that the
14  entertainers are not appropriately being treated as
15  employees?
16      A.  Yes.
17      Q.  Okay.  What was the result of the lawsuit that
18  you were deposed in?
19      A.  I don't know result, question mark.
20      Q.  Did it go to trial?  Did it settle?  Did it
21  just get dismissed?  What happened?
22      A.  It went to arbitration.
23      Q.  And did you have to testify or, or show up for
24  the final arbitration hearing?
25      A.  No, I did not.

Page 31

1      Q.  Okay.  Did the final arbitration hearing
2  actually occur?
3      A.  I believe, yes.
4      Q.  Okay.  And do you know, did the arbitrator
5  award any -- make any awards in the case?
6      A.  Yes.
7      Q.  What was the award?
8      A.  I don't know the exact number.
9      Q.  Well, let me ask it a, a different way.  Did
10  the arbitrator say that Heartbreakers owed the
11  entertainer any money?
12      A.  Yes, and the reason I get confused about the
13  number is because the entertainer got a certain amount of
14  money and the attorney got a huge amount of money.
15      Q.  So did -- was it your understanding that there
16  was also a claim for attorney's fees related to that
17  arbitration?
18      A.  Yes.
19      Q.  Do you under -- did you get some sort of --
20  well, do you know when that arbitration award was
21  entered?
22      A.  No, I don't.
23      Q.  Was it sometime after 2017?
24      A.  I think so, yes.
25      Q.  Was it pre pandemic though?

Page 32

1      A.  I can't remember.  I -- the pandemic -- I have
2  pandemic brain I guess.
3      Q.  The only reason I'm asking is, again, one of
4  the topics that you're here to testify about so I need to
5  understand what information is available to you.  Is that
6  something that you would be able to look up or refresh
7  your recollection on?
8      A.  Yes, definitely.
9      Q.  Now do you understand why the arbitrator made
10  an award for the entertainer?
11      A.  Well, understanding and liking it are two
12  different things.
13      Q.  That's -- yeah.  Yes, they are, and I, I would
14  think anytime someone tells you you have to pay money to
15  someone else it's not liked so that -- that's not my
16  question.  My question is what is your understanding of
17  why Heartbreakers was required to pay the entertainer?
18      A.  I understand that kind of thinking but it's
19  not my kind of thinking.
20      Q.  Well, do you understand what the thinking was
21  or described to you as?
22      A.  Yes.
23      Q.  What was it?
24      A.  Oh, my goodness.  I really can't list all the
25  things that they put in that ruling or --

Page 33

1      Q.  Well, is that something you have access to or
2  could refresh your memory?
3      A.  Yes, I can -- I can read it off of the, the
4  final opinion.
5      Q.  Like I said, I think there -- we're going to
6  have to suspend this at some point because it sounds like
7  there's some information you're going to need to either
8  have handy or refresh yourself on before we can ask all
9  the questions about it but I want to keep going to see
10  what information we can get today to shorten whatever we
11  have to do in the future.  Okay?
12      MR. KING:  Well, if, if you want to ask
13  some questions and then we can take a break and I can
14  give, give her those documents that you're asking for so
15  she can look at them and produce them to you so we can go
16  ahead.  It's up to you.
17      MS. MONTGOMERY:  I'm happy to do that as
18  well.  I -- I -- if they're accessible let's do it
19  because it'll be a lot easier than coming back later but
20  that's up to you.  I don't know if they're accessible to
21  you right now.
22      MR. KING:  Because like it seems like the
23  gross revenues, those, those figures probably just -- I
24  don't remember but I thought we were in it but you
25  might be -- we might be able to access those during a

Peggy Armstrong
April 30, 2021

Page 34

1  break.

2          MS. MONTGOMERY:  You might be able to

3  access the quarterly reports and, and that arbitration

4  award?

5          MR. KING:  Definitely the arbitration.

6      A.  I don't know about the quarterly reports.

7  We -- that's mainly information on the computer in my

8  office and files in my office so.

9      Q.  (By Ms. Montgomery)  Well, that's kind of what

10 I was thinking and, you know, if -- if -- let's keep

11 going a little bit more and we may get clear on the

12 arbitration issue but it sounds like we're still going to

13 have a problem with some of the revenue unless it's in

14 front of you which is -- which I understand but I'd like

15 to see what else -- see as much as we can cover and then,

16 and then we'll come back if there's something we can fix

17 later.  After the arbitration award came out, did

18 Heartbreakers change any of its policies or procedures as

19 may relate to the entertainers?

20     A.  Well, since one of the issues was control, we

21 have totally told our managers to quit telling the

22 dancers to do anything and before the, the arbitration

23 they were allowed to come and go whenever they wanted and

24 that was already in place but sometimes we would put up

25 signs for their safety and those were construed as

Page 35

1  control so we've tried to not put up any signs and not

2  control them in any way.

3      Q.  I understand one thing that Heartbreakers does

4  is present a new entertainer with two different options

5  for a contract, one being an independent contractor and

6  one being an employee; is that correct?

7      A.  That is correct.

8      Q.  Now that option, the, the, the contract option

9  I'll call it, was that in place before that arbitration

10 award?

11     A.  Yes.

12     Q.  And it's still in place as we sit here today,

13 right?

14     A.  Yes.

15     Q.  Do you know if the entertainer that was

16 involved in that arbitration award, did that entertainer

17 sign an independent contractor agreement?

18     A.  Yes.

19     Q.  Prior to the arbitration award we've been

20 discussing, was there any other lawsuit or arbitration

21 award that indicated Heartbreakers was treat -- treating

22 the or misclassifying the entertainers as independent

23 contractors?

24     A.  Was there, was there an arbitration?

25     Q.  Was there any -- either -- either a, either a

Page 36

1  trial, either in a jury or trial in a court or

2  arbitration that said Heartbreakers was misclassifying

3  the entertainers as independent contractors?

4          MR. KING:  Objection, vague.

5      A.  Do you want me to answer what I think?

6          MR. KING:  Just --

7      A.  There was a case but I'm not exact -- I don't

8  think it went to arbitration.  I think it just went to a

9  judge.

10     Q.  (By Ms. Montgomery)  Okay.

11     A.  I'm not -- I'm -- it may have been an

12 arbitration judge but I don't think it was, but there was

13 a case prior to the one --

14     Q.  And that --

15     A.  -- we're discussing.

16     Q.  And that prior case did they also determine

17 the entertainer to be an employee as opposed to an

18 independent contractor?

19     A.  No, they did not.

20     Q.  Did they determine that the entertainer was in

21 fact an independent contractor?

22     A.  Yes.

23     Q.  Do you know if that was in court?

24     A.  I don't know.  It was handled by our attorney

25 Casey Wallace.

Page 37

1      Q.  You didn't have to provide any testimony at

2  that time?

3      A.  No.

4      Q.  Do you know if anyone else provided any

5  testimony for that prior court case?

6      A.  I don't know.

7      Q.  Did you have to show up for a trial in that

8  case?

9      A.  No.

10     Q.  But there was some sort of final determination

11 is your understanding?

12     A.  Yes.

13     Q.  Do you know the name of that prior case?

14     A.  That was Stephanie Tarpester, however you

15 pronounce it.

16          MS. MONTGOMERY:  All right.  Let's, let's

17 go off the record for a minute.

18          (Brief recess from 10:55 a.m. to 11:09

19 a.m.)

20     Q.  (By Ms. Montgomery)  Okay.  Ms. Armstrong, now

21 we have some of the arbitration decisions that, that we

22 were previously discussing and I want to ask you just a

23 few questions about each of these awards.  So I'm going

24 to mark as Exhibit 2 the interim award for Kaitlyn

25 Jersey.  Now this one says -- I think there's a date in

Page 38

1  here.  See if it says it at the bottom.  Hold on.  May
2  3rd of 2019, does that sound like the case that you
3  actually provided deposition testimony in?
4      A.  I believe that I was deposed in the Frankie
5  Henderson case.
6      Q.  Oh, okay.  Okay.  Do you recall providing any
7  testimony in this Kaitlyn Jersey case?
8      A.  No, I don't recall.
9      Q.  Now, I -- just glancing through Exhibit 2, it
10  looks like in this case the arbitrator did determine, at
11  least under the Fair Labor Standards Act, that Kaitlyn
12  was in fact a employee.  Was that your understanding as
13  well?
14      A.  No.
15      Q.  Okay.  So you didn't understand that's what
16  the arbitrator awarded?
17      A.  I'm not exactly sure what he awarded and how
18  he arrived at those conclusions.
19      Q.  Okay.  Did anybody go through this award with
20  you?
21      A.  No.
22      Q.  Okay.  Is this -- the Kaitlyn Jersey, is this
23  the arbitration that we were previously discussing in
24  this deposition?
25      A.  Yes.

Page 39

1      Q.  Okay.  Is there a -- I understand that there
2  is still a floor fee charged by Heartbreakers, a fee that
3  the entertainers pay, pay the cashier upon closing out
4  or, or, or leaving for the end of the evening; is that
5  accurate?
6      A.  Yes.
7      Q.  And is that fee varied between what time the
8  entertainer shows up to perform?
9      A.  Yes.
10      Q.  Is there also a cover charge charged by the
11  club for customers?
12      A.  Yes.
13      Q.  Is there also a cover charge or charge of some
14  sort for a patron to enter the executive room at the
15  club?
16      A.  Yes.
17      Q.  Is there a charge of some sort for an
18  entertainer to use a booth at the club?
19      A.  Yes.
20      Q.  I understand the floor fees that the
21  entertainer would have to pay if she performed at the
22  club per shift, if you will, would be anywhere from $27
23  to $57.  Does that sound accurate?
24      A.  That sounds accurate.  I don't have the sheet
25  in front of me and I don't work with that daily so.

Page 40

1      Q.  Does it sound accurate that the cover charge
2  to get into the executive room is $30?
3      A.  I thought it was 25 but it could be 30 now.  I
4  don't --
5      Q.  In that, in that range; is that correct?
6      A.  Yes.  I just get a total dollar amount that --
7  for the deposit.
8      Q.  Is that total dollar amount that you get, is
9  that on a daily report that Barbara puts together or how
10  do you get that information?
11      A.  No, it's included in the deposit with the
12  cover charge I believe.
13      Q.  So you would only know what the total amount
14  per day is that the club receives from both executive
15  room and cover charge, right?
16      A.  Yes.
17      Q.  They're not broken out by category?
18      A.  No, that -- that's not necessary for my
19  reports.
20      Q.  Is the cover charge for the club $9?
21      A.  Yes.
22      Q.  Is it -- was it $9 pre pandemic as well?
23      A.  No.  We were open day shift and a night shift
24  pre pandemic.  Now we're just open at 4:00 o'clock in the
25  afternoon.

Page 41

1      Q.  So is it -- was there a different cover charge
2  when the hours were different?
3      A.  Yes.
4      Q.  What was the different cover charge?
5      A.  $6 for day shift and $12 for night shift.
6      Q.  Do the -- is there any suggested amount for
7  the dancers to perform like a lap dance or private dance?
8      A.  Each dancer chooses whatever amount she wants
9  to charge a customer.
10      Q.  Yeah, and my question is is there any amount
11  suggested by the managers?
12      A.  Not really.  They -- it's a -- it's a
13  conversation between the dancer and the customer.
14      Q.  Is there a customary amount that you're aware
15  of?
16      A.  Not really.  They -- they make their own
17  negotiations.
18      Q.  Is there a fee charged if a patron wants to
19  use a credit card to pay for entertainer -- entertainer
20  services?
21      A.  I'm not exactly sure I understand the
22  question.
23      Q.  So if a, if a patron says I want to use my
24  credit card to pay for a private dance and tip an
25  entertainer, I understood that the club would do a

Page 42

1 transaction with, with the customer.  The waitress would
2 take the credit card.  There would be some sort of
3 signature on something saying, you know, I want $200 say
4 on this credit card and that there -- there would be some
5 sort of fee charged to do that process for the customer
6 by the club?
7      A.  We sell -- we sell him dance dollars and then
8 it's up to him who he gives them to.
9      Q.  Right.  And so I understood if a customer did
10 that though that there was some percentage charged by the
11 club for processing that trans -- that credit card
12 transaction; is that correct?
13      A.  To the customer?  I'm not exactly sure that
14 the customer gets charged.  I'm -- I don't work with that
15 daily so I, I would have to just look at the credit cards
16 themselves to see what fees that then you're charged.
17      Q.  Is that something that's on the daily report
18 that, that Barbara puts together for you?
19      A.  I'm not sure if that's broken down or not.
20      Q.  Do -- does the club keep track of the dance
21 dollars that -- okay.  Well, let me back up.  I
22 understand when a entertainer gets dance dollars from the
23 customer then at the end of the night she can exchange
24 her dance dollars with the cashier for cash; is that
25 correct?

Page 43

1      A.  That -- that is correct.
2      Q.  And is that exchange between the entertainer
3 and the cashier, when she turns in her dance dollars and
4 gets the cash, is that something that's tracked by the
5 computer system?
6      A.  Yes, and it's a very complicated system.
7      Q.  And I understand that the club then issues a
8 1099 to the entertainer.  That 1099 only covers those
9 credit card transaction -- the, the dance dollars
10 exchanged; is that fair?
11      A.  No, it's not fair.
12      Q.  What else -- let me ask what else is, is, is
13 covered on the 1099 issue by the club to any entertainer?
14      A.  Well, whenever she's checking out she also
15 declares her tips and the other money, I
16 don't know if it's cash dances that she declares or if
17 it's just the credit card dances, I'm not exactly sure of
18 the system they have in place, and the cashier enters
19 those numbers and those two numbers are what goes
20 eventually on the 1099, but there's a whole system of
21 reconciling dance dollars to cash because we sell so many
22 a night but there's never that same number turned in so
23 then there has to be a reconciliation of those numbers
24 with the cash.
25      Q.  And I understood that a customer was actually

Page 44

1 allowed to, you know, if they got $200 in dance dollars
2 in one evening but they only tipped out or paid a hundred
3 dollars that they could take their dance dollars and come
4 back another day and use those dance dollars; is that
5 right?
6      A.  I believe that's correct.  We used to change
7 them out periodically but I haven't -- I don't know if
8 they still do that or not.
9      Q.  So on the 1099 then that would be issued to
10 any dancer, would be -- it, it would include whatever
11 tips and cash dances that the dancer declares as well as
12 any dance dollars she exchanges with the club?
13      A.  I'm, I'm not exactly sure what's included in
14 those numbers.  It's what she declares and tips.  It's,
15 it's all up to her.
16      Q.  Okay.  Well, if --
17      A.  I mean she can turn -- she can turn in as many
18 dance dollars as she wants to whenever she wants to and
19 that's the day that it goes on the report.
20      Q.  And that's what I'm asking is when does
21 heart -- what triggers Heartbreakers to include it in
22 that entertainer's 1099 and I --
23      A.  The day that --
24      Q.  -- I understand the, the declaration she would
25 have to make as far as cash but as far as money that's

Page 45

1 exchanged between the dancer and Heartbreakers that's
2 whatever she -- that dancer turns in dance dollars
3 Heartbreakers issues the cash, that's the date that
4 triggers Heartbreakers to document or record money going
5 to the dancer; is that right?
6      A.  That is my understanding, yes.
7      Q.  Okay.  Now is there any written policy or
8 procedure written notifying the dancer she has to declare
9 her cash tips or dance fees?
10      A.  No.
11      Q.  How would the dancer know that information?
12      A.  I'm not exactly sure I understand your
13 question.
14      Q.  Who tells the dancer she has to, to, to tell
15 the cashier at the end of the night her tips and, and,
16 and cash dance fees?
17      A.  Who tells her?  She -- she just knows to go to
18 the cashier so she can check out.
19      Q.  Well, how does she -- well, yeah, but how
20 would she know that part of that check-out procedure is
21 to tell the cashier how much cash tips and cash dances
22 she has?
23      MR. KING:  Objection, assumes facts.  Go
24 ahead.
25      A.  The cashier would ask her What do you declare

Peggy Armstrong
April 30, 2021

**EXHIBIT E**

46 to 49

Page 46

1  today.

2      Q.   (By Ms. Montgomery)  And if the tips and the

3  dance fees are, as I understand it, negotiated between

4  the customer and entertainer, meaning the club's not

5  involved in that process at all, right?

6      A.   Right.

7      Q.   Then why is the entertainer declaring any

8  amount to the club?

9      A.   Because we're not supposed to tell her that

10  she has to do anything so how can we tell her what and --

11  she's supposed to declare.  That's entirely up to her to

12  declare what she made that night.  We have no idea what

13  she made.  She just has to declare it.

14      Q.   And why does she have to declare it I guess is

15  what I'm getting at?

16      A.   Well, they want records of what they made

17  and -- or what they say they made and we try to keep

18  track of what they've made for them.

19      Q.   So it's for the entertainer's own purpose if

20  they want the club to track it?

21      A.   Yes.

22      Q.   Okay.  Other than this exchange though, I

23  understand the club does not pay any sort of wages to its

24  entertainers, correct?

25      A.   That is correct.

Page 47

1      Q.   They wouldn't, they wouldn't pay minimum wages

2  or overtime wages, correct?

3      A.   That is correct.

4      Q.   And that has been the case since at the very

5  least from 2017 moving forward, right?

6      A.   Yes.

7      Q.   Now I also understand that the dancers would

8  keep the -- any tips that they got from the customer,

9  right?

10      A.   That is correct.

11      Q.   And that is not necessarily an amount that

12  would go in any portion to the club, right?

13      A.   That is correct.

14      Q.   And the same would be true for any private

15  dance fees like a lap dance, that's money that would be

16  exchanged between the customer and the entertainer and

17  would not go to the club, right?

18      A.   That is correct.

19      Q.   You said that you handled the insurance for

20  the club?

21      A.   Yes.

22      Q.   Is there a monthly amount that is expended on

23  the insurance for the club that you know?

24      A.   Well, we, we make a down payment and then

25  there's a, a monthly note and -- yes, a monthly note.

Page 48

1      Q.   Is it -- do you know how much the monthly note

2  is?

3      A.   No, I can't remember.  It's over $3,000 a

4  month though and it's just for the building, fire, flood,

5  and wind.

6      Q.   And that doesn't include like a general

7  liability policy?

8      A.   No, we can't afford general liability or a

9  liquor liability.

10      MR. KING:  Ms. Montgomery, are you done

11  with this exhibit?  I'm just asking if --

12      MS. MONTGOMERY:  Sorry.

13      MR. KING:  There you go.

14      Q.   (By Ms. Montgomery)  The quarterly reports

15  that you do to provide to the CPA, does that break down

16  the different expenses we've been discussing today?

17      A.   Yes.

18      Q.   And does it also list the, the revenues that

19  were coming in?

20      A.   Yes.

21      Q.   And then I'm guessing there is a net

22  profitability number also listed on the quarterly

23  reports?

24      A.   Yes.

25      Q.   And that's something that you keep on your

Page 49

1  computer at the club?

2      A.   The ones that I send to the CPA, yes, but they

3  make all kinds of adjustments to them for depreciation

4  and other things cause I'm not an accountant and -- or a

5  CPA and so they, they do the final adjustments.

6      Q.   And by they do you mean the CPA when they do

7  the final adjustments is that for the annual report?

8      A.   No, for the quarterlies and the annual.

9      Q.   And are you provided a copy of both the

10  quarterlies and the annuals that are finalized by the

11  CPA?

12      A.   Yes.

13      Q.   Is that something you would have access to

14  going back to 2017?

15      A.   Yes.

16      MS. MONTGOMERY:  Well, counsel, then if

17  that's something that you guys are willing to provide

18  then I would suggest that we probably, based on what I

19  can see from the quarterlies and the annual report, we

20  probably wouldn't have need to come back to finish this

21  deposition.  Is that something that you're willing to

22  provide us?

23      MR. KING:  Yeah, and I mean I got to look

24  at them to see what other financial information is out

25  there but if you're looking for, you know, kind of your,

Peggy Armstrong
April 30, 2021

Page 50

1 your typical business numbers I'm happy to provide that
2 to you.
3          MS. MONTGOMERY:  Yeah, and, and we can
4 enter a protective -- you know, if we want a protective
5 order agreement.  I just -- we obviously need the
6 expenditures, you know, the investment in the, in the
7 club and that they spend on a monthly basis as well as
8 the revenue stream.  So if that's something that's on
9 there and we can make an agreement that those will be
10 provided I can bypass that information and move on to
11 anything else I have to ask.  Is that fair?
12          MR. KING:  Yeah, we can have a stipulation
13 in principle.  We might -- I don't know if we might have
14 a disagreement about the full extent of the information
15 that these reports might contain, but I am, I am willing
16 to provide you with the information that you're looking
17 for I, I presume for purposes of the relative investments
18 factor, right?
19          MS. MONTGOMERY:  Yeah, there's the two,
20 the two things, the enterprise liability as well as the,
21 yeah, relative investments factor.  Those are the two
22 things we're --
23          MR. KING:  You know, I can't remember if
24 we denied whether gross revenues in excess of a half
25 million dollars a year.

Page 51

1          MS. MONTGOMERY:  I don't either and
2 that's, that's why I'm reserving that right I -- to be
3 fair.  So like I said, what we can do then at least on,
4 on those issues to have a few more questions but at least
5 on the issues related to the investments and revenues if
6 we can get a copy of those things I will reserve my right
7 to recall her but if it has the information we need then
8 we probably won't --
9          MR. KING:  I can -- I -- I can produce
10 documents once I've had an opportunity to review and if
11 you want you can send me a interrogatory for any
12 explanations and I can agree to send you interrogatory
13 responses, you know, within 7 to 14 days before your
14 briefing deadline.
15          MS. MONTGOMERY:  I was going to say we
16 just need to do it before the -- the only thing we're,
17 we're under the briefing deadline.  That's the only -- my
18 only issue right now is the briefing deadline but if we
19 can get some agreement on those things then --
20          MR. KING:  Sure.
21          MS. MONTGOMERY:  -- I'll just ask any
22 other questions about nonspecific dollars and --
23          MR. KING:  That's fine.
24          MS. MONTGOMERY:  Okay.  All right.
25     Q.    (By Ms. Montgomery)  I understand that the

Page 52

1 staff at the club includes, I'm going to list off some
2 people, bartenders, waitresses, door people, managers,
3 there's an executive room, so a person in charge of the
4 executive room, a maintenance guy, and this is all in
5 addition to your office staff.  Does that sound accurate?
6     A.    Did you say cashier?
7     Q.    I did not, no.  I was just thinking that.  I
8 understood there's two cashiers Jen and Brandy; is that
9 right?
10     A.    Yes.
11     Q.    And all of these people I have list or
12 positions listed off are considered employees, right?
13     A.    Yes.
14     Q.    Were any of those people provided a choice --
15 well, one, did any of those people sign a contract that
16 they are an employee of Heartbreakers?
17     A.    No.
18     Q.    And were any of those individuals provided a
19 choice to sign a contract to be an independent
20 contractor?
21     A.    No.
22     Q.    And do some of those -- the, the, the
23 positions I listed off, are some of them tipped
24 employees, meaning they can keep their tips?
25     A.    Yes.

Page 53

1     Q.    And some of the other ones like the managers I
2 understand are salaried, right?
3     A.    Yes.  Well, some --
4     Q.    And the --
5     A.    Some -- a couple of our managers are also
6 bartenders so they have like a shift pay when they're
7 managing.
8     Q.    I see.  They have a different way they're paid
9 between when they're acting as a bartender and when
10 they're acting as a manager, right?
11     A.    Yes.
12     Q.    In both instances though, if they're an
13 employee in dual roles they're still considered an
14 employee by the club, right?
15     A.    Yes.
16     Q.    Are there any benefits paid to, to the club
17 employees?
18     A.    No.
19     Q.    And I'll be clear, is there any like paid time
20 off?
21     A.    Yes, they get vacation pay after they've been
22 there five years I believe it is.
23     Q.    Is there any other benefit that an employee of
24 the club would receive?
25     A.    Not that I know of.

Page 54

1    Q.   Now I think you said after the arbitration
2  award we've already looked at as Exhibit 2, after that
3  was entered there were some changes that you said were
4  made at the club, right?
5    A.   Yes.
6    Q.   And, and can you describe for me what those
7  changes were again?
8    A.   Well, we took down all the signs and the
9  managers were instructed not to interfere in any way with
10 the dancers' interactions with the customers.  Oh,
11 goodness.  We -- we had already determined not to tell
12 them what to wear.  We haven't told them what to wear in
13 many years.  When we opened in 1985 no one could have
14 tattoos.  They had to be covered up.  Now they can have
15 tattoos all over their body and they don't have to be
16 covered up.  There are just a lot of little minute things
17 that we just don't interfere with the entertainers making
18 their money.
19   Q.   Let me ask this.  I understand that
20 Heartbreakers is classified as a sexually oriented
21 business under the ordinances of Dinkinson where it's
22 located as well as the laws of the State of Texas; is
23 that right?
24   A.   That is correct.
25   Q.   And there are some laws in place governing the

Page 55

1  dress of entertainers in sexually oriented businesses; is
2  that right?
3    A.   Yes, the dress has to follow the, the laws of
4  the State of Texas and the ordinance of the City of
5  Dickinson.
6    Q.   And, and I understand that the -- that if, if
7  a entertainer was violating that ordinance or law, she
8  wasn't wearing something that complied with that, it's
9  something that might get the club in trouble; is that
10 true?
11   A.   That is correct.
12   Q.   And so I also understand that the, the
13 managers as a result will interfere or say something to
14 an entertainer who is not complying with that ordinance
15 or law, right?
16   A.   Yes.
17   Q.   My understanding of that rule specific to
18 their dress is that at least on the bottom, on the bottom
19 half they have to have coverage over their vaginal area,
20 that part has to be covered in an -- in a non-see-through
21 material; is that right?
22   A.   Yes.
23   Q.   Is there any other rules that you're aware of
24 related to ordinance or law related to the clothing of --
25   A.   I believe the -- I believe the buttocks also

Page 56

1  have to be covered.  Well, not the buttocks but anyway --
2  I'm getting confused.
3    Q.   The middle of the buttocks?
4    A.   Yes.
5    Q.   That part needs to be covered?
6    A.   Exactly.
7    Q.   So, for example, a thong or a T-back, they
8  would be allowed to wear that as long as it's covering
9  the middle portion of the buttocks; is that right?
10   A.   Yes, ma'am.  Yes.
11   Q.   Doing my best.  All right.  Now one of the
12 other ordinances or laws I understand related to sexually
13 oriented businesses regulates contact between an
14 entertainer at a sexually oriented business and any
15 patron or customer.  Do you understand that there's some,
16 some ordinances or laws related to that contact?
17   A.   Yes.
18   Q.   And I understand once again if, if a
19 entertainer -- either an entertainer or a patron is
20 violating that rule it's something that could get the
21 club in trouble, right?
22   A.   Yes.
23   Q.   So the managers at the club are responsible or
24 would interfere with any violation that they perceive of
25 that ordinance or law related to contact between

Page 57

1  entertainers and customers, right?
2    A.   Yes.
3    Q.   And that might include if there was
4  inappropriate contact -- contact happening during a
5  dancer's performance or private lap dance; is that right?
6    A.   Yes.
7    Q.   It's also true if a patron or customer was
8  trying to inappropriately contact that entertainer in
9  violation of the ordinance or law, the manager would then
10 interfere and maybe ask that patron or customer to leave
11 the club; is that true?
12   A.   Yes.
13   Q.   Who decided to change the club's hours from --
14 I, I understood it used to open at, at 11:30 and stay
15 open until 2:00 a.m. pre pandemic; is that right?
16   A.   Well, Monday through Friday.  On Saturdays and
17 Sundays we were open at noon till 2:00 a.m.
18   Q.   Okay.  Who decided to change that opening time
19 to only opening at 4:00?
20   A.   I believe our general manager decided that.
21   Q.   Mr. Forster?
22   A.   Prob -- probably with consulting with Mike
23 Armstrong.
24   Q.   And do you know why that decision was made?
25   A.   Because we had no business on the day shift.

Peggy Armstrong
April 30, 2021

**EXHIBIT E**

58 to 61

Page 58

1    Q.  Do you know Stacey Kibodeaux?
2    A.  No.
3    Q.  Do you know Jean Hoffmeister?
4    A.  No.
5    Q.  Do you know Roxanne Murillo?
6    A.  No.
7    Q.  How about Hailey Chapman?
8    A.  No.
9    Q.  Did you know Kaitlyn Jersey?
10   A.  No.
11   Q.  Do you know or have a relationship with like
12   socially any of the entertainers at Heartbreakers?
13   A.  At the present time, no.  At the beginning of
14   our club many years ago I did.
15   Q.  Now I noticed something you said earlier about
16   the signs, that you took down the signs after that
17   arbitration award with Kaitlyn Jersey; is that right?
18   A.  That was supposed to happen.  I haven't been
19   down  n the club today to make sure before I came up here
20   but that was supposed to happen, yes.
21   Q.  Well, let me ask and I'm going to mark this
22   exhibit whatever we're on.
23          THE COURT REPORTER:  3.
24   Q.  (By Ms. Montgomery)  3.  I'll mark, mark this
25   as Exhibit 3, represent to you this is some of those

Page 59

1    signs that have been produced in this case.
2    A.  On this --
3    Q.  Go ahead.
4    A.  On this particular sign that you have up here
5    now --
6    Q.  Mh-mh.
7    A.  -- I can attest to the fact cause I was in the
8    club not long ago that they do climb on the stage, so the
9    sign must be down that they can't climb on it.  They sit
10   on the stage, they put their feet on it, do splits or
11   whatever to get up on the stage.  They do not always use
12   the stairs.
13   Q.  So it's your understanding that the sign in
14   Exhibit 3 at Heartbreakers 137, which references using
15   the stairs to get on the main stage and signed by Whitey,
16   who I understand to be the general manager, Mr. Forster,
17   that's no longer up in the club.  Is that your
18   understanding?
19   A.  It's my understanding, yes.
20   Q.  But I think you said you hadn't gone through
21   to actually check to make sure that they were pulled
22   down?
23   A.  Not in the last couple of days, no.
24   Q.  Did -- who did you inform -- well, did you
25   inform anybody to take the signs down after the final

Page 60

1    award was given in -- I should say interim award to be
2    specific, after the interim award came down in the
3    Kaitlyn Jersey case?
4    A.  It was probably my husband Mike Armstrong.
5    Q.  And who would he have told?
6    A.  Our general manager, George Forster or he
7    might have just gone and taken them down himself.
8    Q.  Do you know if this sign at Heartbreakers 138,
9    is that still up?
10   A.  I don't know.  I haven't been down into the
11   dancers' dressing room where that would be.  I, I don't
12   know.
13   Q.  Now do you know if Jen and Brandy, do they
14   still buy, you know, deodorant, products to keep in the
15   dressing room for the entertainers?
16   A.  I'm sure they do.
17   Q.  It's not an expenditure that they are
18   reimbursed for by the club, right?
19   A.  No, it's not.
20   Q.  Now this Heartbreakers 139, I understand this
21   is an old version of this --
22   A.  Yes.
23   Q.  -- because of the times, right?  It shows that
24   it was still open --
25   A.  Yes.

Page 61

1    Q.  -- at 11:30?
2    A.  Yes.
3    Q.  But this shows a representation of the floor
4    fees that are -- the range of floor fees that are paid by
5    the entertainers when they check out for the evening; is
6    that correct?
7    A.  Yes.
8    Q.  And I, I know it would be updated now but is
9    there something like this with the updated hours up
10   somewhere in the club or the dressing room?
11   A.  I haven't been down there to check but
12   hopefully there is.
13   Q.  You would -- they're still paying the floor
14   fees, right?
15   A.  Yes.
16   Q.  I understand on this next Heartbreakers 140 of
17   Exhibit 3, this next sign is for a boutique that's
18   located inside of Heartbreakers somewhere; is that right?
19   A.  Yes.
20   Q.  Does the -- do you know who runs the boutique
21   right now?
22   A.  I can't remember her name.
23   Q.  Is that space leased?  Whoever runs it, do
24   they lease that from ADA Investments or Heartbreakers?
25   A.  Yes.  Yes.  They -- I believe they were paying

Page 62

1  300 a month for the space.
2      Q.   And I understand the, the boutique sells like
3  entertainer like outfits; is that right?
4      A.   Yes.  Yes.
5      Q.   Do you know if this Heartbreakers 141, is that
6  still up in the club?
7      A.   I don't know.  I -- but I believe it is
8  against the law so.
9      Q.   You don't know -- but you don't know whether
10  the sign is still up in the club?
11      A.   No, I don't.
12      Q.   Do you know if Heartbreakers 142, this sign
13  signed by Whitey, is that up in the club?
14      A.   I don't know.
15      Q.   I think these are some federal mandated
16  posters maybe, one from the IRS.
17      A.   Yes.
18      Q.   Are these -- especially this Heartbreakers
19  145, I know it's small, are these posters up in the club?
20      A.   Somewhere.  They -- we have a poster lady that
21  comes around to sell us these.  She brings the updated
22  ones and sells them to us.  I don't know how often she
23  comes, if she comes every six months or every year but
24  she specifically comes to sell us posters.
25      Q.   And does she -- and the, and the posters she's

Page 63

1  selling you are the, the federal like employee, employer,
2  other mandated --
3      A.   Yes.
4      Q.   -- posters, right?
5      A.   Yes.
6      Q.   Okay.  And they're up -- you don't -- do you
7  know where they're up in the club?
8      A.   I believe they're back toward the kitchen
9  area.
10      Q.   Okay.
11      A.   There's a hallway that goes from the check-out
12  office to the kitchen, I -- they used to be on that wall
13  back there in that area.
14      Q.   This last poster at Heartbreakers 148, do you
15  know if that poster is still up in the club?
16      A.   I don't know but it should be taken down.
17      Q.   Okay.  Is this one of the ones that should
18  have been taken down because of the, the Jersey
19  arbitration award or for some other reason?
20      A.   I, I don't know why it was taken down but it,
21  it should be taken down if it hasn't been.
22      Q.   I'm going to show you what I'm marking as
23  Exhibit 4, if I can get it to open.
24          THE WITNESS:  Your battery is running low.
25          MS. MONTGOMERY:  Okay.

Page 64

1          MR. KING:  It's my battery.
2          THE WITNESS:  Oops, I touched something
3  and it went off.
4          MR. KING:  There you go.  Okay.
5      Q.   (By Ms. Montgomery)  Okay?
6      A.   Okay.
7      Q.   This is Exhibit 4 to the deposition and I
8  understand is another arbitration we haven't talked
9  about.  Is Reina Jones a former -- I hope I'm saying her
10  name right, Reina Jones, is that a former entertainer
11  that was at Heartbreakers?
12      A.   Yes.
13      Q.   And it looks like this final hearing, this
14  arbitration was in November of 2019.  Do you recall that?
15      A.   Yes.
16      Q.   And did you participate in the final -- in the
17  arbitration hearing on this case?
18      A.   No.
19      Q.   Do you recall providing any deposition
20  testimony in the Reina Jones case?
21      A.   No.
22      Q.   Okay.  Do you recall that for the purposes of
23  this arbitration that it looks like Heartbreakers agreed
24  that Ms. Jones was an employee under the Fair Labor
25  Standards Act?

Page 65

1      A.   I would have to read it again.  I don't know
2  what we agreed to.
3      Q.   Were you participating in the legal
4  representation of Heartbreakers on this case?  Did you
5  work with the attorneys and get them the information they
6  needed for this Reina Jones case?
7      A.   I probably did, yes.
8      Q.   Let me say it this way.  Well, did Mr.
9  Armstrong also work with the attorneys on this case?
10      A.   Yes.
11      Q.   Is that something that Mr. Armstrong would
12  typically be in charge of is if there's any legal action
13  related to the club?
14      A.   Yes.
15      Q.   That's not something that like a, a manager
16  would handle on behalf of the club, is it?
17      A.   Well, the general manager would be involved.
18      Q.   Right but I mean as far as, you know, hiring
19  an attorney or working with that attorney throughout the
20  litigation, is that something that the general manager
21  would be responsible for or is Mr. Armstrong in charge of
22  that?
23      A.   Mike would -- my -- my husband Mike would be
24  in charge.
25      Q.   Do you -- both you and your husband maintain

Page 66

1  offices at the club?
2      A.  Yes.
3      Q.  And you told me that you, you work generally
4  Monday through Friday for about four to six hours each
5  day; is that right?
6      A.  Yes.
7      Q.  And your role or responsibility is mostly
8  related to the business end reviewing expenditures and
9  financial records and so forth for the club; is that
10 right?
11     A.  Yes, making sure there's money to pay all the
12 bills and the payroll.
13     Q.  Okay.  Is -- does -- what hours or days does
14 Mr. Armstrong typically work at the club?
15     A.  Whenever he wants to.
16     Q.  Is there any set day or time that he's
17 normally at the club?
18     A.  No.
19     Q.  Does he come in usually to the club?
20     A.  He comes in maybe two to three days a week.
21 Usually Fridays to sign checks and, and to check with the
22 general manager of what's going on in the club and that's
23 about it.
24     Q.  Is Mr. Armstrong a signatory I'm guessing on
25 the bank account for the club?

Page 67

1      A.  Yes.
2      Q.  Are you also a signatory on that account?
3      A.  Yes.
4      Q.  Is there anyone else that is a signatory on
5  that account?
6      A.  Yes.  We have several accounts.  The general
7  manager can sign on the operating and the transfer
8  accounts I believe and Barbara Barich can also sign on
9  those two accounts, but I'm the only one that signs on
10 the payroll account.  We just never changed it over the
11 years because they come from a payroll processing
12 company.
13     Q.  And you meaning, Mr. Armstrong, also does not
14 sign on the payroll account or can he do it too?
15     A.  I believe he can sign on it, yes, but I'm
16 not -- but I'm not sure.  It's been so long ago since we
17 started.
18     Q.  That's fair.  Did -- who determines the the,
19 the salaries of, of the managers?
20     A.  Mike Armstrong.
21     Q.  Who would determine the pay of, of, of anyone
22 else at the club?
23     A.  The general manager would be in charge of
24 everybody except the office staff.
25     Q.  Who determines what the office staff gets

Page 68

1  paid?
2      A.  I do cause they work directly for me.
3      Q.  And do you also make decisions about the
4  insurance for the club?
5      A.  Yes.
6      Q.  Is that something that Mr. Armstrong is
7  involved in or do you do that on your own?
8      A.  He would be involved.
9      Q.  And working with the CPA, is that something
10 that you're kind of responsible for at the club?
11     A.  Yes.
12     Q.  Does Mr. Armstrong get involved in that at
13 all?
14     A.  He just goes through me to ask his questions.
15     Q.  You're the main person that interacts with the
16 CPA?
17     A.  Yes.
18     Q.  And you're the main person that deals with the
19 financials related to the club other than the CPA?
20     A.  Yes.
21     Q.  And you're the supervisor of Barbara who's the
22 office manager and also handles some of the financials
23 related to the club?
24     A.  Yes.
25     Q.  What do the managers have to provide you at --

Page 69

1  you know, if they're closing the club say for the
2  evening, what is brought to the office at the end of the
3  evening by the managers?
4      A.  Well, the manager actually does the checkout
5  and each bartender or -- and waitress brings their money
6  and report to them and it's put on a check-out sheet.
7      Q.  And then are the check-out sheets provided to
8  Barbara?
9      A.  Yes, then the next morning Barbara and her
10 assistant will verify the amounts and reconcile the day's
11 receipts.
12     Q.  Do they do like the bank deposits and things?
13     A.  Yes.  On Thursdays when we get the change for
14 the weekends, a manager accompanies Barbie to the bank.
15 Other than that she goes on her own because we have very
16 little cash deposited on a daily basis.  It's mainly
17 credit cards.
18     Q.  Okay.  Let's take a five minute break and kind
19 of review where we're at and see what else we need to
20 discuss.  Okay?
21         MR. KING:  Okay.
22         (Brief recess from 11:57 a.m. to 12:03
23 p.m.)
24     Q.  (By Ms. Montgomery)  Okay.  Let me ask about a
25 couple more things I, I need to clear up.  I understand

**Page 70**

1 that it's ADA Investments which is owned by you and your
2 husband and that owns the, the building and the, and the
3 land, right?
4     A.   Yes.
5     Q.   And does ADA -- the mortgage that's with
6 Moody's does that have ADA Investments -- is that the
7 mortgagee on that?
8     A.   Well, there are actually several entities
9 that, that are on that debt.
10    Q.   Okay.
11    A.   A&D Interests, Inc., ADA Investments, another
12 corporation Mainsail Developers, Inc.  The bank wanted
13 all the security they could get.
14    Q.   Okay.  Who's the other -- we talked about ADA
15 Interests and -- and -- A&D Interests, Inc. which is --
16 does business as Heartbreakers and ADA Investments which
17 I understand is a joint venture between you and -- with
18 you and your husband.  What's the other corporate entity
19 that's on that mortgage?
20    A.   It's a corporation that was started by my
21 husband and two of his friends, once -- one of whom has
22 since died, one of those is George Forster, the other one
23 was Ronnie Cole and they started it to, to buy a
24 restaurant in San Leon and that property has since been
25 sold and all the property that Mainsail owned has since

**Page 71**

1 been sold.
2     Q.   What's the name of the corporate --
3 corporation?
4     A.   Mainsail, M-a-i-n-s-a-i-l, Development, Inc.
5     Q.   But they are still listed as a mortgagee on
6 the property on which Heartbreakers is?
7     A.   Yes, they were the original holder of the
8 note.
9     Q.   And do they have any interest in
10 Heartbreakers, the business?
11    A.   No.  No.
12    Q.   Now does the mortgage -- the payment for the
13 mortgage, does Heartbreakers, ADA (sic) Interests, Inc.
14 make that payment to ADA who then pays Moody Bank or how
15 does that exchange work?
16    A.   Well, ADA receives lease income from A&D
17 Interests, Inc. and then ADA loans the money to Mainsail,
18 or it has in the past, to pay the note.  Mainsail, when
19 it sold the property now has cash to pay its own note.
20    Q.   Okay.  So Mainsail actually pays directly to
21 Moody?
22    A.   Yes.
23    Q.   Is there a lease agreement between ADA
24 Interests, Inc. -- A and -- hold on.  Is there a lease
25 between A&D Interests, Inc. and ADA Investments?

**Page 72**

1     A.   Yes.
2     Q.   What's the amount of the rent?
3     A.   12,500 a month.
4     Q.   And has it been that amount since at least
5 2017?
6     A.   I think so.  I'm not sure we -- we renewed --
7 we had to have a new lease but I can't remember how many
8 years ago it's been.
9     Q.   Do you have a copy of the lease agreement?
10    A.   Yes, I do.  Not with me but on my computer.
11    Q.   Who signed, who signed the lease agreement on
12 behalf of A&D Interests, Inc.?
13    A.   Mike Armstrong and me as the secretary.  Mike
14 as president and me as the secretary/treasurer.
15    Q.   Other than the mortgage payment and we just
16 went through that, how that process works, is there
17 anything else that ADA -- well, ADA Investments has or
18 financially is tied to Heartbreakers?
19    A.   Besides the lease agreement?
20    Q.   Right.
21    A.   No.
22    Q.   Besides the lease and mortgage, is there any
23 other connection between those two corporate entities?
24    A.   Which two?  You mean Mainsail and A -- A&D or
25 ADA and A&D?

**Page 73**

1     Q.   ADA and A&D?
2     A.   Okay.  ADA is the joint venture so I, I get
3 confused when people call it a corporation.  So the only
4 thing I know that between them is the ADA owns the
5 property that --
6     Q.   Okay.
7     A.   -- that it leases to A&D.
8     Q.   Okay.  You said in -- after the -- during the
9 pandemic at the beginning the club was shut down and that
10 it opened back up and it was going to be shut back down
11 or it was shut back down again because the governor or
12 Houston or somebody shut down the bars; is that right?
13    A.   It was the governor.  We're not in Houston.
14    Q.   Okay.  And when the governor shut down the
15 bars, you said that Heartbreakers applied for some sort
16 of food permit?
17    A.   Yes.  There's a thing called the 51 percent
18 rule and you have to sell more than 51 percent of not
19 just -- it's -- I don't know exactly how to explain it
20 but alcohol has to be less than 51 percent of your
21 sales but --
22    Q.   So that --
23    A.   -- but -- but the other sales can include all
24 kinds of things that we sell.
25    Q.   And so you applied to be considered not just a

Peggy Armstrong
April 30, 2021

**EXHIBIT E**

74 to 77

---

Page 74

1  bar?

2      A.   Right.  We've always had a full kitchen and

3  we've always sold food and given away food.  We give away

4  steaks still on Saturdays and Sundays.

5      Q.   But you had never applied for this particular

6  permit to be considered a business that is not primarily

7  in the sales of alcohol; is that right?

8      A.   That is correct.  We didn't need it.

9      Q.   And you had it and that's -- was done in --

10  sometime in the summer of 2020?

11      A.   Yes.

12      Q.   Okay.  Is that permit still in place as we sit

13  here today?

14      A.   Yes.

15      Q.   The paperwork that a new entertainer might

16  have to sign or fill out when she is first starting to

17  work at Heartbreakers, is that something that you

18  developed on behalf of Heartbreakers?

19      A.   Are you talking about the, the agreements?

20      Q.   Yes.

21      A.   We had an attorney that helped us develop

22  that.

23      Q.   Is that something that you worked with an

24  attorney on or did Mr. Armstrong do that?

25      A.   My -- Mr. Armstrong and I both worked with the

---

Page 75

1  attorney.

2      Q.   Now there was another -- I'm going to show

3  you -- I'll show you what I'll mark as Exhibit 5 to your

4  depo and I'll let you look at this real quick.  This is

5  Heartbreakers 2.  Do you know who came up with this

6  particular document for a new entertainer to sign?

7      A.   I don't recall who was involved in this.

8      Q.   Is it something that you were involved in?

9      A.   I doubt it.

10      Q.   Okay.  Was it something that Mr. Armstrong was

11  involved in?

12      A.   That's a possibility.  He and the general

13  manager are concerned with the operations of the club.

14      Q.   Okay.  Do you know if the entertainers, as we

15  sit here today, if a -- if -- do the entertainers still

16  sign this, this form, the Heartbreaker policy?

17      A.   I don't believe so.

18      Q.   This one was signed in January of 2019.  Do

19  you know if any entertainer signed this policy after

20  January of 2019?

21      A.   I don't know.  I, I rarely see the

22  entertainers' folders that we have to keep for the City

23  of Dickinson so.

24      Q.   What do you have to keep in a entertainer's

25  folders for the City of Dickinson?

---

Page 76

1      A.   Well, there's a list in the ordinance.

2  There's a thumbprint and their ID and background check.

3  I think those are the three main things.  I'm not sure

4  what else is in there but -- and they come -- the City of

5  Dickinson comes every year to inspect and one particular

6  person comes up and goes through all those folders.

7  Sometimes we think they look at every I think single one

8  of them to make sure all those things are in there.

9      Q.   Is there any -- other than the the, the

10  criminal background check and the, and the ID and

11  thumbprint, is there anything else that a, a new

12  entertainer is required to provide to Heartbreakers

13  before she can start performing there?

14      A.   I'm not sure I understand the question.

15      Q.   Is there anything else, any other

16  documentation that the entertainer has to provide to

17  Heartbreakers before she can perform there?

18      A.   I don't think so but I'm, you know, trying to

19  wrap my brain.  I'm not down there handling that on a

20  daily basis and I don't --

21      Q.   Do you --

22      A.   -- I don't really look at the folders when

23  they come upstairs.  They just go in the filing cabinet

24  and --

25      Q.   Do they -- I'm sorry, I didn't mean to cut you

---

Page 77

1  off.

2      A.   It's okay.

3      Q.   Did you -- do the entertainers have to redo or

4  re-sign any of that information if -- you know, every

5  year so or every so often?

6      A.   They -- I believe the ordinance says

7  everything has to be updated every six months for the

8  entertainers --

9      Q.   Okay.

10      A.   -- and I think for the employees they have to

11  be or it's every year.

12          MS. MONTGOMERY:  Okay.  I will pass the

13  witness.  Well, I'll say that with the reservation and

14  I'll put the reservation at the end.

15          MR. KING:  Okay.  Ms. Armstrong, you've --

16          THE COURT REPORTER:  I can't hear you.

17          MR. KING:  Oh, you can't hear me?

18          THE COURT REPORTER:  There, you have to

19  speak up.  Sorry.

20          MR. KING:  Oh, sorry.

21                  EXAMINATION

22  QUESTIONS BY MR. KING:

23      Q.   Ms. Armstrong, you've been with Heartbreakers

24  for how long approximately?

25      A.   In November it'll be 36 years.

---

U.S. LEGAL SUPPORT, INC
713-653-7100

Page 78

1    Q.   And in that time you've probably seen a lot of
2  dancers come through, right?
3    A.   Yes.
4    Q.   Okay.  Do all dancers perform on stage in the
5  same way?
6    A.   No, they don't all perform on stage.
7    Q.   What do you mean by that?
8    A.   Well, they elect just to dance for customers
9  or just sit with customers and don't want to be on stage.
10    Q.   Do all dancers even use the pole?
11    A.   No.  There are a lot of dancers that don't
12  know how to use a pole.
13    Q.   Do dancers ever bring their own equipment to
14  perform on stage?
15    A.   Yes.  We have one entertainer who brings a
16  hoop and she hangs it from the ceiling and performs
17  acrobatics on it and it -- years ago we had a girl that
18  put a chair on stage and performed acrobatics on it.
19    Q.   Do you know if the club would allow any
20  entertainer to use a hoop or a chair on stage if they
21  wanted?
22    A.   Anytime.
23    Q.   Do any dancers ever decide to quit dancing and
24  become bar attenders or waitresses?
25    A.   Yes.  We've had entertainers become waitresses

Page 79

1  and we've had waitresses become entertainers.
2    Q.   Why is that?
3    A.   Well, entertainers would become a waitress
4  because they want to work a regular shift and get paid
5  the minimum wage and be on a schedule and then the
6  opposite is true.  If a waitress didn't want to be on a
7  schedule and didn't -- wanted to make more money than she
8  was making she could work as an entertainer.
9    Q.   Does Heartbreakers have any requirements about
10  how waitresses do their jobs?
11    A.   Oh, yes.
12    Q.   Like what?
13    A.   Well, they have to know how to process the
14  credit cards and, you know, enter all the information as
15  for drinks and there's a little training that they go
16  through with another waitress before they can start and
17  they have to know how to approach the customers and, and
18  go back to customers to purchase drinks.
19    Q.   Do they have to follow a schedule?
20    A.   Yes, they follow a schedule.
21    Q.   What happens if a, if a -- if you have a
22  waitress that just decides not to show up when she's
23  scheduled?
24    A.   There's a possibility if she doesn't have a
25  good reason that she would be fired.

Page 80

1    Q.   Do they have to wear any kind of uniform or
2  attire?
3    A.   Yes, they wear a black vest and black shorts
4  which is provided by the -- well, I think that they
5  provide their own shorts but we provide the vests.
6    Q.   Do the, the dancers have to do any of these
7  kinds of things that we've just discussed?
8    A.   No, they have -- they're in complete control
9  whatever they wear and whenever they work.
10    Q.   Now has that always been the case at
11  Heartbreakers?
12    A.   As far as I remember, entertainers could
13  always come and go when they wanted to.  We, we did try
14  to make them stay till the end of the shift at one point
15  but when all these rulings started happening now they can
16  leave whenever they want to.
17    Q.   Ms. Montgomery asked you if the club could get
18  in trouble for not following the various and sundry laws
19  and regulations that a sexually oriented business has to
20  comply with.  Do you, do you recall that question?
21    A.   Yes.
22    Q.   Can you describe what sort of consequences
23  could happen?
24    A.   Well, there could be fines and there could be
25  loss of our license, which would be loss of our total

Page 81

1  business.
2    Q.   What kind of licenses are we talking about?
3    A.   The TABC license and the sexually oriented
4  business permit from the City of Dickinson.
5    Q.   And if the club lost any of these licenses you
6  talked about what, what would the consequence be?
7    A.   Oh, we, we would be out of business.
8    Q.   Do you -- does the club ever get visits from
9  say TABC officials?
10    A.   Yes, occasionally we do.
11    Q.   And what do they look for?
12    A.   They mainly have been looking at liquor
13  bottles to make sure their stamps are on them and
14  sometimes they walk around.  I'm never there when they
15  come in so I'm not exactly sure what they're looking for.
16    Q.   Do the any officials with the City of
17  Dickinson ever come in to inspect the club?
18    A.   They mainly come in once a year when it's time
19  to renew our permit and they inspect the premises for the
20  signs that we're supposed to display according to the
21  ordinance and go through the files to make sure that
22  we're getting the thumbprints and doing the background
23  checks and they look at the facility's -- the fire
24  marshal comes in at this time and -- to see if there's
25  any things that needs to be fixed or replaced for

Page 82

1  safeties.

2       Q.   Does the club require dancers to sell alcohol?

3       A.   No.

4       Q.   You, you said that with a little emphasis.

5  Why is that?

6       A.   Everybody that sells alcohol has to be

7  certified, TABC certified.

8       Q.   Does the club encourage dancers to say help

9  with the sale of alcohol?

10      A.   No.

11      Q.   Why?

12      A.   Well, because part of your TABC training is

13  that you don't encourage people to buy drinks whenever

14  they're intoxicated or on the verge of being intoxicated

15  and since they're not seller trained they don't

16  understand those principles.  So, therefore, we don't

17  want them to encourage people to buy drinks cause they

18  don't know what the rules are.

19      Q.   What, what would the club do if a manager ever

20  encouraged a dancer to, you know, try to talk beverages

21  to customers, alcoholic beverages?

22      A.   Well, he would be talked to and if it

23  continued he'd be fired.

24      Q.   What about the food, does the club encourage

25  dancers to sell food on behalf of the club?

Page 83

1       A.   We don't encourage dancers to do anything for

2  the club.  They're there -- they're there to make their

3  own money in their own particular way.

4       Q.   Do dancers ever serve food?

5       A.   No.

6       Q.   Why?

7       A.   They're not -- they're -- they're not hired to

8  do that.

9       Q.   If a, a dancer say claimed that a manager told

10  her that she had to groom her private areas, shall we

11  say, do you have any idea why that, that kind of dictate

12  might be set, set forth?

13      A.   Well, I don't think anybody wants to, to see

14  that to tell you the truth.  I -- I -- I think that would

15  be a matter of personal hygiene that should be taken care

16  of by the individual.

17      Q.   Well, let me ask it like this.  Does the

18  club -- the club serves food, right?

19      A.   Yes.

20      Q.   And is the club required by the state and the

21  local government to maintain a certain kind of hygiene

22  level within the club?

23      A.   Yes.

24      Q.   And everybody in the club has to abide by

25  those hygiene requirements, true?

Page 84

1       A.   That is true.

2       Q.   Does -- do you or the club, for that matter,

3  know what dancers did when Heartbreakers was closed for

4  several weeks after Hurricane Harvey?  What -- do you

5  know what dancers did for a living?

6       A.   Well, a lot of them started on these video

7  chat things, or whatever you call it, where they showed

8  their bodies to people and were sent money through Venmo

9  or whatever devices people use these days to send money

10  to other people.

11      Q.   And how do you know that?

12      A.   I've talked to several people that did it.

13      Q.   What about when the club was closed during the

14  pandemic last year, do you know, do you have any

15  knowledge of what dancers did since they couldn't work at

16  Heartbreakers?

17      A.   They did the same thing.  They, they couldn't

18  go without making any money.  They had regular customers

19  they got in touch with and asked them to send the money

20  or sent them a picture of themselves and I don't know if

21  total nudity or partial nudity or whatever and then they

22  got Venmoed money.

23      Q.   What do you mean by regular customers?

24      A.   Well, there are gentlemen that come in that

25  want to see particular ladies and so they become -- they

Page 85

1  come in just to see those particular ladies.

2       Q.   Do you have any idea how common that is?

3       A.   Very.

4       Q.   And what are you basing that statement on?

5       A.   Because dancers will say themselves Well, I

6  have a customer coming in and they, they will have told

7  them that they're no longer working at another club,

8  they're working at Heartbreakers.  They're coming to see

9  them in particular.

10      Q.   Okay.  Would Heartbreakers pay a dancer

11  minimum wage or overtime if that's what a dancer wanted?

12      A.   Sure.

13      Q.   Why?

14      A.   Because it's her choice.

15      Q.   And what, what would happen if a dancer said

16  Well, I want to be paid minimum wage and overtime?

17      A.   We put them on the payroll and then we would

18  go by the rules in that agreement, which says that we

19  would take I think it says half of their dance money that

20  they make.

21      Q.   Okay.

22      A.   That they would keep their own tips.

23      Q.   Now there's been some testimony in this case

24  I'll represent to you that no dancers have ever, quote

25  unquote, elected to become employee type dancers.  Is

Peggy Armstrong
April 30, 2021

**EXHIBIT E**

86 to 89

Page 86

1 that accurate?
2    A.   I believe that's true but they have become
3 waitresses which is a, a person who makes the minimum
4 wage and is paid by us and we pay their taxes and
5 everything.  So they don't have to be an entertainer
6 employee.  They can be a waitress employee and then have
7 all the responsibilities of that.
8    **Q.   Does -- do you have any knowledge as to why no**
9 **dancers have ever elected to become employee dancers?**
10    A.   It's not --
11         MS. MONTGOMERY:  Objection, form.
12         THE COURT REPORTER:  I'm sorry, objection
13 to what?
14         MS. MONTGOMERY:  I said objection,
15 speculation.
16         THE COURT REPORTER:  Thank you.
17    **Q.   (By Mr. King) Go ahead.**
18    A.   Okay.  I'm losing track here.  Why wouldn't
19 they want to become an employee?  Because they have -- as
20 an employee they have to be there at a certain time and
21 leave at a certain time, handle other people's money, our
22 money.  They -- they just have all kinds of rules that
23 they have to follow and they don't want to follow any
24 rules.
25    **Q.   Are you saying that dancers don't like**

Page 87

1 following rules?
2    A.   That's what I'm saying.
3    **Q.   What is, what is the basis for that statement?**
4    A.   After 36 years I think I know what I'm talking
5 about.
6    **Q.   What -- well, why is there a, a house or floor**
7 **fee at the club?**
8    A.   Well, it's a, it's a part of the income of the
9 club and we started it because that's what was the --
10 what all the clubs in Houston were doing at the time.
11 Everybody had floor fees and so we started it then and
12 have continued it.  I'm sure all the other clubs have
13 continued it too.  It's -- one thing the reason that the
14 prices vary is to get people there on -- when we open if
15 you -- it gives them an incentive to get there earlier if
16 the fee is lower.  So if they don't -- you know, they can
17 get there anytime they want to but if they want a lower
18 floor fee, well, they get there earlier.
19    **Q.   Are floor fees absolutely fixed?**
20    A.   No, if there are no or few customers floor
21 fees are waived many times.  There's all kinds of reasons
22 that they could be waived for specific entertainers and
23 then there's times that they're waived for everybody that
24 walks in for a specific period of time.
25    **Q.   Is there any kind of list of dancers who owe**

Page 88

1 money to the club for floor fees?
2    A.   Not that I know of.
3    **Q.   Has there ever been?**
4    A.   Yes, I'm sure there has been.
5    **Q.   Do you know if there has been in the last**
6 **three years?**
7    A.   I don't know.  I -- I believe we stopped that
8 practice a long time ago but that would be the general
9 manager's discretion there.
10    **Q.   Let's see.  I just want to make sure I**
11 **understand your individual role at Heartbreakers.  Have**
12 **you ever hired or fired any dancers?**
13    A.   No.
14    **Q.   Do you even have the, the power to do that?**
15    A.   No.
16    **Q.   In your 36 years at Heartbreakers, you're**
17 **telling me that you've never hired or fired a single**
18 **entertainer?**
19    A.   No, that has always been you left up to the
20 managers.
21    **Q.   Do you control any of their working**
22 **conditions?**
23    A.   No.
24    **Q.   Have you ever told a dancer how to dance?**
25    A.   No.

Page 89

1    **Q.   You say that kind of with a laugh.  Why are**
2 **you laughing?**
3    A.   Because I could never stand on a stage and
4 dance for anybody, how would I tell anybody else how to
5 do it.
6    **Q.   Have you ever given a dancer a schedule?**
7    A.   No.
8    **Q.   So is, is your -- is it your testimony that**
9 **you have absolutely no involvement with the dancer's work**
10 **at Heartbreakers?**
11    A.   Only to go watch them on occasion.
12    **Q.   So you do go down to the, the first floor**
13 **where the floor is at from time to time, right?**
14    A.   Yes.
15    **Q.   And when you're on the floor do you ever tell**
16 **managers to tell dancers what to do?**
17    A.   No.
18    **Q.   What would you say if a dancer said that when**
19 **you appear on the floor managers start becoming more**
20 **strict?**
21    A.   I didn't know that I was intimidating like
22 that.  That's what I would say.  I always have a smile on
23 my face, especially when I'm in public in, in my own
24 club.
25    **Q.   Do you consider yourself individually an**

Peggy Armstrong
April 30, 2021

**EXHIBIT E**

90 to 93

Page 90

1  employer of any dancer?
2      A.   No.
3      Q.   Do you understand that you've been named as a
4  Defendant in this lawsuit?
5      A.   Yes.
6      Q.   Do you have any idea why?
7      A.   No.
8      Q.   Let's see.  Are there any things that make
9  Heartbreakers different from other clubs in the area that
10  you can think of?
11      A.   Well, we started out in 1985.  My husband's
12  philosophy was that the entertainers that work for us and
13  any other -- and the employees, anybody that worked for
14  us was not going to be badgered and intimidated.  We had
15  heard that a lot of the other clubs the managers would
16  take, especially entertainers, into a check-out room or
17  somewhere and they would, you know, just do things that
18  we thought were inappropriate and Mike said that we were
19  going to be different and three of our nieces also danced
20  for us.  So we tried to keep our club above the standards
21  of some of the other clubs.
22      Q.   Do some dancers at Heartbreakers perform at
23  the club for long periods of time?
24      A.   Yes.
25      Q.   Is that true for all of them?

Page 91

1      A.   No.
2      Q.   Do some just kind of come for a week and
3  leave?
4      A.   Some come from -- for a day and leave.
5      Q.   Sure.  Those dancers though that do choose to
6  perform at the club for extended periods of time, have
7  you ever talked to any of them about why?
8      A.   Yes.
9      Q.   And what, what have they told you?
10      A.   Because of the atmosphere we have, that
11  they're not forced to do things that they don't want to
12  do.
13      Q.   What, what kinds of things are you talking
14  about?
15      A.   I'm talking about sexual acts specifically.
16      Q.   What about interactions with managers?
17      A.   Our managers are -- well, I don't know exactly
18  what you mean by interaction.  They're not supposed to be
19  berating them and telling them what to do.
20      Q.   Do, do you know if managers require dancers to
21  pay them tips?
22      A.   If they give them tips it's of their own
23  volition.
24      Q.   Does the club require dancers to pay managers
25  tips?

Page 92

1      A.   No.
2      Q.   Why?
3      A.   That's just not our policy.  We don't, we
4  don't get the dancers to -- the dancers aren't told to do
5  anything.
6      Q.   Now the -- there's been testimony in this case
7  that say if a dancer wants to use the booth area to
8  provide entertainment services that she pays a certain
9  amount of money to the club.  Is that, is that accurate?
10      A.   Well, halfway accurate.  She may actually hand
11  the money to the manager but the money came from the
12  customer that she's sitting in the booth with.  The
13  dancer does not actually take money out of her pocket and
14  pay it.
15      Q.   Why is that?
16      A.   Because that's the way it's done.  Dancers
17  don't pay for anything.  They only get the money.
18      Q.   And then they pay -- so they get the money
19  from the customer and then they pay the club?
20      A.   Yes.
21      Q.   Do you receive any tips from dancers?
22      A.   No.
23      Q.   Have you ever received any tip from a dancer?
24      A.   No.
25      Q.   Have you ever paid a dancer yourself

Page 93

1  individually?
2      A.   You mean in, in a tip?
3      Q.   Or just, you know, because she gave a good
4  dance or something like that?
5      A.   Sure, I've gone to the stage and, and tipped
6  people.
7      Q.   What kinds of customers does Heartbreakers
8  see?
9      A.   It's a wide variety from businessman to shift
10  workers, police.  Just a, a wide variety of customers.
11      Q.   I think Ms. Montgomery asked you earlier about
12  club -- the club's advertisements and, please correct me
13  if I'm wrong, I think you said that the club doesn't
14  really run any advertisements.  Is that accurate?
15      A.   Yes.  We used to do billboards and even did
16  radio at one time but we're so far removed from Houston,
17  we were at the beginning that we decided to spend our
18  money on this electronic message unit and that's where
19  our advertising money went and that's where it still
20  goes.  The -- it's paid for now but the electricity to it
21  is, you know, a few thousand dollars a month sometimes.
22      Q.   Was there any reason why Heartbreakers stopped
23  running advertisements in print and radio or other media?
24      A.   Financial reasons and that it didn't really
25  help us.

Peggy Armstrong
April 30, 2021

**EXHIBIT E**

94 to 97

Page 94

1    Q.   What do you mean it didn't really help you?
2    A.   Well, it didn't get any customers.
3    Q.   Why do customers go to Heartbreakers?  What
4 draws them in?
5    A.   Because we have a good reputation.  We have so
6 many customers that just come in to stand at the bar and
7 have a few drinks and visit with their friends and then
8 go home.
9    Q.   Are there any other things that draw customers
10 into Heartbreakers?
11    A.   Well, we give away free steaks on the weekends
12 and we do have good, good food and we have reasonably
13 priced drinks for our form of business and we just have
14 a, a great atmosphere.  Some guys just come into shoot
15 pool.  They'll go directly to the pool tables.  Our pool
16 tables are free so and then --
17    Q.   Do you --
18    A.   Go ahead.
19    Q.   Do you know if customers who, you know, they,
20 they come because they like the atmosphere, do you know
21 how that effects the amounts of money that dancers stand
22 to potentially make?
23    A.   Oh, it makes it easier for them because they
24 don't have to worry about being harassed by anybody for
25 sure.

Page 95

1    Q.   Do all customers who come to the club pay
2 dancers for their entertainment?
3    A.   No.  Some come just to drink and some come --
4 we have one guy that comes every Thursday to eat his
5 dinner and have a few drinks.
6    Q.   And does he ever pay for, for dances?
7    A.   I've never seen him.
8    Q.   Not once?
9    A.   I've never seen him personally.
10    Q.   Based on your, you know, three decades at the
11 club how do dancers make, make their money?
12    A.   Well, they can do table dances.  They can
13 dance on stage.  There's a new thing going around that
14 customers just want to throw dollar bills on the front
15 stage and then when one guy does it, well, then the next
16 guy does it and they just make it a little show of, you
17 know, we've got all this money so here it is, but it's
18 dollar bills so then there's, you know, what people call
19 couch or table dances and they can just sit with a
20 customer and talk.  Some guys just want to talk and, and
21 the dancer will make a deal with them to just sit and,
22 and listen.
23    Q.   Does the club set any minimums or maximums as
24 far as what customers can pay dancers?
25    A.   No.  That's entirely between the customer and

Page 96

1 the, and the dancer.
2    Q.   So if there's been testimony in this case
3 that, that the club says that dancers can only accept $20
4 for a lap dance would that be true or false?
5    A.   That's false.
6    Q.   Why do you say that?
7    A.   Because it -- because it is false.  We don't
8 set -- we don't even know what the customer is paying the
9 dancer.  They make their own negotiations and we have
10 nothing to do with it.  We can't -- we don't have any way
11 to check what they're doing.  They're sitting at a table
12 with each other and they make the deal with each other.
13    Q.   Does the club have any rules or policies
14 restricting dancers from, I don't know, accepting money
15 or payment through things like Zelle or Venmo or Apple
16 Pay?
17    A.   No, there's no way for us to have any kind of
18 rules because we don't even know when it's happening.
19    Q.   So if a customer wanted to pay a dancer for
20 their times dancing or chatting, no one would have a
21 problem if a dancer said Well, you can pay me on a Venmo?
22    A.   He hands her his credit card and she gets the
23 money.
24    Q.   What are the different things in your
25 experience or based on what you've seen over 30 years at

Page 97

1 Heartbreakers that can effect how much a dancer makes?
2    A.   It's entirely up to her.  I -- I've -- it's
3 her personality.  I -- I really don't know what, what it
4 takes to be a dancer.  Each -- and each person that comes
5 in has to find their own way.  It's, it's just a very
6 individualized occupation.
7    Q.   Does the club tell dancers that they have to
8 do their work in any particular way?
9    A.   No.
10    Q.   Does the club tell dancers how to dance?
11    A.   No.
12    Q.   Does the club have any rules effective that
13 constricts their behavior with customers?
14    A.   Follow the law.
15    Q.   Does the club make dancers approach any
16 certain number of customers?
17    A.   No.  They don't even have to approach
18 customers.
19    Q.   What do you mean by that?
20    A.   So sometimes they sit there and read a book.
21    Q.   Are you, are you telling me dancers read books
22 at the club?
23    A.   Yes, sometimes and they're on their phones.
24    Q.   I -- I -- it's a little loud in the club to be
25 reading books, isn't it?

Peggy Armstrong
April 30, 2021

EXHIBIT E

98 to 101

Page 98

1    A.   Oh, some people have -- are able to
2  concentrate with music in the background.
3    Q.   What kinds of music does the club play?
4    A.   All kinds.
5    Q.   Rap?
6    A.   Well, some -- there's some kind of rap or hip
7  hop or whatever.  We -- that was another thing that we
8  changed.  Years ago we used to require that our DJ to
9  play country western every few songs because a lot of our
10  customers like country western music but now the dancers
11  are in complete control of whatever music that they want
12  to be played and so now we have a bunch of hip hop and
13  rap and it just -- it's just different.
14    Q.   Can you think of any other changes at the club
15  that, that might effect dancers, their, their work, that
16  have happened over the past three to five years?
17    A.   I'm not exactly sure what you mean.
18    Q.   Well, you're familiar with the allegations in
19  this lawsuit, right?
20    A.   What, that they, that they have rules?
21    Q.   Right.
22    A.   Well, they have -- they run their own show.
23  That's all I can say.  They walk in the door.  They get
24  ready or not.  They finally check in.  Finally get out to
25  the floor.  They go sit in the corner and look at their

Page 99

1  phone.  They -- maybe they're texting somebody to come
2  in.  I don't -- we have no idea what they're doing and
3  then eventually they're called to the stage and they
4  dance on the stage and then they get off the stage and
5  then they go back to doing whatever they want to do.
6  They can approach a customer.  They can sit down.  They
7  can, they can leave.
8    Q.   I'm trying to think if there's anything else
9  that -- that's been testified to in this case that the
10  facts give the way that dancers do their jobs.  You -- I
11  think you, you mentioned that Heartbreakers is, is
12  actually -- you had relatives perform at Heartbreakers?
13    A.   Yes.
14    Q.   Do you know if those relatives felt that they
15  had their, their work as, as dancers controlled by the
16  club?
17         MS. MONTGOMERY:  Objection, form.
18    A.   Did she say something?
19    Q.   (By Mr. King)  She, she said objection, form
20  but you can answer.
21    A.   Okay.  Well, these girls are now -- and I can
22  call them girls because they are my nieces.  They're now
23  52, 53, and 54 years old and they were dancing back in
24  the day when we did exercise control and -- but the, the
25  reason -- yeah.  So I can't really compare what happened

Page 100

1  with them to what's happening today.
2    Q.   What is happening today?
3    A.   People don't want to work.  They show up to
4  work.  They don't want to work.  They -- as far as the
5  entertainers are concerned, they wear less and less
6  clothing.  We used to have girls wear beautiful gowns and
7  costumes when we first opened and they put -- actually
8  put on a show.  Some of the people don't even dance.
9  They just walk around on the stage.  A lot of them do
10  learn pole work but it's just a whole different
11  atmosphere, the music, the clothing, the -- it's just our
12  society has changed and so our business had to change.
13    Q.   Does the club have control over where it's
14  located?
15    A.   No.
16    Q.   Why?
17    A.   Well, we were grandfathered.  There will never
18  be another adult club in the City of Dickinson or
19  probably anywhere in the area because when we came in all
20  the little cities made their own ordinance against our
21  type of business being close to schools, churches, and
22  basically that leaves no, no area for a adult club to be
23  and -- but we're grandfathered and, and if lose that
24  location there will be no more adult entertainment in
25  Dickinson.

Page 101

1    Q.   So the club couldn't just move to a new
2  building somewhere in Dickinson, right?
3    A.   No.
4    Q.   The, the club does have some record keeping
5  system I understand that shows when dancers -- what days
6  they appear and what times they appear and what hours
7  they depart.  Is that accurate?
8    A.   Yes.
9    Q.   What is the purpose of those records?
10    A.   Well, to keep track of, of what we collect for
11  one thing in our -- what we charge the dancers and that
12  was probably the main reason and --
13    Q.   Do you know if the city requires that those
14  records be kept?
15    A.   I think the city does require that.  That's
16  a -- I haven't read the ordinance in a long time but
17  that's probably one of the reasons that we do keep it.
18    Q.   Would the club ever change those time records?
19    A.   No.
20    Q.   Why?
21    A.   Nobody would know how to do it.  Those -- the
22  program that we use is so old and we've lost contact with
23  the people that sold it to us so I don't -- you would
24  have to hire some kind of -- what do they call those
25  people?  Hackers to come in, something like that.

Page 102

1        Q.   Is it possible that a dancer could show up at
2   the club and not check in or have her date and time
3   entered into this computer program and start performing?
4        A.   I don't think so.
5        Q.   Have you ever -- have you ever heard of that?
6        A.   No.
7        Q.   What would you say if a dancer said that those
8   records are incomplete or inaccurate?
9        A.   I don't believe that they are.
10       Q.   Does the -- would the club have any kind of
11  incentive to change the records?
12       A.   No.
13       Q.   Why?
14       A.   Well, for one thing I want to know how much
15  money that I took in and that has to balance.  Those
16  numbers have to balance with the money I get.  So I
17  wouldn't -- I want the, I want the records to be
18  accurate.
19       Q.   Well, do managers ever allow dancers to check
20  in a little bit earlier to get lower house fees?
21       A.   I'm sure they do.
22       Q.   Do you know if that's at all common?
23       A.   I'm not sure if it's common but I'm sure it
24  happens.
25       Q.   Does the club have any restrictions or rules

Page 103

1   that prevent managers from doing that?
2        A.   No.
3        Q.   You were testifying earlier about dancers
4   declaring money to the cashiers.  I just want to be sure
5   that I understand.  Does the club require dancers to
6   report any sums to the cashiers at the end, at, at the
7   end of a shift?
8        A.   Well, I don't know if required is the word but
9   if they were there for a whole shift they wouldn't stay
10  for a whole shift if they hadn't made some money.
11       Q.   Okay.  Well, whenever they leave are -- does
12  the club require that they show the money that they, they
13  took from customers to the cashiers?
14       A.   Absolutely not.
15       Q.   Why do you say it so adamantly?
16       A.   Well, it just sounds ridiculous to me.
17       Q.   The club does give 1099's out though, right?
18       A.   Yes.
19       Q.   Okay.  Do you, do you know where the
20  nonemployee compensation figures might come from?
21       A.   They come from that computer in the check-out
22  office where the cashier works.
23       Q.   Does the club require dancers to tip
24  waitresses or bartenders?
25       A.   No.

Page 104

1        Q.   Why?
2        A.   It's just not a requirement.  We don't, we
3   don't require them to do anything, not even dance.
4        Q.   Do some dancers choose to tip waitresses and
5   bartenders, if you know?
6        A.   Yes, they do.
7        Q.   Why?
8        A.   Well, sometimes a waitress knows customers
9   that want dances and she will point the dancer to that
10  customer so the dancer will give her some money, say
11  Well, thanks for helping me make some money.
12       Q.   Have you ever seen managers at the door of the
13  club at the end of the night with their hands out telling
14  dancers to pay them?
15       A.   No.
16            MS. MONTGOMERY:  Objection, form.
17       Q.   (By Mr. King)  Not once?
18       A.   I'm never --
19            MS. MONTGOMERY:  Objection, form.
20       A.   -- hardly ever there when we close.
21       Q.   (By Mr. King)  Have you ever heard of that?
22       A.   No.
23       Q.   Have dancers ever complained to your knowledge
24  about managers doing that?
25       A.   Not to me.

Page 105

1        Q.   What would happen to a manager if, if
2   Heartbreakers found out that he was demanding tips from
3   dancers?
4        A.   Well, he'd be reprimanded and eventually
5   fired.
6        Q.   Has the club ever had to fire a manager for
7   that?
8        A.   I don't know.  I would have to talk to our
9   general manager about that.  I'm not exactly sure of all
10  the circumstances of, of why anyone was fired.
11       Q.   If a dancer is underage can she buy alcohol at
12  the club?
13       A.   No.
14       Q.   What would happen if she did try to buy
15  alcohol at the club?
16       A.   She would be asked to leave.
17       Q.   Why is that?
18       A.   It's against the law.
19       Q.   Would the club tell a customer who's underage
20  who tries to buy alcohol to leave?
21       A.   Well, he wouldn't get in because he presents
22  his ID when he enters.
23       Q.   Fair enough.  Do you have waitresses who are
24  under the age of 21 or at?
25       A.   I'm, I'm not sure but I think we have had.

Page 106

1       Q.   Would a waitress who tried to buy alcohol be
2   asked not to return --
3       A.   Yes.
4       Q.   -- if she was underage?
5       A.   Yes.
6       Q.   Does the, does the club allow dancers to just
7   hang out in the locker room?
8       A.   They can hang out wherever they want.
9       Q.   Is there any set amount of time that they're
10  allowed to be in the locker room?
11      A.   No.
12      Q.   Do you know if the club requires dancers to
13  prepare for their work in the locker room?
14      A.   No, they can be ready when they get there.
15      Q.   Is it at all true that some dancers spend
16  hours in the locker room?
17      A.   I don't know but I -- I wouldn't think it'd be
18  very profitable for them to stay in the locker room.
19           MR. KING:  I think that's it.  I pass the
20  witness.
21           MS. MONTGOMERY:  Let me ask some follow-up
22  questions.  I didn't expect quite that long on your
23  direct so let me ask a few follow-ups.
24                RE-EXAMINATION
25  QUESTIONS BY MS. MONTGOMERY:

Page 107

1       Q.   If I understand your testimony correctly,
2   there's no other sexually oriented businesses like
3   Heartbreakers in Dickinson; is that true?
4       A.   That is true.
5       Q.   Where is the nearest one?  Do you know?
6       A.   146 Double Shoe.
7       Q.   Is that Bacliff?
8       A.   Yes.
9       Q.   When's the last time that a entertainer has
10  asked to be a waitress at Heartbreakers?
11      A.   I don't know.  I'd have to ask the general
12  manager.
13      Q.   Was it pre pandemic?
14      A.   Probably.
15      Q.   When you heard that information that a
16  entertainer wanted to be a waitress, was it through the
17  general manager or did you actually -- did the
18  entertainer actually approach you about it?
19      A.   No, no one approaches me about anything like
20  that.
21      Q.   So if, if you know anything about, about the
22  dancers in particular, is that through a general manager
23  or manager at the club?
24      A.   Or maybe my office manager cause she's -- you
25  know, goes down to fill the cigarette and those machines

Page 108

1   down there and the ATM and she has more contact with
2   what's going on in the club than I do.
3       Q.   Okay.  You said at some point Heartbreakers
4   use -- used to make the entertainers stay to the end of
5   the shift; is that correct?
6       A.   Yes, it was for their safety.
7       Q.   When, when was that rule in effect?
8       A.   Years ago.
9       Q.   More than five years ago?
10      A.   I don't know.  You have to ask our general
11  manager.  I -- you know, I have gone down in the club
12  less frequently over the years because of my job I have
13  in my office is so demanding, paying the bills and
14  getting loans and it's just overwhelming so I don't, I
15  don't go down there to check on anything.  I, I rely on
16  my -- Mike and our general manager to handle anything
17  down there.
18      Q.   So most of your experience or knowledge about
19  why entertainers do things or what -- you know, what's
20  happening specifically with policies related to the --
21  with regard to entertainers, you, you know about that
22  through what either your managers tell you or maybe your
23  husband, right?
24      A.   Yes.
25      Q.   One of the things you talked about was the

Page 109

1   requirements that a, that a waitress would have to go, go
2   through and I heard you say that they had some sort of
3   training provided; is that true?
4       A.   Yes.  Well, they have to be TABC certified
5   before they can start and then a -- another waitress will
6   take them around and, and explain to them the credit card
7   system and the banks and just different procedures that
8   we use, the check-out process and everything that a
9   waitress does.
10      Q.   Is there any sort of written training manual
11  for a waitress?
12      A.   We have a, a little packet that lists a lot of
13  things that, that they're supposed to do.
14      Q.   Is that packet just for waitresses or does
15  that apply to any other staff?
16      A.   Well, there's a packet for waitresses and a
17  packet for bartenders and so on.
18      Q.   What is the schedule for a entertainer if she
19  decides she wants to be an employee?
20      A.   Well, that would be decided by our general
21  manager.
22      Q.   It's not something that's already in the
23  contract that's offered to her?
24      A.   No, it would -- she would have to be put on
25  the schedule by the general manager.

Peggy Armstrong
April 30, 2021

Page 110

1    Q.   I'm just curious as to whether when she's
2  offered the choice of, of the two contracts if she knows
3  at the point -- at the point that she's offered the two
4  contracts what the schedule's going to be?
5    A.   No, she wouldn't know.  The waitresses don't
6  know what their schedule is going to be either.
7    Q.   Are the waitresses told how frequently they
8  would need to work?
9    A.   Yes.
10   Q.   Is there a general requirement for that?  Like
11 all of you have to work three shifts a week or something
12 like that?
13   A.   There used to be for the waitresses, yes.  I'm
14 not sure how many shifts they have to work now since
15 we -- it's kind of confusing now because our day shift is
16 only from 4:00 to 8:00 and then the night shift is 7:00
17 to 2:00.  So it's, it's just confusing to try to figure
18 out shifts right now.
19   Q.   I think one thing you discussed was
20 advertisements and I understand that Heartbreakers
21 isn't -- the main advertisement you have is the
22 electronic billboard sign, right?
23   A.   Yes.
24   Q.   Is there a website for Heartbreakers?
25   A.   Yes but it hasn't been updated in years

Page 111

1  because we --
2    Q.   Who --
3    A.   -- we don't have anybody that works for us
4  or -- we haven't hired any outside help to help us so
5  it just kind of sits there.
6    Q.   What about with social media, is there any
7  social media for Heartbreakers?
8    A.   Are you talking about -- yeah.  I think we
9  have a Facebook and there several of our -- there's
10 our DJ and one of waitresses that make posts on that and
11 then I think one of waitresses started an Instagram
12 account and she makes posts on that, but I'm not sure if
13 they're posts or they just make them on their own.  I
14 don't think -- I don't know if they get the general
15 manager's approval or -- before they do it or they just
16 do it on their own advertise for the club and we don't
17 pay --
18   Q.   Well, I --
19   A.   -- and we don't pay them to do it.
20   Q.   Yeah.  I just didn't know if there was
21 somebody on -- at the office side that was managing any
22 of that.  Is that true?
23   A.   No.  We've, we've tried to hire people to help
24 us with social media and we have not found anyone that --
25 I can't say it's cause we didn't like them or probably --

Page 112

1  mainly because we couldn't afford them.
2    Q.   Would you find it acceptable if a manager was
3  berating one of your bartender staff?
4    A.   You mean in front of everybody?
5    Q.   Yes.
6    A.   No, it wouldn't be acceptable.
7    Q.   Might that be something that you would
8  reprimand or talk to that manager about?
9    A.   Yes.
10   Q.   Would it be the same if a, if a manager was
11 berating a door person?
12   A.   Yes.
13   Q.   It's just not acceptable behavior for a
14 supervisor of any sort at the club; is that true?
15   A.   That's true.
16   Q.   Whether they're talking to an employee of the
17 club or an entertainer, right?
18   A.   That's true.
19   Q.   Is there a dress code for the patrons of the
20 club?
21   A.   Well, when we started we tried to have a dress
22 code but then we found out that we were in the Clear Lake
23 area which is a boating community and the guys that own
24 those expensive yachts, they wanted to come in in their
25 shorts and boat shoes and so we relaxed our dress code

Page 113

1  and now it's what we all call Clear Lake casual, which is
2  clean and neat.
3    Q.   And I understood that to be, for example, if,
4  if someone was a painter and came in with their, you
5  know, clothes tarnished with paint maybe they wouldn't be
6  allowed entrance because that's not a clean and neat
7  attire, right?
8    A.   Correct and before Hurricane Harvey we used to
9  have T-shirts to sell to customers if they, for instance,
10 wore a tank top.  We don't want tank tops either so we
11 would either sell or give them -- we had some giveaway
12 T-shirts also that we'd give them to wear.
13   Q.   The D -- is it the DJ at the club that runs
14 the stage rotation for the entertainers?
15   A.   Yes.
16   Q.   And when an entertainer shows up to perform
17 does she have to sign in with the DJ to be part of that
18 rotation?
19   A.   Yes.
20   Q.   And the DJ plays -- decides the music that's
21 going to be played for each performance?
22   A.   No, the dancer tells him what kind of music
23 she wants.
24   Q.   Is there a light show as well or lights on the
25 stage?

Peggy Armstrong
April 30, 2021                                                     114 to 117

---

Page 114

1    A.   Yes.

2    Q.   Who, who runs the lights?

3    A.   The DJ.

4    Q.   All right.  Other than my reservation about

5  the review of the financials and the potential need to

6  recall you if I'm -- can't get the information from

7  looking at the financials, I will reserve the rest of my

8  questions.

9              MR. KING:  All right.  Thank you much.

10             THE WITNESS:  Thank you.

11             (P. Armstrong Exhibits 1 through 5

12  marked.)

13

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 115

1    REMOTE VIDEOCONFERENCE DEPOSITION OF PEGGY ARMSTRONG

2

3                    CORRECTION PAGE

4

5        Please indicate changes on this Signature and

6   Correction Page giving the page and line number, the

7   change, and the reason for the change.  Reasons for

8   change are:  (1) to clarify the record; (2) to conform to

9   the facts; (3) to correct transcription errors.

10

11   PAGE/LINE          CORRECTION            REASON

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25

---

Page 116

1                   SIGNATURE OF WITNESS

2

     I, PEGGY ARMSTRONG, solemnly swear or affirm under the

3  pains and penalties of perjury that the foregoing pages

   contain a true and correct transcript of the testimony

4  given by me at the time and place stated, with the

   corrections, if any, and the reasons therefore noted on

5  the foregoing correction page(s).

6

                   _____

7                         PEGGY ARMSTRONG

8  STATE OF  TEXAS

9  COUNTY OF _____

10

11  Before me, _____, on

    this day personally appeared PEGGY ARMSTRONG, known to

12  me, or proved to me under oath, to be the person whose

    name is subscribed to the foregoing instrument and

13  acknowledged to me that she executed the same for the

    purposes and consideration therein expressed.

14

         Given under my hand and seal of office on this, the

15  _____ day of _____, 2021.

16

                   _____

17                       Notary Public in and for the

                         State of Texas

18                       My Commission Expires:_____

19

20

21

22

23

24

25

---

Page 117

1              IN THE UNITED STATES DISTRICT COURT

               FOR THE SOUTHERN DISTRICT OF TEXAS

2                      GALVESTON DIVISION

3  STACEY KIBODEAUX aka ILLUSION, ) Case No.: 3:20-CV-00008

   HAILEY CHAPMAN aka DAISY,      )

4  JEAN HOFFMEISTER aka JOHNE and ) JURY TRIAL DEMANDED

   ROXANNE MURILLO aka            )

5  UNIQUE/ROXANNE, individuals,   )

6          Plaintiff,             )

                                  )

7          VS.                    )

                                  )

8  A&D INTERESTS, INC. D/B/A      )

   HEARTBREAKERS GENTLEMAN'S      )

9  CLUB, MIKE A. ARMSTRONG, PEGGY )

   A. ARMSTRONG AND WHITEY DOE,   )

10  INDIVIDUALS,                   )

                                  )

11          Defendants.           )

12             REPORTER'S CERTIFICATE

      TO THE REMOTE VIDEOCONFERENCE DEPOSITION OF

13                  PEGGY ARMSTRONG

                  APRIL 30TH, 2021

14      I, Susan L. Graham, a Certified Shorthand Reporter

15  in and for the State of Texas, hereby certify to the

16  following:

17      That the witness, PEGGY ARMSTRONG, was duly sworn

18  by the officer and that the transcript of the remote

19  videoconference deposition is a true record of the

20  testimony given by the witness;

21      That the original deposition was delivered to Leigh

22  Montgomery;

23      That the amount of time used by each party at the

24  deposition is as follows:

25      Leigh Montgomery - 2:05

---

Peggy Armstrong
April 30, 2021

**EXHIBIT E**

118

Page 118

1      William X. King - :41

2      That a copy of this certificate was served on all

3  parties and/or the witness shown herein on

4  _____.

5      I further certify that pursuant to the FRCP Rule

6  30(f)(1) that the signature of the deponent:

7      _____was requested by the Deponent or a party

8  before the completion of the deposition and to be

9  returned within 30 days from date of receipt of the

10 transcript.  If returned, the attached Changes and

11 Signature Page contains any changes and the reasons

12 therefore;

13     I further certify that I am neither counsel for,

14 related to, nor employed by any of the parties or

15 attorneys in the action in which this proceeding was

16 taken, and further, that I am not financially or

17 otherwise interested in the outcome of the action.

18     Certified to by me on this, the 8th day of

19 May, 2021.

20                    _Susan L. Graham_____

                   SUSAN L. GRAHAM

21                 Texas CSR No. 2534

                   Expires:  January 31, 2022

22                 Firm Registration No. 122

                   16825 Northchase Drive

23                 Suite 800

                   Houston, Texas  77060

24                 (713) 653-7100

25