# EXHIBIT F2

```
                                                               Page 1
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     GALVESTON DIVISION

 3   STACEY KIBODEAUX aka        ) CASE NO.: 3:20-cv-00008
     ILLUSION, HAILEY CHAPMAN    )
 4   aka DAISY, JEAN             )
     HOFFMEISTER aka JOHNE, and  ) JURY TRIAL DEMANDED
 5   UNIQUE/ROXANNE,             )
     individuals,                )
 6                               )
                  PLAINTIFFS,    )
 7                               )
     vs.                         )
 8                               )
     A&D INTERESTS, INC. D/B/A   )
 9   HEARTBREAKERS GENTLEMAN'S   )
     CLUB, MIKE A. ARMSTRONG,    )
10   PEGGY A. ARMSTRONG AND      )
     WHITEY DOE, INDIVIDUALS,    )
11                               )
                  DEFENDANTS.    )
12

13       -----------------------------------

14              ORAL DEPOSITION OF

15              GEORGE B. FORSTER

16                APRIL 26, 2021

17       -----------------------------------

18      ORAL DEPOSITION OF GEORGE B. FORSTER, produced as a

19   witness at the instance of the PLAINTIFFS, and duly

20   sworn, was taken in the above-styled and numbered cause

21   on the 26th day of April, 2021, from 10:02 a.m. to 11:46

22   a.m., via videoconference, before Velma C. LaChausse,

23   Shorthand Reporter and Notary Public in and for the

24   State of Texas, reported by machine shorthand, appearing

25   remotely from Harris County, Texas, pursuant to the
```

Page 2

1  Federal Rules of Civil Procedure and the provisions
2  stated on the record or attached hereto.

---

Page 3

R E M O T E   A P P E A R A N C E S

FOR THE PLAINTIFFS:
   Ms. Leigh S. Montgomery
   ELLZEY & ASSOCIATES, PLLC
   1105 Milford Street
   Houston, Texas 77066
   Phone: (713)554-2377
   E-mail: leigh@ellzeylaw.com

FOR THE DEFENDANTS:
   Mr. William X. King
   WALLACE & ALLEN, LLP
   440 Louisiana Street, Suite 1500
   Houston, Texas 77002
   Phone: (713)227-1744
   E-mail: wking@wallaceallen.com

---

Page 4

                    INDEX
                                                     PAGE
Stipulations........................................ 2
Appearances......................................... 3
WITNESS:  GEORGE B. FORSTER
     Examination by Ms. Montgomery.................. 5
     Examination by Mr. King........................ 58
     Further Examination by Ms. Montgomery.......... 67
Signature Waived
Reporter's Certificate.............................. 72

                   EXHIBITS
NO.  DESCRIPTION                                    PAGE
1    Hours and Earnings Report                       22
2    Entertainer/Employment Application              30
3    Employment Agreement                            31
4    Henderson Complaint                             46
5    Toporcer v. Heartbreakers Complaint             47
6    Memo to Entertainers                            47
7    Heartbreakers Policy                            48
8    Signs or Rules                                  49

---

Page 5

                  PROCEEDINGS
          THE REPORTER:  The attorneys participating
in this deposition acknowledge that I am not physically
present in the deposition room and that I will be
reporting this deposition remotely.  They further
acknowledge that, in lieu of an oath administered in
person, I will administer the oath remotely.  The
parties and their counsel consent to this arrangement
and waive any objections to this manner of reporting.
          Please indicate your agreement by stating
your name and your agreement on the record.
          THE WITNESS:  My name is George Forster,
and I agree.
          MS. MONTGOMERY:  Leigh Montgomery on behalf
of plaintiffs; I agree.
          MR. KING:  Will King on behalf of
defendants; I agree.
             GEORGE B. FORSTER,
having been first duly sworn, testified as follows:
                  EXAMINATION
BY MS. MONTGOMERY:
     Q.  Will you state your full name for the record?
     A.  George Forster.
     Q.  And, Mr. Forster, do you go by any other names?
Nicknames?

Page 6

1   A.  Some people call me "Whitey."
2   Q.  Mr. Forster, are you currently employed at
3   Heartbreakers?
4   A.  Yes.
5   Q.  And what is your role?
6   A.  General manager.
7   Q.  How long have you been a general manager for
8   Heartbreakers?
9   A.  Thirty-plus years.
10  Q.  And in that time that you've been a general
11  manager at Heartbreakers, have you held any other
12  employment positions?
13  A.  Yes.
14  Q.  What other -- let me be clear about that.
15  Other employment positions outside of Heartbreakers?
16  A.  You didn't ask me that.  You asked me at
17  Heartbreakers.
18  Q.  Right.  I'm asking you a different question
19  now.  Have you held any additional employment positions
20  simultaneous to your employment at Heartbreakers, those
21  being outside of Heartbreakers?
22  A.  I can't recall any.
23  Q.  Prior to working at Heartbreakers, did you work
24  at any other gentlemen's clubs?
25  A.  Yes.

Page 7

1   Q.  What other gentlemen's clubs did you work at
2   prior to Heartbreakers?
3   A.  Whitey's.
4   Q.  Was that your own club?
5   A.  Yes.
6   Q.  And where was it located?
7   A.  Nassau Bay, Clear Lake.
8   Q.  And how long did you operate your own club?
9   A.  Eight months.  Maybe three -- longer than that.
10  I don't exactly remember the length of time.
11  Q.  And how did you first come to work at
12  Heartbreakers?
13  A.  I was hired.
14  Q.  Well, I mean, how did you find out?  Did you
15  apply for the job, or was it something that, like, you
16  knew the Armstrongs?  How did you come to work there?
17  A.  No.  I knew the general manager that worked
18  there.
19  Q.  And who was that at the time?
20  A.  Fred Diescher.
21  Q.  When you first started working at
22  Heartbreakers, were you hired as a manager?
23  A.  Yes.
24  Q.  When did you become the general manager?
25  A.  A year or two in.

Page 8

1   Q.  Have you ever been in the military?
2   A.  No, ma'am.
3   Q.  And what's your highest level of education?
4   A.  College.
5   Q.  Did you get a degree?
6   A.  No.
7   Q.  Were you working towards a degree in anything?
8   A.  Yes.
9   Q.  What were you working towards?
10  A.  Psychology and education.
11  Q.  And where did you go to college?
12  A.  Alliance College.
13  Q.  Who are the owners of Heartbreakers?
14  A.  A&D Interests, I believe.
15  Q.  Well, I understand A&D Interest, Inc., is the
16  corporate entity that does business as Heartbreakers.
17  But who owns A&D Interest?
18  A.  Mike and Peggy Armstrong, I believe.
19  Q.  Are you aware of any other owners of
20  Heartbreakers?
21  A.  No.
22  Q.  Is Mike Armstrong who you would directly report
23  to?
24      MR. KING:  Objection; form.  It's vague.
25  Go ahead and answer.

Page 9

1   A.  Yes.
2   Q.  (BY MS. MONTGOMERY)  Do you ever report to
3   Peggy Armstrong as a general manager?
4   A.  As "report," you mean talk to?
5   Q.  No.  I mean as the person who would be above
6   you.  If you weren't entitled to make a decision about
7   something about the business, who would you have to go
8   to to authorize that?
9   A.  That would be correct.  She would be one of
10  them.
11  Q.  Okay.  What do you do?  What are your
12  responsibilities as a general manager of Heartbreakers?
13  A.  Manage the club.
14  Q.  And what all does that entail?
15  A.  Making sure we have liquor, food, staff,
16  employees.
17  Q.  So you would actually place the orders for
18  liquor?
19  A.  No.  I have that done for me by another
20  manager.
21  Q.  All right.  Is there a particular manager
22  that's in charge of that?
23  A.  It varies.  Are you talking about currently
24  or...
25  Q.  Currently.

Page 10

1    A.  Currently, yes.
2    Q.  Who is the manager that does it currently?
3    A.  Carl Arceneaux.
4    Q.  And is there also a manager that is responsible
5  for actually ordering the food for the club?
6    A.  The chef is.
7    Q.  And what's the chef's name?
8    A.  Chris.
9    Q.  Does Chris have a last name?
10   A.  Yeah.  It escapes me at this time.  I'm sorry.
11   Q.  Okay.  And are you responsible for hiring other
12 staff at the club like the waitresses or door people?
13   A.  All of -- yes.
14   Q.  And if one of them needed to be terminated, are
15 you the person that would terminate those individuals?
16   A.  It would have to be just me.
17   Q.  Who else would have the authority to terminate
18 staff such as waitresses or door people at the club?
19   A.  Managers.
20   Q.  Any of the managers?
21   A.  Yes, ma'am.
22   Q.  They wouldn't have to come and speak to you
23 first about that?
24   A.  That's correct.
25   Q.  Was the club shut down due to the pandemic?

Page 11

1    A.  Yes.
2    Q.  How long was it shut down?
3    A.  I don't have those exact numbers, dates, you
4  know.  March of last year is when it was shut down.  I
5  don't exactly know when we opened back up.
6    Q.  Was it sometime in the summer?
7    A.  Yes, I believe.
8    Q.  Are you also limited in capacity?
9    A.  At this time?
10   Q.  At this time.
11   A.  No.
12   Q.  Was there a time period after you were allowed
13 to open back up after the pandemic shut down --
14   A.  Yes.
15   Q.  Hold on.  Let me finish.
16   A.  Oh, I'm sorry.
17   Q.  From the time you opened back up after the
18 pandemic until present, was there a time period where
19 the capacity of the club was restricted?
20   A.  Yes.
21   Q.  And what was the restrictions?
22   A.  Fifty percent, I believe.
23   Q.  And do you know when the restriction was
24 lifted?
25   A.  I could look it up, but off the top of my head,

Page 12

1  no.
2    Q.  Was it within the past couple of months?
3    A.  Yes.
4    Q.  Did the club have any capacity restrictions not
5  related to the pandemic?
6    A.  If I recall, yes.
7    Q.  What's the capacity of the club, say --
8    A.  I don't know exactly.
9    Q.  What would be your best guess?
10   A.  400-plus.
11   Q.  And I understand there is a door person that
12 will check customer IDs as they're entering the club.
13 Is that right?
14   A.  Yes.
15   Q.  And they would also -- the door person might
16 also collect the cover charge that's charged by the
17 club?
18   A.  Yes.
19   Q.  And are there other restrictions on customers
20 entering the club?
21   A.  Yes.
22   Q.  What are they?
23   A.  If they're intoxicated, we don't allow them in.
24   Q.  Anything else?
25   A.  If they're acting inappropriately.

Page 13

1    Q.  What would be an example of acting
2  inappropriately such that a patron wouldn't be allowed
3  to enter Heartbreakers?
4    A.  Acting like he's high.
5    Q.  Are there any clothing or dress restrictions
6  for customers entering Heartbreakers?
7    A.  Clean, neat attire.
8    Q.  What would be an example of a patron who was
9  not dressed appropriately to enter Heartbreakers?
10   A.  I don't -- I -- that would be -- I don't know.
11   Q.  Have you ever seen or told the door person that
12 patron needs to go, they're not clean or neat in attire?
13   A.  What time frame are we talking about?
14   Q.  Well, we'll say in the past three years.
15   A.  No.
16   Q.  Is the cover charge, is it $9?
17   A.  Currently.
18   Q.  Has it been $9 for the past three years?
19   A.  I have to check my records; not sure.
20   Q.  If there was a different charge that was
21 charged in the past three years, do you know what that
22 would be?
23   A.  Six, I believe.
24   Q.  And that's money that goes to the club.
25 Correct?

Page 14

1   A.  Correct.
2   Q.  Is there any time period where the cover charge
3 is waived?
4   A.  Yes.
5   Q.  When is it waived?
6   A.  After 1:45 in the morning.
7   Q.  So if someone enters within 15 minutes that the
8 club is going to close, you would waive the cover
9 charge?
10   A.  Yes.
11   Q.  And I understand the current operating hours
12 are 4:00 p.m. to 2:00 a.m.
13   A.  Correct.
14   Q.  And is that for every single day?
15   A.  Correct.
16   Q.  Prior to the pandemic, I understand that hours
17 were 11:30 a.m. to 2:00 a.m.  Is that accurate?
18   A.  Correct.
19   Q.  And prior to the pandemic, was it 11:30 a.m. to
20 2:00 a.m. every day of the week?
21   A.  No.
22   Q.  What days of the week was it different?
23   A.  Saturday and Sunday.
24   Q.  And what time -- what were the times on
25 Saturday and Sunday?

Page 15

1   A.  Noon to 2:00.
2   Q.  Is there any advertising for Heartbreakers?
3   A.  Not that I -- internal only that I know of.
4   Q.  Okay.  What do you mean by "internal"?
5   A.  TVs say stuff on them, you know.
6   Q.  You mean inside the club?
7   A.  Correct.  Correct.
8   Q.  Are you a part of or do you help work on the
9 website at all for Heartbreakers?
10   A.  No.
11   Q.  Are you a part of or do you work on any of the
12 social media for Heartbreakers?
13   A.  No.
14   Q.  Do you know who does?
15   A.  No.
16   Q.  As the general manager, are you in charge of
17 supervising all the staff at the club?
18   A.  Yes.
19   Q.  Is there any employees of the club that you are
20 not over as a general manager?
21   A.  Maintenance.
22   Q.  Anyone else?
23   A.  Not to my recollection.  Office staff -- office
24 staff, I'm not really over the office staff.
25   Q.  Okay.  And who all would be included in the

Page 16

1 office staff?
2   A.  Ladies that work upstairs in the office.
3   Q.  So I understand there's one named, I think,
4 Barbara.  Is that correct?
5   A.  That's correct.
6   Q.  And I understand Barbara may have, like, a
7 helper or assistant that works with her.  Is that
8 accurate?
9   A.  That would be correct, also.
10   Q.  Do you know her name?
11   A.  Nora Diaz.
12   Q.  Other than Nora and Barbara and, obviously, the
13 Armstrongs, is there anyone else that works in the
14 office area that you are not a supervisor of?
15   A.  From time to time she brings in other help
16 that, you know -- but that varies.
17   Q.  So the people that are kind of permanently
18 there or more stably there, Barbara and her assistant
19 Nora.  That's it?
20   A.  Correct.
21   Q.  But you would have supervision authority over
22 all the bartenders.  Right?
23   A.  Correct.
24   Q.  And the waitstaff?
25   A.  Yes.

Page 17

1   Q.  And the floor managers?
2   A.  Yes.
3   Q.  And the kitchen staff?
4   A.  Yes.
5   Q.  And the, I guess, the executive room manager?
6   A.  Yes.
7   Q.  I understand the executive room manager is
8 currently someone named Terry.  Is that right?
9   A.  Yes.
10   Q.  What's Terry's last name?
11   A.  Davis.
12   Q.  Have you had to provide testimony as a witness
13 on behalf of Heartbreakers in other legal actions?
14   A.  Yes.
15   Q.  What cases?
16   A.  I'd have to research them.  I don't know off
17 the top of my head.
18   Q.  When was the last time that you had to provide
19 any sort of testimony on behalf of Heartbreakers?
20   A.  Several years ago.
21   Q.  Have you testified or provided either
22 deposition or trial testimony on behalf of Heartbreakers
23 in any case involving an entertainer suing the club?
24   A.  Yes.
25   Q.  Do you recall what, if any, those cases were?

Page 18
1  A. No, I do not.
2  Q. Do you know the names of the dancers that were
3  involved in those cases?
4  A. I'd have to look them up. I don't know them
5  off the top of my head.
6  Q. Did you have to provide testimony in a
7  deposition format like what we're doing today?
8  A. Yes.
9  Q. Did you have to testify at trial in a
10 courtroom?
11 A. For dancer cases?
12 Q. Yes.
13 A. No.
14 Q. Do you recall what the subject matter was of
15 the dancer cases in which you had to provide deposition
16 testimony?
17 A. Employment, I believe.
18 Q. Do you know what the dancers were claiming?
19 A. That they -- yes.
20 Q. What were they claiming?
21 A. Claiming they should have been employees, I
22 guess.
23 Q. Do you know if they were making claims under
24 the Fair Labor Standards Act?
25 A. I don't know -- no.

Page 19
1  Q. Do you know what the result of those lawsuits
2  were?
3  A. No.
4  Q. Did you ever -- as the general manager at
5  Heartbreakers, did you ever have to get trained on what
6  the Fair Labor Standards Act was or its requirements?
7  A. No.
8  Q. Did anyone else at the club, underneath your
9  supervision, have to go through any training on the Fair
10 Labor Standards Act or its requirements?
11 A. Not to my knowledge.
12 Q. I understand from talking to some of the other
13 managers that there are some employment posters up. We
14 may look at some of those in a minute. Are you aware of
15 any posters involving labor employment that are posted
16 in the club?
17 A. Labor employment?
18 Q. Yes.
19 A. No.
20    Well, I guess. There's a bunch posted. I
21 don't know exactly what they all say.
22 Q. Where are they located?
23 A. In the club.
24 Q. Well, yeah. Where in the club?
25 A. In the back area.

Page 20
1  Q. Where is the back area of the club?
2  A. In the back behind the bar.
3  Q. And that's behind the bar where the main stage
4  area is?
5  A. No.
6  Q. Where is -- I understand there's a bar on both
7  sides, the pool table side and the stage side. Is that
8  accurate?
9  A. Yes.
10 Q. So where is the back area, behind which bar?
11 A. The bar that's -- well, the older bar. I don't
12 know how to tell you which bar it is. You know, the one
13 away from the pool tables.
14 Q. The one in the room where the pool tables are?
15 A. No, the other room.
16 Q. Okay. The room -- I've been calling that the
17 main stage area because I understand there's three
18 stages in that area.
19 A. That's correct. That's correct. I didn't mean
20 to interrupt you.
21 Q. No, it's okay. I'm just trying to make sure
22 we're on the same page where the posters are located.
23    The back area behind the bar of the main
24 stage area, is that where, like, the manager's office
25 is?

Page 21
1  A. Well, yes.
2  Q. And is that where the dressing room is located?
3  A. No.
4  Q. Where is the dressing room located?
5  A. Behind the DJ booth.
6  Q. Do the -- the entrance to the club, is there
7  only one entrance for patrons?
8  A. Correct.
9  Q. Do the entertainers, do they also come in that
10 same entrance?
11 A. Correct.
12 Q. When an entertainer comes to the club to
13 perform, does she have to check in with anyone?
14 A. DJ.
15 Q. Does she check in after she's already dressed
16 to perform?
17 A. No.
18 Q. Does the DJ keep track of the time that the
19 entertainers come in?
20 A. Yes.
21 Q. Is that something that's logged like in a
22 computer?
23 A. Handwritten.
24 Q. Are those handwritten records kept?
25 A. I don't know.

Page 22

1  Q. Well, what would the DJ have to do with those
2  records at the end of the evening?
3  A. The cashier -- he would give them to the
4  cashier when she got there.
5  Q. And does the cashier have to input that
6  information into the computer system?
7  A. Yes.
8  Q. I'm going to show you what I'm marking as
9  Exhibit 1 to your deposition.
10         (Exhibit No. 1 was marked.)
11  Q. (BY MS. MONTGOMERY) Let me know if you can see
12  that or if I need to make it a little bigger.
13  A. I can see it.
14  Q. And it's called an "Hours and Earnings" detail
15  report from Heartbreakers. I'll represent I got this
16  from defense counsel in this case.
17  A. Okay.
18  Q. Have you ever seen one of these hours and
19  earnings reports before?
20  A. Probably.
21  Q. Is this something that's put together from the
22  time records that the cashiers are inputting?
23  A. I would assume so.
24  Q. Is this something -- this hours and earnings
25  report, is this something that would be available for

Page 23

1  any of the employees of Heartbreakers?
2  A. I would assume, yes.
3  Q. Like we could pull one up for a bartender or a
4  waitress?
5  A. It would -- I couldn't, but it would have to be
6  found.
7  Q. But it's something that's tracked by the club.
8  Right?
9  A. I would assume.
10  Q. Well, do you know, as the general manager, if
11  the club is tracking the days and time that its staff is
12  working?
13  A. Yes.
14  Q. Is there any staff that is hourly earning?
15  A. Yes.
16  Q. Who is the staff that earns by the hour? Like
17  what roles?
18  A. Bartenders, waitresses.
19  Q. Anyone else that's paid hourly?
20  A. Door person, cashier.
21  Q. And then are the managers paid on a salary
22  basis?
23  A. Some are; some aren't.
24  Q. Were the individuals at the club, the staff
25  that is hourly like the bartenders or the waitresses, do

Page 24

1  they get any benefits?
2  A. What's benefits?
3  Q. Like health insurance, paid time off, that sort
4  of thing.
5  A. Health insurance, no. Vacations, yes.
6  Q. What's the vacation policy?
7  A. After five years, I believe, you get one week's
8  vacation, and it goes up every year after that.
9  Q. So if you haven't worked there for five years,
10  you wouldn't get vacation time?
11  A. Correct.
12  Q. Is there any other benefits that the hourly
13  paid staff would get?
14  A. I can't think of any.
15  Q. Do the managers that are salaried, do they get
16  any benefits?
17  A. Vacation.
18  Q. Is it the same policy, the after five years?
19  A. Correct.
20  Q. How many managers are working on any given
21  evening at Heartbreakers?
22  A. Two.
23  Q. So Monday night even there would be two
24  managers?
25  A. No. One on Monday.

Page 25

1  Q. What nights would there be two managers?
2  A. Friday and Saturday.
3  Q. And do they just split up the duties, or do
4  they have -- like, when there's two managers, or do they
5  have, like, specific assignments?
6  A. They both take care of all the duties.
7  Q. Does the executive room manager, is that person
8  the same all the time? Like, is it just Terry that does
9  that?
10  A. No.
11  Q. There's other executive room managers?
12  A. Executive room persons, yes.
13  Q. Oh, they're not called managers?
14  A. Correct.
15  Q. The executive room person, do they have the
16  ability to hire and fire staff?
17  A. No.
18  Q. The executive room person, what all is included
19  in their responsibilities?
20  A. Collect cover charge for the executive room and
21  monitor the floor.
22  Q. When they're monitoring the floor, what are
23  they looking for?
24  A. Illegal activity.
25  ==Q. The executive room, I understand, has a cover==

Page 26

1  charge of $30.  Is that correct?
2      A.  Yes.
3      Q.  And then I understand at least recently there's
4  some policy where the entertainers are paid $10 of the
5  $30 charge?
6      A.  Correct.
7      Q.  And so the $30, does that go to the club?
8      A.  No.
9      Q.  Where does the $30 go to?
10     A.  Well, $10 you just said went to a dancer.
11     Q.  Well, I was getting to that.  I think I
12 understood that the club collects $30 from the patron
13 first.  Right?
14     A.  Correct.
15     Q.  And then the club would pay back the $10 to the
16 entertainer that brought that patron to the executive
17 room.  Right?
18     A.  Correct.
19     Q.  And who would be responsible for that exchange
20 of money?
21     A.  The executive person.
22     Q.  As the general manager, are you responsible for
23 assisting in the maintenance on the property?
24     A.  No.
25     Q.  And I'll say it a different way:  Are you

Page 27

1  responsible for helping schedule any maintenance, even
2  though I understand a maintenance team actually performs
3  the maintenance?
4      A.  I might call -- like, if the hood is broken, I
5  might call, you know, a person to come out and fix it or
6  the ice machine, if that's what you're getting at, yes.
7      Q.  Yes, that's what I'm asking.
8      A.  Yes.  Yes.
9      Q.  You're the person, I guess, that would make the
10 call of you need to, you know, remedy this problem with
11 the building?
12     A.  That would be -- that would be any person that
13 manages the club.
14     Q.  What would you say is different about your role
15 as general manager from that of a regular floor manager?
16     A.  They have to -- they have to report to me.
17     Q.  Okay.  What are they reporting to you that they
18 can't handle themselves?
19     A.  No.  It's just they report to me anything that
20 happens during their shift.
21     Q.  So they'd be expected to handle it, but they'd
22 also be expected to tell you that it happened.  Right?
23     A.  That would be correct.
24     Q.  As the general manager, do you handle any of
25 the, I guess, sign-up of the new entertainers?

Page 28

1      A.  No.
2      Q.  Is it -- who would normally handle that?
3      A.  The cashier.
4      Q.  So if a girl walks into the club and wanted to
5  start performing and she had never performed at
6  Heartbreakers before, you would tell her to go see the
7  cashier?
8      A.  No.
9      Q.  Who would you tell her to see?
10     A.  Well, I would talk to her.
11     Q.  Okay.  What would you talk to her about?
12     A.  If she was -- we have to do a back- -- let her
13 know we have to do a criminal background check on her
14 and ask her if she's had any arrests prior to showing
15 up.
16     Q.  Okay.  Anything else?
17     A.  Make sure she had a good ID.
18     Q.  Okay.  Anything else?
19     A.  No.  Well, I can't think of anything at this
20 time.
21     Q.  Would you have her audition for you?
22     A.  No.
23     Q.  Would you ask her about her prior gentlemen's
24 club experience?
25     A.  Occasionally.

Page 29

1      Q.  Would you say it's a requirement to work at
2  Heartbreakers that the entertainer had previously danced
3  at other clubs?
4      A.  No.
5      Q.  Is there any sort of educational requirement to
6  work there?
7      A.  No.
8      Q.  Who would go through the paperwork -- let's say
9  you did the background check and it was okay and her ID
10 was okay.  Who would do the paperwork or go through the
11 paperwork with the new entertainer?
12     A.  Cashier.
13     Q.  Is there a paperwork that has to be signed or
14 filled out by other staff at the club if they're being
15 hired?
16     A.  The office, I would imagine.  I'm not sure if
17 they sign stuff or not.
18     Q.  So like if a bartender came in and there was an
19 open bartender position and they were applying to work
20 at Heartbreakers, what would you go through with them?
21     A.  Same; interview, you know, and do background
22 checks on their work history and their criminal history.
23     Q.  So you would ask them for, like, references of
24 where they'd worked?
25     A.  Correct.  Correct.

Page 30
1  Q. And then if, like, say that they passed all of
2  that, what would happen then? Who would you send them
3  to after that?
4  A. Well, then the paperwork would go to the
5  office.
6  Q. So someone in the office staff would go through
7  whatever paperwork they needed with the bartender?
8  A. They would review what the bartender had filled
9  out.
10 Q. Okay. So you would be able to provide, like,
11 whatever package of new employee paperwork they needed
12 to fill out?
13 A. Correct.
14 Q. Okay. And what all do they have to fill out?
15 Like a bartender, for example, what would they have to
16 fill out or sign as a part of that package of paperwork?
17 A. It's about 40 pages long.
18 Q. Okay. Let me show you what I'm marking as
19 Exhibit 2.
20       (Exhibit No. 2 was marked.)
21 A. Uh-huh.
22 Q. (BY MS. MONTGOMERY) Can you see that?
23 A. I see it.
24 Q. It says it's an "Entertainer/Employee
25 Information," and I'll represent this is actually -- the

Page 31
1  one that's filled out right here is actually an
2  entertainer. But my question is: Would a bartender or
3  waitress need to fill out the form that we're looking at
4  in Exhibit 2?
5  A. I don't know for sure, but probably.
6  Q. Okay.
7        MS. MONTGOMERY: Let me send these in the
8  chat before I forget. Give me just a second.
9  Q. (BY MS. MONTGOMERY) Let me show you what I'm
10 marking as Exhibit 3.
11       (Exhibit No. 3 was marked.)
12 Q. (BY MS. MONTGOMERY) And I can scroll through
13 the whole thing. Can you see that?
14 A. Yes, ma'am.
15 Q. And I want to know if this type of agreement in
16 Exhibit 3 is something that is presented to the other
17 staff like a bartender?
18 A. I don't know. I haven't looked at that packet
19 in a few years.
20 Q. Okay. Do you know if they are required to sign
21 some sort of contract with them designating them as an
22 employee?
23 A. No contract. No, no contract.
24 Q. When you are talking to a new potential
25 performer, an entertainer at Heartbreakers, before you

Page 32
1  send her to the cashier, do you discuss the option of
2  being an independent contractor or employee with that
3  entertainer?
4  A. Cashier handles that.
5  Q. Are you aware of any entertainers at
6  Heartbreakers currently that signed an employee
7  agreement as opposed to an independent contractor
8  agreement?
9  A. Not to my knowledge.
10 Q. Do you know if there's any monies being paid by
11 the club to any of the entertainers, other than the $10
12 executive room commission, for lack of a better word,
13 that we've already discussed?
14 A. Not to my knowledge.
15 Q. Now, there are some fees that are paid by the
16 entertainers to the club. Correct?
17 A. Correct.
18 Q. And I think they're called -- you call them
19 floor fees?
20 A. I believe they're called house fees.
21 Q. Okay. And those house fees change with --
22 depending on when an entertainer starts her performance,
23 like what time of the evening she starts her
24 performance. Is that correct?
25 A. Correct.

Page 33
1  Q. So the earlier she shows up, the lower the
2  house fee is. Right?
3  A. Correct.
4  Q. So if she shows up later on, the house fee may
5  go higher?
6  A. Correct.
7  Q. If I understand correctly, also, it's -- the
8  entertainer will pay that house fee to the club at the
9  end of the night when she's checking out with the
10 cashier. Is that accurate?
11 A. Correct.
12 Q. Do you know if the cashier keeps records of the
13 amounts of house fees that are paid by the girls?
14 A. Correct.
15 Q. And I'm -- just to be clear, since I said
16 "girls," are all of the entertainers or dancers at
17 Heartbreakers women?
18 A. Correct.
19 Q. Now, I understand that on occasion the managers
20 have the authority to waive the collection of the house
21 fee for an entertainer. Is that right?
22 A. Correct.
23 Q. But the general policy is that all entertainers
24 would pay the house fee unless a manager waived that
25 fee. Right?

Page 34

1  A. That's -- there's not a general policy to that
2  effect.
3  Q. Well, I guess it's an exception that an
4  entertainer would have to pay the house fee unless a
5  manager accepted that for her or waived it for her.
6  Right?
7  A. The cashier could do that also, probably.
8  Q. Okay. And would that be notated somewhere?
9  You know, if they're keeping records of the house fees
10 that are paid by each entertainer, would they also
11 notate if somebody waived it?
12 A. The amount they collected would be noted.
13 Q. Yes. But would there be some notation? For
14 example, we saw that the -- we saw in Exhibit 1 that
15 there's an hours and earnings report that could be run
16 for an entertainer's dates and times she performed. Is
17 there also a record of when she performed and the club
18 waived the house fee?
19 A. I don't believe so.
20 Q. Is there any of the staff that shares tips or
21 pools their tips?
22 A. No, not to my knowledge.
23    I take that back. Two bartenders behind
24 the bar split the bar tips at night.
25 Q. And would they split those tips with any of the

Page 35

1  waitstaff or just the two bartenders?
2  A. Just the two bartenders.
3  Q. Is there any policy or agreement at
4  Heartbreakers that non-tipped employees receive any
5  portion of the tips that go to other people?
6       MR. KING: Objection; form, ambiguous.
7  Q. (BY MS. MONTGOMERY) You can answer.
8  A. No policy.
9  Q. Do you know if that happens, whereby either the
10 entertainers or the DJ or the bartender split their tips
11 with other people at the club, other staff or non-tipped
12 employees at the club?
13 A. I don't know of any.
14 Q. Is it customary for the entertainers to tip any
15 of the other staff at the club?
16 A. No.
17 Q. When do you normally work at the club? When
18 you are usually present, I should say?
19 A. Wednesday, Thursday, Friday.
20 Q. And are you there during all hours of operation
21 Wednesday through Friday?
22 A. Correct.
23 Q. Do you have your own office?
24 A. Correct.
25 Q. Where is that located?

Page 36

1  A. Second floor.
2  Q. Is that by where Peggy and Mike Armstrong's
3  offices are?
4  A. No.
5  Q. Is it on the other side?
6  A. Yes.
7  Q. Does any of the staff at the club, do they
8  monitor or track the number of private dances any
9  entertainer may perform in an evening?
10 A. No.
11 Q. Does the club track how many -- I've heard this
12 called different things -- but a private booth is rented
13 by any of the entertainers?
14 A. There are no private booths.
15 Q. What is the -- they've been calling it a booth.
16 Some place that you --
17 A. I'm sorry. It's a booth, but it's not private;
18 it's open.
19 Q. Okay. So I'll just say "booth" then.
20 A. Okay.
21 Q. Is there anyone tracking the private booths, I
22 guess, rented by any entertainer?
23 A. Yes.
24 Q. Who tracks that?
25 A. Cashier, DJs, and managers.

Page 37

1  Q. So if an entertainer -- well, first let me ask
2  this: Is the booth rented by the entertainer, or is it
3  rented by the customer?
4  A. Entertainer.
5  Q. So if an entertainer wants to entertain in the
6  booth area, who does she approach to pay the $20 cover
7  charge?
8  A. Cashier.
9  Q. Now, does she -- for the $20, is that for the
10 evening she can use the booth?
11 A. Yes.
12 Q. Are there any monetary fines or penalties
13 imposed on the entertainers?
14 A. No.
15 Q. I understand that Heartbreakers is considered a
16 sexually-oriented business under the laws of the city
17 and the state. Is that correct?
18 A. Correct.
19 Q. And as a result of being a sexually-oriented
20 business, there's some extra laws or rules that apply
21 to -- between the entertainers and the customers of
22 Heartbreakers. Is that accurate?
23 A. Correct.
24 Q. And so I understand one of those rules is about
25 the clothing that an entertainer is allowed to wear;

Page 38
1  namely, that there has to be -- it has been described to
2  me as some coverage on the bottom.  Is that correct?
3      A.  Yeah.  Yes, it has to be covered.  It can't be
4  exposed.
5      Q.  And bear with me here because remember we're
6  taking this deposition for people who may not understand
7  how these business rules work, so I'm going through some
8  things that seem probably -- you know, goes without
9  saying to you, but we need to make sure everybody is on
10 the same page.  Okay?
11     A.  Yes, ma'am.
12     Q.  Okay.  So can you describe what the restriction
13 or rule is about an entertainer's clothing in a
14 sexually-oriented business?
15     A.  They're -- the vaginal area needs to be covered
16 opaquely where you cannot see through it or anything,
17 you know, needs to cover that area.
18     Q.  And that's during the whole time that she's
19 performing or entertaining at the club.  Correct?
20     A.  The whole time she's on the floor, correct.
21     Q.  And is that something -- if an entertainer was
22 violating that law, is that something that you either as
23 a general manager or the floor manager would have to
24 speak to her about?
25     A.  Correct.

Page 39
1      Q.  And you'd have to take action to make sure that
2  they complied with that law.  Right?
3      A.  Correct.
4      Q.  Is it your understanding that if an entertainer
5  is violating the law when it comes to, you know, being
6  covered, her clothing, that that has an impact on the
7  club as well?
8      A.  If you break the law, you have an impact.  If
9  you're running a business and you break the law, it
10 would have an impact, I would assume.
11     Q.  Right.  That's what I'm asking is, if an
12 entertainer is breaking a law of the sexually-oriented
13 business herself by what she's wearing or not wearing,
14 as the case may be, does that have a potential impact on
15 the club?
16     A.  Potential.
17     Q.  Has the club ever had a problem, any violations
18 of the city ordinances that you're aware of?
19     A.  Not that I'm aware of.
20     Q.  I understand another one of the laws that
21 applies to a sexually-oriented business has to do with
22 contact between an entertainer and a customer.  Is that
23 correct?
24     A.  Correct.
25     Q.  And I don't know if I know the rule fully, but

Page 40
1  there's some limitation on the type of contact that can
2  happen between an entertainer and a customer.  Is that
3  correct?
4      A.  Correct.
5      Q.  And so as a manager, general manager of the
6  club, that's also something that, if it was being
7  violated either by the customer or the entertainer, the
8  manager would need to step in and correct that.
9  Correct?
10     A.  Correct.
11     Q.  If an entertainer violated that law, let's say
12 the contact law, is that something that would prevent
13 her from continuing to perform at the club?
14     A.  Repeated actions would.
15     Q.  And has there been any entertainers that you've
16 had to restrict from performing at the club because they
17 have violated the law?
18     A.  No, not to my knowledge.
19     Q.  Is there any entertainers that you've had to
20 restrict from performing at the club due to other
21 reasons?
22     A.  What do you mean "restrict"?
23     Q.  Prevent them from performing at the club
24 anymore.
25     A.  Correct.

Page 41
1      Q.  What are some other reasons that you have had
2  to tell an entertainer you can't perform here anymore?
3      A.  Breaking -- breaking the laws that we go by.
4      Q.  Well, I guess my question is:  Other than
5  breaking the law, is there any other reason an
6  entertainer would be restricted from ever performing at
7  Heartbreakers again?
8      A.  Yes.
9      Q.  What would be another reason, besides breaking
10 the law?
11     A.  Theft, which is breaking the law.
12     Q.  And you're right.  I should be clear.  So other
13 than breaking the laws particular to sexually-oriented
14 business, there are other criminal laws and that might
15 get -- if an entertainer was breaking another criminal
16 law, that would get her restricted from performing at
17 the club again.  Right?
18     A.  Correct.
19     Q.  Is there anything other -- that doesn't have
20 anything to do with breaking the law, per se, that would
21 get an entertainer restricted from performing at
22 Heartbreakers?
23     A.  Not to my knowledge.
24     Q.  I understand also that if a -- you know, the
25 laws don't just apply to the entertainer.  They also

**Page 42**

1 apply to the patrons or customers of a sexually-oriented
2 business.  Right?
3     A.  Correct.
4     Q.  So if a customer/patron was violating the
5 contact rules that are applicable, is that something
6 that the manager would also have to restrict?
7     A.  Correct.
8     Q.  Would you kick that patron out?
9     A.  It's possible.
10    Q.  Have you ever had to?
11    A.  Yes.
12    Q.  When was the last time that you had to do that?
13    A.  I can't recall.  It's been a while.
14    Q.  More than a couple of years?
15    A.  I can't -- anything over a year is long term.
16 I don't know.
17    Q.  So longer than a year?
18    A.  Well, probably since the pandemic has happened.
19    Q.  Is the -- as the general manager, do you do any
20 of the closing procedures at the end of the night?
21    A.  Yes.
22    Q.  Do you close out the various registers around
23 the club?
24    A.  I don't close them out, but they do check out
25 with me.

**Page 43**

1     Q.  Okay.  So then they -- that means that the -- I
2 guess the cashier at the end of the night, she would
3 come and check out and provide you her receipts for --
4 at the end of the evening?
5     A.  Correct.  Correct.  Correct.
6     Q.  And then what do you do with the gathered
7 receipts and cash register checkouts?
8     A.  Put them in a bag, and put them in the safe.
9     Q.  Do you have to input any of that into a
10 computer system?
11    A.  No.
12    Q.  Do you have to review it to make sure it's
13 balanced?
14    A.  No.
15    Q.  You just physically take it and put it in the
16 safe?
17    A.  Well, I make sure that they balance, but I
18 don't review it.  If it doesn't, the office reviews it.
19    Q.  So you just notify the office, like this one
20 doesn't appear to balance?
21    A.  If the bartender is supposed to be turning in
22 say $2,500 and he only turns in 2,300, we make a
23 notation of that, and then the office verifies what he
24 counted and what was accurate.
25    Q.  Is there a particular person in the office

**Page 44**

1 that's verifying the monies?
2     A.  I think it's the two of them.
3     Q.  Barbara and Nora?
4     A.  Yeah, I think they do it together.
5     Q.  Prior to owning your own club, did you work at
6 any other gentlemen's clubs?
7     A.  No.
8     Q.  What made you get into the business?
9     A.  Guy came in, talked me into it.  I had a
10 regular club, and he talked me into doing that.
11    Q.  What kind of regular club did you have?  Was it
12 like a bar?
13    A.  Yeah, a dance -- a dance club, you know, DJ.
14    Q.  Was it also -- was it called Whitey's?
15    A.  Correct.
16    Q.  And then you just converted to a
17 sexually-oriented business?
18    A.  Correct.
19    Q.  How long did you run the dance club?
20    A.  Several years.
21    Q.  Did you work with or own your dance club with
22 anyone else?
23    A.  It was a corporation.
24    Q.  What was the name of the corporate entity?
25    A.  Fortright.

**Page 45**

1     Q.  Fortright, R-I-G-H-T?
2     A.  Correct.
3     Q.  Have you owned any other businesses, besides
4 the dance club?
5     A.  Yes.
6     Q.  What other businesses have you owned?
7     A.  I have a tree farm.
8     Q.  Is that something you currently own?
9     A.  Correct.
10    Q.  Is it operated under a business name, a
11 corporate entity?
12    A.  Forster and Forster.
13    Q.  Do you own that with someone in your family?
14    A.  Correct.
15    Q.  So who's the person that you own it with?
16    A.  Laurie, my spouse.
17    Q.  And where is the tree farm located?
18    A.  East Texas.
19    Q.  What kind of trees do you sell?
20    A.  I don't sell any.
21    Q.  I'm sorry?
22    A.  I don't sell trees.
23    Q.  Oh, okay.  What do you sell?
24    A.  I don't sell anything.
25    Q.  Do you grow trees?

Page 46
1   A. Correct.
2   Q. But you don't grow them for sale?
3   A. No.
4   Q. What would be the purpose of growing them?
5   A. I like going and hanging out in the forest.
6   Q. But it's a business, but you don't sell
7 anything there?
8   A. Correct.
9   Q. Do you own any other businesses?
10  A. No.
11  Q. Let me mark this as Exhibit 4 to your
12 deposition.
13          (Exhibit No. 4 was marked.)
14  Q. (BY MS. MONTGOMERY) And I won't scroll through
15 the whole thing for you, but I will say that this is a
16 prior lawsuit against Heartbreakers, and this lawsuit
17 was by a person named Frankie Henderson. Is that an
18 entertainer that you know or are familiar with?
19  A. I recognize the name.
20  Q. Is that one of the cases that you had to
21 provide your deposition testimony for?
22  A. I believe so.
23  Q. Okay. And you don't know what the result was
24 in that case?
25  A. No, I do not.

Page 47
1   Q. I'll show you what I'm marking as Exhibit 5 to
2 your deposition.
3          (Exhibit No. 5 was marked.)
4   Q. (BY MS. MONTGOMERY) Again, I'll represent to
5 you this is another lawsuit that was filed against
6 Heartbreakers it looks like in June of 2014 by someone
7 named Stephanie Toporcer. I can't say her last name.
8 Is that a case that you're familiar with, sir?
9   A. No, I'm not familiar with that case.
10  Q. And do you know if you provided any deposition
11 testimony in this case?
12  A. I don't know I did.
13  Q. I'll show you what I'm marking as Exhibit 6 to
14 your deposition.
15          (Exhibit No. 6 was marked.)
16  Q. (BY MS. MONTGOMERY) I'll let you look through
17 this before.
18  A. Okay.
19  Q. Now, this is a document that -- it's a memo.
20 This one says March 22, 2000. Is this something that
21 you would have your -- any of your staff sign?
22  A. I believe so. I'm not sure if it's still
23 currently what we use but, you know...
24  Q. Is this a document that you would go through as
25 the general manager if a new entertainer was trying to

Page 48
1 perform at Heartbreakers, or is it something that the
2 cashier would go through?
3   A. Cashier.
4   Q. Would you go through any other policies or
5 procedures with a new entertainer that was coming to
6 perform at the club?
7   A. No.
8   Q. Who would you expect to go through that, like
9 show them the lay of the land, so to speak?
10  A. The DJ.
11  Q. I'll show you what I'm marking as Exhibit 7 to
12 your deposition.
13          (Exhibit No. 7 was marked.)
14  Q. (BY MS. MONTGOMERY) Can you read that? I can
15 make it bigger.
16  A. No. I can read it.
17  Q. I think that's the end. That's just their
18 signature. This "Heartbreaker Policy," is this
19 something that you would go through with any new
20 entertainer coming to perform at the club?
21  A. I wouldn't know.
22  Q. Who would?
23  A. I'm not sure. Cashier, I would imagine.
24  Q. If a new entertainer was coming to perform at
25 the club, would you go through any of the laws with her

Page 49
1 that are applicable to her performance at the club?
2   A. DJ again.
3   Q. Let me show you what I'm marking as Exhibit 8.
4          (Exhibit No. 8 was marked.)
5   Q. (BY MS. MONTGOMERY) Make it a little bit
6 bigger so we can see. Can you see that now?
7   A. Yes, I can.
8   Q. I'll represent to you there's about 12 pages
9 here, so it's not just one thing. But as the general
10 manager, have you posted things similar to what we
11 see -- we're looking at right now in Exhibit 8 around
12 the club?
13  A. Around the club, no.
14  Q. Where would this -- start with page 1 here of
15 Exhibit 8.
16  A. So several years ago we posted that in the
17 dressing room.
18  Q. Okay. And are you the person that would post
19 these types of warnings or rules?
20  A. No. No.
21  Q. Who would post them?
22  A. The cashier usually.
23  Q. Well, you're Whitey. Right?
24  A. Correct.
25  Q. I mean, you wrote this document. Is that

Page 50

1  accurate?
2      A.  Nope.
3      Q.  Okay.  So someone --
4      A.  My name gets put on everything whether I write
5  it or not, but I didn't write it; but I approved it
6  probably, this one.
7      Q.  Okay.  Did someone else come up with this
8  policy?
9      A.  Possibly.
10     Q.  Is this -- the page 1, the "Attention ladies:
11 Do not climb on and off the main stage," is that
12 something that's still posted up in the club right now?
13     A.  No, it is not.
14     Q.  So this next one on page 2, it's Bates stamped
15 138.  It's also got your name on it, Whitey, but it's
16 talking about the body sprays and deodorants in the
17 dressing room.  Do you see that?
18     A.  Yes, I do.
19     Q.  Is that something that you put together, or
20 you're saying someone else signed your name on it?
21     A.  I authorized it.
22     Q.  Who would actually post these up?
23     A.  Cashier.
24     Q.  Who would actually type them up?
25     A.  Cashier.

Page 51

1      Q.  Now, I understand this next page is older
2  because it shows some house fees, but it shows them
3  starting at 11:30 a.m. as opposed to the time the club
4  is currently open.  Is that correct?
5      A.  That's correct.
6      Q.  Now, do you know if the range of fees from 27
7  to $57, is that still the same?
8      A.  I believe so.
9      Q.  It's just different times because the club is
10 open different times.  Right?
11     A.  Correct.
12     Q.  At the bottom of this -- well, do you know if
13 -- not this particular one since it's older -- but if a
14 version of this is posted in the dressing room?
15     A.  Correct.
16     Q.  That outlines the fees that are owed, the house
17 fees that are owed by the entertainers?
18     A.  Correct.
19     Q.  Okay.  Do you know what this means at the
20 bottom where it says, "You must be ready and on the
21 floor to get your tip out"?
22     A.  That means you need to check in with the DJ.
23     Q.  What does it mean about the tip out?
24     A.  That's -- I don't -- that's poor wording.
25 That's an old paper.  That's not on the current paper

Page 52

1  now.
2      Q.  Was there a time period where there was a tip
3  out?
4      A.  Tip out, tip out being a -- not a mandatory
5  thing.  It's at their discretion.
6      Q.  Well, is there any time where the entertainer
7  would get tips from someone else?
8      A.  Like when you say someone else, who are you
9  talking about someone else?
10     Q.  Another staff.
11     A.  Oh, possibly.
12     Q.  So there's staff that tip the entertainers?
13     A.  Possibly.
14     Q.  Is that a regular thing?
15     A.  No.
16     Q.  Okay.  Is there still a boutique at
17 Heartbreakers, inside Heartbreakers?
18     A.  Correct.
19     Q.  Who is that run by?
20     A.  It's a young lady.  I'd have to get my records,
21 you know, to see who it is.
22     Q.  And I understand the boutique is either leased
23 or it's a separate space.  Well, I guess I understand
24 that the boutique is leased from -- whoever is running
25 it -- from the Armstrongs.  Is that --

Page 53

1      A.  Correct.  From Heartbreakers, yes, ma'am.
2      Q.  Because I understand Heartbreakers, they
3  actually own that building.  They don't rent it from
4  someone else.  Right?
5      A.  I believe they rent it, but I'm not sure of
6  that, ma'am.
7      Q.  Is this next -- this is Bates stamp 141,
8  Heartbreakers 141.  This next poster, it's also got your
9  name on it.  Right?
10     A.  Correct.
11     Q.  Is this poster still up anywhere in the club?
12     A.  It's still -- probably.
13     Q.  In the dressing room area?
14     A.  Yes, ma'am.
15     Q.  Now, this next one, Bates stamp 142 of
16 Exhibit 8, it also has your name on it.  Right?
17     A.  Correct.
18     Q.  If it has your name on it, was it something
19 that you had to approve?
20     A.  Most of the time.
21     Q.  Okay.  When would there be a time where they
22 signed your name and you did not approve it?
23     A.  When -- instances -- there's a sign that says
24 no smoking in the dressing rooms, you know, and it's got
25 my name on it.  I didn't approve it, you know, when it

Page 54

1  was put up.  But it's consideration for the other
2  nonsmokers not to smoke in a confined area.
3       Q.  Is there smoking in the rest of the club?
4       A.  Yes.
5       Q.  Do you know if there's any other posters up
6  that are signed by anybody but you?
7       A.  I believe so.
8       Q.  And what are the other posters up that you know
9  that are not signed by you?
10      A.  I believe there's a couple, but I don't know
11 exactly what the wording is on them.
12      Q.  And who signed those, if anyone?
13      A.  I believe it's got Mike Armstrong's name on it.
14      Q.  And Mike Armstrong, he's one of the owners of
15 the club.  Right?
16      A.  Correct.
17      Q.  Is there any posters up by anyone else other
18 than your- -- signed by yourself or Mr. Armstrong?
19      A.  Well, yes, posters the state makes us put up.
20      Q.  That's true.  I'm not asking about the state
21 employment posters.  I'm talking about internally
22 created Heartbreakers posters.  Are there any up there
23 other than by yourself or Mr. Armstrong?
24      A.  At this time I don't believe so.
25      Q.  In the past three years, have there been any

Page 55

1  posters up, internal Heartbreakers created posters, by
2  anyone other than yourself or Mr. Armstrong?
3       A.  I don't believe so.
4       Q.  Is there a CPA or accountant that works for
5  Heartbreakers?
6       A.  I don't know.
7       Q.  Have you ever had to work with anyone on behalf
8  of Heartbreakers, any CPA or accountant?
9       A.  No.
10      Q.  Look through these.  I think the rest of these
11 are the state posters.  Oh, here's one.  Dance dollars.
12 Can you explain what dance dollars are?
13      A.  If a customer gets dances on a credit card,
14 we're not allowed to give him cash on a credit card, so
15 we give him dance dollars that the dancers in turn turn
16 in for cash.
17      Q.  So at the end of the evening, the dancer would
18 take her dance dollars to the cashier, and she would be
19 given cash in exchange for her dance dollars.  Is that
20 correct?
21      A.  That would be correct.
22      Q.  And who does the exchange with the customer?
23 Like, the customer pays the credit card and gives -- who
24 gives them the dance dollars?
25      A.  The waitresses give it to the customer, and the

Page 56

1  customer gives it to the entertainer.
2       Q.  So I'm guessing this last poster here has to do
3  with that exchange of dance dollars for credit card
4  transactions?
5       A.  Yeah.  It's the dancer -- it's the
6  entertainer's job to get the money from her customer.
7       Q.  All right.
8           MS. MONTGOMERY:  If we can take five, off
9  the record.
10          MR. KING:  Okey doke.
11          (Recess taken.)
12      Q.  (BY MS. MONTGOMERY)  I have a few follow-up
13 questions for you, Mr. Forster.  Do you know Stacy
14 Kibodeaux -- Kibodeaux?
15      A.  I could pick her out of a lineup probably.
16      Q.  How about Jean Hoffmeister?
17      A.  Don't know her by name.
18      Q.  Hailey Chapman?
19      A.  Nope.
20      Q.  Or Roxanne Murillo?
21      A.  No.
22      Q.  Do you know how many entertainers are currently
23 signed up to perform with the club?
24      A.  No, I do not.
25      Q.  Do you know how many managers there currently

Page 57

1  are for the club?
2       A.  Yes, sir [sic].
3       Q.  How many managers?
4       A.  Four.
5       Q.  Do you know how many bartenders are currently
6  employed by the club?
7       A.  Yes.
8       Q.  How many bartenders?
9       A.  One, two, three, four, five.
10      Q.  Do you know how many cashiers there are
11 currently?
12      A.  No, I take that back.  There's probably six or
13 seven bartenders.  I just couldn't count them all real
14 quick.
15      Q.  Do you know how many cashiers are employed by
16 the club?
17      A.  Two.
18      Q.  And is that Jen and Brandi?
19      A.  That's correct.
20      Q.  Do you know if those cashiers have been there
21 three years?
22      A.  Correct.
23      Q.  I should say, they've been there at least three
24 years?
25      A.  Correct.

Page 58
1     MS. MONTGOMERY:  I'm going to reserve my
2  questions and pass the witness.
3                    EXAMINATION
4  BY MR. KING:
5     Q.  I just have a couple of questions for you,
6  Mr. Forster.
7         Do other managers ever go through the
8  dancer paperwork with dancers when they're going through
9  the intake process?
10    A.  Yes, sir.
11    Q.  How do you know that?
12    A.  Well, because they hire entertainers and
13 they're instructed to do that if there's not a cashier
14 on duty.
15    Q.  Is it left up to the managers how they go about
16 it?
17    A.  Correct.
18    Q.  Can an entertainer put on her attire and makeup
19 at home before coming to the club and checking in?
20    A.  Yes, sir.
21    Q.  Is there -- does the club have any sort of
22 requirement that they have to check in and then get
23 ready to perform?
24    A.  No, sir.
25    Q.  You've been with Heartbreakers for, what, over

Page 59
1  three decades.  How has the club changed since you've
2  been there as far as interaction with the entertainers?
3     A.  Well, over 30 years there's been a lot of
4  different interactions.  As far as the entertainers
5  pretty much, you know, a lot different now.  They wear
6  a lot different attire.  They -- they're younger.
7  There's more restrictions on them, I guess, by
8  government-controlled stuff.  Since back in the old
9  days, there was no ordinances for SOBs, but there have
10 been for the past several years that we follow.
11 They have the choice of being an employee or an
12 entertainer, and all managers and cashiers give them
13 that opportunity to decide if they want to be an
14 employee or an entertainer.  A lot of things have
15 changed as far as, you know, the signs, as far as
16 climbing on stage was an OSHA requirement.  We needed to
17 have stairs for them to go up and handrails as opposed
18 to climbing on and off stuff.  It was a safety issue.
19 It was a lot of things that have changed like that.
20    Q.  Do you ever have meetings with the other
21 managers?
22    A.  Oh, yes, sir.
23    Q.  What sort of topics do you cover with those
24 other managers specifically relating to interacting with
25 dancers?

Page 60
1     A.  Well, we make sure that if they do hire
2  somebody without a cashier present, that they do offer
3  both contracts to the individual so they have the choice
4  and explain both of those contracts to the entertainers,
5  and then they would go through and answer any questions
6  that the entertainers may have, you know, and make sure
7  that they did do a background check before they hired
8  her so that we wouldn't hire somebody that was
9  unhireable or un- -- we couldn't get a contract with
10 them, so to speak.
11    Q.  Do you know why this choice between signing an
12 employee agreement and the independent contractor
13 agreement for dancers, do you have any idea why that
14 exists?
15    A.  Well, because of entertainers, you know, trying
16 to sue people to get money.  You know, they said they
17 should have been employees when they all wanted to be
18 independent contractors, so we give them the
19 opportunity, you know.
20    Q.  Do you have any knowledge as to why no
21 entertainers have elected to become employees or have
22 elected to sign the employee agreement, to your
23 knowledge?
24    A.  To my knowledge, they all option for the other
25 one because it's more lucrative to them.

Page 61
1     Q.  In what ways?
2     A.  They get to keep all their own money that they
3  earned.
4     Q.  If they sign which agreement, just to be clear?
5     A.  If they sign the independent contractor
6  agreement.
7     Q.  So that wouldn't be the case if they signed the
8  employee agreement?
9     A.  No, no.  They would be selling something that
10 we would be offering, and they would get a commission on
11 it.
12    Q.  Any other differences?
13    A.  Well, we would schedule them; we would make
14 sure they wore the right attire and everything.  Yeah,
15 if they are an employee, we schedule them, we have
16 meetings with them, you know.  So that's the big
17 difference right there.  They get to work when they
18 want.  As an independent contractor is employed, they
19 would have to work on a schedule.
20    Q.  In terms of interacting with dancers just in
21 the past three years, can you think of any changes that
22 Heartbreakers has made?
23    A.  Well, we've made a lot of changes as far as
24 girls get to wear what they want to wear as long as it's
25 legal attire.  They don't have to -- there's a whole

Page 62
1  slew of things that have changed.  Those signs that were
2  up there, they're not up there anymore because attorneys
3  keep bringing them up like it's -- they were trying to
4  help the girls so they don't get hurt.
5        Q.  What else?  We're talking about the past three
6  years.
7        A.  Yeah.  I mean, the past three years was such a
8  blur because the last year basically just didn't exist.
9  I don't know.
10       Q.  In the 30 years that you've worked at
11 Heartbreakers, have dancers tipped you?
12       A.  Very, very rarely.
13       Q.  Has that changed at all in the past three
14 years?
15       A.  Dancers tip a lot less now.  They're -- you
16 know, everything is a variable anymore.  So, yeah, I
17 can't remember the last time a dancer tipped me; and
18 it's not a requirement for them to tip anybody.
19       Q.  Is it like that at some clubs?
20       A.  I would imagine, yes.  Some clubs require them
21 to tip out people, at least that's what the girls tell
22 me.  I don't know that for a fact.
23       Q.  Is that the case at Heartbreakers?
24       A.  We do not require anybody -- any entertainer to
25 tip anyone.

Page 63
1        Q.  That includes bartenders and waitresses?
2        A.  It's a tip.  It's not a fee.  It's a tip.  So
3  they don't have to tip anybody.  Some of them do tip,
4  you know.  Bartenders, everybody tips bartenders and
5  waitresses, you know, for service, but it's not a
6  requirement.
7        Q.  If the dancer wants to leave, you know, after
8  an hour of performing, is there any sort of protocol she
9  has to go through?
10       A.  All we ask her to do is to check with us so we
11 don't wonder what happened to her, we don't go looking
12 for her and, you know, that way -- you know, because if
13 they're there and we're looking for them, we can't find
14 her, then we start getting concerned.  We just ask that
15 she check with us, and she's good to go.
16       Q.  Out of curiosity, do dancers ever complain to
17 managers or cashiers about what other dancers are doing
18 in the dressing room?
19       A.  Correct.
20       Q.  Like what?
21       A.  Well, girls are -- if they're on Snapchat or
22 one of those forms, I don't use them, but they're
23 videotaping themselves.  They're getting naked girls in
24 the background, and they complain that they're being
25 videotaped and people are seeing them in a state of

Page 64
1  nudity without their permission over the Internet.  And
2  to my knowledge, I believe that's illegal.  I believe
3  that's a felony to tape somebody in the state of nudity
4  without their written permission.
5        Q.  Do dancers complain about any other activity or
6  conduct in the dressing room?
7        A.  Dancers complain constantly about theft.  I had
8  this here, and it's gone now.  You know, from other
9  dancers that complain about doing illegal activity.
10 Dancers are the best way we keep the club legal and
11 safe.
12       Q.  I just want to be clear.  Is there any kind of
13 scheduling requirement for dancers at the club?
14       A.  No, there is not.  They work when they want, as
15 often as they want, or as little as they want.
16       Q.  I'm curious.  Why do dancers bother to pay
17 higher house fees as the day goes on?
18       A.  You'd have to ask them.  I don't really know
19 why they do it except some of them have kids and they
20 might have to wait until they can get -- their husband
21 gets home to babysit before they can come in.
22       Q.  Any other reasons that you can think of or that
23 you've heard?
24       A.  Well, you know, they figure -- now, I've heard
25 a lot of stuff, but it's all by hearsay.  It's not

Page 65
1  really -- they want to come in later because they only
2  want to work a few hours a day.  They don't want to work
3  a full -- you know, like a normal person would work six,
4  seven, eight hours.  They just want to work two or
5  three.
6        Q.  You've met, I assume, hundreds of dancers over
7  30 years at Heartbreakers.  True?
8        A.  More like thousands.
9        Q.  Thousands.  Do you have an opinion as to
10 whether their experiences at Heartbreakers are uniform?
11           MS. MONTGOMERY:  Objection; form.
12       A.  Dancers -- dancers are not uniform.  They all
13 have a different way of doing everything.  So whatever
14 they do, it's -- there is no uniformity in entertainers.
15       Q.  (BY MR. KING)  What are some of the examples?
16       A.  Oh, some girls wear dresses.  Some girls wear
17 just, you know, minimum attire.  Some girls fix their
18 hair.  Some girls put on makeup.  Some girls don't.
19 There is no uniformity in how they perform.  Some girls
20 look at customers and smile, and some girls don't.  You
21 know, they think the scowl works.  It's a sales job, and
22 everybody approaches it differently.
23       Q.  What do you mean by "it's a sales job"?
24       A.  Well, they're selling, you know, entertainment.
25 It's like selling a car, you walk up, you meet, you

Page 66
```
 1  greet, you know, and some salesman is on the car lot
 2  waiting for somebody to come find them.  You know, they
 3  don't have initiative, they don't have drive, but
 4  there's no -- you know, they do it the way they want to
 5  do it.  You know, some people try to pick and choose who
 6  they wait on.
 7      Q.  Are some -- do some dancers have more
 8  initiative than others?
 9      A.  Oh, extremely.  You know, a lot of girls are
10  hustlers, go-getters, go out there and, you know, want
11  to make money.  And some girls just want to sit there
12  and wait for somebody to walk up to them and ask them to
13  dance for them.
14      Q.  Does that kind of variance matter to the club
15  in any way?
16              MS. MONTGOMERY:  Objection; form.
17      A.  No, it doesn't.  It doesn't matter to the club.
18      Q.  (BY MR. KING)  Why?
19      A.  Well, customers don't necessarily come in there
20  to get dances.  They come in there, you know.  We have
21  very good food, we have good drinks, you know, and we
22  have sports on TV.  So customers don't necessarily come
23  in there to get dances.  They come in there to
24  socialize, kind of like a neighborhood bar.
25      Q.  A bar with dancers, of course.  Right?
```

Page 67
```
 1      A.  Right, a bar with beautiful women.
 2      Q.  That's all I have for you unless Ms. Montgomery
 3  has some follow-up questions.
 4                  FURTHER EXAMINATION
 5  BY MS. MONTGOMERY:
 6      Q.  I have a few follow-ups for you.
 7              Mr. Forster, you said that you have
 8  meetings with your managers where you discuss the
 9  contract options that you provide to the dancers.  Is
10  that accurate?
11      A.  I've had meetings to that effect, yes, ma'am.
12      Q.  And have you trained those managers on the
13  different terms of each of the contracts?
14      A.  We've gone over those contracts, yes.
15      Q.  And what do you, as the general manager,
16  instruct your managers to tell new entertainers about
17  the differences between being -- signing the employee
18  contract versus signing the independent contractor
19  agreement?
20      A.  We instruct them to -- they'll have them read
21  it, and then we'll go back and answer any questions
22  about if you become an employee, we will pay you 2.13 an
23  hour, plus we will give you a percentages of the dances.
24  Whereas, if you're an independent contractor, you know,
25  all the dance money is yours.
```

Page 68
```
 1      Q.  And what about tips?
 2      A.  What about tips?
 3      Q.  Is there any differences in the tips that they
 4  receive under either contract?
 5      A.  Tips are a tip.  You know, it's -- a waitress
 6  gets a tip for serving a drink.  It's not a service.
 7  She still collects whatever the price of the drink is,
 8  and he tips on top of that.  Tips are each individual
 9  employee's own business.
10      Q.  So you would tell your managers that if a
11  dancer was to sign an employee agreement, they would
12  keep their tips like -- just like a waitress would?
13      A.  Correct.  After the price of the service,
14  correct.
15      Q.  And what's the percentage of dance fees that
16  they would -- that they -- that the club would keep
17  versus what a dancer got to keep under the employment
18  agreement -- the employee agreement?
19      A.  There is no percentage.
20      Q.  Oh, okay.  I thought you said there was a
21  percentage of dance fees that they got to keep as
22  commission.
23      A.  Not a percentage of them.  A percentage of the
24  cost of the dance fees.  Not a percentage of dances.
25  Like, say it's a $20 dance, maybe they would get $5.
```

Page 69
```
 1  We've never had anybody sign it, so we've never come up
 2  with a number.
 3      Q.  So there is no number that you train your
 4  managers to tell a new entertainer?
 5      A.  Correct.  Correct.
 6      Q.  And is there a specific schedule that you would
 7  tell your managers, you know, to explain, you know, if
 8  you sign this employee agreement as opposed to the
 9  independent contractor agreement, you're going to be
10  placed on this schedule in which you'll have to work
11  three days a week or four days a week?  Do you explain
12  this?
13      A.  Four days a week is a standard agreement for
14  most employees, you know.  The days of the week are all
15  variables.
16      Q.  Do the other employees sign that type of
17  employment agreement?
18      A.  I don't believe so, but like I said, I haven't
19  read the employee packet in a long time.
20      Q.  Is there expectation of the days that a
21  bartender will have to work?
22      A.  Bartenders have a set schedule.
23      Q.  And is that schedule -- like, would you be able
24  to tell a bartender up front if they were applying for a
25  job, we're going to have you working at least three
```

Page 70

1  shifts a week or something like that?
2      A.  Right.  A bartender would know what shift
3  they're working and what days they're working.
4      Q.  Is that something that you would be able to
5  tell them when you were hiring them?
6      A.  That would be correct.  You would tell them
7  four shifts a week.  You wouldn't necessarily tell them
8  what particular day, night shift, but it would be four
9  days a week.
10     Q.  And is it the same when you're discussing or
11 having your managers discuss the difference between the
12 employee contract and the independent contractor with an
13 entertainer, would she be told how many days of the week
14 she would have to perform?
15     A.  I don't believe they would give her a specific
16 number.  They would say she would have to be scheduled a
17 few days a week.
18     Q.  You don't train them to say any specific amount
19 of shifts or days of the week?
20     A.  No, ma'am.  No, ma'am.
21     Q.  Now, you said something about in the past three
22 years, one of the changes about the interaction that
23 Heartbreakers has with the entertainers is there's been
24 changes in what the entertainers can wear.  Can you
25 explain what those changes are?

Page 71

1      A.  Well, we haven't had any.  We haven't told
2  them, but they have worn less and less attire.  The
3  older dancers before used to dress up nicer, and now the
4  younger ones don't.  But that's nothing that we --
5  that's just the difference of what they're doing but not
6  how we interact with them.  They wear what they want as
7  long as it's legal, and most of them are wearing legal
8  stuff these days.
9      Q.  And I haven't been -- so there was no changes
10 as far as the way Heartbreakers interacts with the women
11 in their attire, per se?
12     A.  Correct.
13     Q.  Heartbreakers' position, at least in the past
14 three years, has just been as long as it complies with
15 the ordinances or the laws applicable to a
16 sexually-oriented business, it's fine to wear.  Correct?
17     A.  Correct.
18     Q.  Okay.  I think that's all the follow up I have.
19         MS. MONTGOMERY:  I'll pass the witness.
20         MR. KING:  Okay.
21         THE REPORTER:  Mr. King, would you like to
22 order a copy?
23         MR. KING:  Yes, please.
24         (Proceedings concluded.)
25

Page 72

1         IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
2                   GALVESTON DIVISION
3  STACEY KIBODEAUX aka        ) CASE NO.: 3:20-cv-00008
   ILLUSION, HAILEY CHAPMAN    )
4  aka DAISY, JEAN             )
   HOFFMEISTER aka JOHNE, and  ) JURY TRIAL DEMANDED
5  UNIQUE/ROXANNE,             )
   individuals,                )
6                              )
              PLAINTIFFS,      )
7                              )
   vs.                         )
8                              )
   A&D INTERESTS, INC. D/B/A   )
9  HEARTBREAKERS GENTLEMAN'S   )
   CLUB, MIKE A. ARMSTRONG,    )
10 PEGGY A. ARMSTRONG AND      )
   WHITEY DOE, INDIVIDUALS,    )
11                             )
              DEFENDANTS.      )
12
13 ----------------------------------
14           REPORTER'S CERTIFICATION
15            ORAL DEPOSITION OF
16             GEORGE B. FORSTER
17              APRIL 26, 2021
18 ----------------------------------
19        I, Velma C. LaChausse, a Shorthand
20 Reporter and Notary Public in and for the State of
21 Texas, do hereby certify that the facts as stated by me
22 in the caption hereto are true; that the above and
23 foregoing answers of the witness, GEORGE B. FORSTER, to
24 the interrogatories as indicated were made before me by
25 the said witness after being first duly sworn to testify

Page 73

1  the truth, and same were reduced to typewriting under my
2  direction; that the above and foregoing deposition as
3  set forth in typewriting is a full, true, and correct
4  transcript of the proceedings had at the time of taking
5  of said deposition.
6         I further certify that I am not, in any
7  capacity, a regular employee of the party in whose
8  behalf this deposition is taken, nor in the regular
9  employ of his attorney; and I certify that I am not
10 interested in the cause, nor of kin or counsel to either
11 of the parties;
12        GIVEN UNDER MY HAND AND SEAL OF OFFICE,
13 on this, the 11th day of May, 2021.
14
15        _____
16        Velma C. LaChausse
          Notary Public in and for
          The State of Texas
17        My Commission Expires: 03-22-2022
          U.S. Legal Support, Inc.
18        Firm Registration No. 122
          16825 Northchase Drive
19        Suite 800
          Houston, Texas 77060
20        Phone: (713)653-7100