# EXHIBIT F3

Page 1

```
                    THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF TEXAS
                              GALVESTON DIVISION

 STACEY KIBODEAUX aka              Case No.: 3:20-cv-00008
 ILLUSION, HAILEY CHAPMAN
 aka DAISY, JEAN                   JURY TRIAL DEMANDED
 HOFFMEISTER aka JOHNE and
 ROXANNE MURILLO aka           §
 UNIQUE/ROXANNE,               §
 individuals,                  §
              Plaintiff,       §
       vs.                     §
                               §
 A&D INTERESTS, INC. D/B/A     §
 HEARTBREAKERS GENTLEMAN'S     §
 CLUB, MIKE A. ARMSTRONG,      §
 PEGGY A. ARMSTRONG AND        §
 WHITEY DOE, INDIVIDUALS,      §
              Defendants.      §
                               §
```

*************************************************************
                          ORAL DEPOSITION OF

                            DAMON JACKSON

                           April 23, 2021
*************************************************************

ORAL DEPOSITION OF DAMON JACKSON, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and -numbered cause on the 23rd day of April, 2021, from 10:03 a.m. to 11:29 a.m., before Karen Aralhy Gonzalez, Commissioned Notary, in and for the State of Texas, reported by machine shorthand, remotely from Dallas County, Texas, pursuant to the Texas Rules of Civil Procedure, the Texas Supreme Court Emergency Order Regarding the Covid-19 State of Disaster and the provisions stated on the record or attached hereto.

Page 2

```
 1                A P P E A R A N C E S
 2
 3   FOR THE DEFENDANTS:
        Mr. William X. King (Via Zoom)
 4      WALLACE & ALLEN, LLP,
        440 Louisiana St.,
 5      Suite 1500,
        Houston, TX 77002
 6      Telephone:    (713) 227-1744
        Fax:          (713) 227-0104
 7      E-mail:       Wking@wallaceallen.com
 8
     FOR PLAINTIFFS:
 9      Ms. Leigh Montgomery (Via Zoom)
        ELLZEY & ASSOCIATES, PLLC
10      1105 Milford Street
        Houston, Texas 77066
11      Telephone:    (713) 554-2377
        Fax:          (888) 276-3455
12      E-mail:       Leigh@ellzeylaw.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                     I N D E X
 2
 3   Appearances . . . . . . . . . . . . . . .   2
 4   SWORN STATEMENT OF DAMON JACKSON
 5      Examination by Ms. Montgomery . . . . .   5
        Examination by Mr. King . . . . . . . .  50
 6   Changes and Signature . . . . . . . . . .  64
 7   Reporter's Certificate  . . . . . . . . .  66
 8
 9
10
11                   E X H I B I T S
12
13   1  Heartbreakers' Facebook Page . . . . . . .  22
14   2  Hours and Earnings Detail Report . . . . .  46
15   3  Memo to all Dancers/Entertainers . . . . .  47
16   4  Heartbreakers' Policy. . . . . . . . . . .  49
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1      REPORTED REMOTELY FROM DALLAS COUNTY, TEXAS
 2                   P R O C E E D I N G S
 3
 4           COURT REPORTER:  Today is April 23, 2021.
 5   The time is 10:03 a.m. Central Standard Time.
 6           The attorneys and witness participating
 7   acknowledge that I am not physically present in the
 8   examination room and that I will be reporting this
 9   remotely.  They further acknowledge that in lieu of an
10   oath administered in person, I will administer the oath
11   remotely.  This arrangement is pursuant to the Supreme
12   Court emergency order regarding the COVID-19 state of
13   disaster.  The parties and their counsel consent to this
14   arrangement and waive any objections to this manner of
15   reporting.
16           At this time, would you indicate your agreement
17   on the record, please.
18           MS. MONTGOMERY:  Leigh Montgomery on behalf
19   of plaintiffs and I agree.
20           MR. KING:  Will King on behalf of the
21   defendants.  I agree.
22           MR. JACKSON:  Damon C. Jackson, I agree.
23           COURT REPORTER:  Now, I'm going to swear you
24   in, Mr. Jackson.
25           So, if you could please raise your right
```

Page 5

```
 1   hand.
 2           (Witness presented government-issued
 3            identification prior to deposition and
 4            identity verified.)
 5           Do you solemnly swear or affirm the
 6   testimony you're about to give will be the truth, the
 7   whole truth, and nothing but the truth?
 8           THE WITNESS:  I do.
 9           COURT REPORTER:  Okay.
10           I am ready when all parties are ready.
11                DAMON JACKSON,
12   having been first duly sworn, testified as follows:
13                     EXAMINATION
14   BY MS. MONTGOMERY:
15      Q.  Mr. Jackson, are you currently an employee of
16   Heartbreakers.
17      A.  No, ma'am.  I am not.
18      Q.  When is the last time you were employed with
19   Heartbreakers.
20      A.  Oh, it's been almost six months ago.  I couldn't
21   give you an exact date.  It was probably September,
22   yeah.  And I was released after coming back from a COVID
23   break.  So we hadn't been at work for months already.
24      Q.  Okay.  Well, that was going to be my next
25   question.  Were you terminated?  Were you laid off?  Why
```

Page 6

1  did you part ways with Heartbreakers?
2      A.  Heartbreakers was only allowed to stay open
3  certain amount of hours and they decided to cut, you
4  know, their time in half.  And since my -- I had extra
5  income, I have other businesses that I work with.  So we
6  said let a manager go, so we cut me loose for the time
7  period.
8      Q.  Prior to being -- I'll call it like a layoff --
9      A.  Okay.
10     Q.  -- how long had you worked at Heartbreakers?
11     A.  An accumulated 33 years.  I worked for them in
12 the early 80s, when they first opened up.  I went back
13 to work for them in the early 90s like '93 and then I
14 came back around '96 and stayed through the current
15 date.
16     Q.  So from 1996 to September-ish 2020 --
17     A.  Yes, ma'am.
18     Q.  You were employed by Heartbreakers?
19     A.  Yes, ma'am, I did.
20     Q.  How long were you a manager at Heartbreakers?
21     A.  I was a manager for Heartbreakers for the better
22 part of, I would say fourteen years.
23     Q.  Did you hold any other role during the time you
24 were a manager?
25     A.  No, not necessarily.  I mean, I performed -- I

Page 7

1  performed other duties, like, I'd worked the front door,
2  JDed, and that sort of thing.  But I hadn't had another
3  title, no, ma'am.
4      Q.  Yeah -- and I'll give you an example.  Some of
5  the other managers, I understand, spend part of their
6  time as bartenders and part of their time as managers.
7  Did you a have a dual role like that while you were a
8  manager?
9      A.  I was the unofficial head of security.  My
10 previous position with Heartbreakers besides management
11 was executive manager and security.
12     Q.  When were you an executive manager?
13     A.  Oh, Lord.  Probably from 1996 to about 20- and I
14 want to say '07.
15     Q.  And what's the difference between being just a
16 regular manager and an executive manager?
17     A.  I took care of the upstairs.  The executive
18 lounge --
19     Q.  So the executive room area?
20     A.  The executive room areas, ma'am, yes.
21     Q.  Okay.  And I understand the executive room area
22 at Heartbreakers is similar to what other clubs might
23 call a VIP area?
24     A.  Absolutely not.  The executive lounge at
25 Heartbreakers is just an open space that's upstairs.

Page 8

1  There's no -- there's no rooms, there's no walls.  It's
2  a completely open room concept.
3      Q.  Is there a separate charge of $30 to get into the
4  executive room area?
5      A.  I'm not exactly sure what the price is right now,
6  but I believe it's 30 or 35, somewhere in that ballpark.
7      Q.  And is that something that's collected by the
8  club?
9      A.  The customer pays for that.  It is collected by
10 the club, yeah, yes.
11     Q.  The money doesn't go to the dancer or
12 entertainer, correct?
13     A.  No, ma'am, it does not.  Actually they get a
14 commission back per customer or they were when I was
15 working there.
16     Q.  And I understood that commission back was about
17 $10; is that accurate to you?
18     A.  I would believe that's correct.
19     Q.  Now, you said you have other -- either other jobs
20 or you work with other businesses; is that accurate?
21     A.  Yes, ma'am.  It is.
22     Q.  How long has that been true since you've been
23 working at Heartbreakers?
24     A.  Oh, since the day I came to work for them.
25     Q.  Okay.

Page 9

1      A.  I've always -- I'm an independent contractor
2  also.  I have a small company, and I'm a writer, author,
3  artist for a company.  And then I manufacture medieval
4  armoury for collectors.
5      Q.  We're definitely coming back to that one.  But --
6      A.  Oh, okay.  You want me to wear the helmet?
7      Q.  Let me start with the -- you said you're an
8  independent contractor, who is -- what do you mean
9  you're an independent contractor?
10     A.  I have my own company called Cavalier
11 Contracting.  Before Amazon and eBay if you were looking
12 for a historically affectionate item from your
13 childhood, or rare book, or something like that, swords,
14 you could come talk to me and I would find them for you.
15 My mother was an antique dealer for decades and so we
16 were just plugged in to the antique community.
17     Q.  And this job is that working under like a
18 business name?
19     A.  It's my a/b/a Cavalier Contracting.  But to be
20 honest with you I hardly ever use it.  Heartbreakers'
21 kept me too busy for the most part between that and the
22 armory.
23     Q.  And you said you were an author/artist for --
24     A.  Uh-huh.
25     Q.  -- is that for a specific company?

Page 10

1  A.  Yes, ma'am.  Cutting Edge Presents and Mental
2  Diversions.
3  Q.  What kind of companies are those?
4  A.  Comic Books.  We write, draw, and create comic
5  books.
6  Q.  Is there like a specific line of books that you
7  have?
8  A.  You could find my work in the Impellers, or in
9  Mental Diversions Nails.  Predominately, I do character
10 creation and layout design for them.  I'm not that great
11 of an artist but I am very imaginative.
12 Q.  And how long have you been doing that?
13 A.  I first started with Terri Wagner under Space
14 City Comics in 19- I want to say probably '92-'93.
15 Q.  And you still continue doing that till this day?
16 A.  Yes, ma'am.
17 Q.  The --
18 A.  It's been -- it's been sporadic at best.  The
19 company's folded for four, five, six years at a time.
20 Yeah, and then pops back up.
21 Q.  And how often were you working at Heartbreakers?
22 And I'll say in the past like three years, what was your
23 work schedule?
24 A.  I was normally there Tuesday night, Wednesday
25 Thursday day, Saturday night, and sometimes Sunday or

Page 11

1  Monday depending on the schedule.
2  Q.  How often were you working for or with the
3  Cutting Edge or on the comic book creation?
4  A.  To be honest with you when I worked upstairs I
5  had a lot of time to -- to do both jobs.  And when I
6  worked the front door I had downtime where I could work
7  for Cutting Edge.  And so probably six years there two
8  or three nights a week.
9  Q.  And were you doing like -- your work for the
10 comic book is that done like on a laptop or is it more,
11 like, hand drawing?
12 A.  Let's see, there's hand and laptop.  Lots of hand
13 work though.  Lots of hand.
14 Q.  Let's talk about the medieval armoury --
15 A.  Sure.
16 Q.  -- I'd like to know what that's about.  What --
17 what?
18 A.  Have you --
19 Q.  -- explain what your job is?
20 A.  Have you ever attended the Texas Renaissance
21 Festival?
22 Q.  I have not.  I've only heard about it.
23 A.  Okay.  So I work with a company called Azure,
24 A-z-u-r-e Armoury, you can look them up on Facebook or
25 you can just, you know, Google them.  And we make

Page 12

1  historically accurate armor for combat and display.  And
2  so we own the armor museum there at the Renaissance
3  Festival also.  So, you know, six weeks out of the year,
4  seven weeks out of the year.  And over there taking a
5  couple weeks off -- weekends off work.
6  But, I mean, if you're -- if there is a
7  historically accurate suit of armor you want, or a
8  helmet you want, or if there's something from a video
9  game that you love, we can make it.
10 Q.  And are you an owner in the Azure Armoury?
11 A.  No, ma'am.  But the owner and I have been
12 partners in social group for probably 23 years now.  But
13 we're founding members of a social group.  To put that
14 correctly.
15 Q.  Is the social group having to do with the
16 medieval armoury?
17 A.  Yes, ma'am.  We compete in tournaments all over
18 Texas, occasionally Louisiana.
19 Q.  There's a tournament for medieval armoury?
20 A.  There's a tournament for medieval combat, sword
21 fighting, shields, spears, hammers.
22 Q.  And you still compete in that?
23 A.  Yes, ma'am.  I do.
24 Q.  When's the last time you competed in that?
25 A.  It's been almost two and a half years.  I broke

Page 13

1  my hand twice once on January the 16th, 2019, and then
2  again on January the 17th of 2019.  I broke it in two
3  places within about 8 hours -- 9 hours of a night.  I
4  mean, it's a physically testing, you know, sport.  And
5  so I've taken a year and a half off basically to let my
6  hand heal.
7  Q.  What's your highest level of education?
8  A.  I have some college.  And I worked for the LAP
9  Music Academy out of -- out of -- in the late 80s early
10 90s as a History and English teacher.
11 Q.  Do you have a --
12 A.  Yeah.  I was --
13 Q.  -- teaching --
14 A.  Ma'am?
15 Q.  Do you have a teaching certificate?
16 A.  No, ma'am.  I do not.  I was in -- woefully
17 adequately trained for the job.  But it was a ministry
18 that tended to runaway children who were victims of
19 prostitution, child abuse, and stuff like that.  And so
20 they did -- we did a lot like in home schooling, you
21 know, we had a lot of workbooks.
22 Q.  How did you first come to work at Heartbreakers?
23 A.  Well, I was a -- an able body male the night they
24 opened up I was 19 years of age.  I come from Dickinson,
25 you know, so I was there the night they opened.  It was

Page 14

1  a big public affair, you know.
2      Q.  How -- did you know the owners at that time?
3      A.  We had met, briefly.  At a bar up in Houston.
4  But I knew a couple of people who worked there.  You
5  know, two of the entertainers who were -- who were
6  contracted there.  They were girls that I'd gone to high
7  school with.  And they'd ask me to come in and hangout
8  with them just to make sure they were safe.
9      Q.  And so then did they ask you to come work for
10 them or did you apply for a job there?
11     A.  I actually hung out there on a regular basis and
12 there were, I wouldn't say issues but, you know, bars
13 are bars and since I had friends that worked there
14 whenever there was a problem, I would step in and police
15 the situation.  And Fred Dresser offered me $100 a night
16 to come in four nights a week and do what I was going to
17 do any way.  Those were his words.
18     Q.  And who's Fred Dresser?
19     A.  He, I believe, Fred Dresser was a general manager
20 of Heartbreakers many years ago.
21     Q.  I understand Mr. Forrester is the current general
22 manager?
23     A.  Yes, ma'am.  He is.
24     Q.  And do you know how long he's been a general
25 manager Mr. Forrester?

Page 15

1      A.  I believe, that he came into the company -- he
2  came right after I left the first time.  So I would say
3  it's probably around the very late 80s.  Or, you know,
4  probably around '87, '88 is when he first came around --
5  I mean, I'm sorry about '90.  I couldn't give you an
6  exact date, it's been quite a while.
7      Q.  As a manager at Heartbreakers were you able to
8  hire other employees like bartenders or waitresses?
9      A.  I screened them.  Predominantly, George Forrester
10 does the hiring.  And we would do the -- some
11 interviewing.  And occasionally I would hire somebody if
12 I thought they were just, like, the greatest, you know,
13 waitress ever walked in the door.  And, I mean, I had
14 that ability if I wanted to.  A lot of it gets bumped
15 upstairs.
16     Q.  And does it get bumped upstairs to Mr. Forrester?
17     A.  Yes, ma'am.  Especially for a key position like
18 bartender.
19     Q.  What about for new entertainers, did you also
20 screen new entertainers that were coming -- asking to
21 perform at Heartbreakers?
22     A.  Yes, ma'am.  I have.
23     Q.  Did you do that recently, and I'll say in the
24 last year that you were there, did you screen any new
25 entertainers?

Page 16

1      A.  I had.
2      Q.  Could you walk me through the process that you
3  would do for a new entertainer who was -- who had just
4  walked in while you were on duty and said, you know, I'd
5  like to perform here, what do I need to do?
6      A.  Well they -- I would let them know that they
7  would have to have a current ID and social security card
8  -- valid social security card, or a right-to-work if,
9  you know, they were an immigrant or on a work visa.  And
10 then it would -- it would depend -- it would -- between,
11 you know, it would depend.  If I -- if I made the
12 assertion that I believe that they were an experienced
13 entertainer then we just go through the background check
14 which is priority one.  They have to have a background
15 check.
16         But if they had never worked in the industry
17 before, I would often sit down and talk to them real
18 quick about possibly waitressing.  Because of what a big
19 step in your -- your life that this is to come into the
20 entertainment.  There's a lot of girls that come to us,
21 you know, at 18, 19 years old they've never done it
22 before.  And unfortunately our society glamorizes it now
23 a days.  And so a lot of them when they come right out
24 of high school they think we'll I'll just get to work in
25 the SOB industry and I'll make a lot of money.  And so I

Page 17

1  have a talk to them real quick to make sure they
2  understood what they were doing, you know, with their
3  lives and give them the opportunity possibly to
4  waitress.
5      Q.  Let me --
6      A.  Then we would --
7      Q.  -- let me stop you for a minute --
8      A.  Sure.
9      Q.  -- I'll let you finish.  But I got a couple of
10 questions of some terms.
11     A.  Sure.  Go ahead.
12     Q.  One of those terms is SOB.  Can you explain what
13 that is?
14     A.  I believe, the technical term for an SOB is
15 sexually oriented business.
16     Q.  And if I understand correctly, sexually oriented
17 business is like Heartbreakers have some special laws
18 and regulations that they have to follow because there
19 is nudity or sexually oriented entertainment, is that
20 correct?
21     A.  Yes, ma'am.  That is correct.
22     Q.  So you would counsel if -- if a new entertainer
23 came in that had never performed as a dancer,
24 entertainer in a gentlemen's club before, you would
25 provide some counseling about that step, correct?

Page 18

1    A.  Yes, ma'am.  Undoubtedly.
2    Q.  Okay.  And --
3    A.  I worked in the industry for a lot of years, you
4  know, I have a lot of experience in it.
5    Q.  Would a -- would someone who had never performed
6  as an adult entertainer still be able to perform at
7  Heartbreakers?
8    A.  Of course.
9    Q.  Is there any requirement of -- of, like, a degree
10  or educational background in order to be a dancer or
11  entertainer?
12    A.  No, ma'am.  There is not.
13    Q.  Do -- if someone has experience, do they have to
14  go through, like, an audition or show you their
15  performance?
16    A.  Heartbreakers does not require an audition.
17    Q.  Okay.  And then --
18    A.  That would be highly frowned upon, ma'am.  If a
19  manager was to engage in that -- that it be highly
20  frowned upon.
21    Q.  Is there -- if she passed the background check
22  and went through the -- do you perform the background
23  check?
24    A.  Yes, ma'am.  I do.
25    Q.  Let's --

Page 19

1    A.  I can.  I can, yeah.
2    Q.  Let's assume that you did it for this particular
3  entertainer, would you then have -- go through the -- I
4  understand there's some paperwork that they need to
5  sign.  Do you go through the paperwork with the
6  entertainer as well?
7    A.  Yes, ma'am.  The standard procedure is to do the
8  ID check, and then the background check, and then to
9  offer them a choice between being a full-time employee
10  or becoming an independent contractor.  Which I have
11  dual copies of both contracts that they're welcome to
12  read at that time period.  And we do explain it to them
13  that you'd be put on schedule, et cetera.
14    Q.  What do you explain to them about the difference
15  between the contracts?
16    A.  So the -- primarily that the difference is, is
17  that an independent contractor you work the hours you
18  want to work, you set your own schedule, and you keep
19  your tips after paying a house fee of, you know, the
20  time slot in which you're working.
21    Q.  And what's different about the employee?
22    A.  An employee gets set on minimum wage, and has to
23  work a set standard amount of hours, and they have to
24  turn their tips into the club.  I have literally never
25  had anyone ask to be an employee.

Page 20

1    Q.  So all of the dancers or entertainers that you're
2  aware of signed or engaged at Heartbreakers under the
3  independent contract or agreement; is that a fair
4  statement?
5    A.  To my knowledge, yes, ma'am, it is.
6    Q.  And is it also true that each of the entertainers
7  when they choose to perform at Heartbreakers they are
8  also to pay a house or floor fee upon checkout?
9    A.  Yes, ma'am.  There is -- there is a set fee for
10  set times that you work.
11    Q.  And that fee increases, I understand, the later
12  the entertainer comes or is ready to perform in the
13  evening; is that accurate?
14    A.  Yes.  It increases by what time you do come in,
15  yes, ma'am.
16    Q.  And who keeps track of what -- what floor fee is
17  owed by what entertainer?
18    A.  There's a cashier that works in the back booth.
19  The entertainer checks in with the DJ when they're ready
20  for work and it's logged in by the cashier.
21    Q.  Does the DJ then put the entertainer on a
22  rotation of the stage performances?
23    A.  Yes, ma'am.
24    Q.  Is that generally a part of the work that the
25  entertainer performs at the club, meaning that the

Page 21

1  entertainer would be performing on the stage?
2    A.  Yes.
3    Q.  And I understand in the main room area there is
4  three -- three different stages?
5    A.  Yes, there is.  And one in the backside.
6    Q.  Is that -- okay.  When you say the backside is
7  that the pool area -- the pool table --
8    A.  Yes, ma'am, the club side.  The club side is what
9  we refer to it as.
10    Q.  There's one stage on the club side and three
11  stages on the other side?
12    A.  Yes, ma'am.
13    Q.  Okay.
14    A.  And very seldom except for on a weekend night are
15  all four of those stages on rotation.
16    Q.  Are there like spotlights or special lights for
17  the -- for -- like, put on the entertainers while their
18  performing on the stage?
19    A.  Yes, ma'am.  We have -- we have a light system,
20  yeah.
21    Q.  Who controls that --
22    A.  There's nothing that specifically is designed to
23  follow them or the DJ don't follow them, but we do have
24  a light show, preprogramed light show.
25    Q.  Okay.  Does the JD program that light show?

Page 22
1   A.  They came with the computer, but he keeps -- he
2   keeps track of it.  He changes it now on a regular basis
3   it's got, like, I don't know 16-17 programs that are
4   presets, you know.
5       Q.  And it would, I guess, enhance or follow the
6   performer while she's performing on stage?
7       A.  Not technically, no.  It's just a -- an ambience
8   light system.  It doesn't follow her.
9       Q.  Is the light system focused on the stage area or
10  is it also on the customer area.
11      A.  Oh, on the whole -- the whole club, yeah.
12      Q.  Do you know if the entertainers are allowed to
13  pick the music they performed to?
14      A.  Yes, ma'am, they are.  To a certain degree.  We
15  -- we, like -- I don't know the best way to put that.
16  We try to stay away from -- from, like, gangster rap
17  music.  You know, just to keep the ambience of the club
18  at a regular pace.
19      Q.  I'm going to show you an exhibit here.  Give me
20  just a second.
21      A.  Sure.
22      Q.  I'm going to mark this as Exhibit 1 and send it
23  to our opposing counsel and our court reporter in a chat
24  in a minute.
25          (Exhibit 1 marked.)

Page 23
1       A.  (BY MS. MONTGOMERY)  I'm having a horrible time
2   seeing that, just so you know.
3       Q.  Well, I'll see if I can make it a little bit
4   bigger.
5       A.  I'm on a cell phone so.
6       Q.  I'm only going to ask a couple of questions about
7   the picture.  Can you see that picture at the top?
8       A.  Vaguely, but go ahead.  We'll see -- we'll try to
9   work around each other.
10      Q.  Well, I'm trying to see -- confirm with you if
11  that -- if that shows the picture of the interior of
12  Heartbreakers club, where the stages are?
13      A.  Forgive me for a second, alright?
14      Q.  Sure.
15      A.  I believe so.
16      Q.  Okay.
17      A.  That --
18      Q.  And I'll represent to you, I pulled this -- this
19  page off of Facebook.  It said it was Heartbreakers Bar
20  in Dickinson, Texas.
21          Do you know of any other gentlemen's club or any
22  bar in Dickinson, Texas called Heartbreakers?
23      A.  None that I'm aware of, ma'am.
24      Q.  And I -- I wasn't sure until you confirmed for me
25  if this was a picture of the actual club or just some

Page 24
1   borrowed picture so --
2       A.  I believe that is correct.
3       Q.  This is a fair and accurate depiction of the
4   interior of the Heartbreakers' stages?
5       A.  Yes, ma'am.
6       Q.  Let's scroll up a little bit.  There it looks
7   like there's -- I don't know if I can make this bigger
8   or not.  I'll see if I can.  Okay.  I can't.  Any way.
9   I noticed just scrolling down on some of these Facebook
10  pictures that there's a lot of happy hour listings.
11  While you were working there was there a happy hour?
12      A.  Yes, ma'am.
13      Q.  And it looks like it's, I guess, in the earlier
14  hours in the evening?
15      A.  Yes, ma'am.  We usually end happy hour sometime
16  between 7 and 9.
17      Q.  Okay.  And is that a time where patrons can buy
18  discounted drinks?
19      A.  Yes.
20      Q.  The proceeds of alcohol sales are those proceeds
21  given to the club?
22      A.  Yes, ma'am, they are.
23      Q.  And the same goes for food sales.  If any food is
24  sold to a patron in the club, that's a proceed that the
25  club would keep, right?

Page 25
1       A.  That's correct.
2       Q.  That's not something that would go to any of the
3   entertainers, correct?
4       A.  No.  Not at all.
5       Q.  Do you know if -- who are the owners of
6   Heartbreakers?
7       A.  Mike Armstrong and Peggy Armstrong Debrice
8   (phonetic).
9       Q.  And as far as you're aware, does anyone else own
10  a portion of Heartbreakers?
11      A.  Not that I'm aware of.
12      Q.  Do you know if they own the building?
13      A.  I believe they do.
14      Q.  And so are they -- they, the owners and the club
15  responsible for maintaining the building?
16      A.  Yes.
17      Q.  As a manager who worked at the club, did you have
18  to participate in any of that maintenance?
19      A.  Not anything electrical or anything along or
20  plumbing-wise.  But I would keep my eye open for
21  anything going, you know, that needed to be fixed in the
22  club.  I mean, I put plenty of labor in there.  But
23  nothing technical.
24      Q.  They would hire someone else to do that, right?
25      A.  Yes, ma'am.  Well, they have a maintenance crew.

Page 26

1   Q.  And did they have a crew that also is responsible
2   for cleaning the interior of the club?
3   A.  Yes, ma'am.
4   Q.  It's not something that the entertainer would
5   have to do, right?
6   A.  Oh, no, ma'am.
7   Q.  Does the club have -- the club maintain -- I'm
8   looking at this picture here again in Exhibit 1.  Club
9   maintain any chairs and tables for the patrons to sit in
10  to view the stage area?
11  A.  Yes.
12  Q.  And in the executive room is there also, like,
13  specialized furniture or something that's different than
14  what's on the main --
15  A.  No, ma'am.  There's just couches and tables,
16  that's it.
17  Q.  And those are maintained by the club as well?
18  A.  Yes, ma'am, they are.
19  Q.  And I see that there's poles on -- on the various
20  stages I'm looking at in Exhibit 1.  Is that -- are
21  those poles available for the entertainer's performance
22  use?
23  A.  They are.
24  Q.  Is there any direction given to the entertainers
25  about performance on stage?  And I'll give you an

Page 27

1   example, what I'm asking about.  There's some, you know,
2   some clubs that would require an entertainer to be
3   topless at certain points of her stage performance, or
4   that she be required to wear close-toed shoes.  Is there
5   anything like that, that any -- any rules about that
6   performance that Heartbreakers would provide to the
7   entertainers?
8   A.  The standard -- the only -- the only dress code
9   rule there is, is the two ply G-string rule which is
10  required by state law.  You know, after that they're --
11  they're free to dance how they want to and how to --
12  what do you call it, how to dress how they want to.
13  Q.  I understand that there's also some laws about
14  touching or contact, is that correct?
15  A.  Yes, ma'am.  They're not supposed to make contact
16  with the customer.
17  Q.  If you, as a manager, saw an entertainer doing a
18  performance in which she was violating that rule or law
19  about contact, would you interfere?
20  A.  I would remind them of the law, I mean, I can't
21  penalize her for it or anything along those lines.  But
22  I might walk by and remind her; "Hey, you know, Texas
23  State Law says no contact, ma'am."
24  Q.  Do you know if the club -- club gets in trouble
25  if the entertainer is violating that law?

Page 28

1   A.  I believe, it's -- it's a violation of vice.
2   We've never had an incident where we've gotten in
3   trouble for it, so I don't -- I'm not sure.  To be -- to
4   be honest with you I can't give you an honest answer
5   whether or not there would be, I assume there would be.
6   Q.  Is there a boutique that sells entertainment
7   wear, so to speak, inside Heartbreakers?
8   A.  Yes, ma'am, there is.
9   Q.  And I understand that that space is leased or run
10  by someone other than Mike and Peggy Armstrong?
11  A.  It is.
12  Q.  Do you know who currently runs it?
13  A.  I believe, Mellow Louis (phonetic) was running it
14  last time I was there.
15  Q.  Do you know --
16  A.  I believe -- I believe she stepped away from it
17  since then, I'm not sure.
18  Q.  Do you know is that space, where the boutique is,
19  is that leased from Heartbreakers?
20  A.  I couldn't tell you.
21  Q.  There is a -- is there a cover charge to enter
22  Heartbreakers?
23  A.  Yes, ma'am.  There is.
24  Q.  Is that $9?
25  A.  I believe, it's currently $9.

Page 29

1   Q.  Is there also some guidance or preference on what
2   customers, how they look or are dressed when they enter?
3   A.  We have a sleeve rule after 7 o'clock.  We would
4   prefer that you're clean and neat, like, if you're a
5   painter or landscaper -- oh, no.  Decline.  I'm sorry.
6   Q.  Okay.
7   A.  Okay.  Yeah, if you were like a painter or
8   landscaper that you don't come directly from work.  Of
9   course, you know, no one who is intoxicated.  And
10  checking all the IDs at the front door.  But outside of
11  that, no.  No gender preference, no ethnic, nothing
12  along those lines.  So no social order.
13  Q.  And the -- is it the door person or the -- the
14  door person would be responsible for, I guess,
15  screening, so to speak, the customers that are entering
16  the club?
17  A.  Yes, ma'am.
18  Q.  And, I think, you said you worked as a floor
19  person before, right?
20  A.  For a number of years I did, yes.
21  Q.  Do they count the number of people that are
22  coming in or are leaving the club?
23  A.  Yes.
24  Q.  So they would know, they being the club, would
25  know at any point in time how many patrons are inside

Page 30

1  the club?
2      A.  We would have a general idea.  I mean, it wasn't
3  something that we -- we do keep track of that.  Not only
4  did the doorman keep track, but the DJ kept track also,
5  or clickers.  Just so we can get an idea, you know, how
6  many people are walking through.
7      Q.  Is that something that was tracked, meaning,
8  like, at the end of the night they would write down how
9  many people came through the club?
10     A.  I believe so, yes.
11     Q.  Does the door person have a cash register or
12 computer of some sort where they log or keep the cover
13 charges, and number of people that are entering/exiting?
14     A.  They have a register.
15     Q.  As a manager of the club, at the end of the night
16 are you responsible for collecting the money that's in
17 the registers?
18     A.  Yes, ma'am.  At 1:30 we go to the front door and
19 we collect -- we collect.
20     Q.  And would -- at 1:30 would that be when the club
21 would say no more people can come in to the club?
22     A.  No, ma'am.  We just quit charging a cover charge.
23 And we do leave someone at the door until we close at
24 2 o'clock.
25     Q.  And would you collect that -- as the manager,

Page 31

1  would you be responsible for collecting the money at the
2  other registers like; the bartenders' registers, or the
3  executive room register?
4      A.  Yes, ma'am.  We do checkout at the end of the
5  night.
6      Q.  And as the manager, is there -- do you have to
7  count or tally the money --
8      A.  Yes, ma'am.
9      Q.  Or do you just count --
10     A.  Yes, ma'am.  I wasn't -- as a manager, I was in
11 charge of verifying the amount in all banks at the end
12 of the night for employees, cashier, front door,
13 executive lounge, bartenders, waitresses.
14     Q.  If somebody was tipping the bartenders, for
15 example, would that money be part of the tally or
16 collection that you did at the end of the night as a
17 manager?
18     A.  No, ma'am.  That's the bartender's money.
19     Q.  Do the bartenders share the tips, like, usually
20 there's a tip jar, you know, at the --
21     A.  Yeah.  When they work together they do.
22     Q.  Do the waitresses have a similar tip sharing
23 situation?
24     A.  No, ma'am.  I don't believe they do.  I mean, I'm
25 sure some of them work together, you know, and split

Page 32

1  tips but predominantly, no.
2      Q.  And is there anyone else, other than the
3  bartenders, if there's more than one working together
4  that would share tips at the club?
5      A.  No.
6      Q.  When you --
7      A.  I mean, occasionally, like, as a manager if a
8  customer was going to tip me 50 bucks or something like
9  that or 40 bucks just because they're feeling generous
10 that night which wasn't very often, I would share with
11 the manager on duty because we're both working.  Yeah.
12 But nothing collected.
13     Q.  So if you were -- I think, you just said if you
14 were working, like, the executive room as a manager --
15     A.  No, just as a floor manager.
16     Q.  What's the manager between a floor manager and a
17 manager on duty?
18     A.  It's the same thing.
19     Q.  When you were working as a manager at
20 Heartbreakers was there another manager that was working
21 with you?
22     A.  On one of my shifts, yeah.  Friday and Saturday
23 nights normally, yes, there's two managers.  Outside of
24 that is predominantly single manager shift.
25     Q.  And if there are two managers working do you,

Page 33

1  like, split up the duties or responsibilities?
2      A.  Yes, ma'am, we do.
3      Q.  And how would you split that up?
4      A.  It would just depend.  Sometimes one of the
5  managers would do checkout and the other manager would
6  do closing.  Such as at the end of the night making sure
7  all the customers are sober and have a ride home.  And
8  then escorting the entertainers to their vehicles at the
9  end of the night.
10     Q.  Do the entertainers have to checkout with a
11 manager at the end of the night?
12     A.  Yes, and no.  I mean, there's the big
13 predominantly, yes.  But if it's at the end of the night
14 you're not on rotation, you're not going back up on
15 stage, or anything along those lines, mostly not.
16     Q.  What's the checkout, I guess, procedure for an
17 entertainer?  If she's done performing for the evening
18 what does she have to do?
19     A.  She just goes to the cashier and lets them know
20 that she'll be leaving.
21     Q.  As far as you're aware other than exchanging,
22 what I've been told are dance dollars for cash, does the
23 club pay any money to the entertainers?
24     A.  Except for like the $35, if we're doing, like, a
25 -- yeah, not that I'm aware of.  No.

Page 34
1    Q.   What's the $35 --
2    A.   Like if they go upstairs to the executive they
3  get the $5 or $10 back per customer.  Outside of that,
4  not that I'm aware of.
5    Q.   So other than the commission from the executive
6  room, I guess, I'll call it --
7    A.   I believe, we've done some wine bottle, champagne
8  promotion over the years.  If you sell a bottle you get,
9  you know, $20 or whatever, but outside of that, no,
10 ma'am.
11   Q.   So the -- in that scenario it would just be a
12 special promotion by the club --
13   A.   Yes, ma'am.
14   Q.   -- to incentivize sales of alcohol, right?
15   A.   Yes.
16   Q.   And then -- so do the entertainers assist or help
17 the club in those alcohol sales?
18         MR. KING:  Objection; form.
19   A.   Predominantly, no.
20   Q.   And the instance that you were talking about it
21 would be an incentive to assist, right?
22         MR. KING:  Objection --
23         MS. MONTGOMERY:  You can answer.
24         WITNESS:  Sure.
25         MR. KING:  Go ahead.  I just had to get my

Page 35
1  objection on the record.
2    A.   Okay.  Ms. Montgomery, would you repeat the
3  question please.
4    Q.   (BY MS. MONTGOMERY)  Sure.  In the instance that
5  you described the promotion of, you know, you get so
6  much dollars for assisting in sales of alcohol or
7  bottles of alcohol.  That would be -- incentivize the
8  entertainers to assist with alcohol sales, right?
9    A.   Yes.  But I will tell you this, we only did it
10 about twice and it didn't work, so.
11   Q.   In the executive room area is there any sort of
12 alcohol beverage minimum?
13   A.   No, ma'am.
14   Q.   Are the floor fees negotiable by the
15 entertainers?
16   A.   Yes, ma'am.  They are as a matter of fact.
17   Q.   Okay.  Explain how?
18   A.   In the event that I have a slow day like on a
19 Sunday or a Monday or if there was a financial
20 discretion between an entertainer and her customer, and
21 she lost money and so, you know, to help her out on
22 occasions we would waive the floor fees.
23   Q.   Is that something that's within the manager's
24 discretion to waive the floor fees?
25   A.   Yes, ma'am, it is.  Based on the incident, yeah.

Page 36
1    Q.   So let me make sure I understand.  The general
2  policy is that in order to perform at Heartbreakers an
3  entertainer would have to pay a floor fee, right?
4    A.   Not necessarily, I mean they -- they come -- you
5  can never guarantee that the floor fee will be paid.
6  You just can't because sometimes things happen.
7  Sometimes somebody comes to work and shift and their
8  child gets sick or something happens and they have to go
9  home and at those points we completely waive the fee.
10   Q.   Right.  I'm guessing what -- what I'm getting at
11 is that the policy is that you pay the fee but on
12 occasion the managers would waive that fee depending on
13 the circumstances, right?
14   A.   Yes, ma'am.  The policy is per independent
15 contract, you pay to work those shifts.
16   Q.   And does any manager have the right to waive the
17 floor fees for the entertainer?
18   A.   Yes, ma'am.
19   Q.   Does anyone else have the right to waive the
20 floor fee for the entertainer?
21   A.   No, ma'am.
22   Q.   Like the cashier couldn't waive the floor fee for
23 the entertainer?
24   A.   She could suggest it to us.  I mean, if she's
25 aware of a situation that we're unaware of.  Which is a

Page 37
1  very common practice, you know, something -- so and so
2  wants to go home early because their child is not
3  feeling good or their ride is leaving or whatever.  And
4  they didn't make any money, you know, that evening then
5  we would -- if it was a bad night we would just waive
6  it.
7    Q.   So the cashier would talk to the manager about
8  it?
9    A.   Yes, ma'am.
10   Q.   Is there an amount suggested by the club to
11 charge per dance fee?
12   A.   No.
13   Q.   That's not something that you would discuss in,
14 like, I guess orienting a new entertainer to work at --
15 to her performance at Heartbreakers?
16   A.   I mean, they set their own fees.
17   Q.   There's no amount suggested?
18   A.   No.  It's commonly known that the industry
19 standard is $20, but we don't suggest that.
20   Q.   Is that discussed at all with an entertainer?
21   A.   No.  They -- they set their own parameters.
22   Q.   I understand that there is a booth that patrons
23 entertainers can use as well.  Am I saying that
24 correctly?
25   A.   I'm not sure what you're referring to.

Page 38

1  Q. Well, I understand that there's the main floor
2  area, that there's an executive room area, and then
3  there's these booths?
4  A. Oh, yeah. Yeah. Yeah.
5  Q. And do they have to pay a charge to use the
6  booths?
7  A. They do.
8  Q. Is it the entertainer that has to pay the charge
9  or customer or both?
10 A. Predominantly the customer pays for it. Usually
11 I would -- usually when an entertainer goes to the booth
12 that's already been pre-negotiated before they ever go
13 over there.
14 Q. And, I'm guessing the club keeps the money for
15 the booth?
16 A. I'm not sure where that money goes. It gets
17 turned in at the end of the night.
18 Q. Did -- do you know how much it is for a booth?
19 A. I believe, it's 35, I believe.
20 Q. Are the booths downstairs or upstairs?
21 A. Downstairs.
22 Q. Is it customary for the entertainers to tip the
23 other staff at the club?
24 A. It's not customary, but they do tend to tip on
25 occasions.

Page 39

1  ==Q. Are there any particular staff that the==
2  ==entertainers tip more than others?==
3  ==A. No, not really. I mean, predominantly, not to==
4  ==talk bad about them, but entertainers are not -- are not==
5  ==well tippers. They're not very generous.==
6         Plus, like, I personally don't like to take the
7  money from them because I feel like I can't be objective
8  in the way I do my job. I think it's bad form in a lot
9  of ways. If a customer wants to tip me occasionally,
10 I'll take it depending on the customer. But from the
11 entertainer I just -- I don't feel right taking their
12 money. I don't. They work hard for it.
13 Q. To begin your work at -- at Heartbreakers, did
14 you have to sign a contract?
15 A. Yes, ma'am.
16 Q. Were you given an option between being an
17 independent contractor and employee?
18 A. I don't recall. It's been so long ago. To be
19 honest with you, I don't recall.
20 Q. Have you had to sign anything since you first
21 started work?
22 A. We have to do the every-six-months background
23 checkups, and stuff like that. Where they renew all of
24 our information and stuff.
25 Q. But you haven't had to sign any new contract, I

Page 40

1  guess, is what I'm asking?
2  A. No, ma'am.
3  Q. Did anyone provide you with training on being a
4  manager?
5  A. Oh, yes.
6  Q. When did they provide you that?
7  A. Constantly. I was -- I was groomed for
8  management for years. This industry is really strange,
9  managers, a lot of times don't -- they work for 10, 15,
10 16 years. So even when I was working executive security
11 upstairs, there was constant grooming for a potential
12 manager position.
13 Q. Let me ask you this; what was the security
14 position that you had? What did you have to do as a
15 security?
16 A. Just provide a safe workplace for the
17 entertainers and customers.
18 Q. What would you do exactly?
19 A. Keep an eye out for intoxication. Any type of
20 drug abuse, other people selling or trying to distribute
21 drugs on the premises, which of course in any nightclub
22 is definitely problem. We've had some pretty serious
23 moments there over the years, you know. People get a
24 little worked up on occasion. I've been hit, I've been
25 stabbed, I've been shot at. Yeah. It can be a very

Page 41

1  trying position on occasion.
2  Q. And that's by the customers?
3  A. Yes, ma'am. Well, I've been -- been attacked by
4  an entertainer also.
5  Q. When a entertainer is performing on stage and a
6  customers wants to tip her, how do they tip her?
7  A. They go to the stage and hand them money or put
8  money -- traditionally, you're supposed to put money on
9  the stage.
10 Q. Okay. Is any of that money ever touched or
11 gathered by staff of the club?
12 A. No, ma'am. Only -- the only time that would
13 happen would be at the behest of the entertainer. If
14 somebody had come and thrown, like, $200 in ones on
15 stage and she's asking, hey, can you get me a bucket,
16 throw this in a bucket for me. Or something along those
17 lines. But, no, outside of that we never touch it.
18 Q. And your -- what are some of the ways that you
19 were groomed for the management role? Can you give me
20 some examples?
21 A. Just trained on how to keep an eye out for public
22 intoxication. Or people's aggressive levels escalating,
23 you know. How to -- how to order the liquor sales and
24 stuff like that. How to go back and do the inventory,
25 et cetera.

Page 42
1   Q.  Is that one of the roles or responsibility of the
2   managers in the club to order the alcohol?
3   A.  We do inventory.  We do a monthly inventory and
4   we do a list of liquor -- I'm sorry.  Of our liquor
5   cabinet which is -- which goes through Whitey Forrester
6   to be approved and then it's ordered through Specs.
7   Q.  Mr. Forrester actually places the order?
8   A.  Sometimes he places the order.
9   Q.  Do you also -- are you also responsible as a
10  manager for ordering food?
11  A.  No, ma'am.  That would be the kitchen manager's
12  position.  Although, I am a trained food handler, it's
13  not -- it doesn't fall under our duties.
14  Q.  Were you ever trained on the Fair Labor Standards
15  Act?
16  A.  I believe, we took a class on that a while back.
17  Q.  How far back was the class?
18  A.  Been a while.  If memory recalls, a couple of
19  years.
20  Q.  And what kind of class was it?  Like in person?
21  A.  Just, I think, we had a meeting and we had a
22  brochure that came through that we had to read and go
23  through and read.  I guess, I can't quite recall on that
24  one.  But we -- we have Fair Labor Act posters posted
25  everywhere.  Everything required by state as far as

Page 43
1   sexual abuse, fair labor, fair wages, yeah.
2   Q.  Where is that posted?
3   A.  In direct view in almost every bathroom, hallway,
4   and in the dressing rooms.
5   Q.  The dressing rooms where the entertainers are?
6   A.  Yes, ma'am.  Especially the human trafficking, et
7   cetera ones, which we've attended classes for that also.
8   Q.  Are the classes at the club or are they somewhere
9   else?
10  A.  No, ma'am.  State required that we go and take a
11  class two or three years ago, I believe it was on human
12  trafficking.  So we went up to Houston -- north side of
13  Houston.
14  Q.  Did they tell you what -- what things to lookout
15  for to prevent human trafficking?
16  A.  Yes, ma'am.
17  Q.  What things did they tell you to lookout for?
18  A.  Another person answering all the questions, or
19  having possession of another person's ID, someone who
20  looks a little young, how to look for false
21  identification.
22  Q.  Have you found any instances or have any
23  instances where you believe or suspected human
24  trafficking victims were attempting to work at
25  Heartbreakers?

Page 44
1   A.  Not -- not.  No.  There was one incident years
2   ago where I asked for a girl's ID and another guy --
3   girl had -- had her ID -- identification.  And I asked,
4   like, ma'am, why do you have this young lady's
5   identification and they immediately both walked out the
6   building.  And left the premises before I could get a
7   copy of the driver's -- the license plate of the vehicle
8   they were on.
9   Q.  So you suspected that she could be involved in
10  human trafficking?
11  A.  Probable -- probably.  But in our premises, no,
12  ma'am, I haven't ran across that.
13  Q.  Have you -- are you aware of any prior lawsuits
14  against Heartbreakers by former entertainers?
15  A.  I believe, there was a lawsuit a while back about
16  -- maybe it's still be the same lawsuit from a few years
17  ago.  Yeah.  It was for, I don't remember Frankie's last
18  name.
19  Q.  Henderson.
20  A.  Henderson there you go.  Yeah.
21  Q.  And --
22  A.  But that's the only one that I'm really aware of.
23  Q.  What do you know about Ms. Henderson's case?
24  A.  Very little.  I know, she has sued several other
25  clubs, you know.  I've known her for years off and on.

Page 45
1   We have a professional relationship.
2   Q.  Do you know anything else about the lawsuit?
3   A.  No, ma'am.  I do not.
4   Q.  Did you have to provide any testimony like you're
5   providing today in that -- Ms. Henderson's lawsuit?
6   A.  No, I did not.
7   Q.  In any --
8   A.  You're my first.
9   Q.  In any lawsuits against Heartbreakers whether it
10  was by a former entertainer or not, have you had to
11  provide any testimony whether in trial or deposition?
12  A.  About eight years ago a customer punched one of
13  my waitresses.  Just walked up to her and asked her; "Do
14  you love me," and she goes; "I don't know you," and he
15  just hit her.  And so we used a minimal amount of force
16  to gain compliance from him till the police arrived.
17  And I had to go to, you know, to court for that and give
18  my witness.
19  Q.  Were you one of the people that had to restrained
20  the customer?
21  A.  Yes, ma'am.  I am the person who restrained him.
22  Q.  Other than the incident with the customer who
23  punched a waitress, have you provided any testimony in
24  relation to your work at Heartbreakers?
25  A.  No, ma'am, I have not.

Page 46
1      MS. MONTGOMERY: Let's take, like, a five
2  minutes break.
3          WITNESS: Sure.
4          COURT REPORTER: We're off the record at
5  10:58 a.m. Central Standard Time.
6          (Off the record.)
7          COURT REPORTER: We're back on the record.
8  The time is 11:04 a.m.
9      Q. (BY MS. MONTGOMERY) Mr. Jackson, I'll have you
10 look at a couple more items for me. And I know it's
11 going to be difficult on your phone, so let's just see
12 how it works, okay?
13     A. We'll do our best.
14     Q. Mark this as Exhibit 2, to your deposition.
15         I'll represent to you this is a document that was
16 given to me by Heartbreakers' counsel. And it's titled,
17 Hours and Earnings Detail Report.
18         Have you ever seen this type of a document for an
19 entertainer?
20         (Exhibit 2 marked.)
21     A. (BY MS. MONTGOMERY) No. May I fetch my glasses
22 really quick? I'll be right back.
23     Q. Sure.
24     A. Sure. I am going to have to adjust this real
25 quick.

Page 47
1      Q. I'll make it as big as I can, at least on the
2  title part.
3      A. No. Not in it's printed form, I've never seen
4  that.
5      Q. And I'll -- I can read the columns to you. It
6  gives the Date, the TimeIn, the TimeOut, Hours, Wages, I
7  don't know what that -- oh, tips declared, I guess.
8  Those are some of the columns. In the end it says
9  hourly wage. Have you ever seen --
10     A. Yes. This would all fall into the cashier's
11 responsibilities. I mean, I've seen that but I very
12 seldom have dealt with it.
13     Q. Okay. And is that something then that the
14 cashiers are tracking? The time --
15     A. Beg your pardon?
16     Q. The TimeIn -- the Date, the Timein, the TimeOut?
17     A. Yes, ma'am.
18     Q. Okay. I'll show you what I marked as Exhibit 3
19 and I'll make this bigger for you so you can see it.
20 Okay.
21         Are you able to read that top part at least?
22         (Exhibit 3 marked.)
23     A. Yes, ma'am.
24     Q. And I'll scroll down just so you can get -- let
25 me see if I can center it. I'll scroll down so you can

Page 48
1  see the whole thing?
2      A. Uh-huh.
3      Q. And it's titled; Memo to all
4  Dancers/Entertainers. Let me scroll down a little bit.
5          Have you ever seen this document before?
6      A. Yes, ma'am.
7      Q. And is this a typical document you -- you would
8  have an entertainer fill out when she was coming to
9  perform at Heartbreakers?
10     A. Yes, I would.
11     Q. And is there any other --
12     A. That's -- that's part of the independent
13 contractor form.
14     Q. And is there any other employee or staff of
15 Heartbreakers that would fill out this form?
16     A. No, ma'am. It would either be the general
17 manager or manager on duty.
18     Q. No, no. I guess, other than entertainers is this
19 a document that has to be presented to other staff at
20 the club to be filled out when they start to work at the
21 club?
22     A. No. Because this one here specifically says, as
23 an entertainer.
24     Q. And I don't -- I don't know, is there an
25 equivalent one for --

Page 49
1      A. We have -- we have a waitress handbook, you know,
2  that they -- that let's them know what their general
3  responsibilities are and what their expected to do and
4  not do.
5      Q. Let me show what I'm marking as Exhibit 4. I'll
6  make it bigger. Make it a little --
7          (Exhibit 4 marked.)
8      A. I can see that.
9      Q. Okay. I'll scroll down, so you can see the whole
10 thing.
11         Have you seen this document before?
12     A. Yes, ma'am.
13     Q. And is this also a document that's provided for
14 all entertainers to sign?
15     A. That is correct.
16     Q. Has that been -- has this -- it's titled
17 Heartbreakers' Policy. Has this document been provided
18 for an entertainer to sign in the past five years?
19     A. Oh, yes. Definitely.
20     Q. And maybe --
21     A. Longer -- longer, yeah.
22         MS. MONTGOMERY: I will reserve the rest of
23 my questions. I pass the witness.
24         MR. KING: Let me take five minutes just to
25 take if I have any following questions. I won't --

Page 50

1  because I might not. I just want to go through a couple
2  of things.
3         MS. MONTGOMERY: Sure.
4         COURT REPORTER: Off the record at 11:10
5  a.m. Central Standard Time.
6         (Off the record.)
7         COURT REPORTER: We're back on the record.
8  The time is 11:14 a.m.
9                 EXAMINATION
10 BY MR. KING:
11    Q. All right. Mr. Jackson, I just have a couple of
12 questions for you. I just want to --
13    A. Sure.
14    Q. -- explain a couple things.
15       What sort of schedule requirements exist at
16 Heartbreakers for the dancer?
17    A. There is no schedule requirement. They come and
18 go as they please, they work their own hours. We have
19 set -- set, you know, slots that we, you know, we prefer
20 you working those slots. But outside of that they have
21 an open itinerary.
22    Q. Do managers ever tell performers; "Well, you
23 can't work some -- some shift"?
24    A. No. No. And they're not required to come work
25 any shifts either. I can't tell you; "Hey, if you want

Page 51

1  to work Sunday night -- I mean Friday night you got to
2  be here Sunday morning." We don't do anything like
3  that.
4     Q. Some clubs do that, right?
5     A. To my knowledge, yes, they do.
6     Q. But not at Heartbreakers?
7     A. Not at Heartbreakers.
8     Q. You been working there for what almost --
9     A. Almost 33 years.
10    Q. 33 years?
11    A. Yeah.
12    Q. You've met a lot of entertainers in your time?
13    A. Thousands.
14    Q. Thousands?
15    A. Literally thousands, yes. Literally.
16    Q. So you -- you know a lot about their work, right?
17    A. Yes, sir. I do.
18    Q. What -- what, in your opinion, do entertainers do
19 for a living? Can you describe --
20    A. You know, the -- the -- to me the better
21 definition of the word, would be like a courtesan.
22 Because they're there to entertain and provide company.
23 You know, it's not like they're doing magic tricks or
24 your taxes. Usually they just sit, you know, eat dinner
25 and have conversation. You know, and just spend their

Page 52

1  time with the customer. And a lot of them have
2  regulars, you know, so they come and go on a pretty
3  standard basis. You're liable to see the same girl four
4  or five nights a week.
5     Q. How do entertainers chose -- decide to spend
6  their time?
7         MS. MONTGOMERY: Objection --
8     A. That's -- that's up to them.
9         MS. MONTGOMERY: Objection; form.
10    A. They can -- they can sit in a corner on their
11 phone. I'm sorry.
12        MS. MONTGOMERY: I'm sorry.
13    A. Or they can --
14        MS. MONTGOMERY: Object to form of that. Go
15 ahead.
16    A. Okay. I'm sorry.
17    Q. (BY MR. KING) I might have asked a bad question.
18 Go ahead.
19    A. Me go ahead or --
20    Q. Yes, sir. You go ahead, sir.
21    A. They -- however, they decide to spend it. They
22 can sit on their phone or they can engage with the
23 customer base in the club. But there's no standard.
24 There's no rule. Yeah, I wouldn't go up and tell you,
25 "Hey you need to get off your phone and go talk to this

Page 53

1  guy over here, he's got money." That's -- that's your
2  business.
3     Q. What -- what things effect the amount of money
4  that a dancer can make when she shows up at
5  Heartbreakers?
6     A. I would put that down to attitude and, you know,
7  contribution, what you put into it. I mean, the more --
8  the more time you spend with customers engaging and
9  interacting, you know, and the more you are in view
10 yourself to them, the better money you would make.
11       Yeah, the girls that make most money, I've
12 noticed in this industry, is the girls who are -- are
13 very well engaging a customer verbally, you know.
14    Q. Do -- what sort of -- I'm trying to get this out
15 without leading?
16    A. Yeah.
17    Q. What range of money have you seen entertainers
18 make at Heartbreakers?
19    A. I have seen an entertainer make no money who's,
20 you know, by society standards physically beautiful.
21 And then I've have seen women who are not, by society
22 standards, make lots of money. It just depends.
23 There's no way to gauge. There's no way to gauge on how
24 many customers are in the building, or how many girls
25 are working. You can't do it. I could have four guys

Page 54

1    in the club that night and entertainers do really well.
2    I could have 100 guys in the club that night and they
3    don't, it just depends.  There's -- there's no algorithm
4    that you could apply to, there's not.  It's completely
5    random.
6        Q.  With your decades of experience at Heartbreakers
7    you've -- you met probably also thousands and thousands
8    of customers, true?
9        A.  Oh, yes.  Yes.  I have personal relationships
10   with many of them.
11       Q.  What -- what in your -- what kinds of things do
12   customers come to Heartbreakers for?
13       A.  Oh, predominantly they come for companionship,
14   entertainment.  I mean, this is a place where the
15   standards of society are broken down.  And some of the
16   guys that come into my club, just, you know can be a wee
17   bit introverted, or just shy.  And here is a place where
18   all the barriers and standards of our society are broken
19   down, and a beautiful women engages you.  Where outside
20   of the safety of the environment that we're in if that
21   woman engaged him in a public he may not be able to
22   speak to her.  Yeah.
23       Q.  Do some --
24       A.  Just because he's so nervous or something along
25   those lines.  So the companionship is the primary.

Page 55

1        Q.  Do some customers go to Heartbreakers just to
2    have a beer with friends?
3             MS. MONTGOMERY:  Objection; leading.
4        A.  I have customers that just come in to eat.  I
5    don't know if you ever ate at Heartbreakers but I would
6    say we're probably in the top 40 best restaurants in
7    Galveston County.  Like, honestly top 40.  We have great
8    food, amazing food.  Chris Clark is one of the best
9    cooks I've ever worked with in my life.
10       Q.  Have you ever encountered customers who just --
11   they show up and they don't pay for any dances?
12       A.  Oh, yes.  All the time.
13       Q.  How common is that that?
14       A.  What is that?
15       Q.  How common has that been --
16       A.  On an actual daily basis.  Because, like, you
17   have -- we have clientele that would come in just to
18   eat, drink, and socialize with the bartender, you know.
19   And that's on a daily basis.
20       Q.  Have you ever told entertainers that they need to
21   change their outfits?
22       A.  No.  No.  I haven't told them what they need.
23   I've made suggestions in the past that, you know,
24   clothes is better sometimes, you know, people pay for
25   what they can't have and then, you know.  But there's no

Page 56

1    rule where I can say, "Hey you need to do this and do
2    that."
3        Q.  I'm sorry.  Did you say that you suggest to
4    entertainers that they actual perform clothed?
5        A.  Oh, yes.  Yes.  Oh, yeah.
6        Q.  Why so?
7        A.  Just because the mystique of, you know, kind of
8    like what's the old saying, you don't -- you don't take
9    the milk from the cow.  I mean, you don't want to just
10   give it all away.  Yeah.  And, I think, it's our nature
11   as people predominately, that, you know, we want what we
12   can't have or what we -- what we can't see, we find
13   intriguing, you know.
14            So I've suggested sometimes, you know, a better
15   dress be better, but again I have no standard for which
16   I can force that.
17       Q.  What about, I don't know, dancer's shoes?
18       A.  Nope.  The -- the only thing that ever pops up is
19   being barefoot, you know.  And that's strictly for
20   safety purposes in the event there's broken glass or
21   something along those lines in the carpet.
22       Q.  Do customers drop beer bottles and glass on the
23   floor?
24       A.  Sure.  Sure have.
25       Q.  And smoking is allowed in the club, right?

Page 57

1        A.  Smoking is allowed.
2        Q.  Are there ever lit cigarettes on the floor?
3        A.  I've seen an ashtray get knocked over or
4    something like that, occasionally.  But nothing crazy
5    like people just throwing cigarettes on the floor or
6    anything.
7        Q.  Sure.
8        A.  Our -- our biggest worry with the shoes is glass.
9    We just don't want anybody getting hurt.
10       Q.  Right.  And, you know, I heard you testify a lot
11   about safety and security at the club.
12       A.  Yes, sir.
13       Q.  What sort of issues are dangerous to entertainers
14   as well as customers?
15       A.  Well, occasionally if the customer gets too
16   intoxicated and tries to get handsy.  I've had to step
17   in between verbal disagreements between entertainers.
18   Heartbreakers is a real anomaly, though.  I mean, I
19   worked there when it was at it's absolute worst and it's
20   absolute best and, like, honestly I don't think I put my
21   hands on another human being in about three years.  I've
22   been able to verbally, you know, just persuade them from
23   their actions.
24       Q.  Have you ever had to deal with, I don't know, a
25   violent entertainer?

Page 58
1   A. Yes, sir. I have. I have.
2   Q. How so?
3   A. I've been hit in a head with a hurricane glass, I
4   have been punched with a high heel, I mean, it's just
5   there's a couple of things that goes on. And when that
6   happens, you know, it's just one of those things where
7   you send them home and decide whether or not you should
8   negate their contract -- nullify their contract because
9   their endangering the safety of, you know, everybody
10  else there.
11  Q. But if they're not throwing shoes or
12  stabbing people --
13  A. No. No. No.
14  Q. You don't --
15  A. We normally would send them home, just send them
16  home for the night and discuss it with them the next
17  day. Or when they return.
18  Q. But aside from being attacked with some object by
19  an entertainer, did your job ever involve dictating how
20  they perform for customers?
21  A. No. No. As long as they were, you know,
22  overstepping the boundaries allowed by state law. And
23  even then I just make the suggestion that you might want
24  to separate a little bit.
25  Q. You know, I have a question about entertainers

Page 59
1   who may tip other Heartbreakers' personnel.
2   A. Sure.
3   Q. Do managers at Heartbreakers require dancers to
4   pay them tips?
5   A. No, sir.
6   Q. Why?
7   A. Well, to me it's bad form. You know,
8   predominately you can't be objective, you know. If
9   you're accepting tips from this girl or that girl and
10  you know, say there's an incident later on someone says;
11  "Well, you're playing favorites because of this person
12  right here." Let's say two entertainers get into an
13  argument, it's easier to keep a neutral ground, you
14  know, if not. And honestly they don't tip very often.
15  They're not the most generous souls in the world.
16  There's a few of them, you know. But there's a whole
17  lot that don't.
18  Q. What -- what sort of disputes do entertainers get
19  into?
20  A. Normally things that are outside of the club's
21  control. Things in their outside lives.
22  Q. Do they ever get into fights over customers?
23  A. No. Not really, every once in a while. But, you
24  know, you sit down and explain to them that a customer
25  has no problems. You know, the main reason he's there

Page 60
1   is because he wishes for variety, you know.
2   Q. Do they ever get in fights over money earned at
3   the club?
4   A. They have. You know, I've been sitting with so
5   and so long, I've been sitting with him this long, I was
6   sitting there longer, you know.
7   Q. So okay. That's interesting.
8   A. And I have no way of dictating how long they've
9   been there. It's really a difficult call for us, you
10  know. I mean, it's not like I'm standing over their
11  shoulder going 45 minutes, you know.
12  Q. How long has the commission for the executive
13  room been around?
14  A. The executive room opened in 1999, if I remember
15  correctly '98.
16  Q. Okay. And how long has there been a commission
17  for that --
18  A. Oh, just recently. Like in the last year and a
19  half, I believe.
20  Q. So it hasn't been around the entire time?
21  A. No. No, it has not. And for the majority of
22  that year and a half we've been closed. So it was
23  something we started right before COVID, and yeah.
24  Q. I think, you were discussing with Ms. Montgomery
25  how the club had some sort of promotion of alcohol where

Page 61
1   entertainers could make --
2   A. We only tried it once or twice and it didn't work
3   out. Like, we had a champagne promotion and we had like
4   a case of champagne and we tried it. And honestly, I
5   think, one person sold one, maybe two.
6   Q. When was it?
7   A. Two or three years ago. Its been a while.
8   Q. So is it -- so, am I understanding correctly that
9   over time how -- what happens in the club as far as what
10  entertainers do, that changes over time?
11  A. No. Not really. I mean, it -- clarify that a
12  little bit for me.
13  Q. Sure. I guess, you know, I'm talking about the
14  promotions or the commissions --
15  A. Oh, yeah. There's nothing set in stone for that.
16  Those are -- those are immaterial we trade them -- but
17  we didn't do it very often. Like, I said we did it
18  twice we've done promotions. And they were really just
19  not worth the time and effort.
20  Q. Are you familiar with dance dollars?
21  A. I am.
22  Q. How long have dance dollars been around for?
23  A. Forever, I couldn't give you a date on that.
24  They've been around for a long time.
25  Q. Okay.

Page 62

1  A. Yeah. At least 2000, you know.
2  Q. Do dancers ever use those dance dollars to, you
3  know, tip a waitress or a bartender or something like
4  that?
5  A. I'm sure they do.
6  Q. Do dance dollars circulate the club is basically
7  what I'm asking?
8  A. Oh, yeah. Constantly. Constantly.
9  Q. Are -- are dancers required to redeem their dance
10 dollars at the end of the night?
11 A. No. They're not. They can hold on to them for
12 as long as they want.
13 Q. That's all I have for your, sir. Thank you for
14 your time.
15 A. Yes, sir.
16 Q. Unless Ms. Montgomery has follow-up questions?
17       MS. MONTGOMERY: I'll reserve my questions.
18       MR. KING: All right.
19       Mr. Jackson, we're all done.
20       WITNESS: That's it?
21       MS. MONTGOMERY: That's it.
22       WITNESS: It was a pleasure y'all take care
23 of yourselves.
24       COURT REPORTER: Are we doing a read and
25 sign, sorry.

Page 63

1        MR. KING: Yes, please.
2        COURT REPORTER: Off the record at 11:29
3  a.m. Central Standard Time.
4        (End of proceedings.)

Page 64

1                CHANGES AND SIGNATURE
2  WITNESS NAME: DAMON JACKSON
3  DATE OF DEPOSITION: APRIL 23, 2021
4
5     Please indicate changes on this sheet of paper,
   giving the change, page number, line number, and reason
   for the change. Please sign each page of changes.
6
7  PAGE/LINE       CORRECTION        REASON FOR CHANGE
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 65

1    I, DAMON JACKSON, have read the foregoing
   deposition and hereby affix my signature that same is
2  true and correct, except as noted above.
3
4
                    _____
5                          DAMON JACKSON
6
7
8
9
10
11
12
13
14
15 _____ No changes made _____ Amendment Sheet(s) attached

Page 66

```
 1         THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2                 GALVESTON DIVISION
 3   STACEY KIBODEAUX aka         Case No.: 3:20-cv-00008
     ILLUSION, HAILEY CHAPMAN
 4   aka DAISY, JEAN              JURY TRIAL DEMANDED
     HOFFMEISTER aka JOHNE and
 5   ROXANNE MURILLO aka     §
     UNIQUE/ROXANNE,         §
 6   individuals,            §
                Plaintiff,   §
 7        vs.                §
                             §
 8   A&D INTERESTS, INC. D/B/A §
     HEARTBREAKERS GENTLEMAN'S §
 9   CLUB, MIKE A. ARMSTRONG,   §
     PEGGY A. ARMSTRONG AND     §
10   WHITEY DOE, INDIVIDUALS,   §
                Defendants.   §
11                            §
12        REPORTER'S CERTIFICATION OF THE ORAL
              DEPOSITION OF DAMON JACKSON
13                April 23, 2021
14
15     I, Karen Aralhy Gonzalez, a Notary in and for the
16   State of Texas, hereby certify to the following:
17      That the witness, DAMON JACKSON, was duly sworn by
18   the officer and that the transcript of the oral
19   deposition is a true record of the testimony given by
20   the witness;
21      That a copy of the certificate was served on all
22   parties and/or the witness shown herein on
23   _____.
24      I further certify that pursuant to FRCP Rule
25   30(f)(1) that the signature of the deponent:
```

Page 67

```
 1    X was requested by the deponent or a party before
 2   the completion of the deposition and that signature is
 3   to be before any notary public and returned within 30
 4   days from date of receipt of the transcript.  If
 5   returned, the attached Changes and Signature Page
 6   contains any changes and the reasons therefor;
 7    ___ was not requested by the deponent or a
 8   party before the completion of the deposition.
 9     I further certify that I am neither counsel for,
10   related to, nor employed by any of the parties or
11   attorneys in the action in which this proceeding was
12   taken, and further that I am not financially or
13   otherwise interested in the outcome of the action.
14     Certified to by me this 23rd day of April, 2021.
15
16
17          _____
18          KAREN ARALHY GONZALEZ
            Notary in and for the
19          State of Texas
            Notary: 132644762
20          My Commission Expires:
            August 26, 2024
21          US LEGAL
            8144 Walnut Hill Lane
22          Suite 350
            Dallas, Texas 75231
23          214-741-6001
            214-741-6821 (FAX)
24          Firm Registration No. 343
25
```