United States District Court
Southern District of Texas
**ENTERED**
January 10, 2022
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| STACEY KIBODEAUX, *et al.*, | § § § | |
| Plaintiffs. | § § | |
| VS. | § § | CIVIL ACTION NO. 3:20-cv-00008 |
| A&D INTERESTS, INC. d/b/a HEARTBREAKERS GENTLEMAN'S CLUB, *et al.*, | § § § § § | |
| Defendants. | § | |

## **OPINION AND ORDER**

Before me is Plaintiffs' Motion for Certification and Issuance of Notice Pursuant to Section 216(b) of the Fair Labor Standards Act. Dkt. 82. After carefully reviewing the motion, the parties' briefing, and the applicable law, and for the reasons discussed below, I **GRANT** the motion and authorize class notice.

## **INTRODUCTION**

Back in October 2020, I conditionally certified a collective action of exotic dancers who worked at A&D Interests, Inc. d/b/a Heartbreakers Gentleman's Club ("Heartbreakers") during a three-year period beginning in October 2017. *See* Dkt. 50. Since then, there has been a seismic shift in the Fifth Circuit regarding the certification of collective actions. *See Swales v. KLLM Transp. Servs., L.L.C.*, 985 F.3d 430 (5th Cir. 2021). Namely, *Swales* did away with conditional certification altogether and, instead, requires that district courts apply a more rigorous, case-specific standard when considering whether the proposed class is sufficiently similarly situated to proceed as a collective action. As part of this new standard, district courts must consider "all available evidence" to determine "whether and to whom notice should be issued." *Id.* at 442.

In light of *Swales*, I vacated my conditional certification order and ordered that the parties conduct preliminary discovery on the issue of similarity. Before me

is Plaintiffs' motion for certification and issuance of notice.[1] *See* Dkt. 82. Because both the parties and Court are amply familiar with the facts of this case, I repeat only those necessary to contextualize my decision.

## BACKGROUND AND PROCEDURAL HISTORY

Stacey Kibodeaux ("Kibodeaux") is a former exotic dancer who worked at Heartbreakers in Dickinson, Texas in December 2019 and January 2020. During her employment, Kibodeaux claims she was not compensated on an hourly basis and, instead, received only tips from Heartbreakers' customers.

On January 14, 2020, Kibodeaux sued Heartbreakers for alleged violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201. *et seq.*, on behalf of herself and similarly situated dancers. Since filing suit, three former Heartbreakers' dancers have opted-in as plaintiffs: (1) Hailey Chapman ("Chapman"), who worked there in July 2018; (2) Jean Hoffmeister ("Hoffmeister"), who worked "from 2016–2018"; and (3) Roxanne Murillo ("Murillo"), who worked "from 2018–2019." For ease of reference, I collectively refer to Kibodeaux and the opt-ins as "Plaintiffs."

In March 2020, Plaintiffs amended their complaint, adding Heartbreakers' owners, Mike Armstrong and Peggy Armstrong, as defendants (collectively "Defendants"). Against all Defendants, Plaintiffs assert three causes of action under the FLSA for the deprivation of income and two causes of action for violations of related tipping regulations.[2] Plaintiffs only seek notice of their FLSA claims.

---

[1] Plaintiffs move for "conditional certification." However, as mentioned, courts in this Circuit no longer conditionally certify classes in FLSA collective actions. *See Swales*, 985 F.3d at 440 ("The FLSA, and § 216(b) in particular, says nothing about 'conditional certification'").

[2] Specifically, Plaintiffs assert claims for failure to pay minimum wages, failure to pay overtime wages, unlawful taking of tips, taking illegal kickbacks, and forced tip sharing. *See* Dkt. 18 at 18–24. The latter two causes of action do not arise under the FLSA. *See* 29 C.F.R. § 531.35.

As mentioned, I previously vacated my conditional certification order and set a discovery and briefing schedule to, once again, determine whether this case should proceed on a collective basis. *See* Dkt. 77. On May 21, 2021, Plaintiffs filed the instant motion for certification and issuance of notice, in which they seek permission for this lawsuit to proceed as a collective action on behalf of all dancers who have performed at Heartbreakers over a three-year period. Both parties have extensively briefed their respective positions. *See* Dkts. 82–88.

The thrust of Plaintiffs' argument remains unchanged—Heartbreakers misclassified its dancers as independent contractors when they should have been considered hourly employees. However, unlike the first go-round, the evidence before me is not limited to the pleadings and Plaintiffs' sworn declarations. Instead, I now have the benefit of Plaintiffs' deposition testimony, Heartbreakers' timekeeping logs and financial records, and the deposition testimony of Heartbreakers' corporate representative (Peggy Armstrong) and four of its managers.

As in their declarations, Plaintiffs testified at deposition that Heartbreakers dictated how its dancers performed through a wide range of rules. Some of the allegations are undisputed. For example, Defendants do not dispute that Heartbreakers charged dancers a "house fee" (sometimes referred to as a "floor fee") for the opportunity to work a particular shift. It is also undisputed that Heartbreakers charged dancers $20 to use its private booths, which are simply curtained-off areas where dancers can perform private dances for customers. Other allegations are hotly disputed, such as Plaintiffs' claim that dancers were fined $20 for each missed stage appearance or were required to share a portion of their tips with Heartbreakers' managers, DJs, bartenders, and waitresses.

Defendants adamantly contend that certification is inappropriate, given the Fifth Circuit's directive that district courts must "rigorously scrutinize the realm of 'similarly situated' workers" to ensure that "the requested opt-in notice will go to those who are actually similar to the named plaintiffs." *Swales*, 985 F.3d at 434. In

3

their mind, Plaintiffs have only shown "*some* individual proof of their own circumstances," not that Heartbreakers' dancers are similarly situated. Dkt. 85 at 29. On this point, Defendants continue, Plaintiffs' divergent testimony about "different experiences based on different interactions with different managers at different times for different reasons" fails to show some common nexus of facts that could unify their disparate experiences. *Id.*

## LEGAL STANDARD

### A. FLSA COLLECTIVE ACTIONS

Under the FLSA, "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C § 207(a)(1). The law also mandates that "[e]very employer shall pay to each of his employees who in any workweek is engaged in . . . or is employed in an enterprise [that is] engaged in the production of goods for commerce" no less than the statutory minimum wage. *See id.* § 206(a)(1)(C). The FLSA's minimum-wage and overtime-compensation rules are a bit more nuanced for "tipped employees"[3]—which

---

[3] The statutory minimum wage for non-tipped employees is $7.25 per hour. *See* 29 U.S.C. § 206(a)(1)(C). Employees who customarily receive more than $30.00 per month in tips, however, are considered "tipped employees" under the FLSA. *Id.* § 203(t). The FLSA contains an exception that permits employers to pay less than the general minimum wage—$2.13 per hour—to a tipped employee as long as the employee's tips make up the difference between the $2.13 minimum wage and the statutory minimum wage. *See id.* § 203(m). This is commonly referred to as a "tip credit." Generally, an employer may not claim a tip credit unless a tipped employee is permitted to retain all her tips. *See id.* However, the statute provides a limited exception permitting "the pooling of tips among employees who customarily and regularly receive tips." *Id.* § 203(m)(2)(ii). But, "[w]here a tipped employee is required to contribute to a tip pool that includes employees who do not customarily and regularly receive tips, the employee is owed the full $7.25 minimum wage and reimbursement of the amount of tips that were improperly utilized by the employer." *See* U.S. Dep't of Labor, Wage and Hour Div., Fact Sheet # 15: Tipped Employees Under the Fair Labor Standards Act (FLSA) (rev. April 2018), *available at* https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/whdfs15.pdf (last viewed January 7, 2022).

4

Plaintiffs claim to be. Any employer who violates the minimum-wage or maximum-hours provisions in §§ 206 and 207 "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." *Id.* § 216(b). Once again, the rules differ slightly for "tipped employees."[4]

The FLSA gives employees the right to bring an action on behalf of themselves and "other employees similarly situated." *Id.* Section 216(b) establishes an opt-in scheme under which plaintiffs must affirmatively notify the court of their intention to become parties to the suit. *See Thrower v. UniversalPegasus, Int'l Inc.*, 484 F. Supp. 3d 473, 479 (S.D. Tex. 2020). District courts have the discretionary power to certify collective actions and order notice to putative class members. *See id.*

While not required by the FLSA, collective actions allow "plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). Such actions also benefit the judicial system by encouraging the "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity." *Id.*

**B. CERTIFYING AN FLSA COLLECTIVE IN THE FIFTH CIRCUIT**

Until recently, few areas of the law were less settled than the test for determining whether an FLSA case can proceed on a collective basis. Lacking the Fifth Circuit's guidance, district courts in this Circuit typically bifurcated the certification process, applying (some form of) what is widely known as the *Lusardi* test. *See Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987). Earlier this year, however, the Fifth Circuit rejected *Lusardi*'s two-step approach and, for the first

---

[4] Any employer who violates § 203(m) is liable "in the amount of the sum of any tip credit taken by the employer and all such tips unlawfully kept by the employer, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).

time, adopted a standard for determining whether to certify a collective in an FLSA lawsuit. *See Swales*, 985 F.3d 430. Given *Swales*'s novelty, not to mention the pervasive imprint left by courts applying the now-defunct *Lusardi* approach for over three decades, a brief discussion of how we got here is appropriate.

1. ***Lusardi***

*Lusardi* set forth a two-step process to determine whether prospective opt-in plaintiffs in a proposed collective are "similarly situated" enough to satisfy the FLSA. *Id.* at 436. The two steps are commonly referred to as the "notice stage" (sometimes the "conditional certification stage") and the "decertification stage." *See Thrower*, 484 F. Supp. 3d at 479.

At the notice stage, district courts conducted an initial inquiry into whether the proposed members of the collective action were sufficiently similar to merit sending notice of the lawsuit to possible class members. *See id.* Critically, most courts concluded that it was inappropriate to consider the underlying claim's merits or evidence of a merit-based defense (e.g., FLSA exemption) when deciding whether to conditionally certify a collective action. *See Rosales v. Indus. Sales & Servs., LLC*, No. 6:20-CV-00030, 2021 WL 4480747, at *6 (S.D. Tex. Sept. 30, 2021) (collecting cases). Instead, given the limited evidence available, courts applying the *Lusardi* standard typically based their decision on the pleadings and affidavits of the parties, requiring little more than substantial allegations that the putative collective members were together the victims of a single decision, policy, or plan. This lenient standard generally resulted in "conditional certification" of a representative class. *See Thrower*, 484 F. Supp. 3d at 479.

If a collective action was conditionally certified, the parties proceeded with discovery before moving to the second step—the decertification stage. Here, with the benefit of full discovery, courts made a second and final determination, utilizing a stricter standard, about whether the named plaintiffs and opt-ins were "similarly situated" and could, therefore, proceed to trial as a collective action. *See Swales*, 985 F.3d at 437. If the court found that the opt-ins were not sufficiently

similar to the named plaintiffs, it had to dismiss the opt-in employees, leaving only the named plaintiff's original claims. *See id.* To help decide similarity, courts considered the following factors: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Id.* (cleaned up).

### 2. *Swales*

Over time, *Lusardi* and its progeny devolved into an "amorphous and ad-hoc test" that was inconsistently applied and "provide[d] little help in guiding district courts in their notice-sending authority." *Id.* at 440. Finding that *Lusardi*'s unstructured approach "frustrates, rather than facilitates, the notice process," *id.* at 439, the Fifth Circuit in *Swales* disavowed the multi-step approach and, instead, "provid[ed] a workable gatekeeping framework for assessing, at the outset of litigation, *before* notice is sent to potential opt-ins, whether putative plaintiffs are similarly situated—not abstractly but actually." *Id.* at 433.

*Swales* eliminated the conditional certification stage and, instead, demands that district courts now "rigorously scrutinize the realm of 'similarly situated' workers" before certifying a collective action to ensure that "the requested opt-in notice will go to those who are actually similar to the named plaintiffs." *Id.* at 434. That is, courts must conduct a careful, fact-intensive similarity inquiry before the issuance of notice and collective treatment. To that end, district courts must now "consider all of the evidence"—even if that evidence is also relevant to the merits of the underlying case—to ensure that collective adjudication of the putative class members' claims will not "devolve into a cacophony of individual actions." *Id.* at 442. Put differently, district courts must ensure that proceeding as a collective action will not require "a highly individualized inquiry into each potential opt-in's circumstances," as that would detract from the FLSA's overarching goal to efficiently resolve in one proceeding issues of law and fact that are common to members of the collective action. *Id.* at 442.

7

Although the Fifth Circuit strove to promulgate a workable standard, it made clear that no one-size-fits-all solution exists. In some cases, the appellate court explained, notice might be justified when the pleadings and only preliminary discovery show sufficient similarity between the plaintiff's and potential opt-in plaintiffs' employment situations—e.g., when the plaintiffs all have the same job description, and the allegations revolve around the same aspect of the job. *See id.* at 441–42. In other cases, such as when the plaintiff and potential opt-in plaintiffs have demonstrably different work experiences, courts will need more discovery to determine whether notice is going out to those "similarly situated." *Id.* at 442.

Ultimately, courts must exercise their "broad, litigation-management discretion" to meet the needs of each case. *Id.* at 443. But it remains the plaintiff's burden to prove that the proposed class is similar enough to warrant the issuance of notice to potential class members, and this burden is shaped by the scope and nature of the claims at issue. *See id.* at 443 n.65 (holding that the burden to establish that employees are similarly situated "follows from the general burden that a plaintiff bears to prove her case"); *Hebert v. TechnipFMC USA, Inc.*, No. 4:20-CV-2059, 2021 WL 1137256, at *2 (S.D. Tex. Feb. 5, 2021) ("The plaintiff has the burden to establish that evidence exists, and courts are not required to sift through discovery to find a similarity."). Accordingly, my decision turns on whether the evidence demonstrates sufficient similarity between Plaintiffs and the potential opt-ins. *See Swales*, 985 F.3d at 442.

## ANALYSIS

A. **PLAINTIFFS' OBJECTIONS TO DEPOSITION TESTIMONY FROM UNRELATED LAWSUITS**

Included with their response, Defendants have attached the deposition testimony of two exotic dancers from unrelated FLSA collective actions against different gentlemen's clubs. *See* Dkts. 85-1 and 85-2. In those depositions, Casey Nelson ("Nelson") and Brandy Phillips ("Phillips") briefly testified about their experience working at Heartbreakers. *See id.* Plaintiffs argue the testimony is

8

hearsay and inadmissible under Federal Rule of Civil Procedure 32. *See* Dkt. 87 at 19–20. *See also* FED. R. CIV. P. 32(a)(8) (authorizing the use of depositions taken in an earlier action if the later action "involve[es] the same subject matter between the same parties.").

Defendants counter that Rule 32(a)(8) is primarily applied as a limitation on the introduction of deposition testimony at trial, and that, in the summary-judgment context, courts routinely find deposition testimony from a separate case akin to affidavit testimony. Defendants also argue that the testimony is not hearsay because it is not offered for the truth of the matters asserted but, instead, to show that the facts and experiences vary significantly from dancer to dancer. Finally, even if it is hearsay, Defendants argue the deposition testimony satisfies Federal Rule of Evidence 807(a)'s residual hearsay exception because it is supported by sufficient guarantees of trustworthiness.[5]

Rule 32(a)(8) permits the use of prior deposition testimony in a later action if: (1) the later action involved the same subject matter between the same parties, or their representatives or successors in interest; or (2) it is otherwise allowed by the Federal Rules of Evidence. *See* FED. R. CIV. P. 32(a)(8). Neither Defendants nor Plaintiffs were parties to the lawsuits involving Nelson and Phillips—it appears the only connection between those cases and the case at bar is defense counsel. Moreover, since the lawsuits were brought against different gentlemen's clubs, it cannot be said that any party in either lawsuit shared Plaintiffs' interest or motive to develop the testimony. For this same reason, Federal Rule of Evidence 804(b)(1)'s hearsay exception for unavailable deponents is inapplicable. *See* FED. R. EVID. 804(b)(1).

---

[5] Rule 807(a) provides that "a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804 [if]: (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." FED. R. EVID. 807(a).

9

As for Federal Rule of Evidence 807(a)'s residual hearsay exception, the Fifth Circuit has cautioned that it "is to be used only rarely, in truly exceptional cases." *United States v. Walker*, 410 F.3d 754, 757 (5th Cir. 2005) (cleaned up). Here, Defendants summarily argue that the deposition testimony is trustworthy because both deponents testified under oath, were represented by counsel, and had no reason to lie. This simply does not cut it. *See United States v. Phillips*, 219 F.3d 404, 426 n.23 (5th Cir. 2000) ("The proponent of the statement bears a heavy burden to come forward with indicia of both trustworthiness and probative force." (quotation omitted)).[6]

Defendants are correct, however, that, even where litigation does not involve the same parties and subject matter, district courts have routinely allowed prior deposition testimony at the summary-judgment stage, relying on two different lines of reasoning. The most popular school of thought is that a deposition is at least as good as an affidavit and, therefore, should be usable whenever an affidavit would be permissible. *See* 8A C. Wright, A. Miller, & R. Marcus, *Federal Practice & Procedure* § 2142 (3d ed.); *Guarisco v. Boh Bros. Constr. Co., LLC*, 421 F. Supp. 3d 367, 374 (E.D. La. 2019) (collecting cases). Alternatively, under Rule 56(c)(2), "materials cited to support or dispute a fact [at summary judgment] need only be *capable* of being 'presented in a form that would be admissible in evidence'" at trial, not that it actually be presented in an admissible form. *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (quoting FED. R. CIV. P. 56(c)(2)). Put differently, if the deponent could be deposed or produced at trial, then deposition testimony from a prior proceeding is competent summary-judgment evidence. *See, e.g., Bingham v. Jefferson Cnty.*, No. 1:11-CV-48, 2013 WL 1312563, at *6 (E.D. Tex. March 1, 2013).

---

[6] In addition, there has been no showing that Nelson or Phillips are unavailable or not subject to subpoena, which suggests that their deposition testimony cannot, as Rule 807 requires, be considered "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." FED. R. EVID. 807(a)(2).

Even if I found the deposition testimony admissible under the Defendants' advocated-for summary-judgment standard, it does little, if anything, to move the needle in Defendants' favor. Indeed, Nelson did not work at Heartbreakers during the relevant class period, *see* Dkt. 85-1 at 9 (testifying she worked at Heartbreakers for a four-month period sometime between late-2015 and early-2017), and Phillips's testimony does not nail down when she worked at Heartbreakers, only that she worked there for an unspecified period sometime before December 2017. *See* Dkt. 85-2 at 3–4. Thus, even if taken at face value, testimony regarding their respective experiences at Heartbreakers is of little probative value. Because it ultimately makes no difference to my analysis, I will overrule Plaintiffs' objections to the deposition testimony from unrelated lawsuits.

## B.   THE ARBITRATION ISSUE, ROUND 2

Before working at Heartbreakers, Plaintiffs executed independent contractor agreements which contain an arbitration clause. I have already found that the specific arbitration language at issue does not prohibit Plaintiffs or potential opt-ins who have signed the same agreement from participating in a collective action. *See Kibodeaux v. A&D Ints., Inc.*, No. 3:20-CV-00008, 2020 WL 6292551, at *3–5 (S.D. Tex. Oct. 27, 2020).

Instead of restating my views here on why the relevant arbitration agreements do not preclude notice from being sent to putative class members, I simply incorporate my reasoning set forth in my prior opinion. *See id.* Without explaining how *Swales* affects my previous analysis, Defendants recycle the same arguments, adding only that the evidence establishes "Defendants *have* enforced the arbitration agreement."[7] Dkt. 85 at 27. My answer has not changed. But to be

---

[7] The record contains evidence that Heartbreakers arbitrated similar FLSA claims brought on an individual basis by another exotic dancer. *See* Dkt. 82-8. But whether Defendants have "enforced the arbitration agreement" in an unrelated lawsuit is irrelevant; what matters is that they have not attempted to do so in this case. *See Kibodeaux*, 2020 WL 6292551 at *5 ("Although the Plaintiffs have executed arbitration agreements, Defendants have not moved to compel arbitration. . . . Because (i) the Defendants have failed to seek arbitration; and (ii) the underlying agreements do not prevent employees from

clear, I have carefully considered the Plaintiffs' arbitration agreements. They bar class action proceedings; they say nothing about collective actions. *See Kibodeaux*, 2020 WL 6292551, at *4. To cinch the matter, Defendants admit that Heartbreakers has used "the same or substantially similar" independent contractor agreements since 2014. Dkt. 37-2 at 1. It follows that any potential opt-in who signed an independent contractor agreement is bound by the same arbitration clause—meaning they too have not waived their right to proceed collectively.

### C. SIMILARLY SITUATED

Post-*Swales*, the question courts must answer when deciding whether to certify a collective action is the same question it would ask at the second stage of the *Lusardi* analysis: are Plaintiffs and opt-ins sufficiently "similarly situated" such that this case should proceed on a collective basis? As mentioned, when deciding similarity in this context, courts often consider three factors: (1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *See Swales*, 985 F.3d at 437.

The primary dispute in this matter is whether an employer-employee relationship exists between Heartbreakers and its dancers, as only employees are entitled to FLSA protections. *See* 29 U.S.C. § 152(3) (defining "employee" to exclude, *inter alia*, "any individual having the status of an independent contractor"). Courts in this Circuit use the economic-realities test to determine whether a worker is an employee or an independent contractor for purposes of the FLSA. *See Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998) ("To determine employee status under the FLSA, we focus on whether the alleged employee, as a matter of economic reality, is economically dependent upon the business to which he or she renders his or her services.").

---

participating in collective actions, the Plaintiffs can, at least for the time being, continue to proceed with this case in federal court.").

Simply stated, the economic-realities test asks "whether the individual is, as a matter of economic reality, in business for himself or herself." *Id*. To aid in this determination, courts consider five non-exhaustive factors: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and alleged employer; (3) the degree to which the worker's opportunity for profit and loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *See id*. No single factor is determinative. *See id*. Rather, the determinative question is whether the totality of the circumstances "establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of [the] FLSA or are sufficiently independent to lie outside its ambit." *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311–12 (5th Cir. 1976).

### 1. Disparate Factual and Employment Settings of the Individual Plaintiffs

Whether individual plaintiffs have disparate factual and employment settings may involve a variety of considerations, including: (1) whether the plaintiffs all held the same job title; (2) whether they worked in the same geographic location; (3) whether the alleged violations occurred during the same time period; (4) whether the plaintiffs were subjected to the same policies and practices; (5) whether these policies and practices were established in the same manner and by the same decision-maker; and (6) the extent to which the actions that constitute the claimed violations are similar. *See Smith v. Tradesmen Int'l, Inc.*, 289 F. Supp. 2d 1369, 1372 (S.D. Fla. 2003).

This one is an easy call. The case involves one job position at a single business location. The dancers were all classified as independent contractors,[8] had

---

[8] Heartbreakers did give dancers the option of signing an "employment agreement" rather than the "independent contractor agreement." *See* Dkt. 37-2 at 1; Dkt. 85-17 at 17. However, nothing in the record so much as hints that any dancer ever opted for the employment agreement. To the contrary, it appears that no dancer ever chose to sign the

significantly similar duties and responsibilities, worked under the same management, and were subject to the same pay practices. Although Plaintiffs did not all work at Heartbreakers at the same time, they all worked there during the relevant class period. Moreover, they consistently testified that Heartbreakers management unlawfully took their tips, whether through the imposition of fines (e.g., $20 per missed stage appearance) or as part of the alleged tip-sharing requirement.

Admittedly, Plaintiffs' recollections do not align perfectly. For example, Plaintiffs offered conflicting testimony about how the alleged tip-sharing scheme worked, whether participation was mandatory or more of a "suggestion" coupled with the fear of retribution,[9] and who at Heartbreakers benefited from it.[10] Nevertheless, the gist of their testimony is that they were required to pay back a portion of the tips and that money was distributed among some combination of

---

employment agreement. *See* Dkt. 85-17 at 17 ("To my knowledge, they all option [sic] for the [independent contractor agreement] because it's more lucrative to them.").

[9] *See* Dkt. 82-1 at 44–45 (testifying other dancers, not management, told her about the tip-sharing requirement); *id.* at 135 (testifying if she didn't tip the DJ, he would either leave her off the rotation or pick "the most awful music to dance to"); Dkt. 82-3 at 86–87 (testifying management would directly ask dancers to share their tips); Dkt. 85-6 at 10 (testifying she was required to pay managers for an assortment of reasons, including performance-related punishment); Dkt. 82-2 at 40 ("[Tip sharing] was just an obligation. You know, if you don't do it, you were frowned upon. It was just one of those things that was just understood. You just did it because everyone else did it and you didn't want to be the one that didn't do it.").

[10] Dkt. 82-2 at 39–40 (testifying she was told by management to tip the DJs but understood that she was also supposed to share her tips with the bartenders); Dkt. 82-1 at 43–44, 140–41 (testifying she was forced to tip waitresses, bartenders, and DJs, and that she tipped managers "indirectly" because DJs split their tips with the managers); Dkt. 82-3 at 86–87 (testifying managers would directly ask dancers to share their tips); *id.* at 127–29 (testifying Heartbreakers' management imposed fees and fines "for various violations of different kinds of rules" which were then distributed among Heartbreakers' staff); Dkt. 85-6 at 8–9 ("My managers expected me to pay them. . . . [I]f I skipped a song, I have to pay. If I come in late, I have to pay. If I leave early, I have to pay. If I – if I wanted anything, you have to pay.").

Heartbreakers' staff—e.g., managers, DJs, bartenders, waitresses, and, according to Kibodeaux, even the "house mom" got a piece of the action.

Even so, Defendants have not explained how these or any other differences in Plaintiffs' work experiences will preclude me from deciding the dancers' employment status on a class-wide basis. *See Tolentino v. C&J Spec-Rent Servs., Inc.*, 716 F. Supp. 2d 642, 647 (S.D. Tex. 2010) ("the court need not find uniformity in each and every aspect of employment to determine that a class of employees is similarly situated" (cleaned up)); *Thrower*, 484 F. Supp 3d at 485 ("a plaintiff must show that potential class members are similarly situated in relevant respects given the claims and defenses asserted" (cleaned up)).

### 2. The Various Defenses Available to Defendants Which Appear to be Individual to Each Plaintiff

#### i. *The Economic-Realities Test Can Be Applied on a Collective Basis*

Defendants' primary defense is that Heartbreakers' dancers are independent contractors. While this defense certainly requires application of the economic-realities test, it is important to remember that I am not asked to decide, right here and now, whether Heartbreakers' dancers are employees or independent contractors. Instead, my focus is on whether this question can be answered collectively. *See Swales*, 985 F.3d at 442 ("Considering, early in the case, whether merits questions can be answered collectively has nothing to do with endorsing the merits."). To be sure, part of this inquiry does require me to consider, for example, the degree of control Defendants exercised over Heartbreakers' dancers. But it does not demand a full-blown application of the economic-realities test. Otherwise, certification in cases such as this would be the functional equivalent of summary judgment. Instead, my focus is on whether the evidence shows a sufficient similarity between Plaintiffs' and the potential opt-in plaintiffs' employment situations that will allow me to apply the economic-realities test on a class-wide basis.

15

I have carefully reviewed all the evidence submitted by the parties. While I agree with Defendants that Plaintiffs' testimony is not entirely consistent on all fronts, to put it bluntly, "there are some occupations for which all of us in society have a basic understanding." *Kibodeaux*, 2020 WL 6292551, at *5. Moreover, I find it significant that dozens of district courts across the country, when asked to consider whether exotic dancers are employees under the FLSA, have had no difficulty addressing the question on a class-wide basis. *See Degidio v. Crazy Horse Saloon & Rest.*, Inc., No. 4:13-CV-02136-BHH, 2015 WL 5834280, at *7 (D.S.C. Sept. 30, 2015) (collecting cases). Even so, each case must be decided on its own facts.

Here, there is no asserted defense that is unique to any of the Plaintiffs or potential opt-ins. Moreover, Defendants do not argue any other FLSA exemption applies should I find that the dancers are, in fact, employees. That is, in this case, misclassification is a zero-sum game—Heartbreakers' dancers are either employees entitled to FLSA protections or they are not. Accordingly, I find that Plaintiffs have shown a sufficient similarity between themselves and potential opt-ins such that application of the economic-realities test will not require a "highly individualized inquiry into each potential opt-in's circumstances." *Swales*, 985 F.3d at 442.

### ii. *Individualized Determinations as to Each Plaintiff's Damages*

To varying degrees, Plaintiffs all characterize Heartbreakers' timekeeping records as unreliable or untrustworthy. However, when pressed at deposition, Plaintiffs could not identify any workweek where they worked over 40 hours. Given the vague testimony, Defendants argue that calculating damages—particularly for unpaid overtime—will require such a highly individualized inquiry that precludes certification. *See* Dkt. 85 at 27–28 (describing the "Amounts & Measures of Damages" as "Dispositive Merits Issues").

Admittedly, calculating damages may present some difficulties if we reach that point. But "[t]he need for individual plaintiffs to establish the amount of uncompensated time does not defeat certification." *Maynor v. Dow Chem. Co.*, 671 F. Supp. 2d 902, 935 (S.D. Tex. 2009). *See also Metcalfe v. Revention, Inc.*, No. 4:10-CV-3515, 2012 WL 3930319, at *6 (S.D. Tex. Sept. 10, 2012) ("Whether individualized determinations are necessary to define the extent of Plaintiffs' damages, if any, does not weigh against efficiently establishing Defendants' class-wide liability.").

### 3. Fairness and Procedural Considerations

The FLSA is designed to be a remedial statute and should be given a broad reading in favor of coverage. *See Mitchell v. Lublin, McGaughy & Assocs.*, 358 U.S. 207, 211 (1959) ("the [FLSA] has been construed liberally to apply to the furthest reaches consistent with congressional direction"). Fairness and procedural considerations direct the court to consider the primary objectives of FLSA collective actions: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arise from the same alleged activity. *See Hoffmann-LaRoche Inc.*, 493 U.S. at 170. Thus, I must balance these benefits with any potential detriment to Defendants and the potential for judicial inefficiency as a result of collective treatment.

Plaintiffs have met their burden and demonstrated they are sufficiently similarly situated to benefit from the advantages of a collective action. And Defendants have failed to present any argument of merit which convinces me that I will not be able to manage this case in "a manner that will not prejudice any party or be particularly burdensome on a jury." *Reyes v. Texas Ezpawn, L.P.*, No. CIV.A. V-03-128, 2007 WL 101808, at *6 (S.D. Tex. Jan. 8, 2007). Thus, given the facts of this case, the (relatively speaking) limited possible number of opt-in plaintiffs, and the extensive factual similarities among them, I find that fairness and procedural concerns do not weigh against certification.

\*\*\*

At this time, I must only decide whether Plaintiffs have shown that the potential class members are similarly situated and that applying the economic-realities test on a collective basis will not require a highly individualized inquiry into each potential opt-in's circumstances. *See Swales*, 985 F.3d at 442. I find that Plaintiffs have satisfied their burden. Accordingly, I certify the following class:

> Anyone who has worked as a dancer at Heartbreakers during the three-year period beginning October 27, 2017, through October 27, 2020.

**D.   NOTICE**

Notice is particularly important for FLSA collective actions as potential plaintiffs' statutes of limitations continue to run unless and until a plaintiff "gives his consent in writing to become a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b).

Both parties recycle the same notice-related arguments I addressed in the previous iteration of this certification saga. Once again, my answers have not changed. *See Kibodeaux*, 2020 WL 6292551, at \*6–7. I believe that mail, e-mail, and text-message notice will all help facilitate the FLSA's overarching goal of providing potential class members the opportunity to join the case and, therefore, will allow all three forms of notice. I will not, however, require Heartbreakers to post notice near its public entrance nor on the company's social media sites. Finally, Plaintiffs' request that I order posted notice of the lawsuit in Heartbreakers' dressing room is granted; however, the sign shall not exceed 8.5 by 11 inches (the size of a standard piece of notebook paper). I trust that the parties can agree on the sign's color.

Plaintiffs have not attached a proposed class notice to their underlying motion. Given that their notice-related arguments have not changed, I will assume Plaintiffs' references to "Exhibits 1 and 2" refer to exhibits attached to their initial motion for conditional certification. *See* Dkt. 34-2 (Exhibit 1) and Dkt. 34-3 (Exhibit 2). To the extent Defendants raise the same objections to the wording of

the proposed notice submitted by Plaintiffs,[11] I expect the parties to get together to iron out the notice that will be sent to potential class members. To assist the parties in crafting such a notice, I have prepared a form FLSA Notice and Consent to Join. These forms are available on my website: https://www.txs.uscourts.gov/page/united-states-magistrate-judge-andrew-m-edison. The parties are highly encouraged to utilize my Notice and Consent to Join forms in preparing the ultimate documents that will be distributed to potential plaintiffs, especially since those forms address many of the wording disputes at issue here.

## CONCLUSION

Based on an exhaustive review of the record and the extensive briefing of the parties, I find that Plaintiffs have shown that the putative class satisfies the FLSA's similarity requirement. As such, Plaintiffs' Motion for Certification and Issuance of Notice (Dkt. 82) is **GRANTED** for a class defined as follows:

> Anyone who has worked as a dancer at Heartbreakers during the three-year period beginning October 27, 2017, through October 27, 2020.

It is further **ORDERED** that parties confer and file an agreed Proposed Notice and an agreed Proposed Consent to Join Form by January 21, 2022.

It is further **ORDERED** that Defendants provide Plaintiffs with a list of all individuals fitting the description of the certified class in a usable electronic format by January 21, 2022. This list shall include each individual's full name, last known mailing address, e-mail address (if known), cell phone number (if known), and date(s) of employment as a dancer at Heartbreakers.

Plaintiffs shall have fourteen (14) days from the receipt of the necessary contact information to send notice to potential class members by first-class mail, e-mail, and text message. The opt-in period shall be sixty (60) days from the date

---

[11] Defendants' briefing on the notice issue consists of a single sentence in which they "reiterate and incorporate their objections in their prior response." Dkt. 85 at 29 (citing Dkt. 37 at 15–23).

the notice is sent. A reminder notice may be sent to the putative class members by first-class mail, e-mail, and text message. Heartbreakers is also required to post the notice and consent form in Heartbreakers' employee common space. The posting shall be made on the date notice is sent and continue for the full 60-day opt-in period.

Signed on this 10th day of January 2022.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE