United States District Court
Southern District of Texas
**ENTERED**
March 31, 2022
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | |
|---|---|
| STACEY KIBODEAUX, *et al.*, § | |
| § | |
| Plaintiffs. § | |
| § | |
| VS. § | CIVIL ACTION NO. 3:20-cv-00008 |
| § | |
| A&D INTERESTS, INC. d/b/a § | |
| HEARTBREAKERS GENTLEMAN'S § | |
| CLUB, *et al.*, § | |
| § | |
| Defendants. § | |

### OPINION AND ORDER

Before me are two motions: (1) Defendant Peggy Armstrong's Motion for Summary Judgment on Employer Status ("Motion for Summary Judgment"); and (2) Defendants' Partial Motion for Summary Judgment on Plaintiffs' Overtime and Off-the-Clock Claims ("Motion for Partial Summary Judgment"). Dkt. 90 and Dkt. 89. After carefully reviewing the motions, the parties' briefing, and the applicable law, and for the reasons discussed below, both motions are **GRANTED**.

### I.     PROCEDURAL HISTORY

Plaintiff Stacey Kibodeaux ("Kibodeaux") is a former exotic dancer who worked at A&D Interests, Inc. d/b/a/ Heartbreakers Gentlemen's Club ("Heartbreakers") in Dickinson, Texas in December 2019 and January 2020. During her employment, Kibodeaux claims she was not compensated on an hourly basis and, instead, received only tips from Heartbreakers' customers.

In January 2020, Kibodeaux sued Heartbreakers for alleged violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, on behalf of herself and similarly situated dancers. Since filing suit, three former Heartbreakers' dancers have opted-in as plaintiffs: (1) Hailey Chapman ("Chapman"), who worked there in July 2018; (2) Jean Hoffmeister ("Hoffmeister"), who worked from 2016–2018; and (3) Roxanne Murillo ("Murillo"), who worked at Heartbreakers off and on from 2002–2019. I collectively refer to Kibodeaux and the opt-ins as "Plaintiffs."

In March 2020, Plaintiffs amended their complaint, adding Heartbreakers' owner, Mike Armstrong ("Mr. Armstrong"), and its secretary/treasurer, Peggy Armstrong ("Ms. Armstrong"), as defendants. I collectively refer to Mr. Armstrong, Ms. Armstrong, and Heartbreakers as "Defendants." Against all Defendants, Plaintiffs assert causes of action under the FLSA for the deprivation of income and related tipping regulations. Relevant to the underlying motions are Plaintiffs' causes of action for unpaid overtime and unpaid off-the-clock hours worked. Plaintiffs argue Mr. and Ms. Armstrong "were corporate officers with operational control over Heartbreakers . . . and, therefore, were 'employer(s)' or 'joint employer(s)' of Plaintiffs along with Heartbreakers." Dkt. 18 at 8.

In June 2021, Defendants moved for partial summary judgment on Plaintiffs' overtime and off-the-clock claims, arguing that Plaintiffs have insufficient evidence to support either claim. Concurrently, Ms. Armstrong moved for summary judgment, arguing, as a matter of law, that she is not Plaintiffs' "employer" under the FLSA. I address each motion in turn. Because the facts relevant to the disposition of each motion largely do not overlap, I provide a "relevant facts" section for each of my analyses.

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the non-movant. *See Rodriguez v. Webb Hosp. Corp.*, 234 F. Supp. 3d 834, 837 (S.D. Tex. 2017). The moving party bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This does not, however, require that the movant negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).

If the burden of proof at trial lies with the non-moving party, the movant may satisfy its initial burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. *See Nola Spice Designs, L.L.C. v. Haydel Enters.*, 783 F.3d 527, 536 (5th Cir. 2015) ("Where the non-movant bears the burden of proof at trial, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material

fact warranting trial." (quotation omitted)). Once the moving party has demonstrated the absence of a material fact issue, the non-moving party must go beyond the pleadings and designate specific facts and evidence in the record and articulate how they support the party's claim(s). *See Boudreaux*, 402 F.3d at 540; FED. R. CIV. P. 56(c)(1). "This burden will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux*, 402 F.3d at 540 (quotation omitted). *See Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.").

In deciding a motion for summary judgment, I must "view the evidence and the inferences to be drawn therefrom in the light most favorable to the non-moving party." *Brown*, 337 F.3d at 541. I must also resolve factual controversies in favor of the non-moving party. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). However, "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant," I must grant summary judgment for the moving party. *Boudreaux*, 402 F.3d at 540 (quotation omitted).

## III.   PEGGY ARMSTRONG'S MOTION FOR SUMMARY JUDGMENT

Ms. Armstrong has moved for summary judgment on claims brought against her in her individual capacity, arguing that she is not Plaintiffs' employer under the FLSA.

### A.   RELEVANT FACTS

In their sworn declarations, which Plaintiffs submitted as part of their motion for conditional class certification back in May 2020, Plaintiffs all testified that Mr. and Ms. Armstrong, among other things:

- Are the owners, officers, and/or managers of Heartbreakers;

- Executed the policies regarding payment to dancers and management of dancers;

- Acted directly and indirectly on behalf of Heartbreakers and exerted operational control and management control over Heartbreakers, including day-to-day management;

- Controlled the nature of their employment relationship;

- Directed and supervised all employees;

- Hired and fired employees; and

- Exercised significant control through written and unwritten policies and procedures.

*See* Dkt. 34-1.

Since then, the parties have engaged in written and oral discovery. In addition to Plaintiffs' sworn declarations, I have before me their deposition testimony, as well as the deposition testimony of Ms. Armstrong.

### 1. *Peggy Armstrong's Testimony*

Ms. Armstrong testified as follows: For 36 years, she has worked as Heartbreakers' secretary and treasurer, where she is primarily responsible for overseeing the club's bookkeeping. *See* Dkt. 85-16 at 5 (testifying that she "primarily handle[s] the business end of the club as opposed to the operational end"). She has no ownership interest in the club—her husband is Heartbreakers' president and sole owner. *See id.* at 4. Although Ms. Armstrong admitted that she would "go down to the . . . first floor . . . from time to time" and "watch [the dancers] on occasion," *id.* at 24, she adamantly denied any operational, managerial, or functional control over Plaintiffs' work as dancers. *See id.* at 4 (testifying that Heartbreakers' managers have the authority to hire and fire staff members without consulting with her or her husband); *id.* at 24 (testifying she never: (i) had the authority to hire or fire dancers; (ii) controlled dancers' working conditions; (iii) told dancers how to perform their job; or (iv) gave a dancer a work schedule); *id.* at 29 (explaining Mr. Armstrong and Heartbreakers' general manager handled activities on the "floor"—i.e., the performance area).

### 2. *Plaintiffs' Deposition Testimony*

Kibodeaux testified she "thinks" she met Ms. Armstrong "maybe once." Dkt. 82-1 at 162. Similarly, Chapman admitted she never had any face-to-face interactions with Ms. Armstrong and that her knowledge of Ms. Armstrong is limited to the fact that she is married to the club's owner. *See* Dkt. 82-2 at 23–24. Hoffmeister did not even mention Ms. Armstrong during her deposition.[1]

---

[1] In all fairness, Hofmeister's deposition was cut short. However, Hoffmeister submitted a second sworn declaration as part of Plaintiffs' Response to Defendants' Motion for Partial Summary Judgment, in which she does not mention Ms. Armstrong, aside from identifying her as a defendant in this lawsuit. *See* Dkt. 91-1.

The only Plaintiff who provided ostensibly appreciable testimony regarding Ms. Armstrong's purported influence over the dancers was Murillo, who testified that Ms. Armstrong controlled what dancers wear, "how [they] look," and "whether [they are] inactive or not." Dkt. 82-3 at 24. But when pressed for details, Murillo had difficulty explaining how Ms. Armstrong purportedly exercised this control. The only specific incident Murillo could recall was an occasion where Ms. Armstrong allegedly instructed a floor manager to reprimand Murillo because she "didn't have [her] top off" on stage. *Id.* at 24–25. Even then, Murillo could not recall when this incident occurred, providing only a ballpark estimate of sometime "before 2017." *Id.* at 25–26. Aside from this one example, Murillo generally testified as to her subjective belief that Ms. Armstrong exercised clandestine control over the dancers through Heartbreakers' floor managers. *See id.* at 24–26. Once again, however, when pressed for details, Murillo was unable to explain her conviction. Instead, Murillo essentially testified that she believes Ms. Armstrong was pulling strings behind the scenes because Heartbreakers' floor managers were "extra . . . strict" and "on the prowl" when she was around. *Id.* at 27.

**B.   LEGAL STANDARD**

### 1. *Joint Employment Under the FLSA*

Under the FLSA, an employer must pay overtime compensation to its non-exempt employees who work more than 40 hours a week. *See* 29 U.S.C. § 207(a)(1). Liability for violating the FLSA's overtime provision attaches to individuals and entities who qualify as an "employer." *See Donovan v. Grim Hotel Co.*, 747 F.2d 966, 971 (5th Cir. 1984).

Consistent with its broad, remedial purposes, the FLSA defines the term "employer" expansively—the statute places no express limitation on the word's meaning, stating only that it "includes any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The FLSA defines the related terms "employee" and "employ" in similarly broad fashion. *See id.* § 203(e)(1) (defining "employee" as "any individual employed by an employer"); *id.* § 203(g) (stating that the term "employ" "includes to suffer or permit to work"). The breadth of these definitions brings some employment relationships that might not qualify as such "under a strict application of traditional agency law principles" or under other federal or state statutes within the FLSA's coverage. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).

The FLSA does not expressly reference "joint employment." Rather, the joint-employment doctrine has largely evolved through various interpretations of the law by the Department of Labor ("DOL") and federal courts. *See Folk v. Brennan*, 414 U.S. 190, 165 (1973) (recognizing that maintenance workers were employees of both the building owners and the company rendering management services for the owners); *Hodgson v. Griffin and Brand of McAllen, Inc.*, 471 F.2d 235, 237–38 (5th Cir. 1973) (discussing joint-employer status); *Wirtz v. Lone Star Steel Co.*, 405 F.2d 668, 669 (5th Cir. 1968) (recognizing the concept of joint employers).

### 2. The Framework for Determining Joint-Employment Status in the Fifth Circuit

In determining a party's status as an employer under the FLSA, courts rely on the economic-realities test. *See Orozco v. Plackis*, 757 F.3d 445, 448 (5th Cir. 2014). Labels, such as "independent contractor" are "dispositive only to the degree that [the label] mirrors the economic reality of the relationship." *Donovan v. Tehco, Inc.*, 642 F.2d 141, 143 (5th Cir. 1981). Determining whether a defendant is an employer entails a fact-intensive inquiry based "upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947). This "diagnosis is not always easy to perform" because there are no neat diagnostic formulas, "only rough guidelines and checklists to determine employee status." *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1043 (5th Cir. 1987).

For determining joint-employer status, the Fifth Circuit set forth the following framework in *Wirtz v. Lone Star Steel Co.*:

> In considering whether a person or corporation is an "employer" or "joint employer", the total employment situation should be considered with particular regard to the following questions: (1) Whether or not the employment takes place on the premises of the company?; (2) How much control does the company exert over the employees?; (3) Does the company have the power to fire, hire, or modify the employment condition of the employees?; (4) Do the employees perform a 'specialty job' within the production line?; and (5) May the employee refuse to work for the company or work for others?

405 F.2d at 669–70. Under *Lone Star Steel*, these five considerations are all potentially relevant, but not necessarily exhaustive, since "[e]ach case must be considered in light of the total situation or whole activity to determine whether an employer-employee relationship exists." *Id.* at 669.

Over time, the Fifth Circuit has held that district courts deciding whether a joint-employer relationship exists must apply the economic-realities test. *See Gray v. Powers*, 673 F.3d 352, 355 (5th Cir. 2012). The four-factor economic-realities test asks whether an alleged employer: (1) possessed the power to hire and fire employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. *See id.*

The dominant theme in the caselaw is that only those who "have operating control over employees within companies may be individually liable for FLSA violations committed by the companies." *Id.* at 357. In other words, generalized control over an aspect of the business, alone, will not suffice. "Instead, to be an 'employer,' an individual defendant must possess control over a company's actual 'operations' in a manner that relates to a plaintiff's employment." *Irizarry v. Catsimatidis*, 722 F.3d 99, 109 (2d Cir. 2013).

As I recently recognized, there is an inherent tension between the Fifth Circuit's holdings in *Lone Star Steel* and *Gray*. *See Avila v. SLSCO, Ltd.*, No. 3:18-CV-00426, 2022 WL 784062, at *13 n.12 (S.D. Tex. Mar. 15, 2022). Although there is some overlap between *Lone Star Steel* and *Gray*'s four-factor test, *Gray* expressly held that there can be no finding of employer status when not one of the four factors is present. Given that the four factors recited in *Gray* ignore several considerations expressly identified in *Lone Star Steel* as being particularly relevant to assessing joint-employer status, *Gray* unavoidably contradicts *Lone Star Steel*'s mandate that joint-employer determinations be based upon the totality of each situation. *See id.* Nevertheless, even recognizing this difference, the tests are substantially similar—the second and third *Lone Star Steel* considerations largely overlap with *Gray*'s first and second factors, so the same evidence concerning the putative employer's authority over the alleged employee will create a triable issue of fact under either test. *See id.*

Given that the Fifth Circuit has frequently acknowledged that district courts must consider the totality of the circumstances when considering employment status under the FLSA, any of the *Lone Star Steel* or *Gray* factors may inform my joint-employer decision. *See, e.g.*, *Itzep v. Target Corp.*, 543 F. Supp. 2d 646, 653 (W.D. Tex. 2008) (citing both *Gray*'s and *Lone Star Steel*'s factors and observing that "[n]o one factor is determinative

of whether a defendant is an 'employer' under the FLSA"); *Artis v. Asberry*, No. 3:10-cv-323, 2012 WL 5031196, at *4 (S.D. Tex. Oct. 16, 2012) (same).

## C.   ANALYSIS

Plaintiffs did not respond to Ms. Armstrong's Motion for Summary Judgment. The failure to submit a timely response constitutes a representation of non-opposition. *See* S.D. TEX. L.R. 7.4. Nonetheless, at summary judgment, the movant bears the burden of demonstrating the absence of a genuine issue of material fact and must always bear this initial burden regardless of whether an adverse party fails to respond. *See Quorum Health Res., L.L.C. v. Maverick Cnty. Hosp. Dist.*, 308 F.3d 451, 471 (5th Cir. 2002) ("If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response."). I have given Plaintiffs the benefit of the doubt, reviewing the entire case record for evidence conceivably supporting a joint-employer claim against Ms. Armstrong.

### 1.  *The Power to Hire and Fire Employees*

Ms. Armstrong testified that the decision to hire or fire dancers "has always been left up to the managers." Dkt. 85-16 at 24. She also testified that the club's general manager and floor managers do not report to her on such matters. *See id.* at 5 ("If they report to anybody it's my husband, Mike.").

Plaintiffs' cursory declaration testimony that Ms. Armstrong "hired and fired employees" is the only record evidence that ostensibly challenges her claim that she lacked the authority to do so. *See* Dkt. 34-1 at 8, 13, 19, 25. However, at deposition, Kibodeaux and Murillo admitted that they were unaware of any instance in which Ms. Armstrong exercised her purported ability to hire or fire any employee. *See* Dkt. 82-1 at 162 ("Q: . . . [A]re you personally aware of any instance in which Peggy Armstrong has hired or fired any employee? A: [Kibodeaux] No."); Dkt. 82-3 at 32 (Q: Did [Ms. Armstrong] hire you? A: [Murillo] No."). Chapman similarly admitted that she never personally experienced Ms. Armstrong hire or fire an employee, nor did anyone ever tell her that Ms. Armstrong had the authority to do so. *See* Dkt. 82-2 at 90. Even so, Chapman did not back down from her belief that Ms. Armstrong wielded such power. *See id.* at 88–90. Tellingly, however, when asked to explain the basis for her belief that Ms. Armstrong "hired and fired" and "directed and supervised" all Heartbreakers' employees, Dkt. 34-1 at 13, Chapman explained: "Because she's the owner of the establishment so she has the

8

final say. She's the one who enforces the rules upon everybody, so I feel like that's almost common sense." Dkt. 82-2 at 90.

Testimony taken in a deposition, rather than sworn to in an affidavit or declaration, is considered more favorable for summary-judgment purposes since affidavit or declaration testimony is not subject to cross-examination. *See Shearer v. Homestake Mining Co.*, 557 F. Supp. 549, 558 n.5 (D.S.D. 1983) ("When a witness has given testimony both by affidavit and by deposition, the two forms should be considered on a motion for summary judgment, but greater reliability is usually attributed to the deposition. Summary judgment may be granted based upon the deposition testimony if the court is satisfied that the issue potentially created by the affidavit is not genuine." (citations omitted)); 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2738 (4th ed. 2022) ("[A] witness' affidavit will not be automatically excluded because it conflicts with the witness' earlier or later deposition, despite the greater reliability usually attributed to the deposition. The court may, however, consider whether the conflict creates a credibility issue preventing summary judgment from being entered." (citation omitted)). In addition, the Fifth Circuit has held that a party may not create a material fact issue with a declaration that impeaches other testimony without explanation. *See S.W.S. Erectors v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996).

Here, at their respective depositions, Plaintiffs could not explain facts they swore to in their declarations or gave testimony that contradicted or undermined their declaration testimony. Such contradictory or inconsistent statements cannot be reconciled with their earlier testimony for purposes of creating an issue of material fact. *See Hacienda Recs., LP v. Ramos*, No. 2:14-CV-19, 2015 WL 6680597, at *7 (S.D. Tex. Nov. 2, 2015). Plaintiffs' "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation" about Ms. Armstrong's ability to hire or fire Heartbreakers' dancers are insufficient to establish a fact issue for trial. *Brown*, 337 F.3d at 541. *See also Orozco*, 757 F.3d at 449 (explaining that the first element of the economic-realities test requires the plaintiff to "present evidence that [the defendant] possessed the power to hire and fire him").

## 2. *Supervision and Control of Work Schedules and Other Conditions of Employment*

Plaintiffs do not contend that they ever received a work schedule from anyone at Heartbreakers,[2] let alone from Ms. Armstrong, who explained that Heartbreakers' hours were set by the club's general manager in consultation with her husband. *See* Dkt. 85-16 at 16. Ms. Armstrong also unequivocally testified that she never wielded any control over the dancers' working conditions. Rather, beyond venturing downstairs "from time to time," Ms. Armstrong testified that she did not have any direct or indirect interaction with the dancers. *See id.* at 24.

Murillo is the only Plaintiff who attempted to explain how Ms. Armstrong exercised control over the dancers' work. Aside from generally complaining that managers were "extra . . . strict" or "on the prowl" when Ms. Armstrong was around, Dkt. 82-3 at 27, Murillo's testimony was limited to one instance in which she claims Ms. Armstrong sent a manager over to reprimand her for failing to take her top off while on stage. *See id.* at 24–25, 27. Of course, as already explained, Murillo did not actually know whether the message came from Ms. Armstrong.

Even when fully crediting Murillo's testimony regarding the incident where she was reprimanded or her general allegations that managers were "extra . . . strict" or "on the prowl" when Ms. Armstrong was around, *id.* at 27, such "isolated events are too paltry to support an inference of control." *Gray*, 673 F.3d at 356–57.

## 3. *Determined the Rate or Method of Payment*

Chapman testified she did not know whether Ms. Armstrong controlled the dancers' pay structure at all; however, she assumed that to be the case. *See* Dkt. 82-2 at 87–88 ("because [Ms. Armstrong's] the owner of the club so she's the one who came up with it"). Murillo similarly testified that she believes "the rules were coming from [Ms. Armstrong]" because "she was the one who ran the . . . business part of it . . . the money

---

[2] Dkt. 82-1 at 111 ("Q: Did anyone at Heartbreakers ever give you a written schedule? A: [Kibodeaux] No. It was never a written schedule."); Dkt. 82-2 at 24 ("Q: Did Peggy ever give you, like, a schedule or anything? A: [Chapman] No. . . . Q: Did anyone with the club ever give you a written schedule? A: [Chapman] No."); *id.* at 91 ("Q: Do you know if Peggy Armstrong ever refused to let a dancer work a shift? A: No."); Dkt. 82-3 at 31–32 ("Q: Did Peggy ever give you a schedule? A: [Murillo] No, they never gave me a schedule."); Dkt. 85-6 at 9 (Q: Now, you got to determine which days you worked and which days you didn't work, correct? A: [Hoffmeister] Yes.").

part." Dkt. 82-3 at 29. But Murillo conceded that Heartbreakers' managers told her about the alleged pay-related rules, not Ms. Armstrong. *See id.* at 28. Shortly thereafter, Murillo admitted that she "basically inferred that whatever the managers told [her] came from [Ms. Armstrong]." *Id.* at 30. As for Kibodeaux, she was unsure whether she learned from a manager or other dancers that the amount dancers could charge for dances was allegedly capped at $20 per song. *See* Dkt. 82-1 at 59–61. Whatever the case may be, Kibodeaux did not testify that Ms. Armstrong determined her rate or method of payment. Once again, Plaintiffs' unsubstantiated assertions and unsupported speculation about Ms. Armstrong's control over the Plaintiffs' rate or method of pay are not sufficient to defeat a motion for summary judgment. *See Brown*, 337 F.3d at 541.

As with the others, this factor weighs in favor of granting summary judgment for Ms. Armstrong.

### *4.  Maintained Employee Records*

Ms. Armstrong testified that she "rarely" saw the dancers' employment records, which Heartbreakers maintained in compliance with the City of Dickenson's Code of Ordinances. *See* Dkt. 85-16 at 21; Dickenson, Tex., Code of Ordinances, ch. 8, art. VII, § 8-232 (listing records that sexually oriented businesses must maintain). At best, this factor slightly weighs in Plaintiffs' favor. *See Gray*, 673 F.3d at 356 (recognizing that "individuals ordinarily are shielded from personal liability when they do business in a corporate form, and it should not lightly be inferred that Congress intended to disregard this shield in the context of the FLSA" (cleaned up)).

***

When viewed in the light most favorable to Plaintiffs, the record evidence would not allow a reasonable jury to find that Ms. Armstrong was Plaintiffs' employer. While the evidence demonstrates that Ms. Armstrong enjoyed generalized control over aspects of Heartbreakers' business operations, it does not indicate that she possessed any control over Heartbreakers' "actual 'operations' in a manner that relates to [Plaintiffs'] employment." *See Irizarry*, 722 F.3d at 109.

For the foregoing reasons, I find that Ms. Armstrong has carried her initial burden of demonstrating the absence of a genuine issue of material fact. Because Plaintiffs did not respond, it necessarily follows that they have failed to identify specific evidence in the record that supports their claims. *See, e.g.*, *Gutierrez v. Ocwen Loan Servicing, LLC*, No.

7:18-CV-392, 2020 WL 161167, at *4–5 (S.D. Tex. Jan. 13, 2020) ("[S]ummary judgment is warranted only if the movant meets its initial burden; at that point, the analysis ends instead of continuing to whether Plaintiff has adequately shouldered its burden, for the simple reason that Plaintiff has not attempted to do so." (footnote omitted)). Accordingly, Ms. Armstrong's Motion for Summary Judgment is **GRANTED,** and Plaintiffs' claims against her are **DISMISSED** with prejudice.

## IV.   DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Before delving into the merits of the Motion for Partial Summary Judgment, there is one issue I need to address. Plaintiffs' Response to Defendants'[3] Motion for Partial Summary Judgment attempts to "incorporate by reference" arguments and evidence "set forth in" their Motion for Class Certification.[4] *See* Dkt. 91 at 10–12. But Plaintiffs do not cite to *specific* pages in their class-certification briefing, much less identify the "evidence" to which they refer. Instead, they simply direct me to their Motion for Class Certification and ask that I ferret out the arguments and evidence myself. *See id.* at 11–12 ("As such, Plaintiffs incorporate by reference, as if set forth herein in full, the arguments and evidence set forth in and attached to their original and most recent Motion for Conditional Certification and Issuance of Notice on file with the Court. (Dkt. No. 82)."). In addition, Plaintiffs' Motion for Class Certification also refers to other documents scattered throughout the record, which conceivably fall under the auspices of "arguments and evidence set forth in" their Motion for Class Certification. *See, e.g.*, Dkt. 82 at 6 ("Plaintiffs have filed substantial briefings on this issue and hereby incorporate and adopt by reference, as if set forth herein in full, the arguments, authorities, and evidence submitted in these prior briefings on file with the Court (*see* Dkts. 34, 41, and 43).").

Further complicating matters, Plaintiffs' Motion for Class Certification does not directly address the viability of Plaintiffs' overtime or off-the-clock claims. Instead, it focuses on whether Plaintiffs have demonstrated a sufficient similarity between

---

[3] Because I have dismissed Plaintiffs' claims against Peggy Armstrong, for the remainder of the opinion, "Defendants" refers to Heartbreakers and Mike Armstrong.

[4] Specifically, Plaintiffs seek to incorporate by reference: (1) "the arguments and testimony of Murillo and Kibodeau[x]" regarding whether "a reasonable juror could find that Murillo and Kibodeaux . . . may have worked more than 40 hours some weeks"; and (2) "the arguments and evidence" regarding "the time Plaintiffs, and all other dancers/entertainers at Heartbreakers, spent doing 'integral and indispensable' work at the club." Dkt. 91 at 10–12.

themselves and the potential opt-in plaintiffs such that the case can proceed on a collective basis—namely, whether I am able to apply the economic-realities test[5] on a class-wide basis. Put differently, Plaintiffs' vague attempts to incorporate arguments and evidence by reference lack sufficient particularity for me to reasonably determine the arguments or evidence to which they refer.

It is well-settled that a party opposing summary judgment "is required to *identify specific evidence* in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (emphasis added). *See also* Fed. R. Civ. P. 56(c). Defendants urge me to find that "Plaintiffs' vague citations constitute an implicit concession that summary judgment should be granted for lack of evidence." Dkt. 92 at 3. I will not go so far as to say that Plaintiffs' briefing is an implicit concession that summary judgment is appropriate. However, I do find that Plaintiffs' vague references to arguments made in, or evidence attached to, their Motion for Class Certification do not satisfy Rule 56's requirement that a party opposing summary judgment identify specific evidence in the record and articulate how that evidence supports their claim. As the Fifth Circuit has explained:

> Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment, especially where, as here, the nonmoving party is well aware of the existence of such evidence. Rule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact.

*Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992), *opinion corrected* (Mar. 26, 1992). *See also Norman v. QES Wireline, LLC*, No. 4:16-CV-02396, 2019 WL 4674957, at *5 (S.D. Tex. Aug. 30, 2019) ("Plaintiffs have attempted to rebut many of Defendant's factual assertions without citation to specific pages in the record. . . . This is insufficient under Rule 56.").

---

[5] The Fifth Circuit employs slightly different factors to assess whether an individual is an *employee* versus whether an individual or entity is an *employer* under the FLSA; however, both tests are commonly referred to as the economic-realities (or economic-reality) test. *See Williams v. Henagan*, 595 F.3d 610, 621 n.17 (5th Cir. 2010) (recognizing that the Fifth Circuit has utilized different economic-reality factors depending on the context). *Compare Lone Star Steel*, 405 F.2d at 669–700 (determining whether an entity is an employer), *and Gray*, 673 F.3d at 355 (determining whether an individual is an employer), *with Reich v. Circle C. Invs.*, 998 F.2d 324, 327 (5th Cir. 1993) (determining whether an individual is an employee).

In sum, I will not go on a scavenger hunt for evidence in the record supporting Plaintiffs' arguments. However, keeping in mind the Fifth Circuit's preference for merit-based dispositions, I will review Plaintiffs' Motion for Class Certification, and, if I am able to reasonably determine the arguments or evidence that Plaintiffs attempt to incorporate by reference, I will give them appropriate consideration. Of course, I will also consider Plaintiffs' arguments that adequately cite to record evidence.

## A.  RELEVANT FACTS

Chapman has abandoned her claim for unpaid overtime. *See* Dkt. 91 at 10.

Plaintiffs all claim they worked "approximately five shifts per week." Dkt. 34-1 at 5, 17, and 22. Kibodeaux and Hoffmeister testified that their shifts "generally ran from 5 pm to 2 am," *id*. at 6 and 18, and Murillo testified that her shifts "generally ran from 11 am to 6 pm." *Id*. at 24. Plaintiffs all also claim that they were "generally . . . required to stay past the end of [their] shift." *Id*. at 6–7, 12, 18, 24. Below is a breakdown of the average weekly "on-the-clock" hours Plaintiffs *claim* to have worked:

|  | **Kibodeaux** | **Hoffmeister** | **Murillo** |
|---|---|---|---|
| **Approximate Hours Worked Per Shift** | **9 hours** (5 p.m. – 2 a.m.) | **9 hours** (5 p.m. – 2 a.m.) | **7 hours** (11 a.m. – 6 p.m.) |
| **Approximate Hours Worked Per Week** | **45 hours** (9 hours x 5 days) | **45 hours** (9 hours x 5 days) | **35 hours** (7 hours x 5 days) |

Although Plaintiffs do not expressly plead that they are seeking to recover for time spent preparing to perform or changing in and out of dance attire pre- and post-shift, in their interrogatory answers, Plaintiffs—including Chapman—claim they are entitled to "compensation for any time [they were] 'on the clock' at [Heartbreakers], including preparation for entertainment . . . and changing out of costume prior to 'clocking out' of the Club to return home." Dkt. 89-2 at 5; Dkt. 89-5 at 5; 89-8 at 5; Dkt. 89-11 at 5. *See also* Dkt. 91 at 11–12 (arguing that time spent getting ready or changing out of their attire is "integral and indispensable" to Plaintiffs' work as dancers and, therefore, compensable under the FLSA). Plaintiffs claim that it generally took them anywhere between one and four hours to get ready—with one to two hours being the consensus—and that they would not clock in until they were actually ready to perform. *See* Dkt. 82-1 at 124; Dkt. 82-2 at 31; Dkt. 82-3 at 84–85, 126.

Heartbreakers has submitted its hours-and-earnings reports[6] for each Plaintiff to refute their claims for unpaid overtime. Heartbreakers' records severely undermine Plaintiffs' assertion that they worked "approximately five shifts per week." Based on their respective hours-and-earnings reports, Kibodeaux worked two five-shift workweeks during her tenure, *see* Dkt. 89-9 at 6, 8; Hoffmeister never did so, *see* Dkt. 89-12; and Murillo worked one five-shift workweek back in 2017. *See* Dkt. 89-6 at 2–3. Above all else, Heartbreakers' records indicate that no Plaintiff ever worked more than 40 hours in a single workweek.

Plaintiffs dispute the accuracy of Heartbreakers' records.

## B. OVERTIME CLAIMS

### 1. The FLSA's Burden-Shifting Framework

The FLSA requires an employer to pay its employees overtime wages for every hour that employees work over 40 hours per week. *See* 29 U.S.C. § 207(a)(1). An employee who claims that he was not paid this overtime rate "has the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), *superseded by statute on other grounds as stated in, Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. 27 (2014). "When the employer has kept proper and accurate records, the employee may easily discharge his burden by securing the production of those records. But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes, a more difficult problem arises." *Id.*

An employee may fill this evidentiary gap if he "produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* The evidence of hours worked need not be perfectly accurate and will suffice if it provides a sufficient basis to calculate the number of hours worked. *See Marshall v. Mammas Fried Chicken, Inc.*, 590 F.2d 598, 599 (5th Cir. 1979). Under this standard, courts may draw inferences from oral testimony, sworn declarations, and any other relevant documentary evidence produced by the plaintiff. *See Mohammad v. Nwabuisi*, 990 F. Supp. 2d 723, 739–40 (W.D. Tex. 2014). The evidence may be anecdotal and

---

[6] Heartbreakers' hours-and-earnings report includes the clock-in and clock-out time for each shift and calculates the number of hours worked to the nearest one-hundredth of an hour.

imprecise, but mere assertions will not suffice. *See Harvill v. Westward Commc'ns L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005). If the employee carries his burden, the employer must come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference drawn from the employee's activities. *See Anderson*, 328 U.S. 687–88. As the Sixth Circuit recently explained when discussing a plaintiff's burden at summary judgment: "Generally speaking, if an employee describes a specific work schedule exceeding 40 hours, courts have found the testimony sufficient. If, by contrast, the employee testifies generically that the employee worked overtime without providing details to support this claim, courts have found that the testimony falls short." *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020).

### 2. *Plaintiffs' Overtime Claims Are Unsubstantiated and Speculative*

#### i. **Hoffmeister**

Like her cohorts, Hoffmeister disputes the accuracy of Heartbreakers' pay records, which show that she never exceeded 40 hours in a given workweek. Where there is a discrepancy between the employee's alleged hours worked and the employer's records, the employee must tender some evidence to substantiate her version of events. Hoffmeister submitted a declaration as part of Plaintiffs' Response to Defendants' Motion for Partial Summary Judgment. *See* Dkt. 91-1. Her testimony is largely duplicative of the declaration she submitted as part of the class-certification process, with one notable difference: Hoffmeister included over one-hundred receipts she received from Heartbreakers when she "clocked out" at the end of her shift. *See* Dkt. 91-2.

Hoffmeister claims that her receipts, "together with the records Heartbreakers kept regarding the dates and hours [she] worked . . . show that [she] did work more than 40 hours some weeks." Dkt. 91-1 at 3. Even so, she still "disputes the accuracy and adequacy of Heartbreakers' records as a whole." Dkt. 91 at 9.

I have painstakingly gone through the haphazard jumble of receipts and cross-referenced them with Heartbreakers' timekeeping records. The results are as follows:

- One receipt is illegible;[7]

---

[7] *See* Dkt. 89-12 at 28

- 27 receipts only show Hoffmeister's clock-in time; however, the clock-in times match those in Heartbreakers' hours-and-earnings report;[8]

- 12 receipts show that Heartbreakers collectively *overpaid* Hoffmeister for 22.34 hours of work;[9]

- Two receipts show that Heartbreakers collectively underpaid Hoffmeister for 4.94 hours of work.[10]

- 70 receipts line up with Heartbreakers' hours-and-earnings report.

Starting with the obvious—Heartbreakers' records are overwhelmingly consistent with Hoffmeister's receipts. Hoffmeister cannot have it both ways. On the one hand, she agrees that the receipts are "consistent with some of the information in portions of Defendants' records and [her] recollection of . . . her work at Heartbreakers." Dkt. 91 at 9. But, on the other hand, she "disputes the accuracy and adequacy of Heartbreakers' records as a whole." *Id.* Heartbreakers' *only* records in evidence are the hours-and-earnings reports. So, which is it? More importantly, despite being given what was essentially a free opportunity to do so, Hoffmeister's declaration fails to explain *how* Heartbreakers' records are inaccurate or unreliable or identify any workweek in which she claims to have worked more than 40 hours.

Plaintiffs specifically direct my attention toward the week of November 12, 2017, through November 17, 2017, during which time they claim the record evidence conclusively proves that Hoffmeister worked 41.5 hours; therefore, Plaintiffs argue, "Hoffmeister has presented evidence from which a just and reasonable inference can be drawn . . . that she worked more than 40 hours some weeks during her employment at Heartbreakers." Dkt. 91 at 9. But there is one problem: Hoffmeister's math does not add up. Hoffmeister contends that she worked 7.08 hours on November 12, 8.12 hours on November 13, 8.03 hours on November 16, 7.9 hours on November 17's first shift, and 6.9 hours on November 17's second shift. Simply adding 7.08 + 8.12 + 8.03 + 7.9 + 6.9 comes to 38.03 hours, not 41.5 hours. *See id.* Not only that, but Plaintiffs' calculation of 38.03

---

[8] *See id.* at 6–11, 13, 15, 19, 22, 26–27, 29

[9] *See id.* at 2, 6, 10, 13–14, 16, 18–19, 22–24.

[10] *See id.* at 9 and 16.

hours is actually 0.41 hours *less* than Heartbreakers' hours-and-earnings report indicates that she worked that week. *See* Dkt. 89-12 at 5.

Without her supposed 41.5-hour workweek, all Hoffmeister is left with is her assertion that she "work[ed] more than 40 hours some weeks" during her employment. Dkt. 91-1 at 3. This won't cut it. Although Hoffmeister's calculations need not be perfectly accurate, *see Marshall*, 590 F.2d at 599, "they must at least land somewhere on the proverbial dart board." *Sias v. Metalcraft of Mayville Inc.*, No. 20-CV-0447-BHL, 2021 WL 5964470, at *4 (E.D. Wis. Dec. 16, 2021). Bare allegations, speculative guesswork, or vague undocumented estimates are insufficient to survive summary judgment. *See Millington v. Morrow Cnty. Bd. of Comm'rs*, No. 2:06–cv–347, 2007 WL 2908817, at *7 (S.D. Ohio Oct. 4, 2007). Hoffmeister's equivocal claim that she "work[ed] more than 40 hours *some* weeks" hits the trifecta—it's bare, speculative, and vague—and is certainly not sufficient to show the amount and extent of overtime she allegedly worked as a matter of just and reasonable inference. Dkt. 91-1 at 3 (emphasis added).

In *Ihegword v. Harris County Hospital District*, an employee similarly alleged that her employer's pay records were inaccurate without providing any basis for her belief. *See* 929 F. Supp. 2d 635 (S.D. Tex. 2013), *aff'd*, 555 F. App'x 372 (5th Cir. 2014). When considering the defendant's motion for summary judgment, the district court noted the complete lack of evidence, other than the plaintiff's assertions speculated from memory, to prove that she actually worked overtime for which she was not compensated:

> Plaintiff's testimony that "to the best of her memory" she worked twelve hours of unpaid overtime per week is not sufficient to raise a genuine issue of material fact for trial because [the defendant] maintained records of the hours that plaintiff worked in each pay period, and plaintiff's unsubstantiated assertion[s] . . . were insufficient to raise a reasonable inference of the amount of overtime that she worked.

*Id.* at 668. The court went on to explain that an unsubstantiated and speculative estimate of uncompensated overtime does not constitute evidence sufficient to show the amount and extent of that work as a matter of just and reasonable inference. *See id.* ("Because plaintiff has not submitted any evidence other than her own unsubstantiated assertions that she worked an estimated twelve hours of unpaid overtime per week, plaintiff has failed to raise a genuine issue of material fact for trial.").

As in *Ihegword*—and despite Plaintiffs' argument to the contrary[11]—Heartbreakers' records do not show that Hoffmeister ever worked more than 40 hours in a single workweek. Instead, the only evidence that Hoffmeister worked any unpaid overtime is her own unsubstantiated assertion, which is insufficient to raise a genuine issue of material fact for trial. *See* Dkt. 91-1 at 3.

Plaintiffs have failed to produce sufficient evidence for me to reasonably infer the amount and extent of uncompensated work Hoffmeister allegedly performed. *See Brand v. Comcast Corp.*, 135 F. Supp. 3d 713, 742 (N.D. Ill. 2015) ("Bare allegations and vague undocumented estimates are insufficient to survive summary judgment." (quotation omitted)). Accordingly, summary judgment is granted on Hoffmeister's overtime claim.

### ii.    Kibodeaux

In response to the Motion for Partial Summary Judgment, Plaintiffs conclusively state that "Defendants' inadequate employment records . . . are insufficient to negative the evidence and [Kibodeaux's] testimony . . . which demonstrates that a reasonable juror could find that . . . Kibodeaux . . . may have worked more than 40 hours some weeks." Dkt. 91 at 10. Plaintiffs do not elaborate on why Heartbreakers' records are inadequate.

Kibodeaux's hours-and-earnings report reflects that she never worked more than 40 hours in a workweek—she topped out at 35.12 hours in September 2019. *See* Dkt. 89-9 at 8. Coming in a distant second is the week of July 28, 2019, through August 3, 2019, where she worked 28.56 hours. *See id.* at 6. For the remaining 45 workweeks, Kibodeaux

---

[11] Even if Plaintiffs were correct and Heartbreakers' records did show that Hoffmeister worked *one* 40-plus-hour workweek, it is not enough for Plaintiffs to prove that Hoffmeister performed *some* work for which she was not properly compensated; she must also prove the *amount and extent of that work* as a matter of just and reasonable inference. Only then will the burden shift to Defendants to come forward with evidence to negate the reasonableness of the inference drawn from Plaintiffs' evidence. *See Beck v. Access eForms, LP*, No. 4:16-CV-00985, 2019 WL 3717633, at *5 (E.D. Tex. Aug. 7, 2019) ("Plaintiff must first prove that she performed work for which she was improperly compensated. Second, she must prove the amount and extent of that work as a matter of just and reasonable inference. And, only if Plaintiff satisfies these will the burden shift to Defendant to come forward with evidence to negative the reasonableness of the inference to be drawn from Plaintiff's evidence."). Here, Heartbreakers' hours-and-earnings report indicates that Hoffmeister never exceeded 31 hours during any other workweek. *See* Dkt. 89-12. Hoffmeister's speculative complaint about the reliability of Heartbreakers' records and vague claim that she worked "more than 40 hours some weeks" are not sufficient to show the amount and extent of overtime she worked as a matter of just and reasonable inference.

cleared 20 hours only six times. *See id.* Aside from her testimony, Kibodeaux has produced no evidence to refute Heartbreakers' records.

At deposition, Kibodeaux testified that she was "not convinced" that Heartbreakers' records are accurate. Dkt. 82-1 at 134. But Kibodeaux was unable to articulate how they are inaccurate, only stating that she *believes* they are inaccurate because Heartbreakers' management "are not very good people and . . . [she does not] really trust them at all." *Id.* at 122–23. Notably, Kibodeaux could not identify any day that she supposedly worked more hours than reflected in her hours-and-earnings report. *See id.* at 123, 125–27, 129–33. Instead, she generally opined that Heartbreakers' records for May, June, and November 2019 seem low. *See id.* at 127 ("I truly think that I worked more than that."); *id.* at 129 ("I do not think that is very accurate."); *id.* at 132–33 ("Because I worked more days than that."). Kibodeaux also could not identify any day she performed at Heartbreakers that her hours-and-earnings report did not include.

Kibodeaux's mere assertions that Heartbreakers' records are inaccurate are insufficient to create a jury issue. *See Turner v. The Saloon, Ltd.*, 595 F.3d 679, 691 (7th Cir. 2010) ("Although Turner disputes the accuracy of The Saloon's records, his mere assertions are insufficient to create a jury issue."). Because Plaintiffs have failed to produce sufficient evidence for me to reasonably infer the amount and extent of uncompensated work Kibodeaux allegedly performed, summary judgment is granted on Kibodeaux's overtime claim.

### iii. Murillo

As with Kibodeaux, Plaintiffs conclusively state that "Defendants' inadequate employment records . . . are insufficient to negative the evidence and [Murillo's] testimony . . . which demonstrates that a reasonable juror could find that Murillo . . . may have worked more than 40 hours some weeks." Dkt. 91 at 10. However, Plaintiffs add: "Defendants' records for Murillo are wholly lacking insofar as Murillo signed her first independent contractor agreement with Heartbreakers in 2015 and the second agreement in 2019, yet Defendants have produced only provide [sic] a one-page 'Hours and Earnings' report for Murillo from 2019 that contains one single entry." *Id.*

Beginning with the low-hanging fruit, Murillo does not even attempt to explain how her signing an independent contractor agreement in 2015 has anything to do with her claim for unpaid overtime. Moving on to Heartbreakers' 2019 records, those

documents show that Murillo worked one shift that year. *See* Dkt. 89-6 at 7. At deposition, Murillo first testified that she was unsure whether she even worked at Heartbreakers in 2019 because her driver's license was suspended. *See* Dkt. 82-3 at 112 ("I don't know if I worked there in 2019."). But moments later, Murillo claimed she worked 15 to 20 shifts per month that year.[12] *See id* at 115–16. However, Murillo was unable to offer any source of information—calendars, records, diaries, uber receipts, social-media posts, friends, etc.— to corroborate her claim. *See id*. at 116–17. In fact, Murillo was unable to point to a week or month—or even a season—during which she claims to have worked any overtime hours. *See id*. at 122 ("I just know that I worked there a lot."). *See also id*. at 121–22 (repeatedly answering "I don't know" to questions regarding her alleged overtime in 2017 and 2018). The following exchange perfectly sums up Murillo's testimony:

> Q:    So just to shortcut this whole line of questioning, you have absolutely no way of telling me if you might have worked overtime and how much, right?
>
> A:    Right.

*Id*. at 123.

Like Hoffmeister and Kibodeaux, Murillo has failed to satisfy her initial burden of providing sufficient evidence for me to reasonably infer the amount and extent of uncompensated work she allegedly performed. Accordingly, summary judgment is granted on Murillo's overtime claim.

## C. Off-the-Clock Claims

Although Plaintiffs do not expressly state in their complaint that they are seeking to recover for time spent preparing to perform (that is, fixing their hair, applying makeup, and putting on dancer attire), their interrogatory answers assert that they are entitled to compensation for such activities. *See* Dkt. 89-2 at 5; Dkt. 89-5 at 5; 89-8 at 5; Dkt. 89-11 at 5.

As a legal matter, activities which are "preliminary or postliminary" to an employee's "principal activity or activities" are not compensable under the FLSA. 29 U.S.C. § 254(a). An activity is not preliminary or postliminary if it is "an integral and

---

[12] It's worth noting that Murillo's hours-and-earnings report shows that she never worked more than nine shifts in a single month. *See* Dkt. 89-6 at 3–4.

indispensable part of the principal activities." *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956). "[A]n activity is integral and indispensable to the principal activities that an employee is employed to perform—and thus compensable under the FLSA—if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 37 (2014). *See also Von Friewalde v. Boeing Aero. Operations*, Inc., 339 F. App'x 448, 454 (5th Cir. 2009) ("To be 'integral and indispensable,' an activity must be necessary to the principal work performed and done for the benefit of the employer." (quotation omitted). The mere fact that certain pre-shift activities are necessary for employees to engage in their principal activities does not mean that those pre-shift activities are "integral and indispensable" to a "principal activity." *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 40–41 (2005). Rather, the test to determine which activities are "principal" and which are "an integral and indispensable part" of such activities is whether the activities "are performed as part of the regular work of the employees in the ordinary course of business." *Dunlop v. City Elec., Inc.*, 527 F.2d 394, 401 (5th Cir. 1976).

I find that time spent by Plaintiffs fixing their hair, putting on makeup, and changing into and out of dance attire are preliminary and postliminary activities that are not an integral and indispensable part of their principal activities as exotic dancers. *See Washington v. Int'l Follies*, No. 1:18-CV-03951-ELR, 2020 WL 10223307, at *4 (N.D. Ga. Feb. 27, 2020) ("[T]he time that Plaintiff spent getting ready for work and the time that she spent waiting for customers to depart the premises were not integral and indispensable to the principal activity that she was employed to perform. Plaintiff was hired to dance and entertain customers, which she could have done with or without a certain appearance."); *Labriola v. Clinton Ent. Mgmt.*, LLC, No. 15 C 4123, 2017 WL 1150989, at *12 (N.D. Ill. Mar. 28, 2017) (finding that time spent by exotic dancers "changing clothes and applying makeup are not principal activities"). As Defendants aptly note:

> What Plaintiffs' arguments are really based on is the idea that every minute and hour that a worker spends putting on his or her clothes, shaving, or doing their hair before going to work is automatically compensable if the job does not lend itself to one showing-up to perform tasks unbathed and sporting pajamas. That logic could be applied to almost any customer-facing occupation.

Dkt. 92 at 7. Well said.

## V.    CONCLUSION

For the foregoing reasons, both Defendant Peggy Armstrong's Motion for Summary Judgment on Employer Status (Dkt. 90) and Defendants' Partial Motion for Summary Judgment (Dkt. 89) are **GRANTED**.

Signed on this 31st day of March 2022.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE